IGNACIA S. MORENO
Assistant Attorney General
ROMNEY S. PHILPOTT, Trial Attorney
Natural Resources Section
Environment & Natural Resources Division
United States Department of Justice
P.O. Box 663
Washington, D.C. 20044-0663
Telephone: (202) 305-0258
Telefax: (202) 305-0274
romney.philpott@usdoj.gov

DAVID B. BARLOW, United States Attorney (#13117)
JOHN K. MANGUM, Assistant United States Attorney (#2072)
185 South State Street, Suite 300
Salt Lake City, UT  84111
(801) 524-5682

ATTORNEYS FOR THE UNITED STATES OF AMERICA

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH - CENTRAL DIVISION

| | | |
|---|---|---|
| KANE COUNTY, UTAH, | ) | Civil No. 2:08-CV-00315-CW |
| Plaintiff, | ) | **DEFENDANT'S POST TRIAL BRIEF** |
| STATE OF UTAH, | ) | Judge Clark Waddoups |
| Plaintiff-Intervenor, | ) | |
| v. | ) | |
| UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

**TABLE OF CONTENTS**

I.      INTRODUCTION ..................................................................................................1

II.     ARGUMENT.........................................................................................................2

        A.      Claimants must demonstrate the existence and scope of alleged R.S.
                2477 rights-of-way by clear and convincing evidence .............................2

        B.      Issues related to existence.........................................................................7

                1.      Use of the claimed roads for the purposes of accessing private
                        ranch property and grazing operations on public lands does not
                        qualify as "public use" for purposes of establishing a public
                        highway under R.S. 2477...............................................................7

                2.      Deviations between current and historical routes on certain
                        of the claimed rights-of-way indicate lack of a fixed and
                        established route..........................................................................11

                3.      Public Water Reserve No. 107 prevented operation of R.S. 2477
                        on certain lands traversed by the Swallow Park/Park Wash route.................16

                4.      The Plaintiffs have not proved the existence of a right-of-way over
                        the SITLA parcels .......................................................................18

                5.      The Court lacks subject matter jurisdiction over Plaintiffs' claims
                        to the Cave Lakes Roads.............................................................19

                6.      The County's Title V rights-of-way for the Bald Knoll road .......................24

        C.      Issues related to Scope ...........................................................................26

                1.      Plaintiffs have not demonstrated the existence of County commission
                        action establishing a standard 66 foot width for County rights-of-way.........26

                2.      The Current Use of an R.S. 2477 Right-of-Way Does Not
                        Establish the Scope of the Right-of-Way.....................................28

                3.      The scope of certain routes, if found to be R.S. 2477 rights-of-way,
                        should include seasonal limitations .............................................31

4.      Dr. Gines' testimony as to widths should be admitted ...................................35

III.    CONCLUSION...........................................................................................................39

## TABLE OF AUTHORITIES

**<u>FEDERAL CASES</u>**

Alaska v. United States,
   201 F.3d 1154 (9th Cir. 2000) ............................................................................... 22

Andrus v. Charlestone Stone Prods. Co., Inc.,
   436 U.S. 604 (1978) ............................................................................................... 3

Att'y Gen. of Okla. v. Tyson Foods, Inc.,
   565 F.3d 769 (10th Cir. 2009) ............................................................................... 37

Bitler v. A.O. Smith Corp.,
   400 F.3d 1227 (10th Cir. 2004) ........................................................................ 35, 37

Buford v. Houtz,
   133 U.S. 320, 10 S.Ct. 305, 33 L.Ed. 618 (1890) ................................................... 8

Carr v. Alta Verde Indus., Inc.,
   931 F.2d 1055 (5th Cir.1991) ................................................................................ 22

Coosaw Min. Co. v. South Carolina,
   144 U. S. 562, 12 Sup. Ct. 689 ............................................................................... 2

Daubert v. Merrell Dow Pharms.,
   509 U.S. 579 (1993) .............................................................................................. 37

Dubque and Pacific Railroad Co., Plaintiffs In Error v. Litchfield,
   64 U.S. 66 (1859) ................................................................................................... 2

Fitzgerald Living Trust v. United States,
   460 F.3d 1259 (9th Cir. 2006) ................................................................................. 8

Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.,
   528 U.S. 167  (2000) ............................................................................................... 8

Garcia v. Bd. of Educ. of Albuquerque Pub. Schs.,
   520 F.3d 1116 (10th Cir. 2008) ............................................................................. 19

Goebel v. Denver & Rio Grande W. R.R. Co.,
   346 F.3d 987 (10th Cir. 2003) ............................................................................... 37

Jordan v. Sosa,
   654 F.3d 1012 (10th Cir. 2011) ............................................................................. 22

Kane Cnty. v. Salazar,
   562 F.3d 1077 (10th Cir. 2009) ............................................................................. 23

Leavenworth, Lawrence, & Galveston R.R. Co. v. United States.,
   92 U.S. 733 (1875) .............................................................................................. 2, 3

Leisnoi, Inc. v. United States,
   170 F.3d 1188 (9th Cir. 1999) ............................................................................... 22

Lewis v. Cont'l Bank Corp.,
   494 U.S. 472 (1990) ......................................................................................... 23, 24

Lyon v. Gila River Indian Comm.,
   626 F.3d 1059 (9th Cir. 2010) ........................................................................ 20, 30

McClendon v. City of Albuquerque Pub. Schs,
  100 F.3d 863 (10th Cir. 1996) ................................................................... 19
McFarland v. Kempthorne,
  545 F.3d 1106 (9th Cir. 2008) ..................................................................... 8
Milne v. USA Cycling Inc.,
   575 F.3d 1120 (10th Cir. 2009) ................................................................ 36
Mink v. Suthers,
  482 F.3d 1244 (10th Cir. 2007) ................................................................ 22
Mitchell v. Gencorp Inc.,
  165 F.3d 778 (10th Cir. 1999) .................................................................. 37
N.Pac. Ry. Co. v. Soderberg,
   188 U.S. 526 (1903)................................................................................... 3
Nagahi v. Immigration & Naturalization Serv.,
  219 F.3d 1166 (10th Cir. 2000) ................................................................ 17
Nova Health Systems v. Gandy,
  416 F.3d 1149 (10th Cir. 2005) ................................................................ 22
Ralston v. Smith & Nephew Richards Inc. v. United States,
  275 F.3d 965 (10th Cir. 2001) .................................................................. 36
Rosette Inc. v. United States,
  277 F.3d 1222 (10th Cir. 2002) ............................................................ 2, 27
S. Utah Wilderness Alliance v. BLM (SUWA)
  425 F.3d 735 (10th Cir. 2005) ................................. 2, 5, 6, 11, 15, 21, 29, 30, 32, 34
SWS, LLC v.Weynand,
   No. 2009AP2309, 2011 WL 534978 (Wis. App. 2011) ......................................... 33
San Juan Cnty. v. United States,
  Civil No. 2:04-CV-0552-BSJ, 2011 WL 2144762 (D. Utah May 27, 2011)..................... 6, 10
Sierra Club v. Hodel,
  848 F.2d 1068 (10th Cir. 1988) ................................... 25, 26, 27, 28, 29, 30, 31, 32
Sierra Club v. Hodel,
  675 F.Supp. 594 (D. Utah1987)............................................................... 25, 26
Sioux City & St. P. R. Co. v. U. S.,
  159 U.S. 349, 16 Sup. Ct. 17, 22 ............................................................. 2, 4
Slidell v. Grandjean,
  111 U.S. 437, 4 Sup. Ct. 487 ..................................................................... 2
SWS, LLC v. Weynand,
  No. 2009AP2309, 2011 WL 534978 (Wis. App. 2011) ............................................ 33
United States v. Garfield Co.,
  122 F. Supp. 2d 1201 (D. Utah 2000)....................................................... 29, 32
United States v. Gates of the Mountains Lakeshore Homes,
  732 F.2d 1411 (9th Cir. 1984) ..................................................................... 4
United States v. Jenks,
  129 F.3d 1348 (10th Cir. 1997) .................................................................... 8

United States v. Or. & Cent. R.R. Co.,
  164 U.S. 526 (1896)..................................................................................................... 3
United States v. Rodriguez-Felix,
  450 F.3d 1117 (10th Cir. 2006) ............................................................................... 36
United States v. Union Pacific R.R. Co.,
  353 U.S. 112 ............................................................................................................... 4
Utah v. Babbitt,
  137 F.3d 1193 (10th Cir. 1998) ............................................................................... 23
Vill. of Los Ranchos De Albuquerque v. Marsh,
  956 F.2d 970 (10th Cir. 1992) ................................................................................. 25
Washington County v. United States,
  903 F. Supp. 40 (D. Utah 1995).......................................................................... 19, 20
Watt v. W. Nuclear, Inc.,
  462 U.S. 36 (1983)...................................................................................................... 2
Weitz Co. v. MH Washington,
  631 F.3d 510 (8th Cir. 2011) ................................................................................... 39

## STATE CASES

Block v. Sexton,
  577 N.W.2d 521 (Minn. Ct. App. 1998).................................................................. 33
Crane v. Crane,
  683 P.2d 1062 (Utah 1984)....................................................................................... 32
Dome Mountain Ranch, LLC v. Park County,
  37 P.3d 710 (Mont. 2001)......................................................................................... 34
Draper City v. Estate of Bernardo,
  888 P.2d 1097 (Utah 1995)................................................................................... 6, 11
Essential Botanical Farms, LC v. Kay,
  -- P.3d --, 2011 WL 5865390 (Utah Nov. 15, 2011) ................................................ 5
Ewan v. Stenberg,
  168 Mont. 63, 541 P.2d 60 (1975)............................................................................ 35
Hamerly v. Denton,
  359 P.2d 121 (Alaska 1961)...................................................................................... 35
Harding v. Bohman,
  491 P.2d 233 (Utah 1971).......................................................................................... 34
Haynes Land & Livestock Co. v. Jacob Family Chalk Creek, LLC,
  233 P.3d 529 (Utah Ct. App. 2010) .......................................................................... 27
Jeremy v. Bertagnole,
  116 P.2d 420 (Utah 1941).......................................................................................... 32
Kohler v. Martin,
  916 P.2d 910 (Utah Ct. App. 1996) .......................................................................... 10
Lindsay Land & Live Stock v. Churnos,
  285 P. 646 (Utah 1929)........................................................................................ 13, 15

Luchetti v. Bandler,
    777 P.2d 1326 (N.M. Ct. App. 1989)........................................................................... 34
Maynard v. Bara,
    30 P.2d 93 (Mont. 1934) ............................................................................................. 13
McIntyre v. Bd. of Cnty. Comm'rs, Gunnison Cnty.,
    86 P.3d 402 (Colo. 2004) ........................................................................................... 12
Memmott v. Anderson,
    642 P.2d 750 (Utah 1982)..................................................................................... 26, 27
Mont. Ore-Purchasing Co. v. Butte & Bos. Consol. Min. Co.,
    65 P. 420 (Mont. 1901)............................................................................................... 12
Oates v. Knutson,
    182 Mont. 195, 595 P.2d 1181 (Mont. 1979) ............................................................ 34
O'Dell v. Stegall,
    703 S.E.2d 561 (W. Va. 2010).................................................................................... 32
Our Lady of the Rockies, Inc. v. Peterson,
    181 P.3d 631 (Mont. 2008)......................................................................................... 12
Petersen v. Combe,
    438 P.2d 545 (Utah 1968).................................................................................... 4, 6, 10
Pitts v. Roberts,
    562 P.2d 231 (Utah 1977)........................................................................................... 11
Price v. Eastham,
    75 P.3d 1051 (Alaska 2003)........................................................................................ 33
Shaffer v. Baylor's Lake Ass'n,
    141 A.2d 583 (Pa. 1958)............................................................................................. 33
Shively v. Bd. of Cnty. Comm'rs of Eagle Cnty.,
    411 P.2d 782 (Colo.1966)........................................................................................... 12
State of Neb., Dep't. of Roads v. Kilberg,
    223 N.W.2d 665 (Neb. 1974)...................................................................................... 12
Thomson v. Condas,
    493 P.2d 639 (Utah 1972)..................................................................................... 4, 6, 34
Thurman v. Byram,
    626 P.2d 447 (Utah 1981).............................................................................................. 6
Utah Cnty. v. Butler,
    179 P.3d 775 (Utah 2008)........................................................................................... 11
Violet v. Martin,
    205 P.221 (Mont. 1922).............................................................................................. 12
Wasatch Cnty. v. Okelberry,
    179 P.3d 768 (Utah 2008).......................................................................................... 4, 6
Watson v. Bd. of Cnty. Road Comm'rs for Montmorency Cnty.,
    217 N.W.2d 129 (Mich. Ct. App. 1974) .................................................................... 12
Widell v. Tollefson,
    462 N.W.2d 910 (Wis. App. 1990).............................................................................. 33

vi

**STATUTES**

28 U.S.C. § 2401(a) ............................................................................................... 17, 18
28 U.S.C. § 2409a ..................................................................................................... 1
28 U.S.C. § 2409a(a)................................................................................................ 22
28 U.S.C. § 2409a(d) ............................................................................................... 22
43 U.S.C. § 300 (1925) ........................................................................................... 17
43 U.S.C. § 315........................................................................................................ 9
43 U.S.C. §§ 1761-1771 ......................................................................................... 21
43 U.S.C. § 1761(a) ................................................................................................. 25

**FEDERAL EVIDENCE**

Fed. R. Evid. 401 .................................................................................................... 31

**MISCELLANEOUS**

39 C.J.S. Highways § 6............................................................................................ 12

Bruce & Ely, *The law of Easements and Licenses in Land,* § 5:15 .............................................. 32

Geroge C. Coggins and Robert L. Glicksman, Public Natural Resources Law § 15.18 (2d Ed. 2011) ............................................................................................................................. 8

I.      **INTRODUCTION**

In this action, brought under the Quiet Title Act ("QTA"), 28 U.S.C. § 2409a, plaintiff Kane County ("Kane County" or "the County") and intervenor-plaintiff State of Utah ("Utah" or "the State") (together "Plaintiffs") seek to quiet title in alleged rights-of-way on fifteen roads[1] that traverse federal public land managed by the United States Bureau of Land Management ("BLM") in Kane County, Utah.  This case was tried before the Court on August 15, 16, 17, 18, 19, 24, 25, 26, and 29, 2011.  Over the course of these nine days, the Court heard testimony from nineteen witnesses.  In addition, transcripts of deposition testimony for five additional witnesses were received.

At the close of trial, the Court instructed the parties to file post-trial briefs addressing any legal issues the parties deemed appropriate by December 2, 2011 (which date was subsequently extended to December 23, 2011 by the Court's granting of the parties' joint motions).  See ECF Nos. 204 & 208.  The Court suggested certain topics that the parties might consider addressing in the briefing.  This brief addresses those topics as well as certain other issues that Defendant believes warrant further discussion.  However, prior to commencement of trial, Defendant filed a Trial Brief outlining its legal positions and Defendant does not repeat those discussions herein, except where necessary to a full explication of the issues.  Defendant otherwise incorporates the arguments in its Trial Brief by reference.  See Def.s' Trial Br., ECF No. 164.

---

[1] All individual or collective references to roads, rights-of-way, routes, and the like, including reference to the specific rights-of-way and associated roads claimed in this litigation, are used solely as a matter of convenience based upon the allegations of the Plaintiffs' complaints and do not constitute an admission that the claimed rights-of-way and/or roads actually qualify as R.S. 2477 rights-of-way, except as otherwise expressly indicated.

1

## II.    ARGUMENT

### A.    Claimants must demonstrate the existence and scope of alleged R.S. 2477 rights-of-way by clear and convincing evidence.

As recognized by the Court in its request for further briefing on the issue, determining the applicable standard of proof is of fundamental importance to the resolution of the Plaintiffs' claims in this matter.  In accordance with well-established rules of construction applicable to federal land grants and complementary principles of state law, claimants must demonstrate the existence and scope of their alleged R.S. 2477 rights-of-way by clear and convincing evidence.

A party claiming an R.S. 2477 right-of-way against the federal government bears the burden of proving its alleged right-of-way.  See S. Utah Wilderness Alliance v. BLM (hereinafter "SUWA"), 425 F.3d 735, 768-69 (10th Cir. 2005).  Because rights-of-way are a type of easement constituting an interest in real property, they are subject to the rules of construction governing lands grants from the United States.  Under these rules, it has long been established that "land grants are construed favorably to the government and nothing passes except that which is conveyed in clear language, resolving all doubts in favor of the government."  Rosette Inc. v. United States, 277 F.3d 1222, 1229 (10th Cir. 2002) (citing Watt v. W. Nuclear, Inc., 462 U.S. 36, 59 (1983)).  As the United States Supreme Court explained over a century ago:

> The rule of construction applicable to the granting act is the familiar rule that *all grants of this description must be construed favorably to the government, and that nothing passes but what is conveyed in clear and explicit language*. Railroad Co. v. Litchfield, 23 How. 88; Leavenworth R. Co. v. U. S., 92 U.S. 740; Slidell v. Grandjean, 111 U.S. 437, 4 Sup. Ct. 487; Coosaw Min. Co. v. South Carolina, 144 U. S. 562, 12 Sup. Ct. 689. And that the construction should be such as will effectuate the legislative intention, avoiding, if possible, an unjust or absurd conclusion, is also well settled.
>
> In Sioux City & St. P. R. Co. v. U. S., 159 U. S. 349, 360, 16 Sup. Ct. 17, 22, it was said by Mr. Justice Harlan, speaking for the court: 'If the terms of an act of congress, granting public lands, 'admit of different meanings, one of extension and the other of limitation, they must be accepted in a sense favorable to the

grantor. *And if rights claimed under the government be set up against it, they must be so clearly defined that there can be no question of the purpose of congress to confer them*.' <u>Leavenworth R. Co. v. U. S.,</u> 92 U.S. 733, 740.

<u>United States v. Or. & Cent. R.R. Co.,</u> 164 U.S. 526, 539 (1896) (emphasis added); <u>see also</u> <u>N. Pac. Ry. Co. v. Soderberg,</u> 188 U.S. 526, 534 (1903) ("In construing this grant we must not overlook the general principle announced in many cases in this court, that *grants from the sovereign should receive a strict construction, a construction which shall support the claim of the government rather than that of the individual. Nothing passes by implication, and unless the language of the grant be clear and explicit as to the property conveyed, that construction will be adopted which favors the sovereign rather than the grantee.*") (emphasis added); <u>Andrus v. Charlestone Stone Prods. Co., Inc.,</u> 436 U.S. 604, 617 (1978) ("It has long been established that, when grants to federal land are at issue, any doubts 'are resolved for the Government, not against it.'") (quoting <u>United States v. Union Pac. R.R. Co.,</u> 353 U.S. 112, 116 (1957)).

Consistent with this authority, claimants of R.S. 2477 rights-of-way must carry their burden of proof by clear and convincing evidence. A necessary corollary of the requirement that the rights conveyed under federal land grants "be so clearly defined that there can be no question of the purpose of congress to convey them," <u>Leavenworth, Lawrence, & Galveston R.R. Co. v. United States,</u> 92 U.S.733, 740 (1875), is that R.S. 2477 claimants are subject to the exacting clear and convincing evidence standard. Application of the more relaxed preponderance of the evidence standard would violate the rule of strict construction applicable to federal land grants, and could result in claimants succeeding on a lower quantum of evidence than is mandated by the rule requiring that all doubts be resolved in favor of the federal government.

Moreover, the clear and convincing evidence standard applies both to a claimant's burden of demonstrating the acceptance of a right-of-way under R.S. 2477, as well as the scope of the

3

rights conferred. Because questions of scope pertain to the extent and character of the interest that Congress intended to convey, the rule of strict construction applicable to federal land grants applies equally to the resolution of acceptance and scope. In fact, the United States Supreme Court in its railroad right-of-way cases confirmed this very conclusion by applying the rule of strict construction both to the question of whether the railroad grants encompassed certain lands, as well as to the issue of the scope of the rights conveyed for established rights-of-way. See e.g., Sioux City & St. Paul R.R. Co. v. United States, 159 U.S. 349 (1895) (applying rule of strict construction in denying railroad company's claim to certain lands for failure to satisfy conditions to acceptance of grant under federal statute directing issuance of land patents for construction of railroad line); Union Pacific R.R. Co., 353 U.S. 112 (applying rule of strict construction in ruling that right to drill for oil was not included within scope of right-of-way grant to railroad). See also United States v. Gates of the Mountains Lakeshore Homes, 732 F.2d 1411, 1413 (9th Cir. 1984) ("Any doubt as to the scope of the grant under R.S. 2477 must be resolved in favor of the government"). Claimants of R.S. 2477 rights-of-way must therefore carry their burden of proof by clear and convincing evidence, both in seeking to demonstrate their alleged acceptance of the rights-of-way claimed, as well as the scope of the rights attendant to that alleged acceptance.

This conclusion also comports with state law. The Utah Supreme Court has imposed a "clear and convincing" standard for determining whether a highway was dedicated and abandoned to public use, including for public highways allegedly created by operation of R.S. 2477. See Wasatch Cnty. v. Okelberry, 179 P.3d 768, 773 (Utah 2008); Thomson v. Condas, 493 P.2d 639, 641-42 (Utah 1972) (applying clear and convincing standard to claim that right of way crossing private landowner's property was purportedly created under R.S. 2477 while property was public land); Petersen v. Combe, 438 P.2d 545, 546 (Utah 1968) ("Irrespective of

4

the departure from theory or proof, we think the burden of proving a real public use continuously for 10 years was not met here in the light of principles to the effect that dedication of rights to the public generally, must be displayed by clear and convincing evidence").  As the Utah Supreme Court recently explained, this heightened standard of proof applies "when the interests at stake in a civil case are particularly important and more substantial than the mere loss of money." Essential Botanical Farms, LC v. Kay, -- P.3d --, 2011 WL 5865390, *5 (Utah Nov. 15, 2011). The court held that interests in real property are such interests which "ha[ve] more importance than money," and as a result, the Utah Supreme court has consistently applied a clear and convincing standard to claims involving such interests, including the dedication of highways to public use.  Id.[2]  (adopting clear and convincing standard of proof for boundary acquiescence, consistent with Utah's application of the standard to eight other issues of Utah real property law).

Under Tenth Circuit precedent, this elevated standard of proof under state law may be appropriately "borrowed" as a measure of the validity of the claimed R.S. 2477 rights-of-way under federal law due to its conformity with federal law.  As the Tenth Circuit explained in SUWA:

> [T]o the extent state law is "borrowed" in the course of interpreting R.S. 2477, it must be in service of "federal policy or functions," and cannot derogate from the evident purposes of the federal statute. State law is "borrowed" not for its own sake, and not on account of any inherent state authority over the subject matter, but solely to the extent it provides 'an appropriate and convenient measure of the content' of the federal law.

---

[2] Consistent with the increased significance of the interests at stake in such cases, the Court explained that the clear and convincing standard requires "the existence of facts that make a conclusion 'very highly probable'" as opposed to the lower "'greater weight'" of the evidence requirement under the preponderance standard.  Essential Botanical Farms, 2011 WL 5865390, at *6 (citations omitted).

425 F.3d at 763 (citation omitted).  Here, these requirements are met because state law's clear and convincing evidence standard serves "federal policy and functions" by complementing the strict rules of construction applicable to federal land grants requirements under federal law.

Indeed, Judge Jenkins of this Court recently determined that state law may be borrowed as a measure of the appropriate standard of proof to be applied to a plaintiff seeking to quiet title to an alleged R.S. 2477 right-of-way:

> Utah appellate courts have noted that because "the ownership of property should be granted a high degree of sanctity and respect," Draper City v. Bernardo, 888 P.2d 1097, 1099 (Utah 1995), "dedication of property to public use should not be lightly presumed," Thurman v. Byram, 626 P.2d 447, 448 (Utah 1981). In consideration of this policy, the Utah Supreme Court has placed the burden of proving the existence of a public road by clear and convincing evidence on the party seeking to establish the dedication. See Draper City, 888 P.2d at 1099 ("This higher standard of proof is demanded since the ownership of property should be granted a high degree of sanctity and respect.") (citing Thomson v. Condas, 27 Utah 2d 129, 130, 493 P.2d 639, 639 (1972); Petersen v. Combe, 20 Utah 2d 376, 377–78, 438 P.2d 545, 548 (1968)); see Wasatch County v. Okelberry, 2008 UT 10, ¶ 9, 179 P.3d 768, 773 (reaffirming that "a party seeking to establish dedication and abandonment under [Utah Code Ann. § 72–5–104(1) ] bears the burden of doing so by clear and convincing evidence"). Having borrowed the Utah law standard in determining what is required for public acceptance of the grant of a right-of-way under R.S. 2477, we likewise borrow the corresponding Utah law standard of proof: *clear and convincing evidence*.

San Juan Cnty. v. United States, Civil No. 2:04–CV–0552-BSJ, 2011 WL 2144762, at *5-6 (D. Utah May 27, 2011) (emphasis in original) (slip copy) (notice of appeal filed July 22, 2011).

Significantly, no decision (including those of Judge Jenkins and the Utah state courts) have distinguished between the establishment of a right-of-way and the scope of a right-of-way in applying the clear and convincing evidence standard to public highway claims.  Rather, the courts, by not attempting to parse a line between the burden of proof applicable to these two related concepts, implicitly confirm that the higher standard of proof necessarily applies both to questions of existence and scope.  In addition, the public policy concerns underlying the use of

the clear and convincing evidence standard in the state law context also support the use of this same standard in federal court.  As Judge Jenkins recognized, the state courts have applied a clear and convincing standard of proof in keeping with the policy under state law that the dedication of private property to public use should not be lightly presumed.  For similar reasons, the federal courts should apply this heightened standard of proof consistent with the long-standing federal rules of construction that favor the sovereign over the grantee and which mandate the resolution of all doubts in federal land grants in the United States' favor.

Accordingly, given the well-established judicial precedent in federal and state court supporting the application of an elevated standard of proof to R.S. 2477 rights-of-way, this Court should require that the Plaintiffs demonstrate both the existence and scope of their claimed rights-of-way by clear and convincing evidence.

**B.      Issues related to existence.**

**1.      Use of the claimed roads for the purposes of accessing private ranch property and grazing operations on public lands does not qualify as "public use" for purposes of establishing a public highway under R.S. 2477.**

A significant amount of testimony regarding use of the disputed rights-of-way in this litigation, namely for the Upper Mill Creek, Oak Canyon, Tenny Creek, Swallow Park/Park Wash, North Swag, Nipple Lake and the four Cave Lakes routes, related to use by individuals accessing their private property or grazing operations on public lands.  Because homesteaders and federal grazing permittees have historically accessed the federal public lands for their individual proprietary purposes as invitees of the United States, such access does not qualify as "public use" for purposes of establishing a public highway under R.S. 2477.

7

The federal courts have repeatedly recognized that homesteaders have an implied license across the federal public lands to access their inholdings.  As stated in United States v. Jenks, 129 F.3d 1348, 1354 (10th Cir. 1997):

> [T]hroughout our nation's western expansion, a right of access across government lands was implied if necessary to effectuate the purpose for which an inholding was granted. But it does not follow that the right of access accompanying the grant of an inholding was necessarily a property interest known as an implied easement.

See also Fitzgerald Living Trust v. United States, 460 F.3d 1259, 1265 (9th Cir. 2006) ("Jenks concluded that settlers had an implied license to use public lands to access their property, relying on Buford v. Houtz, 133 U.S. 320, 10 S.Ct. 305, 33 L.Ed. 618 (1890). 129 F.3d at 1354. . . . In sum, we hold that the Homestead Act did not grant settlers a vested property right of access over public lands to their homesteads, but instead merely sanctioned the longstanding customary use of public lands by a settler."); McFarland v. Kempthorne, 545 F.3d 1106, 1112 (9th Cir. 2008) ("Although the government has historically provided for access across federal land to reach privately owned inholdings, that access was granted in the form of a license.") (citing Jenks, 129 F.3d at 1353-55).  Although these decisions explain that this license interest does not equate to a vested property right, their recognition of an implied license to use the public lands for access to inholdings necessarily renders such access in the nature of an authorized private use rather than public use.

To similar effect, in the grazing context, ranchers hold an implied license to use the federal public lands for access to pastures.  George C. Coggins and Robert L. Glicksman, Public Natural Resources Law § 15.18 (2d Ed. 2011) (footnotes omitted) ("A rancher who long has used federal lands for access to pastures, for instance, is not protected by FLPMA's savings provision for preexisting rights because he has only a license, not a property right or a vested

8

interest."). Where a formal right-of-way is required for stock driving purposes, the Taylor Grazing Act includes a provision expressly requiring the Secretary of the Interior to grant to owners of land adjacent to a grazing district, upon application by such owners, such rights-of-way over the public lands included within the grazing district as are necessary for convenient access to areas upon which the owners have stock grazing rights. See 43 U.S.C. § 315 ("Whenever any grazing district is established pursuant to this subchapter, the Secretary *shall grant to owners of land adjacent to such district*, upon application of any such owner, such rights-of-way over the lands included in such district for stock-driving purposes as may be necessary for the convenient access by any such owner to marketing facilities or to lands not within such district owned by such person or upon which such person has stock-grazing rights.") (emphasis added). Accordingly, as with homesteaders' use of the federal public lands for access to their private property, federal grazing permittees' use of these lands for access to their grazing lands does not qualify as "public use" because the permittees are entitled to a private right of access, either by way of an implied license or a right-of-way under the Taylor Grazing Act.

Consistent with this regulatory scheme, Judge Jenkins of this Court held in the San Juan County case (addressing a R.S. 2477 right-of-way claimed for the so-called Salt Creek Road) that access in connection with grazing operations was a proprietary interest and did not equate to general public use. As Judge Jenkins explained:

> More evidence was presented at trial concerning the subsequent use of the upper Salt Creek Canyon area by cattle ranchers, particularly the Scorup–Somerville Cattle Company, which pastured its Aristocrat Herd of bulls near the Kirk's Cabin site and would move cattle between their winter and summer grazing areas through Salt Creek Canyon. Though the company's presence in upper Salt Creek at times during the 1920s, 1930s and 1940s was more consistent than that of Kirk or Peachman, it would strain the language to characterize its presence as a "public" use, or that Salt Creek Canyon was then being used as a "public thoroughfare." *The company had its own proprietary interests in upper Salt*

9

> *Creek—federal grazing permits issued after 1936, and a 1942 deed to 80 acres of land near Kirk's Cabin.*

San Juan Cnty., 2011 WL 2144762, at \*34 (footnote omitted) (emphasis added).  Based on this

rationale, Judge Jenkins ultimately concluded:

> "Was there sufficient evidence by competent testimony" about the company's cattle herding activity in Salt Creek Canyon "to show by clear and convincing evidence, that the public generally,— not just a few having their own special and private interests in the road, had used the road continuously for 10 years?" Petersen v. Combe, 20 Utah 2d 376, 377–78, 438 P.2d 545, 546–47 (1968). The court concludes that on this record, there was not.

Id.  The same rationale applies here, where grazing permittees testified that they used certain of

the claimed routes in connection with their private grazing operations under their federal permits

and/or to reach their private property.  Such testimony, pertaining solely to access over the public

lands for private proprietary purposes, is simply insufficient to support a finding of continuous

public use.

Utah law supports this same conclusion.  The Utah courts have consistently held that use

of roads for private access purposes is not sufficient to demonstrate "public use" sufficient to

give rise to a public highway.  As the Utah Supreme Court reasoned in Petersen v. Combe, 438

P.2d at 546, which involved a road that ended at private property:

> [I]t was not alleged that any member or members of the general public used the road, save the property owners in this area. Such property owners cannot be considered members of the public generally, as that term generally is used in dedication by user statutes.

Thus, property owners abutting or straddling the road in question "and they or their personal

visitors cannot be numbered in the class of members of the general public using such road in a

fashion that might ripen into a dedication of a road under the statute."  Id. at 547; see also Kohler

v. Martin, 916 P.2d 910, 913 (Utah Ct. App. 1996) (accepting argument that "the public used the

roadway as business invitees of Buehler Hot Pots, and it is well established that mere use of the

roadway by adjoining property owners (and public invitees thereof) does not create a public thoroughfare"); Draper City v. Estate of Bernardo, 888 P.2d 1097, 1099 (Utah 1995) ("It is important here to note that our case law has distinguished between use of a road by owners of adjoining property and by the general public"); Pitts v. Roberts, 562 P.2d 231, 233 (Utah 1977) ("there was no evidence the public had made any use of the passageway across defendant's land. All the testimony concerned the use made by property owners abutting the alley, for their own business and convenience"); Utah Cnty. v. Butler, 179 P.3d 775, 782 (Utah 2008) ("[i]ndividuals with a private right to use a road, such as adjoining property owners who 'may have documentary or prescriptive rights to use the road,' are not members of the public, nor are those who have been given permission to use a road [from the land owner.]") (quoting Draper City, 888 P.2d at 1099).[3]  Accordingly, consistent with the proprietary nature of ranchers' and homesteaders' use of the public lands for access and complementary principles of state law, the testimony of use of the claimed roads for purposes of accessing private ranch property and grazing operations on public lands does not support a finding of continuous public use within the meaning of R.S. 2477.

**2. Deviations between current and historical routes on certain of the claimed rights-of-way indicate the lack of a fixed and established route.**

During the trial, evidence was adduced regarding deviations from the claimed course of certain of the routes claimed by Plaintiffs, including instances where there did not appear to be a single, fixed course.  This evidence is fatal to all or portions of certain of Plaintiffs' claims,

---

[3] These state law decisions may be properly "borrowed" to inform federal law in this case due to their conformity with the above-discussed principles of federal law.  See SUWA, 425 F.3d at 763, discussed above.

particularly their claim for the North Swag route and for the rerouted segments of the Skutumpah road.

A public highway or easement may not be established unless the claimant demonstrates a single, fixed and definite route.  See Our Lady of the Rockies, Inc. v. Peterson, 181 P.3d 631, 655 (Mont. 2008) (quoting Violet v. Martin, 205 P. 221, 223 (Mont. 1922)) (holding that to establish a public highway under R.S. 2477, claimant must present convincing evidence that the public pursued "a definite, fixed course;" i.e. "a course with clear and precise limits and of a permanent character."); Watson v. Bd. of Cnty. Road Comm'rs for Montmorency Cnty., 217 N.W.2d 129, 130 (Mich. Ct. App. 1974) ("To be a public highway by user there must be a defined line or right-of-way for the road"); State of Neb., Dep't. of Roads v. Kilberg, 223 N.W.2d 665, 667 (Neb. 1974) ("To establish a road or highway by prescription there must be use by the general public under a claim of right, adverse to the owner of the land, of some particular or defined line of travel"); Shively v. Bd. of Cnty. Comm'rs of Eagle Cnty., 411 P.2d 782, 784 (Colo.1966), overturned on other grounds, McIntyre v. Bd. of Cnty. Comm'rs, Gunnison Cnty., 86 P.3d 402 (Colo. 2004) (noting that, although some slight variation in the route is allowed, the "public cannot acquire a prescriptive right to pass over a tract of land generally; in order to create a highway by prescription the user must be confined to a definite and specific line or way, [especially] where the locus in quo consists of wild or uninclosed lands") (quoting 39 C.J.S. Highways § 6); Mont. Ore-Purchasing Co. v. Butte & Bos. Consol. Min. Co., 65 P. 420, 421 (Mont. 1901) ("Travel by the public generally over uninclosed land, but not confined to any particular way, will not inaugurate such an adverse claim as will presently ripen into a right which may be asserted against the owner").

12

Utah law is consistent with this principle: "the public cannot acquire a right by use to pass over a tract of land generally, but only in a certain line or way." Lindsay Land & Live Stock v. Churnos, 285 P. 646, 649 (Utah 1929). The court in Lindsay Land & Live Stock further noted that "it is not indispensable to the acquisition of the right that there should be no deviation in the use from a direct line of travel," but that the travel must have "remained substantially unchanged" and the practical identity of the road preserved. Id. But see Maynard v. Bara, 30 P.2d 93, 95 (Mont. 1934) (noting that a "fixed and definite course does not permit of any deviation") (emphasis added).

The evidence adduced at trial demonstrated significant deviations on the North Swag road (as well as, as has previously been addressed, significant deviations on the Skutumpah road resulting from the County's 1993 rerouting project). In particular, Dr. Gines identified a variety of discrepancies between the 1974 aerial imagery and Plaintiffs' GPS data depicting the claimed North Swag route, which Dr. Gines overlaid on the aerial imagery. Trial Tr. 1578:18-1582:15 (Aug. 26, 2011). Dr. Gines identified areas where no established route appeared on the ground consistent with the County's GPS data, where there was a tangled web of routes enveloping the same general area, and an area where for approximately 1/3 of a mile, there were at least two essentially parallel routes, separated by a varying distance of approximately 100 feet. Id. at 1586:16-1590:2. Dr. Gines testimony was corroborated by the State's own aerial imagery witness, Mr. Peters, who also identified areas where the Plaintiffs' GPS data varied from what he saw on the ground in the 1976 vintage imagery and on historical U.S. Geological Survey maps. Id. at 802:5-803:1; 804:6-23; 851:1-11; 852:21-854:4. Taken together, this testimony and interpretation of the 1974 and 1976 aerial photographs demonstrates that what travel there was in

13

the general vicinity of the North Swag route prior to 1976 was not limited to the same travelway or line, and there was, in fact, no single, fixed and definite route.[4]

Similar (although potentially smaller) deviations were noted by Mr. Peters with respect to the Cave Lakes K1088 route, id. at 811:19-812:18 & 840:20-842:5; 872:15-873:725 and the Cave Lakes K1075 route, id. at 833:14-837:15.  Indeed, with respect to the K1088 route, Dr. Gines determined that although there was a disturbance paralleling the Plaintiffs' GPS data for much of the route, this clearly was not the case for the last 280 feet of the claimed route.  Id. at 1594:1-23.  In fact, Dr. Gines testified that no disturbance whatsoever was visible in the 1974 aerial photography along or in the vicinity of this last segment of the claimed route.  This testimony squarely refutes Plaintiffs' efforts to establish ten years continuous public use prior to 1976 for this portion of their claim.

With respect to the Skutumpah road, consistent with Defendant's prior briefing of this topic, the deviations created by the County's unilateral rerouting of this road in 1993 were not part of the single, fixed and definite route that existed prior to October 21, 1976, and they cannot be accepted as part of the County's right-of-way for that road.  See ECF No. 164 at 29-31; ECF No. 124 at 36-41.  The evidence at trial confirmed Defendant's argument:  the testimony given by Verlin Smith—and the photographs and other exhibits he discussed during his testimony—

---

[4] In the alternative, to the extent the Court recognizes an R.S. 2477 right-of-way for any portions of the North Swag route, it should exclude from that right-of-way the sand ridge area located roughly in the middle of the claimed route.  In this regard, much of the testimony indicated that motorists typically approached the sand ridge area either from the north or the south before turning around or traveling back out by way of the Park Wash route not claimed in this litigation. Likewise, Dr. Gines testified that that the 1974 aerial photography of the sand ridge area appeared to show a turn-around area in the vicinity of the claimed route as it approached from the north. Plaintiffs have therefore failed to carry their burden of establishing continuous public use of the North Swag route as a continuous throughway that includes the sand ridge area.

14

demonstrate that Kane County elected to reroute the road from its preexisting definite and fixed course.[5] See generally Trial Tr. 1414-43 (Aug. 25, 2011).  Further, it should be reemphasized that Kane County's post-1976 rerouting of the Skutumpah road should not be determined to fall within the Plaintiffs' R.S. 2477 right-of-way because the reroutes were undertaken unilaterally. As the Tenth Circuit has held, informed by long-standing principles of common law relating to easements, the scope of a specific R.S. 2477 right-of-way does not include the right to unilaterally alter the course of the route.  See SUWA, 425 F.3d at 747 (noting that the counties' argument, that any activities conducted within the physical boundaries of a right of way were permissible, "misconceives the nature of a right of way.")[6].

Accordingly, because Plaintiffs may only establish an R.S. 2477 right-of-way for a fixed and definite route that was established prior to October 21, 1976, the substantial deviations and

---

[5] As the Court indicated, the question of where precisely the boundary of the adjacent Paria Hackberry Wilderness Study Area ("WSA") commences is not relevant to the present question of whether the County has established the existence of an R.S. 2477 right-of-way for the segments of the Skutumpah road that the County rerouted after 1976.  See Trial Tr. at 1466:5-8. Rather, the relevant question is, whether such reroutes were so minimal as to leave the original line of travel "substantially unchanged."  Lindsay Land & Live Stock, 285 P. at 649.

[6] While Plaintiffs adduced testimony that the trespass action against the County relating to the reroutes was dismissed with prejudice, this testimony is irrelevant to the question of whether the scope of Plaintiffs' alleged R.S. 2477 rights-of-way established before 1976 includes the 1993 re-routes.  The prior dismissal of the trespass action did not and could not expand the previously established scope of the right-of-way, as the scope of the right-of-way is limited as a matter of law to the route that had been established as of 1976.  Moreover, the Court should not give judicial sanction to Plaintiffs' unilateral improvements made in violation of the requisite consultation requirements by determining that these unauthorized improvements are included within the scope of the presently claimed rights.  Finally, the United States stated in the stipulation of dismissal of the trespass action that it was not recognizing any rights-of-way or waiving any defenses to such, thereby preserving its ability to oppose Plaintiffs' present efforts to expand the proper scope of its claimed right-of-way.  See Ex.74.

15

discrepancies testified to at trial for the North Swag and certain of the Cave Lakes routes, and the rerouted segments of the Skutumpah road, undermine their claims for these routes.

> **3.      Public Water Reserve No. 107 prevented operation of R.S. 2477 on certain lands traversed by the Swallow Park/Park Wash route.**

As discussed in the parties' briefing on the County's motion for partial summary judgment, because segments of the Swallow Park/Park Wash route traverse lands that were reserved by Public Water Reserve No. 7 ("PWR No. 107"), Plaintiffs' claim for an R.S. 2477 right-of-way across those segments fails. Specifically, in 1926 the President issued PWR No. 107, ordering that:

> every smallest legal subdivision of the public land surveys which is vacant unappropriated unreserved public land and contains a spring or water hole, and all land within one quarter of a mile of every spring or water hole located on unsurveyed public land be, and the same is hereby, withdrawn from settlement, location, sale, or entry, and reserved for public use . . .

In Interpretation No. 92, executed on April 11, 1929, the Secretary of the Interior construed PWR No. 107 to include, among others lands Township 39 South, Range 3 West, section 31, N ½ SE ¼, and Township 40 South, Range 3 West, section 5, NW ¼ NE ¼, NE ¼ NW ¼.  The Swallow Park/Park Wash route traverses these reserved lands.   The plain language of R.S. 2477, which provided that a right-of-way grant could be created only across public lands that were "not reserved for public use," and PWR No. 107, which explicitly ordered that lands subject to it were "reserved for public use," establishes that an R.S. 2477 right-of-way cannot be recognized for the Swallow Park/Park Wash route on those segments crossing the reserved lands identified in Interpretation No. 92.

Further, as discussed more thoroughly in Defendant's Trial Brief, Plaintiffs' argument, that interpreting PWR No. 107 as precluding operation of R.S. 2477 would be inconsistent with one of its purposes, i.e., to ensure availability of water sources to the general public—attempts to

create a contradiction where none exists.  There is no inconsistency with preserving a water source for the public and allowing the Department of the Interior to control access to that water source—which is exactly what PWR 107's authorizing statute, the Stock Raising Homestead Act (SRHA), contemplated.  See 43 U.S.C. § 300 (1925) (providing that reservations should be kept and held open to the public use "under such general rules and regulations as the Secretary of the Interior may prescribe"); Def.'s Trial Br., ECF No. 164, at 32-34.

The Court appeared to have questions regarding the interaction between the spring that is subject to the public water reserve and the Swallow Park/Park Wash route, including whether the public water reserve might currently serve some practical function in protecting the spring.  See Trial Tr. 1691:24-1692:20 (Aug. 29, 2011).  Defendant's position, however, is that PWR No. 107, by its express terms, reserved the subject lands from the operation of laws such as R.S. 2477, and evidence concerning the present use of these lands and the subject spring cannot as a matter of law alter the legal effect of that reservation.

There is no dispute that PWR No. 107 applied to the subject lands prior to the repeal of R.S. 2477.  See Pretrial Order ("PTO"), ECF No. 174, at 32 (parties stipulating that the Swallow Park/Park Wash route traverses lands that were included in the public water reserve by Interpretation No. 92, executed on April 11, 1929 by the Secretary of the Interior).  Nor is there—nor can there be—a dispute as to whether it *should have* been applied to the subject lands at issue.  Plaintiffs never challenged Interpretation No. 92 or its decision to include these lands in the public water reserve.  Id. at 32.  This 80-plus year old administrative determination cannot be challenged now.  See Nagahi v. Immigration & Naturalization Serv., 219 F.3d 1166, 1171 (10th Cir. 2000) ("In the absence of a specific statutory limitations period, a civil action against the United States under the APA is subject to the six year limitations period found in 28 U.S.C. §

17

2401(a).")  Thus, it does not ultimately matter whether PWR No. 107 effectively advanced federal interests related to the water source included in Interpretation No. 92.[7]

Therefore, the pertinent issue before the Court is whether, during the time R.S. 2477 was in force, the subject lands underlying the Swallow Park/Park Wash route were "reserved" such that they were not open to the operation of R.S. 2477.  As noted above, PWR No. 107's plain language, stating that it withdrew certain lands from "settlement, location, sale, or entry, and reserved [them] for public use . . ." acted to prevent the operation of R.S. 2477 on those lands. Accordingly, the Court should determine that Plaintiffs' claim for an R.S. 2477 right-of-way traversing those sections included in PWR No. 107 should be denied.

### 4.       The Plaintiffs have not proved the existence of a right-of-way over the SITLA parcels.

As the Court indicated at the close of trial, "the state of the record in terms of the evidence presented as to the SITLA parcels remains much the same as it was at the time of summary judgment."  Trial Tr. 1695:18-20 (Aug. 29, 2011).  Under these circumstances, Plaintiffs have indisputably failed to meet their burden of proof with respect to the routes crossing the former SITLA sections.  Indeed, the parties stipulated in the final pretrial order that:

- The Plaintiffs have never submitted an application to SITLA for a permanent easement or right of entry pursuant to Utah Code Ann. § 72-5-203 for any portion of the claimed Mill Creek or Swallow Park/Park Wash roads; and

---

[7] Defendant does not mean to imply that the reservation under PWR No. 107 of certain lands underlying the claimed Swallow Park/Park Wash Route was not appropriate or that the establishment of an R.S. 2477 right-of-way over these lands would not interfere with the purposes for which the reservation was made.  Rather, Defendant simply asserts as a matter of law that such factual questions are irrelevant to the issue of whether these lands were reserved from entry under R.S. 2477, as such a reservation categorically removes these lands from the operation of R.S. 2477.

- SITLA has never granted a permanent easement or right of entry across SITLA Parcel One or SITLA Parcel Five for any portion of the claimed Mill Creek or Swallow Park/Park Wash roads.

PTO at 37.  Under these circumstances, as Defendant described in its Pretrial Brief, it is impossible to find, consistent with state law, that any sort of easement or right-of-way vested while the lands were owned by the State of Utah.  Further, Plaintiffs presented no evidence at trial that a right-of-way was established prior to the lands being transferred to the State of Utah, in 1896 and 1915, PTO at 36-37, and therefore Plaintiffs have not met their burden of demonstrating a right-of-way over the former SITLA parcels.

### 5. The Court lacks subject matter jurisdiction over Plaintiffs' claims to the Cave Lakes Roads.

As Defendant argued in its Trial Brief, Plaintiffs' claims to the four Cave Lakes roads must be dismissed for lack of subject matter jurisdiction.  The evidence adduced at trial confirms Defendant's argument.

An actual, live controversy must exist between the parties before jurisdiction is proper in federal district court.  Garcia v. Bd. of Educ. of Albuquerque Pub. Schs., 520 F.3d 1116, 1123 (10th Cir. 2008) (quoting McClendon v. City of Albuquerque, 100 F.3d 863, 867 (10th Cir. 1996)).  In Washington County v. United States, this court determined that a Utah county failed to present a case or controversy based on allegations of only a *potential* interference with its right to construct and maintain the alleged R.S. 2477 rights-of-way.  903 F. Supp. 40, 41 (D. Utah 1995).  Absent allegations that the United States had actually interfered with or denied the existence of any rights claimed by the plaintiff, there was no a case or controversy.  Id. at 42; see also Lyon v. Gila River Indian Comm., 626 F.3d 1059, 1074 (9th Cir. 2010) (concerning the scope of an easement, the Ninth Circuit upheld the determination of no live controversy or injury

19

where there was "no indication that the roads or utilities as they currently exist are inadequate to support the current use . . . or that the [plaintiff] has any intent to improve the roads or utilities").

The evidence adduced at trial demonstrates no interference with or denial of the existence of the Plaintiffs' claimed rights-of-way on the Cave Lakes roads.  Indeed, former Kane County Commissioner Mark Habbeshaw admitted that BLM had never indicated to Kane County that it intended to close any of the Cave Lakes routes.  Trial Tr. 1344:17-25 (Aug. 25, 2011).  Further, Kanab Field Office Manager Harry Barber testified that the BLM did not make any ownership determinations concerning the status of claimed R.S. 2477 rights-of-way as part of the Kanab Resource Management Plan planning process, Trial Tr. 1686:8-18 (Aug. 29, 2011), and that the Cave Lakes routes are designated as open to motorized vehicle travel on the "Kanab West" map, which was prepared two to three months following the approval of the Plan to give the public a more detailed view of the status of roads under the Plan's transportation and travel management provisions than was readily apparent from the smaller scale of the map first published with the plan.  Id. at 1660:14-25-1671:1-16; see also Def. Ex. A (excerpts from Kanab Resource Management Plan) Def. Ex. B ("Kanab West" map).  Nor was there any testimony that BLM had acted to deny access on these routes.  See e.g., Trial Tr. 914:8-17 (Aug. 19, 2011) (James Mace testifying that BLM has never closed K1075 to prevent his access to his ranching operations, and he has always been able to access his own property); Trial Tr. 461:10-13 (Aug. 16, 2011) (James Ott testifying that he had never heard of BLM preventing a rancher from reaching his or her property).

Further, to the extent Plaintiffs claim a controversy based upon the issuance of right-of-way grants under Title V of the Federal Land Policy and Management Act of 1976  ("FLPMA"),

20

43 U.S.C. §§ 1761-1771 to a private entity for the K1070, K1075, and K1087 routes,[8] such a claim fails because it does not account for the nature of an R.S. 2477 right-of-way. Specifically, "[a] right of way is not tantamount to fee simple ownership of a defined parcel of territory. Rather, it is an entitlement to use certain land in a particular way." SUWA, 425 F.3d at 747. Plaintiffs therefore cannot demonstrate that the grant of a FLPMA Title V right-of-way interfered with or impaired Plaintiffs' use of their claimed R.S. 2477 rights-of-way because the existence of an additional easement over the same route does not *ipso facto* result in an interference with Plaintiffs' enjoyment of their own claimed easement.

The evidence adduced at trial confirms this point. Indeed, Plaintiffs' own witness, former County Commissioner Mark Habbeshaw, admitted that the Title V right-of-way grants issued by BLM stated that they were not intended to extinguish or limit any R.S. 2477 right-of-way that Kane County might have. Id. at 1346:7-16; see also Def.'s Exs. II, JJ, & KK. He further admitted that the Title V right-of-way grants required the holder to comply with Kane County road specifications and standards. Id. at 1346:17-1347:3. Finally, nothing in the Title V grants denied or limited the County's ability to perform the maintenance and construction activities set forth under the permits. See Exs. II, JJ, and KK. Consequently, Plaintiffs' efforts to establish a case or controversy based upon the Title V grants are therefore wholly unfounded.

For similar reasons, the Court also lacks jurisdiction over these claims because they do not satisfy the QTA's conditions on the waiver of the United States' sovereign immunity. See 28 U.S.C. § 2409a(a), (d). Plaintiffs presented no evidence establishing that the United States

---

[8] Since no Title V right-of-way was granted for K1088, Plaintiffs' argument of case or controversy based upon the issuance of a Title V right-of-way cannot be applied to this route in any event.

claims an interest in the easements asserted for these roads, or that there is a disputed title to real property for these roads.  See Leisnoi, Inc. v. United States, 170 F.3d 1188, 1191 (9th Cir. 1999); see also Alaska v. United States, 201 F.3d 1154, 1164-65 (9th Cir. 2000) (United States' refusal to either confirm or deny the State's claimed property right was, and is, insufficient to create an actual title dispute).  Nor can Plaintiffs establish jurisdiction based upon action taken – or not taken – by the United States in response to the filing of this action.  Rather, it is a fundamental principle of the federal courts that a justiciable dispute must exist at the time of the filing of a lawsuit.  Jordan v. Sosa, 654 F.3d 1012, 1019 (10th Cir. 2011); Mink v. Suthers, 482 F.3d 1244, 1254 (10th Cir. 2007) ("[S]tanding is determined at the time the action is brought . . . , and we generally look to when the complaint was first filed, not to subsequent events") (citing Friends of the Earth, Inc. v. Laidlaw Envt'l. Servs. (TOC), Inc., 528 U.S. 167, 180 (2000)); Nova Health Systems v. Gandy, 416 F.3d 1149, 1154 (10th Cir. 2005); Carr v. Alta Verde Indus., Inc., 931 F.2d 1055, 1061 (5th Cir.1991) ("As with all questions of subject matter jurisdiction except mootness, standing is determined as of the date of the filing of the complaint.").  Therefore, the United States' defense of the action on the merits cannot be relied upon to manufacture the very jurisdiction that did not exist at the outset of the lawsuit.

In any case, even if the lack of a controversy or dispute could be cured after the filing of their complaint (which it cannot), the Court still lacks subject matter jurisdiction because Plaintiffs have also failed to establish standing as to their claims for the Cave Lakes routes. Plaintiffs have not—and cannot—establish that they "have suffered, or [are] threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision." Lewis v. Cont'l Bank Corp., 494 U.S. 472, 477 (1990) (citations omitted).  These routes remain open to public motor vehicle use under the Kanab Resource Management Plan, the

22

BLM has done nothing to preclude the public's use or the Plaintiffs' maintenance of these roads, and Plaintiffs have made no showing that they have suffered injury arising from the United States' alleged failure to affirmatively recognize the Cave Lakes routes as R.S. 2477 rights-of-way. In fact, the Tenth Circuit has expressly affirmed that the BLM has no such duty to affirmatively recognize R.S. 2477 claims as part of its land use planning process. Kane Cnty. v. Salazar, 562 F.3d 1077, 1086-88 (10th Cir. 2009) (holding that the BLM had no duty in preparing a land management plan to identify and determine the existence of alleged R.S. 2477 rights-of-way). Standing cannot be grounded upon "harm" flowing from the failure to carry out a non-existent duty. Utah v. Babbitt, 137 F.3d 1193, 1207 (10th Cir. 1998).

Accordingly, the Court lacks subject matter jurisdiction over the Plaintiffs' claims related to the four Cave Lakes roads.[9]

---

[9] Indeed, testimony adduced at trial highlighted the practical import of allowing R.S. 2477 claims to go forward despite the existence of a concrete dispute between the parties—or injury suffered by the Plaintiffs. Mr. Habbeshaw testified that Kane County believed that it had approximately 1,000 R.S. 2477 rights-of-way, more than half of which occur on public lands, demonstrating the potential for a wave of claims that may be filed by Kane County. Trial Tr. at 1349:20-1350:17 (Aug. 25, 2011). In fact, recently the State of Utah and certain Utah counties (including Kane County) have filed three additional suits seeking to have this Court adjudicate hundreds of claimed rights of way, with Kane County alone claiming approximately 710 additional rights-of-way in its new lawsuit. See Kane County and State of Utah v. United States, Case No. 2:11-cv-01031 BCW; Carbon County v. United States, Case No. 2:11-cv-01043 PMW; and State of Utah and Garfield County v. United States, Case No. 2:11-cv-01045-SA. What's more, the State of Utah has served the United States with over 20 Notices of Intent to Sue under the Quiet Title Act, indicating that Utah and 22 of its various counties intend to seek to establish approximately 18,784 additional rights-of-way through the Court. See Exhibit A, available at http://www.utah.gov/governor/news_media/article.html?article=6201 (as last visited December 23, 2011). An example of one of these Notices of Intent is attached as Exhibit B.

23

### 6.    The County's Title V rights-of-way for the Bald Knoll road.

The Court indicated at the close of trial that it had questions as to the interplay between the rerouted sections at both ends of the Bald Knoll road, which were made pursuant to Title V right-of-way grants, and the original routes.  One of the grants—that authorizing the reroute of the Bald Knoll at its intersection with the Glendale Bench road—and which resulted in the Old Leach Ranch segment falling into disuse—expired of its own terms in 2010.  Trial Tr. 1190:13-23 (Aug. 24, 2011).[10]  Plaintiffs' claim for the Bald Knoll road apparently seeks to quiet title to the entire original route—even those sections that are no longer used due to the Title V reroutes.  Under these circumstances, Plaintiffs lack standing to quiet title to these now-unused sections because they cannot demonstrate any concrete injury, or any injury that would be redressable by judicial action, in the absence of any specific plans to use the old segments at each end of the Bald Knoll road, either now or in the foreseeable future.  See Lewis, 494 U.S. at 477.

The rerouted segments of the Bald Knoll road that are (or were) authorized under Title V of FLPMA are not at issue in Plaintiffs' claims.  See Am. Compl., Ex.1A.  However, Plaintiffs argue that BLM's issuance of one of the Title V grants with a width of 66 feet (and the other, according to Plaintiffs, with a width of 100 feet)[11] supports a finding that Kane County is entitled to a standard 66 foot width for all of its R.S. 2477 rights-of-way.  There is no support for this position in law or fact.

---

[10] After trial had finished, Kane County reapplied for a Title V right-of-way grant for this segment.

[11] Defendant disputes that it is clear that the second Title V right-of-way has a scope of 100 feet.  The grant itself sets no physical width other than to note that "[c]learing of vegetation from within the right of way will be limited to 50 feet."  See Ex. 86.  Ultimately, however, for the reasons stated below, the width of the second Title V right-of-way grant is immaterial.

24

First, the scope of an R.S. 2477 right-of-way in Utah is that "which is reasonable and necessary for the type of use to which the road has been put . . . in light of the traditional uses to which the right-of-way was put." Sierra Club v. Hodel, 848 F.2d 1068, 1083 (10th Cir. 1988), overruled on other grounds by Vill. of Los Ranchos De Albuquerque v. Marsh, 956 F.2d 970, 971 (10th Cir. 1992) (quoting Sierra Club v. Hodel, 675 F. Supp. 594, 607 (D. Utah 1987)).  In contrast, the scope of a right-of-way granted under Title V of FLPMA is determined under a completely different analysis addressing a variety of forward-looking factors.  Specifically, the "boundaries" of a Title V right-of-way are to be limited to the ground which BLM determines (1) will be occupied by facilities which constitute the project for which the right-of-way is granted, issued, or renewed, (2) to be necessary for the operation or maintenance of the project, (3) to be necessary to protect the public safety, and (4) will do no unnecessary damage to the environment.  43 U.S.C. § 1761(a).  Not surprisingly then, Plaintiffs presented no evidence that in granting these Title V rights-of-way, BLM made a determination as to what width "is reasonable and necessary for the type of use to which the road has been put," because such determination is irrelevant to the scope of a Title V right-of-way.

Plaintiffs also ignore the fact that both of the Bald Knoll road Title V grants were originally issued to authorize the actual construction of a rerouted portion of the road.  Kane County's own Transportation Director (and former Roads Supervisor) testified that a 66 foot wide right-of-way was *not* necessary for undertaking routine maintenance of an existing road— but that it might be in situations where the County needed to build a new road or to reconstruct an existing road.  See Trial Tr. 1190:2-12 (Aug. 24, 2011).  Accordingly, because these Title V rights-of-way were issued to authorize construction of entirely new road segments, their scope

25

has no relevance to determining what is reasonable and necessary for an existing R.S. 2477 right-of-way.

### C.    Issues related to Scope.

#### 1.    Plaintiffs have not demonstrated the existence of County commission action establishing a standard 66 foot width for County rights-of-way.

Plaintiffs appear to take the position that past Kane County Commission action with respect to road widths supports their claimed standard 66 foot width for any rights-of-way established in this litigation.  This position is untenable because Utah law requires the Court to determine what is "reasonable and necessary" on a road-by-road basis, and because Kane County did not act to designate any standard width prior to October 21, 1976.

First, the scope of an R.S. 2477 right-of-way is that "which is reasonable and necessary for the type of use to which the road has been put . . . in light of the traditional uses to which the right-of-way was put." Hodel, 848 F.2d at 1083 (quoting Sierra Club v. Hodel, 675 F. Supp. 594, 607 (D. Utah 1987)).  As Defendant argued in the summary judgment briefing, this analysis adopted by Hodel (and in many cases from the Utah state courts) is antithetical to the County's proposed one-size-fits-all right-of-way width.  Id. at 1084 (affirming district court's factual findings relating to scope); Memmott v. Anderson, 642 P.2d 750, 754 (Utah 1982) ("the width of a public road is determined according to what is reasonable and necessary under all the facts and circumstances").  It also violates the well-established federal rule of construction that federal "land grants are construed favorably to the government and nothing passes except that which is conveyed in clear language, resolving all doubts in favor of the government." Rosette, 277 F.3d at 1229 (citing Watt, 462 U.S. at 59).  Accordingly, Plaintiffs' alleged entitlement to a standard 66 foot width for all of its claimed rights-of-way is inconsistent with federal law.

26

Likewise, state law recognizes the fact-specific nature of a scope determination and rejects the view that public highways are entitled to a standard, one-size-fits-all right-of-way width.  Specifically, the Utah Court of Appeals, interpreting Utah Code section 72-5-108 (which, like the earlier Section 36-1-4, authorizes counties to determine the widths of rights-of-way for public highways under their jurisdiction), held that the statute did not apply to road widths in public road dedication cases.  Haynes Land & Livestock Co. v. Jacob Family Chalk Creek, LLC, 233 P.3d 529, 536 (Utah Ct. App. 2010); see also Memmott, 642 P.2d at 754 ("the width of a public road is determined according to what is reasonable and necessary under all the facts and circumstances"). Rather than relying on a county determination of appropriate width, the appellate court held that, consistent with long-standing case law, it was for the district court to determine road width in public road dedication cases "according to what is reasonable and necessary under all the facts and circumstances." Haynes Land & Livestock, 233 P.3d at 536 (quoting Memmott, 642 P.2d at 754).  Indeed, even the State's own witness, John Harja, testified that state policy recognizes scope is "not an inflexible standard," but is rather based upon what is "reasonable and necessary."  Trial Tr. at 979:8-16.

Regardless, even if such a county designation could have some legal effect, Plaintiffs have failed to demonstrate that Kane County acted to set the width of all such rights-of-way prior to October 21, 1976.  To be sure, former County Commissioner Mr. Habbeshaw testified to several instances where County minutes purported to address the width of County roads, including County minutes from July 20, 1950 (Ex. 94), which purported to set "a standard width of 75 feet" for the Glendale Bench road and all county rights-of-way.  Trial Tr. 1321:1-19 (Aug. 25, 2011).  However, it is clear that these minutes do not reflect effective action by the County Commission to formally set such a width for all county roads—or even for the road specifically

27

mentioned in the minutes.  Indeed, several months after the July 20, 1950 meeting, on December 11, 1950, the Kane County Commission issued a formal resolution setting the width for the right-of-way for the very same Glendale Bench road—and only that road—at 75 feet.  Id. at 1336:10-1339:21; see also Ex. LLLL.  This resolution demonstrated the Commission's compliance with a variety of procedural formalities (including the formal approval of the resolution itself, and then ensuring its publication to the general public), none of which are present in the earlier County documents relied upon by Plaintiffs.  Id. at 1339:22-25.  Further, if the July 20, 1950 action by the Commission had resulted in a county-wide standard right of way width of 75 feet, then there would have been no need for the December 11, 1950 action and resolution.  Finally, it should be noted that when Kane County enacted a resolution in 1993 purporting to set a standard 66-foot right-of-way "on any and all land" within the County, the resolution made no mention of any previous standard width established by the County.  See Ex. 95.[12]  Accordingly, Plaintiffs' argument for standard 66-foot rights-of-way fails.

> ### 2. The current use of an R.S. 2477 right-of-way does not establish the scope of that right-of-way.

As the Tenth Circuit has repeatedly stated, the scope of a right-of-way is limited by the established usage of the route as of October 21, 1976.  SUWA, 425 F.3d at 746; Hodel, 848 F.2d at 1084 (holding that the correct definition of "reasonable and necessary" is fixed as of October 21, 1976).  Current use is therefore generally not relevant to the question of scope as of 1976.

---

[12] To the extent Plaintiffs claim that the 1993 resolution is relevant to the scope determination in this case, it is well-established that such post-1976 county action can have no effect, because "FLPMA preserved only preexisting rights-of-way as they existed on the date of passage, October 21, 1976." Hodel, 848 F.2d at 1083.

28

Further, while current use can be relevant to the question of whether proposed improvements are necessary in light of increased use, that issue is not before the Court in this litigation.

The grant of an R.S. 2477 right-of-way was open-ended, and the scope of the right-of-way included existing public uses established as of October 21, 1976. Hodel, 848 F.2d at 1084 ("all uses before October 21, 1976, not terminated or surrendered, are part of an R.S. 2477 right-of-way.") (emphasis added). However, any new uses that post-date 1976 may not be considered in establishing what is "reasonable and necessary" as of 1976 to ensure safe travel. Id. (citing district court findings for pre-October 21, 1976 uses and holding that the scope of the ROW was that which is "reasonable and necessary" to ensure safe travel for those pre-October 21, 1976 uses); see also United States v. Garfield Co., 122 F. Supp. 2d 1201, 1217 n.23 (D. Utah 2000) (use for tourist access in 1973, where cut-off date for establishing certain R.S. 2477 right-of-way was in 1969, was not relevant to defining the scope of the right-of-way).

Granted, the Tenth Circuit has held that the limitation to pre-October 21, 1976 uses does not freeze the condition of an R.S. 2477 right-of-way as of that date. As the Circuit noted, this limitation to uses established as of 1976:

> did not mean, however, that the road had to be maintained in precisely the same condition it was in on October 21, 1976; rather, it could be improved "as necessary to meet the exigencies of increased travel," so long as this was done "in the light of traditional uses to which the right-of-way was put" as of repeal of the statute in 1976. [Hodel, 848 F.2d.] at 1083.

SUWA, 425 F.3d at 746. Similarly, the Circuit noted in Hodel that "under Utah common law, the road could be widened as necessary to meet the exigencies of increased travel, at least to the extent of a two-lane road." Hodel, 848 F.2d at 1083 (emphasis added).[13]

---

[13] Certainly, this does not mean that such an expansion of a road is necessarily proper, depending upon the nature of its historical use. See SUWA, 425 F.3d at 747 ("To convert a two-track jeep

However, whether it is reasonable and necessary for any of the roads in this litigation to be altered due to present safety or maintenance concerns – such as to be expanded to two lanes of traffic so that travelers may pass one another – is not an issue that is before the Court.  As noted in Defendant's Trial Brief, the question of whether a proposed improvement of a road (including widening the road) falls within the scope of an R.S. 2477 right-of-way is to be made, not in the abstract, but in response to a specific proposal, and further, is a question the Tenth Circuit has expressly assigned to the federal land management (in this case, BLM) for initial determination. SUWA, 425 F.3d at 748-49; see also Hodel, 848 F.2d at 1084-85 ("As the district court correctly notes, Tenth Circuit precedent requires 'that the initial determination of whether activity falls within an established right-of-way is to be made by the BLM and not the court.'") (citation omitted).  Moreover, absent a concrete controversy over whether a proposed alteration or expansion of any established R.S. 2477 right-of-way to address safety or related concerns is appropriate (and it certainly is not a foregone conclusion that BLM would reject any such proposal following the consultation process under SUWA), there is no basis for the Court to determine whether such an improvement or expansion falls within the established scope of any road.  See Gila River Indian Comm., 626 F.3d at 1074 ("The Trustee has not shown that there is a live controversy with regard to the *scope* of any easement. There is no indication that the roads or utilities as they currently exist are inadequate to support the current use of Section 16, or that the Trustee has any intent to improve the roads or utilities. The parties may disagree in principle over what activities the Trustee may undertake on those roads, but there is as yet no particularized or imminent injury arising out of that disagreement") (emphasis in original).

---

trail into a graded dirt road, or a graded road into a paved one, alters the use, affects the servient estate, and may go beyond the scope of the right of way").

30

Under these circumstances, because the question of whether any proposed improvements fit within the scope of any of the claimed rights-of-way is not before the Court, current use has little probative value in this litigation.[14]

### 3. The scope of certain routes, if found to be R.S. 2477 rights-of-way, should include seasonal limitations.

To the extent the Court recognizes rights-of-way for certain of the claimed roads, the scope of such rights-of-way should be limited to their historic, seasonal uses by the general public as demonstrated by the evidence presented at trial. In other words, for those routes for which there was only evidence of use during certain seasons, such a seasonal limitation should be included in the description of the scope of the rights-of-way for those routes.

According to the Tenth Circuit "all uses before October 21, 1976, not terminated or surrendered, are part of an R.S. 2477 right-of-way." Hodel, 848 F.2d at 1084. The corollary is that uses *not* established prior to October 21, 1976 do not fall within the scope of an R.S. 2477 right-of-way. Indeed, the Tenth Circuit has stated this plainly: "the scope of an R.S. 2477 right of way is limited by the established usage of the route as of the date of repeal of the statute." SUWA, 425 F.3d at 746. Consequently, where the established usage of a route is only during a certain season or seasons, the scope of any R.S. 2477 right-of-way must likewise be limited.

---

[14] That is not to say such evidence necessarily has *no* relevance to this case. For instance, evidence that a route receives little use today may have some probative value as to use pre-October 21, 1976, as it may corroborate the fact that a route is in an area of little interest to the general public. See Fed. R. Evid. 401 (relevant evidence is evidence having "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence"). Likewise, in the absence of evidence of the substantial widening or relocation of a route after 1976, the current surface disturbance may be probative of the existing disturbance as of 1976.

Imposing a seasonal limitation is consistent with common law principles governing easements, which are appropriately borrowed in addressing the scope of R.S. 2477 rights-of-way. Specifically, the Tenth Circuit expressly instructed that R.S. 2477 "[r]ights-of-way are a species of easements and are subject to the principles that govern the scope of easements." Hodel, 848 F.2d at 1083; see also SUWA, 425 F.3d at 747-48 (referring to common law principles governing easements in discussing the relationship between dominant and servient estates for R.S. 2477 purposes); Garfield Cnty., 122 F. Supp. 2d at 1243 (same). Indeed, prescriptive easements present a situation analogous to rights-of-way established pursuant to R.S. 2477, in that the scope of each right is defined by the past use of the route. Cf. Jeremy v. Bertagnole, 116 P.2d 420, 424 (Utah 1941) ("private easement acquired by [a] user is limited to the use made of the servient estate during the prescriptive period"); with SUWA, 425 F.3d at 746 ("the scope of an R.S. 2477 right of way is limited by the established usage of the route as of the date of repeal of the statute").

That the scope of an easement may include seasonal limitations is a well-recognized concept in property law. See Crane v. Crane, 683 P.2d 1062, 1068 (Utah 1984) (upholding decree which limited easement "to the nature and extent of the use by which it was acquired" and thus existed only for "duration of grazing permits on allotment lands" and imposing additional specific use restrictions for fall and spring cattle driving); see also O'Dell v. Stegall, 703 S.E.2d 561, 587 - 88 (W. Va. 2010) (quoting Bruce & Ely, *The Law of Easements and Licenses in Land*, § 5:15) ("Easements that are seasonal or periodical may be acquired by prescription. For example, one may obtain a prescriptive easement by driving cattle to and from a summer range, by using a beach or a driveway only during the summer, by traveling a roadway in the haying season, or by making seasonal use of a path."); Price v. Eastham, 75 P.3d 1051, 1058-59 (Alaska

32

2003) (acknowledging cases which limit prescriptive easements to specific times of the year, and remanding with instructions for superior court to consider scope restrictions, including "limiting use to certain seasons"); SWS, LLC v. Weynand, No. 2009AP2309, 2011 WL 534978, at *8 (Wis. App. 2011) (affirming trial court's judgment imposing time limitation on easement from April 15th to October 15th where no evidence had been presented showing a pattern of winter use); Block v. Sexton, 577 N.W.2d 521, 523-26 (Minn. Ct. App. 1998) (affirming trial court in limiting scope of prescriptive easement to May through October, reasoning that "the extent of an easement depends upon the character and purpose of the use"); Shaffer v. Baylor's Lake Ass'n, 141 A.2d 583, 587 (Pa. 1958) ("The nature of the easement, whether it is seasonal, periodical, or for all periods of the year, the frequency and the extent of the user, its definiteness, and its location in city or rural districts are important factors in a determination of whether an easement exists and exactly what rights have been acquired thereunder"); Restatement (First) of Property § 478, Comment to Clause (a) (1944) (stating that "[a]n asserted use under a prescriptive easement may vary so widely in place, time, or manner from the use by which the easement was created that because of that variance it may be concluded that the claimed use is not permissible since the variance is so wide that the asserted use is clearly inconsistent with the pattern to which it must conform" and observing that "adverse use of land for winter pasturage creates no right to summer pasturage"); cf. Widell v. Tollefson, 462 N.W.2d 910, 914-15 (Wis. App. 1990) (rejecting "automatic time-based restrictions" but nonetheless acknowledging that certain time-based restrictions may be reasonable).

Thus, consistent with the Tenth Circuit's instruction regarding the scope of an R.S. 2477 right-of-way and the above-stated principles of common law easements, if the Court determines that Plaintiffs hold R.S. 2477 rights-of-way for the upper Mill Creek, Oak Canyon, Tenny Creek,

33

North Swag, Swallow Park/Park Wash, K1087 and/or K1088 routes, the scope of such rights-of-way must include seasonal limitations. Specifically, as demonstrated in Defendant's proposed findings of fact, witness testimony indicated that there was not public usage of the upper Mill Creek, Oak Canyon, and Tenny Creek routes during the winter months. Def.'s Proposed Findings of Fact ("PFOF"), at 31-32. Similarly, to the extent the Court recognizes R.S. 2477 rights-of-way for the North Swag, Swallow Park/Park Wash, and/or Cave Lakes routes, the scope of such rights-of-way must necessarily be limited to the fall deer hunt, as what little evidence there was of use by the general public of these routes overwhelmingly occurred during that time period. See, e.g. PFOF at 108, 137-38.[15] Therefore—to the extent the Court were to

---

[15] It should be emphasized that this argument is presented only as an alternative to Defendant's primary argument; i.e., that such evidence of occasional use for hunting or other recreational purposes does not establish acceptance of an R.S. 2477 grant. See SUWA, 425 F.3d at 775 (noting that in Luchetti v. Bandler, 777 P.2d 1326, 1329-30 (N.M. Ct. App. 1989), the court rejected an R.S. 2477 claim for a right-of-way, "despite testimony by at least four witnesses that they and other members of the public used the road for picnics, hiking, hunting, and access to a spring"); Thomson v. Condas, 27 Utah 2d 129, 132, 493 P.2d 639, 641 (Utah 1972) (finding insufficient evidence to support public highway because "use of the lower road was limited to intermittent private use of the quarry lessees and their employers, and by an occasional hunter or fisherman and by defendants' predecessors for sheep operations from 1928 to 1931, and thereafter by the latter in sheep operations and by a farmer immediately to the South, and that neither road was used during any period of time by the general public as a public thoroughfare, and that at all times both were used as private roadways"); Harding v. Bohman, 491 P.2d 233, 234 (Utah 1971) (route used by two sheepmen in trailing their sheep to and from grazing lands, and occasional use by deer hunters, not sufficient to constitute acceptance of public highway); Dome Mountain Ranch, LLC v. Park County, 37 P.3d 710, 715 (Mont. 2001) ("we have held that "[g]enerally, seasonal use by hunters, fishermen, hikers, campers, use by neighbors visiting neighbors, and persons cutting Christmas trees and gathering firewood are not sufficient" to establish use by the public over a definite course continuously and uninterruptedly") (internal quotations omitted); Oates v. Knutson, 182 Mont. 195, 200, 595 P.2d 1181, 1184 (Mont. 1979) ("Public use was generally seasonal and enjoyed by hunters, fishermen and campers, either on foot, horseback or, (if possible), by four-wheel drive vehicles. Such recreational use is insufficient to raise the presumption of adverse use."); Ewan v. Stenberg, 168 Mont. 63, 68, 541 P.2d 60, 63 (1975) ("Occasional use by hunters, by sightseeing friends and by neighbors visiting neighbors falls short of the extent and type of usage necessary to result in the accrual of a public right."); Hamerly v. Denton, 359 P.2d 121, 125 (Alaska 1961) (holding that

find rights-of-way for any of these routes—the scope of such rights-of-way must include seasonal limitations consistent with the evidence of their use by the general public prior to October 21, 1976.

### 4. Dr. Gines' testimony as to widths should be admitted.

During trial, Defendant presented the testimony of Dr. Julie Gines, who holds a PhD in aerial imagery and is the head of BLM's Utah State Office's remote sensing program. Trial Tr. 1544-45 (Aug. 26, 2011). At trial, Dr. Gines was offered and recognized by the Court as an expert on the topic of remote sensing, without objection by Plaintiffs. Id. at 1554. Subsequently, Dr. Gines testified as to: (1) her measurements of the widths of the alleged routes from aerial imagery taken in 1974; and (2) her interpretation of what such aerial photography portrayed with respect to several claimed routes including the North Swag and Cave Lakes routes. Following the testimony of Dr. Gines, Plaintiffs orally moved the Court to strike Dr. Gines' testimony; however, they later withdrew their motion to strike, but asked the Court to "disregard the road width measurements that were challenged as being unreliable" and as being irrelevant because they were based on 1974 photography. Id. at 1631-32; 1688-89.

Dr. Gines' testimony should not be disregarded. Indeed, Plaintiffs' challenges to her testimony—including because they have withdrawn their motion to strike—properly go to the weight the Court should give her testimony, not whether the Court should consider it at all. See Bitler v. A.O. Smith Corp., 400 F.3d 1227, 1236 n.2 (10th Cir. 2004) (alleged shortcomings in proffered testimony "go to the weight which the trier of fact should accord the evidence and do not make the testimony incredible") (internal marks and citation omitted). While her

use of road by individuals who "were merely sightseers, hunters and trappers" was insufficient to create a public right-of-way under R.S. 2477).

measurements of the width of the routes in 1974 represented an approximation based upon her described methodology, they were arrived at through a sufficiently reliable process, which Dr. Gines consciously undertook in a conservative manner. Further, contrary to Plaintiffs' argument, Dr. Gines' measurements were not unreliable. In fact, they are generally consistent with the on-the-ground estimates made by Kane County road department personnel that were admitted at trial in Exhibit 224-A. Finally, Dr. Gines' measurements based on 1974 imagery are relevant: this case is being litigated more than thirty years after the repeal of R.S. 2477 and, given this time frame, the fact that Dr. Gines' testimony relies on photographs that were taken only two years before 1976 does not eliminate their probative value. In any case, the similarity between Dr. Gines' numbers and those of the County from many years later indicates that many of these routes have not changed significantly in terms of width in the years following 1976.

"When testing the admissibility of expert testimony, courts must first determine whether an expert is 'qualified by knowledge, skill, experience, training, or education' to render an opinion." Milne v. USA Cycling Inc., 575 F.3d 1120, 1133 (10th Cir. 2009) (quoting Ralston v. Smith & Nephew Richards, Inc., 275 F.3d 965, 969 (10th Cir. 2001) (quoting Fed. R. Evid. 702)). "Second, if the court determines that a witness is qualified, it must then 'determine whether her opinions [a]re 'reliable.''" Id. "In reviewing whether an expert's testimony is reliable, the trial court must assess the reasoning and methodology underlying the expert's opinion." Id. at 1134 (quoting United States v. Rodriguez-Felix, 450 F.3d 1117, 1123 (10th Cir. 2006)). The proponent of expert testimony "need not prove that the expert is indisputably correct or that the expert's theory is 'generally accepted' in the scientific community," but merely that "the method employed by the expert in reaching the conclusion is scientifically sound and that the opinion is based on facts which sufficiently satisfy Rule 702's reliability requirements."

Bitler, 400 F.3d at 1233 (quoting Mitchell v. Gencorp Inc., 165 F.3d 778, 784 (10th Cir.1999)).

Finally, "while Daubert's standards must still be met, the usual concerns regarding unreliable expert testimony reaching a jury obviously do not arise when a district court is conducting a bench trial." Att'y Gen. of Okla. v. Tyson Foods, Inc., 565 F.3d 769, 779 (10th Cir. 2009).

> To assist in the assessment of reliability, the Supreme Court in Daubert listed four nonexclusive factors that the trial court may consider: (1) whether the opinion at issue is susceptible to testing and has been subjected to such testing; (2) whether the opinion has been subjected to peer review; (3) whether there is a known or potential rate of error associated with the methodology used and whether there are standards controlling the technique's operation; and (4) whether the theory has been accepted in the scientific community. 509 U.S. at 593-94, 113 S.Ct. 2786. As noted, the list is not exclusive . . .

Goebel v. Denver & Rio Grande W. R.R. Co., 346 F.3d 987, 991-92 (10th Cir. 2003) (citing Daubert v. Merrell Dow Pharms., 509 U.S. 579 (1993)).   However, such factors will not be relevant in every case.  See Bitler, 400 F.3d at 1235.

Here, Dr. Gines' testimony was not the type of theoretical opinion based on some new scientific theory to which such factors are typically applied.  See id. ("Although such a method is not susceptible to testing or peer review, it does constitute generally acceptable practice as a method for fire investigators to analyze the cause of fire accidents").  Rather, it was based on use of a measuring tool available on Arcmap software—software commonly used in the field, and in fact apparently the same software used by the State of Utah and Kane County.  Trial Tr. 1565:9-22 (Aug. 26, 2011); see also Trial Tr. 1008:23-1009:3 (Aug. 24, 2011).  Dr. Gines demonstrated how she used the measuring tool—including how she determined the points from which to measure based on her extensive training and experience in interpreting aerial imagery.  Id.  She further testified as to the rate of possible inaccuracy in such measurements.  Id. at 1568:8-1569:4.

Dr. Gines did not place marks at her measurements so that they could be precisely duplicated.  Id. at 1629:17-1630:13.  However, this does not render Dr. Gines' measurements

37

unreliable, because ultimately Dr. Gines was not attempting to provide a precise measurement of any specific location, but rather to compile a series of measurements from which she could— selecting the widest measurement absent information that it was an outlier[16]—identify a maximum width of the area of disturbance for each route.  Id. at 1572:19-1573:1; 1637:17-19. And indeed, as demonstrated below, the majority of Dr. Gines' measurements of the maximum disturbed width tended to be fairly consistent, and within three feet or less of Kane County's measurements of the area of disturbance (KCS_Width) or for the larger, more established roads, the width of the travelway[17] (KCS_SURFWIDT).  See Ex. 224-A.  These similar results corroborate the reliability of Dr. Gines' measurements.

| | Dr.  Gines | KC S_Width | KC S_SURFWIDT |
|---|---|---|---|
| Mill Creek Upper | 20 | 18 | 16 |
| Mill Creek Lower | 24 | 28 | 20 |
| Bald Knoll | 23 | 22 | 20 |
| Skutumpah | 31 | 40 | 28 |
| Sand Dune | 31 | 60 | 30 |
| Hancock | 32 | 50 | 28 |
| Tenny Creek | 20 | 18 | 18 |
| Oak Canyon | 21 | 26 | 20 |
| Swallow Park/Park Wash Class B | 23 | 14 | 10 |
| Swallow Park/Park Wash Class D | 17 | 14 | 10 |

---

[16] Dr. Gines indicated that her maximum measurement for the lower Mill Creek road, of 34 feet, was anomalous because it appeared to be in the vicinity of a pull off.  Trial Tr. at 1576:2-7.

[17] As Dr. Gines testified, in 1974, the Sand Dune road was the only route with any pavement. Because of that, her measurement was different than with respect to the other routes, because this allowed her to base her measurement on the width of the pavement, rather than from the vegetation lines on each side of the route.  Trial Tr. at 1564:18-25.

| | | | |
|---|---|---|---|
| North Swag | 15[18] | 14 | 10 |
| Nipple Lake | 19 | 22 | 20 |
| K1070 | 25 | 30 | 20 |
| K1075 | 15 | 16 | 12 |
| K1087 | 12 | 10 | 8 |
| K1088 | 10 | 10 | 8 |

Under these circumstances, Dr. Gines' testimony is more than adequately reliable to be admitted and fully credited in this case, and Plaintiffs' concerns are more properly focused on the weight to be afforded this testimony. See Weitz Co. v. MH Washington, 631 F.3d 510, 527 (8th Cir. 2011) (unless expert testimony is "so fundamentally unreliable that it does not assist the jury; . . . the factual basis of the testimony goes to the weight of the evidence"). Accordingly, Plaintiffs' request that the Court disregard Dr. Gines' testimony regarding her measurements should be rejected.

## III. CONCLUSION

For the reasons explained above and in Defendant's Trial Brief, filed August 8, 2011, and as set forth in Defendant's Proposed Findings of Fact and Conclusions of Law, filed concurrently, Plaintiffs' claims with respect to the Nipple Lake, North Swag, Upper Mill Creek, Oak Canyon, Tenny Creek, and Swallow Park/Park Wash routes should be denied with prejudice in their entirety. The claims for the Cave Lakes routes should be dismissed for lack of judicially-cognizable case or controversy and for Plaintiffs' lack of standing to prosecute the claims. Alternatively, to the extent the Court finds it has subject matter jurisdiction over Plaintiffs' claims for the Cave Lakes routes, they should also be dismissed with prejudice. Plaintiffs'

---

[18] Dr. Gines also testified that over three fourths of the 41 measurements she made on the North Swag route were 10 feet or less. Trial Tr. at 1578:5-17

claims for the segments of the Skutumpah road which were rerouted by the County in 1993, and their claim for the segment of the Mill Creek road crossing Section 32 of Township 40 South, Range 4.5 West, should be dismissed with prejudice. Finally, the Court should make a determination of the physical scope necessary for the County to undertake routine maintenance of the Bald Knoll, Hancock, mainstem Mill Creek, Sand Dune, and Skutumpah roads as set forth in Defendant's Proposed Findings of Fact and Conclusions of Law.

RESPECTFULLY SUBMITTED this 23rd day of December, 2011.

IGNACIA S. MORENO
Assistant Attorney General

   /s/ Romney S. Philpott
ROMNEY S. PHILPOTT
JOANNA BRINKMAN
THOMAS SNODGRASS
Trial Attorneys
U.S. Department of Justice
Environment & Natural Resources Division
Natural Resources Section

DAVID BARLOW
United States Attorney, District of Utah
JOHN K. MANGUM
Assistant United States Attorney

ATTORNEYS FOR THE UNITED STATES

OF COUNSEL:

JAMES E. KARKUT
Attorney/Advisor
Office of the Regional Solicitor
Department of the Interior

40

125 South State Street, Suite 6201
Salt Lake City, UT 84138

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I am an employee of the United States Department of Justice and that the foregoing **DEFENDANT'S POST TRIAL BRIEF** was filed using the court's CM/ECF electronic system which is relied upon to promptly serve notice thereof by electronic mail on this December 23, 2011, to the following:

Shawn T. Welch
Tamara L. Stevenson
Ryan R. Jibson
Holland & Hart LLP
222 S. Main Street Suite 2200
Salt Lake City, UT 84101

Harry Souvall
Anthony Rampton
5110 State Office Building
P.O. Box 142477
Salt Lake City, UT 84114

  /s/ Romney S. Philpott
ROMNEY S. PHILPOTT