IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| KANE COUNTY, UTAH<br><br>Plaintiff,<br><br>vs.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | **MEMORANDUM DECISION<br>AND ORDER**<br><br>Case No. 2:08-cv-00315<br><br>Judge Clark Waddoups |

## INTRODUCTION

Plaintiff Kane County, Utah seeks to quiet title to fifteen roads that cross lands owned by the United States.[1]  Kane County asserts the roads are public highways under R.S. 2477 and it is the owner of the rights-of-way.  The United States has challenged the court's jurisdiction to hear claims on nine of the roads because it claims there is no case or controversy about them.  The Southern Utah Wilderness Alliance ("SUWA"), as amicus curiae, has also challenged the court's jurisdiction based on the statute of limitations.  For the reasons stated below, the court concludes it has jurisdiction to hear the claims asserted by Kane County.

## PROCEDURAL BACKGROUND

Kane County filed this action against the United States on April 25, 2008, pursuant to the Quiet Title Act, 28 U.S.C. § 2409a.  In its initial complaint, Kane County sought to quiet title to roads called Mill Creek (including the Tenny Creek and Oak Canyon segments) and Bald Knoll

---

[1] Kane County asserts only twelve roads are at issue.  Two of the roads have spurs or segments that are named differently from the main road.  For ease of reference, the court refers to them as roads, even though the court concludes they are merely a segment of the main road.

(including the Old Leach Ranch segment).  On November 10, 2008, Kane County amended its complaint to assert claims for additional roads, namely, Skutumpah, Sand Dunes, Hancock, Swallow Park/Park Wash, North Swag, Nipple Lake, and the four Cave Lake roads.[2]  Kane County then filed a second amended complaint on February 20, 2009.  That complaint did not assert claims for any additional roads.  Instead, it added more facts pertaining to the claims already asserted.  Subsequently, the State of Utah intervened in the matter and filed its complaint on April 29, 2010.  Kane County and the State claim joint ownership of these roads based on Section 8 of the Mining Law of 1866, which is more commonly known as R.S. 2477.

Prior to the State's involvement, the United States moved on March 9, 2009, to dismiss claims for five of the roads at issue due to lack of subject-matter jurisdiction.  Specifically, the United States contended it had not interfered with or denied the existence of an R.S. 2477 right of way for Skutumpah, Tenny Creek, Oak Canyon, Sand Dunes, or Hancock.  Consequently, it contended Kane County lacked standing because there was no case or controversy.  It further asserted it had not disputed title, and therefore, had not waived its sovereign immunity under the Quiet Title Act.  The court disagreed and issued its ruling from the bench, but stated it would issue a written decision at a later time.  This memorandum decision sets forth the court's reasoning for denying the United States' motion to dismiss.

After the court denied the motion, the United States filed its Answer.  It did not assert there were problems with subject matter jurisdiction for any other road at issue in this case.  One week before trial, however, the United States asserted in its Trial Brief that the same problems about

---

[2]  *See* Memorandum Decision filed concurrently herewith for a more complete description of these roads.

subject matter jurisdiction also existed for the four Cave Lake roads.  Trial Brief, 39 42 (Dkt. No. 164).  Because a challenge to subject matter jurisdiction may be made at any stage of a legal proceeding, the court also addresses that challenge.  *See* Federal Rule Civil Procedure 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.").

Following the trial, SUWA submitted a brief that challenged subject matter jurisdiction for *all* roads at issue in this case on the ground that the statute of limitations had run before Kane County filed suit.  SUWA has the status of an amicus curiae in this case.  "*Amicus curiae* is a latin phrase for 'friend of the court' as distinguished from an advocate before the court."  *Newark Branch, NAACP v. Harrison*, 940 F.2d 792, 808 (3d Cir. 1991) (quotations and citation omitted).  Because an amicus curiae "participates only for the benefit of the court," and "is not a party to the litigation," the court has the sole discretion "to determine the fact, extent, and manner of participation by the amicus."  *Id.* (quotations, citation, and alteration omitted).

Here, the statute of limitations has already been addressed by the parties, with the United States' stipulating that it had not run.  *Kane County v. United States*, No. 2:08-cv-315, 2011 U.S. Dist. LEXIS 66218, at *25 26 (D. Utah June 21, 2011); *see also* Pretrial Order, at 26 (Dkt. No. 174).  The Tenth Circuit has concluded, however, that the Quiet Title Act's statute of limitations is a jurisdictional bar rather than merely an affirmative defense.  *Rio Grande Silvery Minnow v. Bureau of Reclamation*, 599 F.3d 1165, 1175 76 (10th Cir. 2010) (citations omitted).  Consequently, the court must "satisfy itself of its power to adjudicate [this] case . . . at every stage of the proceedings."  *State Farm Mut. Auto. Ins. Co. v. Narvaez*, 149 F.3d 1269, 1271 (10th Cir. 1998) (quotations and citation omitted).  Although the parties have already addressed the statute of limitations, the court

elects to address it again to assure itself of jurisdiction.

The jurisdictional assertions made by the United States and SUWA are highly fact dependent and involve cases and other matters that arose prior to this lawsuit. Because the court's analysis depends upon those facts, it sets them forth below.

## FACTUAL BACKGROUND

As stated above, Kane County claims ownership of the roads at issue in this case based on R.S. 2477. The text of the Act states: "*And be it further enacted*, That the right of way for the construction of highways over public lands, not reserved for public uses, is hereby granted." Act of July 26, 1866, ch. 262, § 8, 14 Stat. 251, 253, *codified* at 43 U.S.C. § 932. Through this Act, Congress authorized the public to enter federal lands, create roads across the land, and obtain a vested right-of-way. The law remained in effect from 1866 until October 1976, when it was repealed by the Federal Land Policy and Management Act of 1976 ("FLPMA"), Pub. L. No. 94-579 § 706(a), 90 Stat. 2793. After Congress had repealed it, the Act applied only prospectively. Thus, any valid R.S. 2477 right-of-way existing by October 1976 was grand-fathered in by FLPMA.

**FLPMA and the Wilderness Act**

FLPMA marked a sea change by Congress. Because no new roads could be created across federal land by the public after 1976, the State and its political subdivisions had to undertake the task of documenting the R.S. 2477 roads that existed across federal land as of October 1976. At the same time, FLPMA required that federal lands, with "roadless areas of five thousand acres or more," be inventoried to determine which areas had wilderness characteristics as defined in the Wilderness Act. 43 U.S.C. §§ 1711, 1782(a). According to the Wilderness Act, an area has wilderness characteristics when "the earth and its community of life are untrammeled by man, where man himself is a visitor

-4-

who does not remain." 16 U.S.C. § 1131(c).  It further means "an area of undeveloped Federal land retaining its primeval character and influence, without permanent improvements or human habitation," so that "the imprint of man's work [is] substantially unnoticeable." *Id.*

On November 1980, the BLM's Final Wilderness Inventory Decision for Utah was published in the Federal Register. *See* 45 Fed. Reg. 75,602 (Nov. 14, 1980).  That inventory designated the Paria-Hackberry region as a Wilderness Study Area.  According to SUWA, "[o]ne of the defining elements of wilderness eligibility is the lack of roads."  Amicus Brief of Southern Utah Wilderness Alliance, 5 (Dkt. No. 215) (hereinafter "SUWA's Amicus Brief") (citing 43 U.S.C. § 1782(a); *Utah v. Babbitt*, 137 F.3d 1193, 1213 (10th Cir. 1998)).  Thus, by designating the Paria-Hackberry region as a Wilderness Study Area in 1980, SUWA contends this provided formal notice to Kane County that the United States claimed an adverse title to Swallow Park/Park Wash and North Swag since those roads were located by or in that region.

Although FLPMA does reference "roadless" areas, the definition of what constitutes a "road" under the Wilderness Act is not necessarily coterminous with a "road" under R.S. 2477.  In 1980, the BLM Director for Utah issued an Instruction Memorandum to the BLM District Managers for Utah.  In that memorandum, the Director stated the following:

> The whole issue of roads is made more significant because of the relationship of road to the wilderness inventory.  The two are, however, not necessarily related issues.  *The wilderness inventory process uses a definition of a road that is distinct from the definition of "public" road contemplated by R.S. 2477 (42 USC 932) and is a definition for inventory purposes only, not for establishing rights of counties, etc*.  A determination that an area should not be excluded from wilderness review because the area does not have any "roads" as defined in the Bluebook is not a determination that a road is or is not a "public" road.  This is a factual determination that does not relate to wilderness, except if a determination is made that a public

> road exists, the right-of-way should be excluded from a wilderness
> study area as with any other intrusion. . . .

Instruction Memorandum, UT '80-240 (Mar. 6, 1980) (Pl. Trial Ex. 154; Dkt. No. 46, Ex. 2 at 2) (emphasis added).

During the bench trial in this action, Ken Mahoney testified about his work on the wilderness inventory conducted by the BLM.  Trial Tr., at 1361 (K. Mahoney).  His work occurred during the time period when the above Instruction Memorandum was in effect.  *See id.* at 1361 62, 1400.  Mr. Mahoney testified about traveling on the Swallow Park/Park Wash road and North Swag road, which were sufficiently visible to be recorded on his inventory.  *Id.* at 1393 95; *see also* Pl. Trial Ex. 75. Because North Swag was a primitive two track road, his team inventoried it as a non-maintained "way."  *Id.*  This, however, was not intended to be a determination about the road's status as an R.S. 2477 right-of-way.  *See* Trial Tr., at 1397, 1400 (K. Mahoney).

Moreover, a nationwide instruction memorandum discussed "standards for boundary setbacks along existing roads in designated wilderness areas" and recognized that "the width for some roads R/W established under 2477 . . . will exceed the [standard setback]."  *Id.* at 1388 89 (quoting Instruction Memorandum 90-589) (Pl. Trial Ex. 149)).  "When such overlaps" occur, the BLM was instructed to adjust the Wilderness Study Area "to eliminate the encroachment of such boundaries with the R.S. 2477 right-of-way."  *Id.* at 1389.  In Utah, that setback could be as much as 100 to 300 feet to allow for "road maintenance, temporary vehicle pull-off, and trailhead parking." *Id.* at 1391 92 (citing Statewide Wilderness Final Environmental Impact Statement, Volume 1 (Nov. 1990) (Pl. Trial Ex. 299)).  Thus, simultaneously with the Paria-Hackberry designation in the Federal Register and thereafter, the BLM acknowledged that Wilderness Study Areas were subject to prior

existing R.S. 2477 roads traversing through such areas.

**Minutes of the Board of Commissioners**

Besides contending the BLM inventory and Federal Register publication started the statute of limitations running for Swallow Park/Park Wash and North Swag, SUWA also contends the statute of limitations started to run on all the roads at least by June 3, 1991.  To support this contention, SUWA cites to the minutes taken at a Board of County Commissioners meeting.  The minutes state the following:

> Verlin Smith, Area Manager, and Mike Noel of the Kanab Office, met with the Commission regarding 2477 determination on county roads.  He explained that 2477 federal land use plans require a determination on county roads which state three items: (1) The date a road was constructed or use was established; (2) A statement that the road is public and has been used by the public for at least ten years and (3) The established width of the road or right of way if recorded.  Mr. Smith said he was glad to know the county was working on some of these roads such as Warm Creek which would be essential in the Andalex Coal mine proposal.  He said he would send a letter to the Commission requesting the information needed on all county 2477 roads.  Commissioner Lopeman assured him the county would respond.

Minutes of the Board of County Commissioners Meeting, June 3, 1991 (Dkt. No. 215, Ex. A at 16).  SUWA contends the minutes reflect "that the BLM formally notified Kane County . . . that it did not recognize the County's R.S. 2477 rights-of-way, and would not recognize them unless the County provided the BLM with certain information to prove the validity of its rights."  SUWA's Amicus Brief, at 4.

During this same period of time, however, Kane County continued to exercise control over roads it deemed Class B or D roads.  On August 12, 1991, the Commission received a report that a project had been completed on the Hancock road.  The Commission authorized the posting of signs

regarding speed limits, curves, and the distances to certain locations, including the Coral Pink Sand Dunes. Both the Hancock and Sand Dunes roads are at issue in this lawsuit. The Commission further provided direction about the Warm Creek road project including width, length, and road base materials. *See* Minutes of the Board of County Commissioners Meeting, Aug. 12, 1991 (Dkt. No. 215, Ex. A at 19).

**1996 Trespass Suit Against Kane County**

On December 6, 1993, Verlin Smith again met with the Commissioners. Gordon Staker from the BLM was also present. They requested that the Commissioners send a letter to the BLM anytime road work was going to be done on roads within the BLM areas. The Commissioners refused to enter into a written agreement on this issue, but agreed to talk with the BLM periodically. Minutes of the Board of County Commissioners Meeting, Dec. 6, 1993 (Dkt. No. 215, Ex. A at 22). Earlier that year, Kane County had realigned portions of Skutumpah, which resulted in the BLM issuing trespass notices against Kane County. *See* Complaint, at 4 5 (Case no. 2:96-cv-884) (Dkt. No. 216, Ex. A at 4 5). After Kane County allegedly intruded into wilderness study areas when grading other roads in 1996, the BLM filed suit against the County on October 18, 1996 for "trespass damages for unauthorized road grading." *Id.* at 3 4.

Notably, the suit did not challenge whether Kane County had an R.S. 2477 right-of-way for Skutumpah or the other roads. The BLM's position was that Kane County had trespassed on federal land regardless of whether the County had a right-of-way. Draft BLM R.S. 2477 Administrative Determinations, Kane County Claim (Dkt. No. 216, Ex. A, at 18). The district court disagreed and required the BLM to make a determination about whether the roads were an R.S. 2477 highway, and if so, the scope of the right-of-way. *Id.* at 18 19. Only then could it determine whether Kane

County had trespassed.  The BLM undertook this determination for the Swallow Park/Park Wash and North Swag roads as well because trespass notices also had been issued for them on a subsequent date.  *See id.* at 22.  Had the United States determined it held an adverse interest to Kane County's claimed rights-of-way, it could have simply asserted its claim to the whole area.  Rather than making such a declaration, however, it undertook an analysis to determine whether Kane County held a valid right to the area where the work had been performed.

On December 6, 1999, the BLM issued a draft report, which found that Kane County had an R.S. 2477 right-of-way for Skutumpah, but not for the new trespass sections.  The BLM also found that Swallow Park/Park Wash and North Swag were not R.S. 2477 public highways.  It issued its final report in January 2000, but the report was non-binding.  *S. Utah Wilderness Alliance v. BLM*, 425 F.3d 735, 757 (10th Cir. 2005) (hereinafter "*SUWA*") (stating "nothing in the terms of R.S. 2477 gives the BLM authority to make binding determinations on the validity of the rights of way granted thereunder, and we decline to infer such authority from silence when the statute creates no executive role for the BLM").

On June 25, 2001, the district court upheld the BLM's administrative determination and granted summary judgment in favor of the government.  *See* Order (Dkt. No 350 in Consolidated Case No. 2:96-cv-836).  Kane County appealed that decision.  On September 8, 2005, the Tenth Circuit reversed and remanded because the district court had not conducted a *de novo* review of the BLM's decision and the BLM had used too narrow of a standard when evaluating whether a route was an R.S. 2477 public highway.  On remand, the parties agreed to dismiss the trespass action.  *See* Order of Voluntary Dismissal of Actions Brought by the U.S. (Dkt. No. 456 in Consolidated Case No. 2:96-cv-836).

**The Wilderness Society Lawsuit**

One month before the BLM sued Kane County for trespass, President William J. Clinton established the Grand Staircase-Escalante National Monument (the "Monument") by Presidential Proclamation 6920.   The Proclamation directed the Secretary of the Interior to develop a management plan for the Monument, but expressly preserved all valid existing rights-of-way.  On July 29, 1999, the BLM published a proposed management plan.  64 Fed. Reg. 41129 (July 29, 1999).  On November 15, 1999, the final management plan was signed, with an effective date of February 29, 2000.  *See generally* 65 Fed. Reg. 10819.  The management plan specified what roads were open or closed to vehicular travel within the Monument.  It also addressed where off-road vehicles could be used.

In Summer 2003, Kane County removed some of the road signs erected by the BLM on roads claimed by the County to be R.S. 2477 roads.  In 2005, Kane County then erected its own signs on some of the roads, stating that the roads were open to off-road vehicles.  The Wilderness Society filed suit against Kane County in October 2005, alleging that the County's actions violated the Supremacy Clause.  The Wilderness Society sought to enjoin Kane County from adopting ordinances or posting signs on any road closed under the Monument Plan.  It further sought to compel Kane County to remove all County signs from federal land that conflicted with federal authority.

On May 16, 2008, the district court granted summary judgment in favor of The Wilderness Society because it found Kane County had violated the Supremacy Clause.  Additionally, the district court issued the following injunction:

> Kane County shall *not adopt ordinances*, *post signs*, or *otherwise purport to manage* or open to vehicle use any route or area closed to such use by governing federal land management plan or federal law.

. . . .

> Kane County is enjoined from any action described above relating to
> *any* route *unless and until Kane County proves in a court of law that
> it possesses a right-of-way to any such route and establishes the
> proper scope of such right-of-way in a court of law*.

*The Wilderness Soc'y v. Kane County*, 560 F. Supp. 2d 1147, 1166 (D. Utah 2008) (emphasis added),

rev'd by *Wilderness Soc'y v. Kane County*, 632 F.3d 1162 (10th Cir. 2011).  Notably, because Kane

County's right-of-way in Skutumpah had only been determined by an administrative action, rather

than in a court of law, the district court concluded that Kane County had no established right-of-way

in that road.  *Id.* at 1160 61.  Consequently, it could not "post signs or otherwise purport to manage"

that road.

**The Kempthorne Lawsuit**

While *The Wilderness Society* suit was being litigated, Kane County was involved in another

lawsuit with the United States.  Kane County filed that suit on November 14, 2005, alleging that the

Monument's Transportation Plan was contrary to law because it improperly sought to control the

County's rights-of-way.  Even roads designated as "open" under the Plan, such as Skutumpah, had

restrictions placed on them.  Hearing Tr., 6 7, 33 (Dkt. No. 102 in Case No. 2:05-cv-941).

The United States moved to dismiss the complaint.  During a hearing on the motion, held on

October 26, 2006,[3] the United States stated the following:

> It is our position that in order for plaintiffs to be able to bring their
> claims in this case, in order to have standing, they must have R.S.
> 2477 rights-of-way, and *the only way that we can determine if they,
> in fact, had those R.S. 2477 rights-of-way* that are violated by the

---

[3] The October 2006 hearing was before the Honorable Ted Stewart.  Shortly thereafter, he
recused from the case.  The United States then appeared before the Honorable Bruce S. Jenkins.

> monument management plan *is to actually adjudicate the validity of
> those claims*.

Hearing Tr., at 6 (Dkt. No. 102 in Case No. 2:05-cv-941) (emphasis added).  With regards to the

restrictions on Skutumpah, the United States stated:

> I really feel if they want to bring an action that pertains specifically
> to [Skutumpah], they should have brought an altogether different
> complaint, *a quiet title action* that seeks to determine the scope of
> those rights-of-way, and then determines whether the BLM has placed
> unreasonable restrictions upon those rights-of-way.

*Id.* at 10 (emphasis added).  The United States then cited to *The Wilderness Society* case to support

that until Kane County had proved its rights-of-way in a court of law, its "unproven assertions of

ownership do not create judicially enforceable rights.  *Id.* at 17.  The United States made this

statement despite acknowledging at the hearing "[t]here are other roads out there and the BLM

knows it." *Id.* at 36.  Nevertheless, the United States argued again that if Kane County believed the

BLM was interfering with the County's rights or scope of its rights-of-way, the County needed to

file a quiet title action.  *Id.* at 37  38.

On January 22, 2007, a second hearing was held on the motion to dismiss.  In that hearing,

the United States' position was that Kane County lacked standing to assert injury as a result of the

Monument's Transportation Plan because the County did not have any duly adjudicated rights-of-

way.  Hearing Tr., at 4  8 (Dkt. No. 61 in Case No. 2:05-cv-941).  Additionally, the United States

argued the County had improperly brought the action under the Administrative Procedures Act

because "plaintiff's challenges are inherently premised upon *threshold adjudications of title*." *Id.*

at 8 (emphasis added).  Another attorney for the United States then reiterated at the hearing:

> [T]hese claims at root implicate title, and the *Block v. North Dakota*
> case is clear that where the *claims for relief implicate title*, the only

> waiver of sovereign immunity for such claims    to bring such claims
> is the *Quiet Title Act*.

*Id.* at 13 (emphasis added).

When Kane County argued that the Monument's Transportation Plan did cause injury because it impacted its ability to maintain County roads, the United States asserted the County could maintain any road designated as "open" under the Plan.  In support of its contention, the United States cited to the following language of the Plan:

> With the exception of those segments listed below, open routes may be maintained *within the disturbed travel surface area* as of the date of this Plan.  No widening, passing lanes or other travel service upgrades could occur."

*Id.* at 61 (citing Monument Transportation Plan, at 47) (emphasis added).

The district court adopted the United States' arguments and dismissed Kane County's action.

*See generally Kane County v. Kempthorne*, 495 F. Supp. 2d 1143 (D. Utah 2007), aff'd by *Kane County v. Salazar*, 562 F.3d 1077 (10th Cir. 2009).  In so doing, the court stated:

> *It is for the Counties as R.S. 2477 claimants to step forward and pursue their unresolved R.S. 2477 claims in a proper forum*, demonstrating the historical existence of rights-of-way that they now assert to exist.  *In the meantime*, the Counties' assertion of R.S. 2477 claims by itself *cannot forestall the BLM implementation of the travel route system* formulated through its internal planning process.

*Id.* at 1157 (citation omitted) (emphasis added).  In further keeping with the United States' position, the court stated the property interests in question had to be brought under the Quiet Title Act.  *Id.* at 1159.  Thus, at the time Kane County filed its Amended Complaint, two district court decisions informed Kane County that it could only proceed on its claims through a quiet title action, and that until its rights were adjudicated in a court of law, it had no recognized R.S. 2477 rights-of-way.

**Kanab Field Office Management Plan**

Some of the roads at issue in this lawsuit are not located within the Monument. They nevertheless are still located on land managed by the BLM and are subject to the federal Kanab Field Office Record of Decision and Approved Management Plan (the "Kanab Field Plan"). The Kanab Field Plan was approved on October 31, 2008. *See* 73 Fed. Reg. 64,983 (Oct. 31, 2008); *see also* Declaration of Harry Barber, ¶ 2 (Mar. 9, 2009) (Dkt. No. 69, Ex. I) (hereinafter "Barber Decl."). The following roads are subject to that Plan: Hancock, Sand Dunes, part of Skutumpah, Bald Knoll, Old Leach Ranch, Mill Creek, Tenny Creek, Oak Canyon, and the four Cave Lake roads. The Plan states it "does not affect valid existing rights." Kanab Field Plan, at 17. It also states it "does not adjudicate, analyze, or otherwise determine the validity of claimed rights-of-way." *Id.*

Nevertheless, like the Monument Plan, the Kanab Field Plan regulates transportation. During development of the transportation management plan, the Kanab Field Office "conducted a complete route inventory in 2005 and 2006 to develop a route baseline for use in the planning process." Kanab Field Plan, Appendix 7, at A7-1. The Kanab Field Plan incorporates maps to show which routes are open, closed, or limited for motor vehicle use.

Map 9 shows *areas* that are "open to cross-country motorized vehicle use, closed to such use, and open to motorized vehicle use on designated routes." Barber Decl., ¶ 4 (Dkt. No. 69, Ex. I). Map 10 shows the specific *routes* that are open, closed, or limited for motorized vehicle use. *Id.* The Kanab Field Plan specifies the approved management plan "designat[es] all BLM lands as open, closed, or limited," and "[n]atural and cultural resource protection is . . . accomplished *by limiting motorized travel to the routes designated* in the [approved management plan]." Kanab Field Plan, at 29 (located at http://www.blm.gov/ut/st/en/fo/kanab/planning/rod_approved_rmp.html) (emphasis

added).  Because motorized travel is limited to designated routes, if a route is not shown then motorized travel is not permitted on that route.

Hancock, Sand Dunes, and Skutumpah are not listed on Map 10, which is the map that shows the designated routes.  Consequently, when Kane County filed its Amended Complaint in November 2008, and a motion to amend on January 5, 2009, the roads had the status of "closed."  After Kane County raised this issue, the BLM published additional maps on its website on approximately January 30, 2009.  *Id.* ¶ 8.  The purported purpose of these additional maps is to show open routes more clearly.  The additional maps show Hancock, Sand Dunes, and Skutumpah as open "Class 3 primary roads."  *Id.*  The "Class 3" designation is a unique term used by the Kanab Field Office to denote major thoroughfares.  Deposition of Harry Barber, 49 (Dkt. No. 84, Ex. F).  The term does not appear to be from any handbook or regulation.  *Id.* at 41  42.

In *The Wilderness Society*, the district court held the following:

> [A] resource management plan, plan revision, or plan amendment constitutes formal designation of off-road vehicle use areas.  Public notice of designation or redesignation shall be provided through the publication of the notice in the federal register [per] 43 C.F.R. § 8342.2(b). . . .  *And any change to the designation (i.e., plan amendment) must be made through the formal resource management planning process, which requires public notice and comment.*

560 F. Supp. 2d at 1161  62 (quotations and citation omitted) (emphasis added).  The Kanab Field Plan sets forth the planning process for that management plan.  It states that modifications to the route system may occur, but such modifications would require prior monitoring and a NEPA analysis.  Kanab Field Plan, at 19  20; *see also id.* at 42 ("Plan amendments and revision are

accomplished with public input and the appropriate level of environmental analysis.").[4]  No evidence has been presented to show the additional maps went through the formal resource management planning process.  Hence, even though the roads have remained open factually, an ambiguity exists regarding the legal status of these three roads.

**Title V Permits for Cave Lake Roads**

The four Cave Lake Roads are designated as "open" under the Kanab Field Plan. Consequently, the United States contends there is no case or controversy because it has not interfered with Kane County's rights-of-way.  Kane County asserts the contrary based on actions taken by the BLM in July 2008.  On July 25, 2008, the BLM issued Title V permits to a private entity for three of the Cave Lake Roads (K1070, K1075, and K1087).  *See* Def.'s Trial Exs. II, JJ, & KK.  In exchange for payment of rental fees to the BLM, the Title V permits granted the private entity a right-of-way over the roads and allowed for development of them.  *See id.* ¶¶ 3, 4(e), & 4(h).  The permits state they are "not intended to extinguish or limit any R.S. 2477 right-of-way that Kane County may have."  *Id.* ¶ 1.  Consequently, if a road were found to be an R.S. 2477 right-of-way by a court or the Secretary of the Interior, the permits state the "Title V grant would be superseded thereby and automatically terminate."  *Id.*  The three permits are in effect until December 31, 2037.

## ANALYSIS

## I.      STANDARD OF REVIEW

"A motion to dismiss for lack of subject matter jurisdiction" under Federal Rule of Civil

---

[4]  The Kanab Field Plan states an exception to these requirements if the BLM is merely correcting minor data errors or refining baseline information.  Kanab Field Plan, at 43.  The court concludes that adding three major thoroughfares to the Plan, without analysis of impact, does not constitute a minor change to data or baseline information.

Procedure 12(b)(1) may take one of two forms." *Rural Water Dist. No. 2 v. City of Glenpool*, 698 F.3d 1270, 1272 n.1 (10th Cir. 2012). One form is a "facial attack" that challenges jurisdiction based solely on the allegations of the complaint. *Id.* (citation omitted). The second form is a "factual attack" which "goes beyond the factual allegations of the complaint and presents evidence in the form of affidavits or otherwise to challenge the court's jurisdiction." *Id.* (quotations and citation omitted).

Both the United States and SUWA have presented evidence outside of the pleadings. Accordingly, they have made a "factual attack" on subject-matter jurisdiction. Under such circumstances, "a district court may not presume the truthfulness of the complaint's factual allegations." *Id.* (quotations and citation omitted). Instead, the court may review affidavits and other documents "to resolve disputed jurisdictional facts." *Id.* (quotations and citation omitted). Because part of the United States' challenge was made in its Trial Brief one week before trial and SUWA's challenge was made during post-trial briefing, the record before the court is more complete than what is typical for a jurisdictional challenge. *See Aragon v. United States*, 146 F.3d 819, 821 & n.2 (10th Cir. 1998) (resolving a jurisdictional challenge after a four-day bench trial was held on the jurisdictional issue).

## II.   UNITED STATES' QUIET TITLE ACT CHALLENGE

### A.   Adverse Claim Requirements

Before the United States may be sued, it must waive its sovereign immunity. The Quiet Title Act provides such a waiver. It states:

> The United States may be named as a party defendant in a civil action under this section to adjudicate a disputed title to real property in which the United States claims an interest.

28 U.S.C. § 2409a(a) (2012).  This provision requires that two elements be met before suit may be brought.

First, the United States must claim an interest in the real property at issue.  Each of the roads at issue in this case are subject either to the Monument Management Plan or the Kanab Field Office Management Plan.  The federal government has marked on the different plans whether the roads are open, closed, or limited to motor vehicle use.  It also has said in briefing that any improvements made to the roads would need to be done in consultation with them, based on the Tenth Circuit's *SUWA* decision.  Because the government has stated its interest in these roads and is exercising some oversight of them through the management plans, the first prong of the Quiet Title Act has been met.

Second, title to the property must be disputed.  If, however, "the United States disclaims all interest in the real property *or interest therein adverse to the plaintiff* at any time [before trial], . . . the jurisdiction of the district court shall cease."  *Id.* § 2409(e) (emphasis added).  The latter provision reinforces that the United States' waiver only applies when the United States claims an adverse interest to the plaintiff.  Recently, the Tenth Circuit stated,

> A government's claim of title to land isn't always and inherently inconsistent with . . . ownership of an easement over that land. Easements and servient estates can (and usually do) peaceably coexist.  To trigger the [Quiet Title Act] . . . there must be some claim, some assertion of an *adverse* interest.

*George v. United States*, 672 F.3d 942, 947 (10th Cir. 2012) (citations omitted) (emphasis added). Because the United States' ownership of federal land does not create an inherent conflict with Kane County's alleged rights-of-way, Kane County must show something more to sustain a Quiet Title Act.

The United States contends the second prong of the Act has not been met because it has not

asserted an adverse interest against Kane County for Hancock, Sand Dunes, Skutumpah, Tenny Creek, Oak Canyon, and the four Cave Lake Roads.  Specifically, the United States argues it has not "disputed that Kane County *may* hold R.S. 2477 rights-of-way" in the relevant roads, "nor interfered with the County's putative rights-of-way."  Mem. in Supp. of Renewed Mot. to Dismiss, 29 (Dkt. No. 69) (emphasis added).  Accordingly, it contends the court lacks jurisdiction because there is no "dispute or conflict in title."  It cites to *Alaska v. United States*, 201 F.3d 1154, 1160 (9th Cir. 2000), to support its contention.

*Alaska* involved a challenge to three river beds.  If a river bed was navigable on the date that Alaska obtained statehood in 1959, then Alaska owns the riverbed.  *Id.* at 1156.  If it was not navigable, then the United States owns it.  *Id.*  For the Black River, the United States had never taken a position as to whether it was navigable or not.  *Id.* at 1164.  It also had not disclaimed an interest in it.  Therefore, at some future date, it could assert an interest, but in the meantime there was no dispute about Alaska's ownership rights.  *Id.* at 1164 65.  Because there was no dispute about title, the Court concluded there was no subject matter jurisdiction, at that time, for the Black River. *Id.*

The United States' position about the Black River is distinguishable from its position in this case because the United States has claimed an interest in each of the roads.  Having claimed that interest, the portion of the *Alaska* ruling that is relevant is the part pertaining to the other two rivers at issue, namely the Kandik and Nation Rivers.  At one point, the United States asserted the rivers were not navigable, which meant it asserted an adverse claim against Alaska because the United States claimed it owned the rivers.  An administrative law judge found the opposite.  *Id.* at 1158.  The United States concluded it was not bound by that decision.  *Id.* at 1159.

Subsequently, the State of Alaska sued the United States under the Quiet Title Act to resolve

title for the Kandik and Nation Rivers.  Without resolution of that cloud on title, the state's "land and water resource management and its ability to provide public information" was impeded.  *Id.*  The United States moved to dismiss the complaint on the ground that it had not waived sovereign immunity because it was not asserting an adverse claim at the time the complaint was filed.  *Id.*  Specifically, "[t]he United States refused to admit or deny the State of Alaska's averment" that the Kandik and Nation Rivers were navigable on the theory that it was a question of law.  *Id.*

The Ninth Circuit found the United States had claimed an interest in the rivers.  *Id.* at 1160 61.  The fact that it had then changed its position before the court did not remove the cloud on title because it did not disclaim title, and therefore, had reserved the right to claim an adverse interest again.  *Id.* at 1161.  Indeed, the Court noted, "[i]f the state cannot get Quiet Title Act jurisdiction, then the potential claim will lurk over the shoulder of the state officials as they try to implement a coherent management plan for state waterways."  Then, any time a "management initiative . . . differed from federal policies, the federal government could revive its claim, and thereby prevent state regulation of the affected river."  *Id.*  The Court concluded this was not the intent of Congress when it provided legislation to quiet title.  In fact, Congress "would have accomplished very little indeed if the United States could obtain a dismissal of any state quiet title suit *by adopting a litigation position of refusing to state whether it asserted a claim or not*."  *Id.* (emphasis added).  The court not only finds this analysis persuasive, but directly in line with the United States' actions in this case.

**B.     Adverse Claims for the Roads at Issue**

       *I.     Skutumpah*

After the United States found, during an administrative proceeding, that Skutumpah is an

R.S. 2477 road, it represented to Judge Stewart and Judge Jenkins in this court that until a court held Skutumpah was an R.S. 2477 road, the United States could impose any type of restriction on Skutumpah it wanted to under its management plan.  It further contended *and persuaded the court* that if Kane County wanted to challenge its management plans, it had to bring a Quiet Title Action. Then, when Kane County followed that directive and filed this suit, the United States has the temerity to stand before this judge and contend it is not disputing Kane County's right-of-way, even though it also would not disclaim its interest in the right-of-way, and even though it had regulated that right-of-way under the Monument's Transportation Plan.  The United States' position is no more persuasive before this court than it was before the Ninth Circuit in *Alaska* because its actions have left a cloud on title to the Skutumpah road.  If the government's argument were accepted, Kane County would never be able to resolve its title issue, which per *Alaska*, runs contrary to the intent of Congress.

Moreover, at the time Kane County filed its claim for Skutumpah, it was enjoined from passing any ordinances, posting any signs, or in any way managing Skutumpah contrary to the Monument's Transportation Plan as a result of *The Wilderness Society* decision.  That decision was in effect until the Tenth Circuit issued an *en banc* decision in 2011 reversing it.  Notably, however, the decision was reversed based on prudential standing grounds.  The Court did not address the cloud on Kane County's title due to the Monument's Transportation Plan (or the Kanab Field Plan for that matter).  The court therefore concludes the United States has disputed title with respect to Skutumpah.

     *ii.*    *Hancock and Sand Dunes*

The United States' actions have also created a cloud on title for Hancock and Sand Dunes.

The BLM went through formal proceedings to approve and publish the Kanab Field Plan. Similar to notice provided in the Federal Register, the Kanab Field Plan provided notice about the BLM's position for roads in the area. Hancock and Sand Dunes are not on Map 10 of the Kanab Field Plan.[5] The legal ramifications of this action are that the roads are "closed," even though, as a factual matter, the BLM has taken no step to enforce the closure. Because Kane County does not have to wait until the United States *acts* to close a road, the designation in the Kanab Field Plan constituted notice of the adverse claim. *See George*, 672 F.3d at 947.

While the BLM has published new maps on its website, showing the roads as "open" under a novel Class 3 designation, that does not alter the official document. *See The Wilderness Society*, 560 F. Supp. 2d at 1161 62 (stating "any change to the designation (i.e., plan amendment) must be made through the formal resource management planning process, which requires public notice and comment."). Given the sea change that has occurred regarding R.S. 2477 roads, it would be unwise for a county to rely upon an unofficial (nonbinding) representation that a road will not be closed when an official (binding) document provides notice to the contrary.[6] Indeed, at any time, the United States can reverse its position and nullify the unofficial maps. The court therefore concludes a disputed title exists for Hancock and Sand Dunes because the unofficial maps do not remove the cloud on title created by the Kanab Field Plan.

     iii.    *Cave Lake Roads*

The United States' position on the Cave Lakes roads is equally problematic. The United

---

[5]  Skutumpah is also not on Map 10 even though a portion of the road falls under the area of the Kanab Field Plan. Therefore, this portion of the court's analysis also applies to Skutumpah.

[6]  The court has been provided no information that shows the United States has now amended the Kanab Field Plan through formal proceedings.

States did not move to dismiss Kane County's claims for the four Cave Lake roads.  Instead, it filed

its answer and denied they were R.S. 2477 roads and also denied the asserted scope of the roads.[7]

For more than three years, the parties litigated this case based on that position taken by the United

States.  Then, one week before trial, without moving to amend its answer, the United States asserted

it had not disputed title for these roads because the roads are "open" under the Kanab Field Plan.

The court rejects this contention for the same reasons stated by the Ninth Circuit in *Alaska*.

Moreover, the United States issued Title V permits for three of the Cave Lake roads.  The

permits state that if a court or the Secretary of the Interior ever holds that Kane County has an R.S.

2477 right-of-way for those roads, the Title V permit would cease.  This constitutes an implicit

acknowledgment that the scope of the permits directly conflicts with Kane County's asserted rights

in the road.  Otherwise, there would be no need to terminate the permits upon such a finding.  The

permits give a private entity the power to manage, develop, and modify the roads, as long as the

developer follows the standards for a subdivision road in Kane County.  Such a right conflicts with

Kane County's ability to manage its alleged rights-of-way and puts the United States in the position

of directing what occurs on those roads.  Having superimposed such Title V permits over three of

the Cave Lake roads, this is further grounds for finding a disputed title for those particular roads.

> iv.     *Tenny Creek and Oak Canyon*

Tenny Creek and Oak Canyon stand on a different footing from the other roads.  The United

States does not deny that it has clouded title with respect to Mill Creek, and consequently, it does

---

[7] "[A] statement that a party 'is without knowledge or information sufficient to form a belief as to the truth of an averment,' even standing alone, has the effect of a denial."  *United States v. Isaac*, No. 91-5830, 1992 U.S. App. LEXIS 16657, at *7 (6th Cir. 1992)  (quoting Fed. R. Civ. P. 8(b)(5)).

not challenge jurisdiction for that road.  It nevertheless challenges the court's jurisdiction with respect to Tenny Creek and Oak Canyon because it contends those roads are separate and distinct from Mill Creek.  Kane County asserts those branches have always been part of Mill Creek historically.  Consequently, by clouding Mill Creek's title, the United States has also clouded title to Tenny Creek and Oak Canyon.

When driving on scenic roads, there is often a branch or spur to pull off the road and park or view an area.  Likewise, there are at times emergency ramps on steep mountain roads to aid vehicles that experiencing brake failure or other mechanical problems.  Although they may have marker posts, one would not typically say that these branches or spurs constitute separate roads. Such is the nature of Tenny Creek and Oak Canyon.

Prior to 2005, Tenny Creek and Oak Canyon did not have separate markers on them.  Then, as part of a road project, Kane County designated Mill Creek as K4400, Tenny Creek as K4410, and Oak Canyon as K4405.  Declaration of Mark W. Habbeshaw, ¶ 8 (Docket No. 84, Ex. K). Nevertheless, Kane County presented evidence that, historically, these branches have been maintained as part of Mill Creek.  Deposition of Vane Campbell, 351 54, 361, 366 67 (Docket No. 84, Ex. E).  The evidence presented at trial did not controvert these facts.  Instead, it supported that Tenny Creek and Oak Canyon are used as areas to park off of Mill Creek when people go hunting. Trial Tr., at 665-67, 709-10, 1116 (L. Pratt).   The branches are also used to turn equipment around when Kane County is maintaining the roads.  In particular, Kane County's road maintenance crews have used the parking areas at the private property gates to maneuver its road maintenance equipment.  *Id.* at 1115 18.  In essence, the branches function as part of Mill Creek rather than as distinct, separate roads.

In *Spirit Lake Tribe v. North Dakota*, 262 F.3d 732, 744 (8th Cir. 2001), the Court addressed whether an adverse claim for one segment of property constituted an adverse claim for the remainder. The Court concluded "[t]he assertion by the United States of its claim to the specific tracts put the state on constructive notice of the United States' claim to the remainder of the riverbed tracts." *Id.* (quotations and citation omitted); *see also Park County Assoc. v. United States*, 626 F.2d 718, 721 n.6 (9th Cir. 1980) (concluding that an adverse claim to one portion of a right-of-way provided constructive notice for the "remainder of the purported right-of-way," especially since severance of the one portion would have injured the remaining portion).  Here, the United States has asserted an adverse claim for part of Mill Creek.  The court concludes, this constituted constructive notice of the United States' adverse claim to the remainder of Mill Creek, including its Tenny Creek and Oak Canyon segments.   Therefore, the court concludes there is disputed title for those two segments as well.

### C.    Dispute as to Scope

In addition to the disputes discussed above, it became apparent during the course of this litigation that significant disputes exist as to the scope of each of these roads.[8]   In *SUWA*, 425 F.3d at 748, the Tenth Circuit held if a right-of-way holder "undertake[s] any improvements in the road along its right of way, *beyond mere maintenance*, it must advise the federal land management agency of that work in advance."  (Emphasis added.)  The implication of this holding is that Kane County may conduct maintenance of its roads without first consulting with the BLM, as long as the maintenance occurs within the scope of its right-of-way.  The Monument's Transportation Plan is

---

[8]  "Scope" has different meanings.  The court's use of the word refers to the width of Kane County's alleged rights-of-way, including both the travel surface and the disturbed area width.

contrary to this holding because it seeks to limit maintenance activities to the road's travel surface, rather than the full width of Kane County's alleged rights-of-way.  Ample testimony was presented at trial to show that maintenance activities require an area greater than a road's travel surface.

 "Scope" is therefore a crucial component of an R.S. 2477 right-of-way because it sets the parameters in which a right-of-way holder may independently carry out its management activities. The fact that the United States has disputed the scope of Kane County's alleged rights-of-way throughout this litigation shows an additional and ongoing dispute as to title.

## III.   UNITED STATES' JURISDICTIONAL CHALLENGE

### A.   Case or Controversy Requirements

The United States also contends the court lacks subject matter jurisdiction for the nine roads discussed above because there is no case or controversy regarding them.  "Under Article III of the Constitution, federal courts may adjudicate only actual, ongoing cases or controversies." *Lewis v. Continental Bank Corp.*, 494 U.S. 472, 477 (1990) (citation omitted).  This means "a litigant must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision." *Id.* (citations omitted).  If a controversy is subject to "specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts," then a case or controversy exists. *Id.* (quotations and citation omitted).  It then must continue to exist "through all stages of federal judicial proceedings." *Id.*

The United States contends the standard for a case or controversy is set forth in *Washington County v. United States*, 903 F. Supp. 40 (D. Utah 1995).  In that case, Washington County sought to quiet title on the basis that "the United States claims, or may claim, the right to deny Washington

County its right to construct and maintain its R.S. 2477 rights-of-way." *Id.* at 41 (quotations and citation omitted). The United States asserted this allegation "fail[ed] to present a definite and concrete controversy." *Id.* (citations omitted). The court agreed. It noted the complaint lacked any assertions "that the United States has interfered with or denied the existence of any rights claimed by Washington County." *Id.* at 42. It then, without further analysis, concluded there was no case or controversy. *Id.*

To the extent the United States contends it must close a road or deny that a road is an R.S. 2477 road before there is a case or controversy, the court rejects that contention. Interference can occur by means other than road closure. A cloud on title affords a sufficient case or controversy under Article III. *United States v. West Virginia*, 295 U.S. 463, 471 (1935) (citation omitted). Moreover, Kane County seeks specific relief, as distinguished from an advisory opinion based on hypothetical facts. Its alleged injury can be redressed through a favorable judicial decision. The court therefore concludes a case or controversy exists for each of the nine roads.

## IV. SUWA'S JURISDICTIONAL CHALLENGE

### A. Quiet Title Act's Statute of Limitations

SUWA challenges subject matter jurisdiction based on the Quiet Title Act's statute of limitations. The Act's statute of limitations provision states:

> Any civil action under this section, *except for an action brought by a State*, shall be barred unless it is commenced within twelve years of the date upon which it accrued. Such action shall be deemed to have accrued on the date the plaintiff or his predecessor in interest knew or should have known of the claim of the United States.

*Id.* § 2409a(g) (emphasis added). Because the statute of limitations does not apply against the State of Utah, SUWA's challenge cannot defeat subject matter jurisdiction for the State. Rather, its

challenge can only apply to Kane County.

As stated above, to file a claim under the Quiet Title Act, the United States must have asserted an interest adverse to the plaintiff. Consequently, when the Act states the statute of limitations begins to run as soon as the plaintiff knew or should have known the United States claimed an interest in the property, it necessarily means that interest must be adverse. *See George*, 672 F.3d at 946 (stating the Quiet Title Act "is triggered by the government's claim . . . of some interest *adverse* to the plaintiff or her predecessor") (emphasis added, alteration omitted). To the extent SUWA contends the claimed interest does not have to be adverse to trigger the statute of limitations, the court rejects that contention.

Finally, when assessing whether a plaintiff knew or should have known about an adverse claim, courts have applied a "reasonableness" standard. Under that standard, "'[k]nowledge of the claim's full contours is not required. All that is necessary is a reasonable awareness that the Government claims some interest adverse to the plaintiff's.'" *Cheyenne Arapaho Tribes of Okla. v. United States*, 558 F.3d 592, 595 (D.C. Cir. 2009) (quoting *Knapp v. United States*, 636 F.2d 279, 283 (10th Cir. 1980)) (other citation omitted).

### B.     1991 Minutes of Board of Commissioners

SUWA contends the statute of limitations started to run in 1991 when the BLM's Area Manager informed Kane County about the necessary procedures to establish an R.S. 2477 road. According to SUWA, this was a warning that the BLM did not recognize Kane County's R.S. 2477 rights-of-way. The court disagrees.

On December 7, 1988, the Secretary of the Interior issued a memorandum stating "it is necessary in the proper management of Federal land to be able to recognize with some certainty the

existence, or lack thereof, of public highway grants obtained under R.S. 2477." Memorandum re Departmental Implementation of *SUWA*, 2 (Dkt. No. 69, Ex. A) (citing 1988 Hodel Policy Memorandum). Consequently, the Secretary "directed Interior land managing agencies to develop internal procedures for administratively recognizing those highways." *Id.*

This policy was in effect at the time Mr. Smith met with the Kane County Commissioners and informed them about the needed procedures to administratively recognize R.S. 2477 rights-of-way. The statement was not a declaration of adverse interest and is in keeping with the assertion that "[a] government's claim of title to land isn't always and inherently inconsistent with . . . ownership of an easement over that land." *George*, 672 F.3d at 947.

Moreover, the minutes are abbreviated and fail to reflect the full discussion that took place during that meeting. What is clear, though, is that Mr. Smith did not just discuss procedures with Kane County. He also expressed that he was "glad" the County was working on some of the roads because the work was essential. This expression conflicts with SUWA's assertion that the United States was claiming an interest adverse to Kane County. Furthermore, subsequent meeting minutes reflect that Kane County continued to make decisions about management and maintenance of its claimed roads following the meeting. This too shows the United States had not asserted management authority over Kane County's claimed rights-of-way. The court therefore concludes the minutes are insufficient to show the United States claimed an adverse interest in 1991.

## C.   Publications in the Federal Register of Wilderness Study Areas

SUWA's next challenge applies only to Swallow Park/Park Wash and North Swag roads. It asserts that when the BLM designated the Paria-Hackberry area as a wilderness study area, and published that decision in the Federal Register in 1980, the statute of limitations was triggered

because the designation meant the BLM claimed there were no public roads in the area.

"Congress has instructed that . . . publishing a regulation in the Federal Register must be considered sufficient to give notice of its contents to a person subject to or affected by it." *George*, 672 F.3d at 944 (citing 44 U.S.C. § 1507 (2012)) (quotations, alterations, and other citations omitted). Thus, publication in the Federal Register is sufficient notice to trigger the statute of limitations, but only on the issue addressed by that notice.

In *Park County*, one portion of a road traveled through a national forest. The national forest was established in September 1902. Later, when a Primitive Area was established in April 1932, a portion of the road traveled through that area. In 1962, the Forest Service posted a sign on the north end of the Primitive Area that stated, "Entering Absaroka Primitive Area  Motor Vehicles Prohibited  Gallatin National Forests." *Park County Assoc.*, 626 F.2d at 720. The Forest Service also placed a rock barrier in front of the sign. *Id.* at 721. The trial court concluded the statute of limitations started on that date because that is when an adverse claim to the right-of-way arose. *Id.*

Just as classifying an area as a national forest or primitive area was insufficient to trigger the statute of limitations in *Park County*, so too is the classification of a region as a wilderness study area. After the United States published notice about the Paria-Hackberry area in 1980, no effort was made by the United States to block road access. This is not surprising because the "wilderness study area" designation does not have the effect of nullifying R.S. 2477 rights-of-way. Indeed, when the inventory was done for the Paria-Hackberry area, no effort was made to determine whether the Swallow Park/Park Wash and North Swag roads were public ways because what constitutes a road under the Wilderness Act is not necessarily coterminous with the definition of a road under R.S. 2477.

-30-

Moreover, a nationwide BLM instruction memorandum directed that wilderness study areas be modified to accommodate R.S. 2477 rights-of-way when the boundary of a wilderness study area infringed upon that right-of-way. These facts show that while notice was published in the Federal Register about the Paria-Hackberry wilderness study area, that notice was not meant to inform rights-of-way holders that the United States was claiming an adverse interest. Instead, the United States, through its instruction memoranda, intended to work with R.S. 2447 rights-of-way holders.

Finally, the present Kanab Field Plan demonstrates that SUWA misstates the effect of a "wilderness study area" designation on motor vehicle use. The Kanab Field Plan designates areas and ways open to motor vehicle use within the Moquith Mountain and Parunuweap Canyon wilderness study areas. Kanab Field Plan, at 18; *see also id.* at 29 (discussing 1,000 acres open to off-highway vehicles within the Moquith Mountain wilderness study area); *id.* at 108 (stating "[u]se of the existing routes in the WSAs ('way' when located within WSAs) could continue as long as the use of these routes does not impair wilderness suitability" and Congress does not change designation to "wilderness"). The Plan also notes that some of the ways "are highly popular with many local residents and hunters who have traditionally enjoyed outings along those routes." *Id.* at 18. Because the designation of a "wilderness study area" does not preclude motor vehicle usage in that area, the 1980 Federal Register publication did not provide notice to Kane County that the United States was challenging its R.S. 2477 rights. The court therefore concludes the publication did not trigger the statute of limitations.

### D.    1996 Trespass Action

On October 18, 1996, the United States filed suit against Kane County for trespass. After

consolidation with other cases,[9] the suit asserted claims involving Skutumpah, Swallow Park/Park

Wash, and North Swag roads, but did not seek to controvert their status as R.S. 2477 rights-of-way.

SUWA contends the suit was sufficient to trigger the Quiet Title Act's statute of limitations.

Assuming without deciding that it did, the statute of limitations does not bar the present case.

Kane County filed an amended complaint, adding Skutumpah, Swallow Park/Park Wash, and

North Swag to this case in November 2008.[10]  It filed its motion for leave to amend, however, on

September 24, 2008, and attached the proposed amended complaint to its motion.  (*See* Dkt. No. 15,

Ex. 1.)

> A number of courts have addressed the situation where the petition
> for leave to amend the complaint has been filed prior to expiration of
> the statue of limitations, while the entry of the court order and the
> filing of the amended complaint have occurred after the limitations
> period has expired.  In such cases, the amended complaint is deemed
> filed within the limitations period.

*Mayes v. AT&T Info. Sys., Inc.*, 867 F.2d 1172, 1173 (8th Cir. 1989) (citing cases from various state

and federal jurisdictions).

The logic for this stems from the fact that when a plaintiff must seek leave to amend its

---

[9]  Of the consolidated cases, the earliest filed complaint was October 2, 1996.  *See S. Utah Wilderness Alliance v. BLM* (Case No. 2:96-cv-836); *United States v. Kane County* (Case No. 2:96-cv-884); *United States v. Garfield County* (Case No. 2:96-cv-885).

[10]  Although the United States' motion to dismiss seeks to dismiss Kane County's February 2009 complaint, for statute of limitations purposes, the court looks to when the claims for the relevant roads were first asserted based on the relation back doctrine.  *See Seaboard A.L. Railway v. Renn*, 241 U.S. 290, 293 (1916) (stating "[i]f the amendment merely expanded or amplified what was alleged in support of the cause of action already asserted, it related back to the commencement of the action and was not affected by the intervening lapse of time."); *see also Scarborough v. Principi*, 541 U.S. 401, 417  18, 421 (2004) (citing *Seaboard A.L. Railway* with approval and noting that the relation back doctrine existed well before "the Federal Rules became effective," which rules apply to the Government in the same manner as they apply to private parties).

complaint, "the plaintiff has no way of controlling or even predicting the time at which any permission to amend will be granted, and thus no ability to control the date on which the amended complaint itself may be filed." *Nett v. Bellucci*, 774 N.E.2d 130, 136 (Mass. 2002). Given the caseload of this court, it may be months before a motion is heard. Requiring plaintiffs to factor in this time would arbitrarily shorten the length of the statute of limitation. *Id.* Moreover, were plaintiffs required to file a parallel lawsuit to ensure their claims were preserved, this would be a waste of "scarce judicial resources and impose pointless litigation costs." *Id.* Accordingly, the court adopts this reasoning and concludes that Kane County filed its claims within twelve years of the 1996 trespass action.

It does bear noting, however, that when the United States filed its trespass action, it did not intend to challenge or address Kane County's alleged R.S. 2477 rights-of-way. Only when the court ordered them to undertake an analysis about the status of the roads, did it address the issue. Moreover, it was not until December 1999 that the United States found Kane County had no R.S. 2477 rights in Swallow Park/Park Wash, North Swag, and the trespass sections of Skutumpah. Therefore, one could well-argue that the statute of limitations did not begin to run until December 1999. Regardless of whether the statute of limitations was triggered in October 1996 or December 1999, though, Kane County filed its claims within the requisite twelve year period.

### E.    United States' Determination About the Statute of Limitations

Another factor of note is that when the United States initially filed its Answer in this case, it asserted a statute of limitations defense. After conducting discovery on the issue, however, the United States concluded that none of its actions was sufficient to show an adverse claim against Kane County. Hearing Tr., 16 17 (Jan. 26, 2012). It therefore stipulated that the statute of

limitations had not run.  *Id.*  Given that the United States is the very entity that was involved in these matters, and not SUWA, it is in a better position to determine if the United States asserted an adverse claim against Kane County.

## CONCLUSION

For the reasons stated above, the court concludes that the United States has asserted adverse claims under the Quiet Title Act, and thereby waived its sovereign immunity.  The court further concludes a case or controversy exists in this case, and that the statute of limitations had not run when Kane County asserted its claims.  Accordingly, the court concludes it has subject matter jurisdiction over each of the roads at issue in this case.

DATED this 20th day of March, 2013.

BY THE COURT:

Clark Waddoups
United States District Judge