IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| KANE COUNTY, UTAH (1)<br><br>Plaintiff,<br><br>vs.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | **MEMORANDUM DECISION,<br>FINDINGS OF FACT,<br>CONCLUSIONS OF LAW, and<br>ORDER**<br><br>Case No. 2:08-cv-00315<br><br>Judge Clark Waddoups |

## <u>TABLE OF CONTENTS</u>

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

FACTUAL AND PROCEDURAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

FINDINGS OF FACT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
      Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
      Road Identification and Classification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
      BLM's Historical Indexes - General Background . . . . . . . . . . . . . . . . . . . . . . . . . . 7
      Sand Dunes Road . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
      Scope of Sand Dunes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
      Hancock Road . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
      Scope of Hancock . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
      Bald Knoll and Old Leach Ranch . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
      Scope of Bald Knoll and Old Leach Ranch Roads . . . . . . . . . . . . . . . . . . . . . . . . 13
      Skutumpah . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
      Scope of Skutumpah . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
      Mill Creek Road - Generally . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
      Upper Mill Creek Segment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
      Oak Canyon Segment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
      Tenny Creek Segment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
      Maintenance of Entire Mill Creek Road and Spurs to Class B Standards . . . . . . . . . . . 34
      Swallow Park/Park Wash Road . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
      Reserved Lands Along Swallow Park/Park Wash . . . . . . . . . . . . . . . . . . . . . . . . . 43
      Scope of Swallow Park/Park Wash . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45
      North Swag Road . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46
      Scope of North Swag . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51
      Nipple Lake Road . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53
      Scope Nipple Lake Road . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57
      Cave Lakes Road . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58
      Scope of K1070 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61
      K1075 Cave Lakes Road . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61
      Scope of K1075 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64
      K1087 Cave Lakes Road . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64
      Scope of K1087 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67
      K1088 Cave Lakes Road . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67
      Scope of K1088 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69
      General Width of Rights-of-Way and Road Maintenance Issues . . . . . . . . . . . . . . . 69
      The Monument and Exchange Patent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

CONCLUSIONS OF LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

I.      JURISDICTION, VENUE, AND APPLICABLE LAW . . . . . . . . . . . . . . . . . . . 76

II.     BURDEN OF PROOF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

III.    CONGRESSIONAL INTENT RE: PUBLIC USERS UNDER
        AN R.S. 2477 GRANT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

        A.      Congressional Grant Versus Adverse Possession . . . . . . . . . . . . . . . . . 80

        B.      Nature of the Road . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

IV.     STATUS OF REMAINING ROADS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

        A.      Upper Mill Creek, Oak Canyon, Tenny Creek . . . . . . . . . . . . . . . . . . . 87

        B.      Swallow Park/Park Wash . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

        C.      North Swag . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

        D.      Nipple Lake . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93

        E.      Four Cave Lake Roads . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

                i.      *K1070* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

                ii.     *K1075* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

                iii.    *K1087 and K1088* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

IV.     SITLA PARCELS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

V.      PUBLIC WATER RESERVE 107 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101

VI.     THE REALIGNMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105

VII.    SCOPE OF THE RIGHTS-OF-WAY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 109

        A.      Ripeness . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 109

        B.      Road Width . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 111

                i.      *Scope of Sand Dunes, Hancock, and Skutumpah* . . . . . . . . . . 112

ii.     *Scope of Mill Creek, Bald Knoll, and Old Leach Ranch Road* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 113

iii.    *Scope of Swallow Park/Park Wash, North Swag, and Nipple Lake Roads* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114

iv.     *Scope of Cave Lake K1070 Road* . . . . . . . . . . . . . . . . . . . . . . . . 116

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 116

ORDER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 117

## INTRODUCTION

"By its express terms, R.S. § 2477 grants a right-of-way, a species of easement across the public lands of the United States." *United States v. Garfield County*, 122 F. Supp. 2d 1201, 1242 (D. Utah 2000) (citing *Sierra Club v. Hodel*, 848 F.2d 1068, 1083 (10th Cir. 1988)).  Based on R.S. 2477, plaintiff Kane County, Utah claims ownership of certain "public highway rights-of-way crossing lands owned by the United States of America."  First Amended Complaint, ¶ 2 (Dkt. No. 65).  Through this action, it seeks to quiet title against the United States pursuant to the Quiet Title Act, 28 U.S.C. § 2409a.  The State of Utah (the "State"), as an intervenor-plaintiff, asserts it is a joint owner with Kane County of the alleged public highway rights-of-way.  Intervenor's Complaint to Quiet Title, ¶ 5 (Dkt. No. 113).

The Quiet Title Act waives the sovereign immunity of the United States to allow claimants to confirm their existing title interests on lands owned by the United States.  Most cases brought under the Quiet Title Act involve fee title claims to specific parcels of land.  Claims to rights-of-way, however, are unique because they involve non-possessory interests.  Consequently, a holder of a right-of-way does not have a right of possession, only a right of use.  *Kapp v. Norfolk Southern Ry.*, 350 F. Supp. 2d 597, 606 (M.D. Pa. 2004) (citations omitted).  Nevertheless, the Quiet Title Act allows the court to quiet title to non-possessory interests on the lands of the United States, including easements and rights-of-way.  Kane County and the State (collectively, "Plaintiffs") seek to prove the existence of fifteen public highway rights-of-way, otherwise termed "roads."

The court traveled all of the roads at issue with counsel and representatives of the parties during a two-day site visit in December of 2010.   This site visit included numerous stops at locations chosen by both parties and the court was able to observe the roads, their destinations, and

the topography of the land they cross.  This case was then tried to the court on August 15–19, August 24–26, and August 29, 2011.  Kane County was represented by Shawn T. Welch and Ryan R. Jibson.  The State was represented by Harry H. Souvall and Anthony L. Rampton.  The United States was represented by John K. Mangum, Romney S. Philpott, Joanna K. Brinkman, and Thomas K. Snodgrass.

The court heard the testimony of both fact and expert witnesses, received into evidence numerous exhibits, and heard the arguments of counsel for the parties.  The parties submitted proposed finding of fact and conclusions of law on December 23, 2011 and concluded their post-trial briefing on January 17, 2012.  The court then heard final oral argument on January 26, 2012.  Based on the evidence presented, the court enters its findings of fact and conclusions of law below.

## FACTUAL AND PROCEDURAL BACKGROUND

Kane County filed this action against the United States under the Quiet Title Act, seeking to quiet title to fifteen roads that traverse federal land.[1]  Some of the roads at issue are located within the Grand Staircase-Escalante National Monument and are subject to the federal Grand Staircase-Escalante National Monument Management Plan.  They are the roads referred to by the parties as Swallow Park/Park Wash, North Swag, Nipple Lake, and a portion of Skutumpah.  The remaining roads are located outside of the Monument, but on land managed by the Bureau of Land Management ("BLM"), and are subject to the federal Kanab Field Office Management Plan.  They are the roads referred to by the parties as Sand Dunes, Hancock, Bald Knoll, Old Leach Ranch, Mill

---

[1]  Kane County asserts only twelve roads are at issue.  Two of the roads have spurs or segments that are named differently from the main road. For ease of reference, the court refers to them as roads, even though the court concludes they are merely a segment of the main road.

Creek, two spurs off of Mill Creek called Tenny Creek and Oak Canyon, four Cave Lake roads, and the remaining portion of Skutumpah.

Although all of the roads traverse federal land, Kane County claims ownership of these roads based on Section 8 of the Act of 1866, which states:

> *And be it further enacted*, That the right of way for the construction of highways over public lands, not reserved for public uses, is hereby granted.

Act of July 26, 1866, ch. 262, § 8, 14 Stat. 251, 253, *codified* at 43 U.S.C. § 932. Because at one point this law was codified as Revised Statute 2477, roads created under this law are commonly referred to as R.S. 2477 roads. Consequently, throughout this decision, the "Act of 1866" shall also be referred to as "R.S. 2477."

The Act of 1866 remained in effect until Congress repealed it on October 21, 1976. *See* Federal Land Policy and Management Act of 1976 ("FLPMA"), Pub. L. No. 94-579 § 706(a), 90 Stat. 2793. Although the Act of 1866 was repealed in 1976, any valid rights-of way existing at the time of repeal were grandfathered in and deemed to continue in effect.

Early in this case, the United States filed a motion to dismiss certain claims. On October 30, 2009, the court heard oral argument on the United States' motion. The United States asserted that claims involving five of the roads at issue had to be dismissed because the United States had not asserted an adverse claim or disputed title. Absent an adverse claim or disputed title, there can be no case or controversy, nor a waiver of sovereign immunity under the Quiet Title Act. Accordingly, the United States asserted the court lacked subject-matter jurisdiction to hear claims involving the Skutumpah, Tenny Creek, Oak Canyon, Sand Dunes, and Hancock roads. The court held that subject-matter jurisdiction did exist because there was sufficient evidence the United States had

-3-

disputed title or the scope of Kane County's asserted rights-of-way for these roads, and had made adverse claims.   The court issued its ruling from the bench, but stated it would memorialize its ruling in a later decision.  Issued concurrently with these Findings of Fact and Conclusions of Law is the court's memorandum decision addressing this jurisdictional issue.[2]

The concurrent memorandum decision also addresses another jurisdictional issue raised by the Southern Utah Wilderness Alliance (the "SUWA").  After the trial, SUWA submitted an amicus brief that challenged jurisdiction based on the Quiet Title Act's statute of limitations.  Because the Quiet Title Act constitutes a waiver of sovereign immunity, its requirements must be complied with strictly.  Consequently, unlike most cases, the statute of limitations is a jurisdictional bar rather than merely an affirmative defense.  Before trial, the United States conceded that the statute of limitations had been met.  Nevertheless, the court has reviewed the new allegations raised by SUWA, and for the reasons stated in the concurrent memorandum decision, has concluded that Kane County did file its claims within the applicable twelve-year time frame.

Later in the litigation, Kane County filed a motion for summary judgment.  On June 21, 2011, the court issued a memorandum decision that granted in part and denied in part Kane County's motion.  In its motion, Kane County sought to quiet title to all roads at issue in this case with the exception of the four Cave Lake roads.[3]  The United States conceded title, but not scope, for Hancock; Sand Dunes; Bald Knoll, except for the Old Leach Ranch segment; and parts of

---

[2]  The United States later disputed the court's jurisdiction over the four Cave Lake roads for lack of case or controversy, lack of standing, and lack of a waiver of sovereign immunity under the Quiet Title Act.  *See* Final Pretrial Order, at 2 (Dkt. No. 174).  This jurisdictional issue is likewise addressed in the concurrent memorandum decision.

[3]  Kane County reserved for trial whether the Cave Lake roads are R.S. 2477 roads.

Skutumpah and Mill Creek.  United States' Partial Response to Mot. for S. Jdmt, 37 (Dkt. No. 129),

United States' Remaining Response, 66, 71 (Dkt. No. 134).

The court quieted title in favor of Kane County on the following roads: Sand Dunes, Hancock, Bald Knoll, and Old Leach Ranch.  *See Kane County v. United States*, No. 2:08-cv-315, 2011 U.S. Dist. LEXIS 66218, at *26 (D. Utah June 21, 2011).  It further quieted title in favor of Kane County for all parts of Skutumpah, except for discrete sections involved in a 1996 trespass action (hereinafter "The Realignments").  *Id.* at *26–27.  The court also quieted title in favor of Kane County for the following parts of Mill Creek:  (1) Section 5, Township 41 South, Range 4.5 West, S.L.M.; and (2) Sections 17, 20 and 29, Township 40 South, Range 4.5 West. S.L.M.  *Id.* at *27.  Although the court held that Kane County had a vested interest in each of these roads, it reserved for trial the scope of the rights-of-way because that was a disputed issue.  *Id.* at *28.  It also reserved for trial whether Kane County had an R.S. 2477 right-of-way over The Realignment sections of Skutumpah and the remaining segments of Mill Creek.  *Id.* at *27–28.

The court denied summary judgment on Swallow Park/Park Wash, North Swag, and Nipple Lake, and reserved for trial whether they are R.S. 2477 roads.  *Id.* at *28–29.  It also reserved for trial issues pertaining to Public Water Reserve 107 ("PWR 107") and former School and Institutional Trust Lands parcels ("SITLA Parcels") located along lower Mill Creek and Swallow Park/Park Wash.[4]  *Id.* at *24–25, 28–29.  Accordingly, the following Findings of Fact and Conclusions of Law address these issues, as well as whether the Cave Lake roads are R.S. 2477 roads.

---

[4]  Skutumpah also traverses four former SITLA Parcels.  The court, however, quieted title in favor of Kane County for each of these parcels.  *Kane County*, 2011 U.S. Dist. LEXIS 66218, at *24.

## FINDINGS OF FACT

The court enters these findings of fact based on clear and convincing evidence.  In assessing the credibility of the witnesses, the court has considered the source and basis of each witness's knowledge; the ability of each witness to observe; the strength of the witness's memory; each witness's interest, if any, in the outcome of the litigation; the relationship of each witness to either side in the case; and the extent to which each witness's testimony is either supported or contradicted by other evidence presented at trial.

**Parties**

1.       Plaintiff Kane County is a Utah political subdivision of the State of Utah.  Final Pretrial Order, at 26, ¶ 1 (Aug. 15, 2011) (Dkt. No. 174) (hereinafter "Pretrial Order").

2.       Plaintiff-Intervenor the State of Utah is one of fifty sovereign states forming the United States of America, having been admitted to the Union on January 4, 1896.  Pretrial Order, at 26, ¶ 2.

3.       Defendant the United States of America ("United States") is the federal government and owns the lands crossed by the roads in this action.  Pretrial Order, at 26, ¶ 3.

**Road Identification and Classification**

4.       Kane County has developed a numbering system to identify the various roads in the county.  Each road numbered by Kane County begins with a letter "K."  Trial Transcript ("Trial Tr."), at 1005 (L. Pratt).  The roads at issue in this case are named and numbered as follows: K1000 Sand Dunes; K1100 Hancock; K3935 Bald Knoll; K3930A Old Leach Ranch; K5000 Skutumpah; K4400 Mill Creek; K4405 Oak Canyon; K4410 Tenny Creek; K4360 Swallow Park/Park Wash;

K4370 North Swag; K4290 Nipple Lake; and the four Cave Lake roads numbered K1070, K1075, K1087, and K1088.

5.       The Utah Highway Jurisdiction and Classification Act, Utah Code Ann. §§ 72-3-101, *et seq.*, defines four road classifications under state law, two of which are relevant to this action. Generally, "Class B" roads are designated county roads located outside of cities or towns and the county is required to construct and maintain Class B roads for passenger vehicle travel, using allocated transportation funds.  *See id.* § 72-3-103; Trial Tr., at 668 (V. Campbell).  A "Class D" road is any road, way, or other land surface route that has been or is established by use or constructed and maintained for use by the public in vehicles with four or more wheels.  *See* Utah Code Ann. § 72-3-105.

6.       Kane County asserts it has classified and maintained Sand Dunes, Hancock, Bald Knoll, Skutumpah, Mill Creek, Oak Canyon, Tenny Creek, and one mile of Swallow Park/Park Wash roads as Class B roads.  It asserts the remaining roads at issue are Class D roads.

**BLM's Historical Indexes - General Background**

7.       As the court discusses the roads at issue in this case, at times it will refer to BLM Historical Indexes.  Much like a county recorder's tract index records documented actions affecting private land, the BLM maintains a Historical Index for each township to document BLM actions affecting the public land.  A Historical Index contains entries showing the specific section and division of the land affected, along with the type of BLM action, such as a land reservation, patent, lease or permit.  Trial Tr., at 949–50 (J. Harja).  It further notes the date of the action and any subsequent cancellation of the action.  *Id.*

8.      R.S. 2477 rights-of-way are not documented in the Historical Indexes because R.S. 2477 rights-of-way vest without any entry, filing, application, or patent issued by the BLM.   The Historical Indexes are relevant nonetheless because they show if the lands traversed by the roads at issue in this case were reserved at the relevant time.  If the lands were reserved, then no right-of-way grant under R.S. 2477 could operate on them.  With that background, the court now turns to the specific roads at issue.

**Sand Dunes Road**

9.      The K1000 Sand Dunes road ("Sand Dunes") is located in southwestern Kane County, Utah.  Pretrial Order, at 29, ¶ 18.

10.      The Sand Dunes road commences at the southern border of the State of Utah near the southwest quarter of the northwest quarter (SW¼ NW¼) of Section 9, Township 44 South, Range 9 West, S.L.M., and proceeds approximately 20 miles northeasterly to its intersection with Utah State Highway 89 in the northwest quarter of the southeast quarter (NW¼ SE¼) of Section 5, Township 42 South, Range 7 West, S.L.M.  *See* Pretrial Order, at 29, ¶ 18.

11.      The exhibits attached to Plaintiffs' amended complaint inaccurately describe a portion of the Sand Dunes road, and Plaintiffs moved to substitute an exhibit providing an accurate portrayal of the road's course.  *See* Pretrial Order, at 30.  At trial, Plaintiffs' Exhibit 7 was admitted that provides global positioning data for Sand Dunes.  In its post-trial briefing, Plaintiffs attached the corrected version of Plaintiffs' Exhibit 7, which has not been opposed by the United States.  *See* Proposed Order & Exhibits (Dkt. Nos. 222 & 223).   The court adopts the corrected version of Plaintiffs' Exhibit 7.  Accordingly, the general course of Sand Dunes, as claimed by Kane County in this litigation, is shown on the map and centerline data in Plaintiffs' Exhibit 7 as corrected.

-8-

12.     The Sand Dunes road crosses private and public land within Townships 41, 42, and 43 South, Ranges 7, 8, and 9 West, S.L.M.  Plaintiffs do not seek to quiet title in this litigation to the portions of the road located over private land or SITLA land.  Pretrial Order, at 29.

13.     In the court's prior memorandum decision, title to the Sand Dunes road was quieted in favor of Plaintiffs as an R.S. 2477 public highway right-of-way, but the issue of its scope was reserved for trial.  *Kane County*, 2011 U.S. Dist. LEXIS 66218, at *28; Pretrial Order, at 8.

**Scope of Sand Dunes**

14.     Vane Campbell testified about maintenance of the Sand Dunes road.  Except for a two-year absence from 1970 to 1972, Mr. Campbell worked for the Kane County Road Department from 1967 until 1992, first as an employee and later as the Road Department Supervisor.  Trial Tr., at 644–46.  Based on Mr. Campbell's position, work records, and testimony at trial, the court finds that Mr. Campbell had significant knowledge about Kane County's road maintenance efforts on Sand Dunes and the other Class B roads at issue in this case.

15.     Mr. Campbell testified that Kane County oiled (*i.e.*, paved) the surface of the Sand Dunes road after he began working for Kane County in 1967.  Trial Tr., at 672; *see also* Exhibit 224-A (classifying Sand Dunes as a paved road).  Prior to that, the Sand Dunes road was a gravel road.  Trial Tr., at 672.

16.     While paving the Sand Dunes road, Kane County realigned the traveling course of the road in two locations to improve sight and visibility distances in the first location and to reduce the grade of the road in the second location.  Trial Tr., at 672–73 (V. Campbell).  Mr. Campbell testified that the traveling course of the road was realigned approximately one-half of a mile in distance.  *Id.* at 673.

17.     Louis Pratt testified that the Sand Dunes road was realigned approximately 200 or 300 feet from its old traveling course, and this realignment has left an island of land that is still visible between the old course and its present course.  Trial Tr., at 1163–65; Pl. Ex. 280.

18.     Sometimes the shoulder of the Sand Dunes road erodes away, causing the pavement to break off, and Kane County has to pull fill material out of the borrow ditch to build up the shoulder of the road to support the travel surface.  Trial Tr., at 1153–54 (L. Pratt).  The shoulder also provides a clear zone, which aids in road safety, and a flat surface to support vehicles fading off the side.  *Id.*

19.     Additionally, some of the culverts along the Sand Dunes road regularly fill with sand, requiring Kane County to clear the exit areas with a front-end loader.  Trial Tr., at 1152–53 (L. Pratt).

20.     To keep vegetation from obscuring the sides of the Sand Dunes road, Kane County regularly clears ("brushes") the vegetation out.  Trial Tr., at 1148–50, 1152 (L. Pratt); Pl. Ex. 281. Because Sand Dunes has a posted speed limit of 45 miles per hour, the county must maintain at least a 6-foot clear zone for safety.  Trial Tr., at 1155.  At the northern end of Sand Dunes, where there are two access points connecting to US Highway 89, and proceeding south for a couple of miles, the vegetation clearance reaches as wide as 80 to 92 feet.  *Id.* at 1152, 1220.

21.     The pavement on the Sand Dunes road is generally 24 to 26 feet in width.  Trial Tr., at 1152 (L. Pratt).  With this type of a paved road, Kane County attempts to keep the pavement at 24 feet in width.  *Id.* at 1166; Pl. Ex. 281.  At some locations, however, the paved surface is

approximately 30 feet.  Trial Tr., at 1219.  Its estimated total disturbed area width is 60 feet, except

for its north end.[5]  *Id.*; *see also* Ex. 224-A.

22.     During the court's site visit, the Sand Dunes road appeared to be a general paved road

and it was apparent that vegetation had been cleared away from the sides of the road.

**Hancock Road**

23.     The K1100 Hancock road ("Hancock") is located in southwestern Kane County,

Utah. Pretrial Order, at 30, ¶ 20.

24.     The Hancock road commences at its western intersection with the Sand Dunes road

in the southeast quarter of the northeast quarter (SE¼ NE¼) of Section 14, Township 43 South,

Range 8 West, S.L.M., and  travels northeasterly approximately 9.5 miles to its intersection with

Utah State Highway 89 in the southeast quarter of the northwest quarter (SE¼ NW¼) of Section 19,

Township 42 South, Range 6 West, S.L.M.  Pretrial Order, at 30; Pl. Ex. 8.

_____

[5]  At trial, the United States presented the testimony of Julie Kerr Gines, who estimated the disturbed area width for the roads at issue in this case.  Plaintiffs objected to the methodology used by Ms. Gines.  The court agrees that the methodology lacks sufficient precision to establish the disturbed area width of these roads.  *See* Trial Tr., at 1612–30 (examining the methodology used by Ms. Gines).  Moreover, some of Ms. Gines' estimated widths lack persuasiveness due to other facts that are known.  For example, on Sand Dunes, Ms. Gines estimated the widest area of disturbance was 31 feet even though the paved travel surface extends almost 30 feet in some places.  Trial Tr., at 1573.  On Hancock, Ms. Gines estimated the widest area of disturbance was 32 feet, even though the paved travel surface extends 28 feet at some locations.  *Id.* at 1574.  Ms. Gines' estimates do not even allow for the minimum 6-foot clear zone that is required for safety, nor do they recognize borrow ditches and shoulders.  As for the other roads, Ms. Gines estimates are closer to those provided by Plaintiffs.  (For Bald Knoll, Tenny Creek, Swallow Park/Park Wash, and North Swag, Ms. Gines' estimated widths actually exceed those stated by Plaintiffs.)  Thus, they provide little added information.  For each of these reasons, the court does not include Ms. Gines' testimony in its decision.

25.     The general course of the Hancock road is shown on the map and centerline data in Plaintiffs' Exhibit No. 8. The parties do not dispute the accuracy of the map or data. *See* Pretrial Order, at 30.

26.     In the court's prior memorandum decision, title to the Hancock road was quieted in favor of Plaintiffs as an R.S. 2477 public highway right-of-way, but the issue of its scope was reserved for trial. *Kane County*, 2011 U.S. Dist. LEXIS 66218, at *28; Pretrial Order, at 30, ¶ 20.

**Scope of Hancock**

27.     Vane Campbell testified that Kane County oiled (i.e., paved) the Hancock road in the early 1990s. Trial Tr., at 674; *see also* Exhibit 224-A (classifying Hancock as a paved road)

28.     In upgrading the road from gravel to pavement, Kane County realigned the traveling course of the Hancock road by up to 100 feet in order to keep it off of the top of a hill and to reduce the grade. Trial Tr., at 674–75 (V. Campbell).

29.     Kane County paved the Hancock road to a width of 24 feet. Trial Tr., at 1166 (L. Pratt); Pl. Ex. 286.  Although Kane County attempts to keep the paved width at 24 feet, in some locations the paved width of Hancock is 28 feet.  *Id.* at 1166, 1220–21.  Kane County clears the brush along this road out about 46 to 59 feet.  *Id.* at 1166.  Kane County clears the brush and vegetation away from the travel surface of Hancock to keep a visibility and clear zone.  *Id*. at 1167. Just to do normal maintenance, a 40-foot width is necessary.  *Id.* at 1172.

30.     During the court's site visit in December of 2010, the Hancock road appeared to be a general paved road crossing moderate topography and it was apparent that vegetation had been cleared away from the sides of the road along most sections.

**Bald Knoll and Old Leach Ranch**

31.     The K3935 Bald Knoll road ("Bald Knoll") and K3930 Old Leach Ranch road ("Old Leach Ranch") are located in western Kane County, Utah.  Pretrial Order, at 29, ¶ 16.

32.     Old Leach Ranch commences in the northeast quarter of the northwest quarter (NE¼ NW¼) of Section 3, Township 41 South, Range 5 West, S.L.M., at the boundary of private land and proceeds approximately 0.4 miles northwesterly across public lands to an intersection with Bald Knoll in the southeast quarter of the southwest quarter (SE¼ SW¼) of Section 34, Township 40 South, Range 5 West, S.L.M.  From this intersection, the Bald Knoll road proceeds approximately 9 miles north and east to its end at the intersection with Mill Creek in the northeast quarter of the northeast quarter (NE¼ NE¼) of Section 17, Township 40 South, Range 4.5 West, S.L.M.  *See generally* Pl. Ex. 5.

33.     The general course of the Bald Knoll road and Old Leach Ranch segment, as claimed by Plaintiffs in this litigation, is  shown on the map and centerline data in Plaintiffs' Exhibit 5, and its Exhibit 7 to Kane County's amended complaint, respectively. The parties do not dispute the accuracy of the map or data.  *See* Pretrial Order, at 29.

34.     In the court's prior memorandum decision, title to Bald Knoll and Old Leach Ranch roads was quieted in favor of Kane County as an R.S. 2477 public highway right-of-way.  *Kane County*, 2011 U.S. Dist. LEXIS 66218, at *28.  The court reserved for trial the scope of the right-of-way.

**Scope of Bald Knoll and Old Leach Ranch Roads**

35.     Referencing entries in his daily logs, including an entry dated May 14, 1973, Vane Campbell testified that he maintained the Bald Knoll road as a Class B road while working for the

Kane County road department. Trial Tr., at 686–89; Pl. Ex. 163.[6] Mr. Campbell further testified that from 1967 through 1992, he tried to maintain the travel surface from 14 to 24 feet wide on all Class B roads. Trial Tr., at 655–56.

36.     Although maintained to Class B standards, Bald Knoll is prone to washouts, particularly where it crosses the Thompson Creek (or Thompson Wash). Trial Tr., at 614–16 (B. Owens).

37.     The BLM has granted Kane County two Title V permits for these roads. Trial Tr., at 1035–36, 1038–40 (L. Pratt); Pl. Exs. 86 & 87. One permit allowed for realignment of the Old Leach Ranch road so it could bypasses private property. The second permit allowed for realignment of Bald Knoll where it intersects with Mill Creek. Bald Knoll at that location was steep and presented a dangerous condition for heavy haul trucks that were using the road.[7] Trial Tr., at 1261 (L. Pratt); Trial Tr., at 1294–95 (M. Habbeshaw). The second permit authorizes a 66-foot right-of-way, but limits the travel surface to 22.5 feet wide. *Id.* at 1261–62; Def. Ex. JJJJJ.

38.     Louis Pratt started working for the Kane County Road Department in 1986, and served as the Kane County Road Department Supervisor from 1996 until 2006 when he became Kane County's Transportation/Graphical Information System (GIS) Director, a position he still holds. Trial Tr., at 1002–05.

---

[6] The pages for Exhibit 163 do not appear to be numbered. The date of the entry, however, helps to identify the correct page. If the cover page is not counted, the referenced entry appears on page 136.

[7] Brent Robinson had a permit to remove burnt shale from an area near Bald Knoll. Trial Tr., at 1293 (M. Habbeshaw). The trucks were hauling shale for that business.

39. Mr. Pratt was part of a Kane County project that obtained GPS data for claimed county roads. *See generally* Trial Tr., at 1006–12 (L. Pratt). As part of that process, county employees (including Mr. Pratt) drove routes with GPS equipment to record centerline data and other GPS points such as culverts, signs, and cattle guards. The individuals also recorded the approximate width of the travel surfaces, the approximate total width of the disturbed area, and the surface material. *Id.* at 1010; 1207; 1210–11.

40. Based on the GPS project, Mr. Pratt estimated the travel surface width for Bald Knoll road ranged from 16 to 20 feet, and that the total width of the prior disturbed area ranged from 20 to 22 feet. Trial Tr., at 1218; *see also* Pl. Ex. 224-A.

41. The surface of the Bald Knoll road was classified as native soil. Pl. Ex. 224-A. Mr. Pratt assigned a road category rating of 3, which indicated that it needed a smaller width for maintenance than roads with a higher rating like Hancock road, which was assigned category 4 and 5 ratings. Trial Tr., at 1232–33.

42. Mr. Pratt also addressed the Old Leach Ranch road (which Plaintiffs identify as a part of the Bald Knoll road). This route has not been used since 1980 when the nearby Title V grant discussed above was accepted. Trial Tr., at 1225. As the court observed itself on a site visit in December 2010, the former course of the route is barely discernible, with only slight differences in the vegetation height now covering the route and surrounding areas. *Id.* at 1225.

43. Mr. Pratt estimated the Old Leach Ranch road's travel surface was approximately 14 feet wide. Because the road has largely been reclaimed, it is difficult to determine if the 14-foot width also included areas of disturbance. Trial Tr., at 1225; Pl. Ex. 224-A.

44.     During the court's site visit in December of 2010, the Bald Knoll road generally appeared to be a maintained road where two vehicles could pass at most points along the road. Sections of the road were wider where it crossed flat terrain, while several sections narrowed along dugways on the sides of hills and steep terrain.

**Skutumpah**

45.     The K5000 Skutumpah road ("Skutumpah") is located in western Kane County, Utah. Pretrial Order, at 29, ¶ 17.

46.     The Skutumpah road commences at its southern intersection with the K3000 Johnson Canyon road in the northeast quarter of the southeast quarter (NE¼ SE¼) of Section 11, Township 41 South, Range 5 West, S.L.M., and proceeds approximately 33 miles northeasterly to where it ends at its intersection with the K7000 Cottonwood road in the southeast quarter of the northwest quarter (SE¼ NW¼) of Section 6, Township 38 South, Range 2 West, S.L.M.  Pretrial Order, at 29, ¶ 17; *see generally* Pl. Ex. 6.

47.     The general course of the Skutumpah road is shown on the map and centerline data in Plaintiffs' Exhibit 6.  The parties do not dispute the accuracy of the map or data.  Pretrial Order, at 29.  The parties do dispute, however, whether those sections of the road that were rerouted by Kane County in 1993 should be included within any right-of-way.

48.     In the court's prior memorandum decision, title to the Skutumpah road was quieted in favor of Plaintiffs as an R.S. 2477 public highway right-of-way, except for the 1993 Realignment sections. *Kane County*, 2011 U.S. Dist. LEXIS 66218, at *26–27; Pretrial Order, at 8, 29, ¶ 17.  The court reserved for trial the issue of whether The Realignments constituted permissible variances from Skutumpah's established route. *Id.*  at *27.

-16-

49. In 1993, Kane County hired a contractor to realign about nine segments of Skutumpah to enhance safety and maintainability. Trial Tr., at 1102 (L. Pratt). The Realignments all occurred on Skutumpah's north end. Defendant's Exhibit V contains a map showing the areas of realignment (hereinafter the "Realignment Map"). *See* Def. Ex. V, at KC4287. The circled numbers on the Realignment Map reflect the segment number and the underlined numbers reflect areas where the realignment created an island between the old road and new route. Trial Tr., at 2435–36 (V. Smith). Some of the realigned segments contain more than one island. *See* Def. Ex. V, at KC4287.

50. At the time of The Realignments, Verlin Smith was the manager of the BLM's Kanab Resource Area, which then encompassed the lands where The Realignments occurred. Trial Tr., at 1410–11 (V. Smith). Mr. Smith testified that Skutumpah had been realigned in some sections just a foot or so and in other sections up to 250 or 300 feet. *Id.* at 1414, 1438.

51. At trial, Louis Pratt testified about a realignment in the vicinity of Sheep Creek.[8] Trial Tr., at 1102–05. A reservoir had been previously created at Sheep Creek for water storage. *Id.* at 1101. It silted up within one or two years, however, so it does little to collect water. *Id.* at 1102. Previously, Skutumpah traversed the top of the Sheep Creek earthen dam where a culvert allowed water to flow underneath the road down onto a concrete spillway. *Id.* Multiple times a years, the culvert washed out and Skutumpah had to be repaired. *Id.* at 1103. After each wash out, Kane County had to drive a front end loader roughly 35 miles each way to replace the culvert. *Id.*

[8] There is some question about whether the Sheep Creek realignment was part of The Realignments, although the work was done around that time. Because the United States is now objecting to the realignment, the court is addressing it with the other realignments. Although "The Realignments" only refer to those realignments included in the trespass action, for ease of reference, the phrase shall also encompass the Sheep Creek realignment unless otherwise noted.

52.     The realignment moved the course of the road from across the top of the earthen dam to just below the dam across a cement spillway where it then rejoins the old path of the road.  After this realignment, Kane County has not had to repair this section of the road.  Trial Tr., at 1104–05 (L. Pratt).

53.     Among The Realignments, one realignment occurred at the intersection of Skutumpah and the Willis Creek Road.  This section of Skutumpah had a steep hill and sharp curve. Trial Tr., at 1106 (L. Pratt).  The realignment straightened the road to remove the sharp curve and reduced the hill's grade.  The changes improved safety and the sight distance.  *Id.*  Mr. Pratt testified that this realignment moved the course of the road just in excess of 200 feet.  *Id.* at 1107; Def. Ex. W at KC 4338–43.  This realignment is reflected as segment 6, island 9 on the Realignment Map. Def. Ex. V, at KC4287; *see also* Def. Ex. NNNN, Bull Valley Gorge, Section 22 (showing island 9 at reference number 27.185); Trial Tr., at 1428–29.

54.     A second realignment occurred at Bull Run Creek.  This segment of Skutumpah ran along a wash.  It was moved to an area above the wash.  Trial Tr., at 1434–35 (V. Smith); Def. Ex. W at KC 4322–27.  The result left an island between the original route and the realignment.  *Id.* This realignment is reflected as segment 8, island 10 on the Realignment Map.  Def. Ex. V, at KC4287; *see also* Def. Ex. NNNN, Rainbow Point, Section 28 (showing island ten at reference number 24.023); Trial Tr., at 1429–30 (V. Smith).

55.     A third realignment occurred near Averett Canyon.  It is reflected as segment 4 on the Realignment Map and contains islands 3 through 8.  Def. Ex. V, at KC4270–71, KC4287. Islands 6 and 7 are two notable islands in this segment.  *See* Def. Ex. NNNN, Bull Valley Gorge, Section 23 (showing island 6 at reference number 28.45 and island 7 at reference number 28.294 per

-18-

Trial Tr., at 1428); *see also* Def. Ex. W, at KC 4350–55 (showing island 6), KC4344–47 (showing of island 7).

56.     Mr. Smith testified that island 7 is the largest island created by The Realignments. Trial Tr., at 1426, 1437.  At its widest point, the new alignment is 250 to 300 feet from the original route.  *Id.* at 1438.

57.     Mr. Smith testified about other smaller islands located along segment 4, but they were not identified by island number or significance.  Trial Tr., at 1439–40 (V. Smith).

58.     Of the nine realigned segments, the United States contends the ones at Bull Run Creek, Willis Creek, and Averett Canyon are the most significant.  Defs. Ex. NNNN, Bull Valley Gorge, Sections 22–23, Rainbow Point, Section 28; Trial Tr., at 1427–28.  It also contends that islands 6, 7, 9, and 10 are by or intrude into the Paria-Hackberry Wilderness Study Area ("Paria-Hackberry WSA").  *See* Def. Ex. V, at KC4271, 4273, 4274.

59.     The parties dispute whether any of The Realignments intrude into the Paria-Hackberry WSA.  The United States contends the Paria-Hackberry WSA commences at the edge of the disturbance of the former travel surface of Skutumpah.  Trial Tr., at 1379–81, 1415–16, 1454.

60.     Plaintiffs introduced contrary evidence.  A 1990 BLM nationwide instruction memorandum notes that there is a standard setback of 30 feet for low grade jeep and logging roads, but also that "the width of some road R/Ws established under R.S. 2477 . . . will exceed the 30 feet from centerline standard just referenced.  When such overlaps are identified, an adjustment of the WSA or wilderness boundary to eliminate the encroachment of such boundaries with the R.S. 2477 R/W area should be made and properly documented."  Instruction Memorandum No. 90-589 (Pl. Ex.

149, at 4). With specific reference to R.S. 2477 rights-of-way along the boundary of a WSA, the BLM must manage the lands subject to valid existing rights, while retaining the right to protect adjacent lands "to avoid unnecessary and undue degradation of WSAs." *Id.* at 3.

61.    Plaintiffs also introduced an excerpt from the 1990 Utah BLM Statewide Wilderness Final Environmental Impact Statement that was issued at the conclusion of the wilderness inventory process in Utah. This included the Paria-Hackberry WSA. In the event an inventoried WSA was later designated as a wilderness area, the BLM "assumed that a maintenance and use border would be allowed along roads, including cherrystems, adjacent to wilderness areas for purposes of road maintenance, temporary vehicle pull-off, and trailhead parking." Pl. Ex. 299 (copy of 1990 Utah BLM Statewide Wilderness Final Environmental Impact Statement, Vol. I, p. 66). "This border would be from 100 to 300 feet from the edge of the road travel surface, depending upon the nature of the road and the adjacent terrain." *Id.*; *see also* Trial Tr., at 1391–92 (K. Mahoney).

62.    In 1996, the United States sued Kane County for trespass and unauthorized construction on federal lands, including for The Realignments of Skutumpah. Trial Tr., at 1311–12 (M. Habbeshaw); *see also* Pl. Ex. 73.

63.    In 2006, the United States stipulated to the dismissal of its trespass and unauthorized construction claims against Kane County with prejudice. Trial Tr., at 1312–13 (M. Habbeshaw); *see also* Pl. Ex. 74. This stipulation followed a 2005 ruling from the Tenth Circuit that clarified the cooperative relationship between the BLM and an R.S. 2477 right-of-way holder. *See S. Utah Wilderness Alliance v. BLM*, 425 F.3d 735, 748 (10th Cir. 2005) (hereinafter "*SUWA*") (stating if an R.S. 2477 right-of-way holder "undertake[s] any improvements in the road along its right of way,

-20-

*beyond mere maintenance*, it must advise the federal land management agency of that work in advance." Emphasis added.).

64.     Although the United States' action was dismissed with prejudice, the dismissal stated "the United States does not recognize any valid right-of-way or waive any defense to a claim of an alleged right-of-way across public lands." Pl. Ex. 74, at 4. Here, the United States asserts, as a defense, that The Realignments do not constitute a permissible variance.

65.     Since The Realignments occurred and the trespass action was dismissed, the United States has not required that any of the routes be restored to there original location. Trial Tr., at 1107 (L. Pratt). During the Court's site visit, the parties stopped at several realigned sections. Most of the old paths have been reclaimed to the point where the old road bed is hard to see.[9]

**Scope of Skutumpah**

66.     In 1967, the south end of the Skutumpah road was approximately 15 to 20 feet wide while parts of the north end was only about 8 to 12 feet wide in places. Trial Tr., at 726–27 (V. Campbell). By 1976, however, the south end was approximately 20 feet wide and the north end was not quite as wide as 20 feet. *Id.* Mr. Campbell testified that at least since 1967, he maintained the Skutumpah road as a Class B road. *Id.* at 687, 697, 719; *see generally* Pl. Exs. 163, 164, 169, 178, 180, and 181.

67.     With respect to the County's measurements made during its GPS project, Mr. Pratt testified that the County estimated that Skutumpah road had a 28-foot travel surface, with a 40-foot

---

[9]   The photographs in Defendant's Exhibit W were taken in 1993, shortly after The Realignments occurred. Trial Tr., at 1432 (V. Smith). The landscape was different during the court's site visit in December 2010.

disturbed area width for the widest segments, and a 24-foot travel surface, with a 28-foot disturbed area width for the other segments. *Id.* at 1218–19; *see also* Pl. Ex. 224-A.

68. Further, Mr. Pratt testified that in 1998 and 1999, he and other members of the Kane County road crew worked with BLM employees who were measuring and documenting features they found along the Skutumpah road. *Id.* at 1271–72. Their work was captured in a document admitted as Defendant's Exhibit NNNN. The exhibit includes aerial photographs of each segment of the Skutumpah road, on which various data (including centerline GPS data) were overlaid. It also includes tables that recorded measurements such as travel surface width and total width. *Id.* at 1272–81. Mr. Pratt initialed each page of the document, after the Kane county road crew verified the mileage and features. *Id.* at 1273–74.

69. Skutumpah has multiple culverts along its route. Mr. Pratt indicated on the document that for areas where a culvert existed, an area 60 feet wide (and continuing for 100 feet along the road) would be sufficient "for maintenance of the culvert only." Def. Ex. NNNN, at 1; Trial Tr., at 1274–75 (L. Pratt). Specifically, he noted that in order to get a front-end loader on either end of the culvert to keep it clean, they would have needed 8 to 10 feet past the end of the culvert, which he estimated at approximately 40 feet. *Id.* at 1275.

70. At the time of the site visit in December of 2010, the Skutumpah road was a wide, two-lane gravel road along the southern section, while the northern section of the road varied in width, being wider where it traverses open valleys and rough topography, and narrower where it traverses dugways cut into hillsides.

**Mill Creek Road - Generally**

71.     The south end of Mill Creek road commences at its intersection with Skutumpah on private land in the northwest quarter of the northwest quarter (NW¼ NW¼) of Section 5, Township 41 South, Range 4.5 West, S.L.M., and proceeds northerly a little over six miles to the boundary of private property in the southwest quarter of the southeast quarter (SW¼ SE¼) of Section 34, Township 39 South, Range 4.5 West, S.L.M.  Pretrial Order, at 26-28.

72.     The general course of Mill Creek road, as claimed by Kane County in this litigation, is shown on the map and centerline data in Plaintiffs' Exhibit No. 2.  The parties do not dispute the accuracy of the map or data.  *See* Pretrial Order, at 27.

73.     Mill Creek crosses private and public lands within Townships 40 and 41 South, Range 4.5 West, S.L.M., but Kane County does not seek to quiet title in this litigation to the portions of road located over private land.  *Id.* at 26.

74.     In the court's prior memorandum decision, title to Mill Creek road was quieted in favor of Plaintiffs where it crosses private property in Section 5, Township 41 South, Range 4.5 West, S.L.M.  *See Kane County*, 2011 U.S. Dist. LEXIS 66218, at *27.  Because Plaintiffs did not seek to quiet title to the portions of the road crossing private property, and Mill Creek only traverses private property in Section 5 of Township 41, the court hereby modifies its order so that Section 5, Township 41 South, Range 4.5 West, S.L.M. is stricken from its ruling.

75.     The United States conveyed the private property at the northernmost end of Mill Creek road into private ownership on June 10, 1937 by Patent 1090548.  Pretrial Order, at 28, ¶ 11.

76.     Mill Creek road has two short branches off of it called Oak Canyon (K4405) and Tenny Creek (K4410).  The roads are located in western Kane County, Utah. Pretrial Order, at 26,

¶ 5.  Kane County considers Oak Canyon and Tenny Creek to be part of the Mill Creek road. Pretrial Order, at 26, ¶ 5.

77.     The segment of lower Mill Creek remaining for decision at trial includes that portion of the road crossing Section 32, Township 40 South, Range 4.5 West, S.L.M.  In 1896, Section 32 passed into ownership of the Utah School and Institutional Trust Lands Administration ("SITLA"). *Kane County*, 2011 U.S. Dist. LEXIS 66218, at *4.  This segment of Mill Creek shall be referred to as "SITLA Parcel One",[10] and will be addressed below.

78.     Also remaining for decision is the segment of Mill Creek extending north above Mill Creek's intersection with the Bald Knoll road.  This segment crosses Sections 5, 6, and 8, Township 40 South, Range 4.5 West, S.L.M. and shall be referred to hereafter as "Upper Mill Creek."  The final segments of Mill Creek remaining for decision are the Oak Canyon and Tenny Creek spurs. Pretrial Order, at 27, ¶ 8.

**Upper Mill Creek Segment**

79.     The Upper Mill Creek road has appeared on the United States Geological Survey ("USGS") Skutumpah Creek, Utah 7.5 minute quadrangle map since at least 1966 (as compiled from aerial photographs taken in 1964).  Trial Tr., at 780–84 (M. Peters); Pl. Ex. 47B.

80.     The Upper Mill Creek road appears on USGS orthophoto quad aerial photography taken on August 14, 1976.  Trial Tr., at 820–26 (M. Peters); Pl. Ex. 262B.

---

[10]  In the court's previous Memorandum Decision, it addressed five SITLA parcels and numbered them SITLA Parcels One through Five.  *Kane County*, 2011 U.S. Dist. LEXIS 66218, at *4–5.  For consistency, the court uses the same numbering in this order.  Issues pertaining to SITLA Parcels Two, Three, and Four were resolved in the Memorandum Decision.  Accordingly, the court only addresses SITLA Parcel One and SITLA Parcel Five in this order.

81.     As evidenced by USGS maps and 1976-era aerial photography, the historically traveled course of the Upper Mill Creek road, as it existed before 1976, is substantially the same as the currently traveled course of the road.  Trial Tr., at 780–84, 820–26 (M. Peters); Pl. Exs. 47A, 47B, 262A, 262B, 262C.

82.     Additionally, the 1911 survey plat, prepared in connection with a cadastral survey of Township 40 South, Range 4.5 West, S.L.M., depicts a road consistent with the present course of the far northern portion of the Upper Mill Creek road.  Trial Tr., at 968–71 (J. Harja); Pl. Ex. 109. The United States contends the "overall network of routes" on the plat is not consistent with the current Mill Creek route.  It is not clear what point the United States is attempting to make with this argument.  The 1911 survey plat does show additional routes than presently existing, but the additional routes do not negate that the far northern portion of the Upper Mill Creek road appears on the 1911 survey plat.

83.     Except for a reservation that existed between 1904 and 1906, the BLM's Historical Index for Township 40 South, Range 4.5 West, S.L.M., shows that the public lands crossed by the Upper Mill Creek road were not reserved from the operation of R.S. 2477.  Pl. Ex. 126; Trial Tr., at 972 (J. Harja); *see also* Pretrial Order, at 28, ¶ 14 (stating the parties agreement that the relevant Upper Mill Creek land "was not reserved from the operation of R.S. 2477 for the ten-year period prior to R.S. 2477's repeal on October 21, 1976").

84.     Several witnesses testified that the Upper Mill Creek road was traveled by members of the public for a continuous period in excess of ten years prior to the repeal of R.S. 2477 in 1976.

85.     Calvin Johnson is a life-long resident of Kane County.  Trial Tr., at 17.  Mr. Johnson was born in 1923. *Id.*

-25-

86.     Mr. Johnson testified that he traveled the Upper Mill Creek road as early as the late

1930s.[11]  *See* Trial Tr., at 105.  He recalled traveling the Upper Mill Creek road to access the Pink

Cliffs area[12] to go fishing with his father and brother when he was about 14 years old (*i.e.*, 1937).

*Id*.  Mr. Johnson was unsure if there was a gate at the private property at that time.  *Id*.  He also used

the road infrequently in high school to collect wood near the Oak Canyon spur and to hunt deer in

the area.  *Id.* at 62, 68.  Additionally, Mr. Johnson testified that there were several homesteads

located along Mill Creek road near water sources.  *Id.* at 63–67; Pl. Ex. 22.

87.     Vane Campbell testified that he first traveled the Upper Mill Creek road in about

1955 while working for a logging company operating on both the private and Forest Service land

north of the Upper Mill Creek road.  Trial Tr., at 634–37.  He recalled other people working there,

including wood haulers, post cutters, and rock cutters.  *Id.* at 638.  He also recalled that the road had

been bladed by this time.  *Id*.

88.     Mr. Antone Wright was born in 1947, and has lived for most of his life in Kanab,

Utah. Trial Tr., at 221.

89.     Anton Wright testified that he traveled part of the Upper Mill Creek road as early as

1955 with his family.  Trial Tr., at 254–56.  Mr. Wright specifically recalled traveling with his

---

[11]  Calvin Johnson testified about several of the roads at issue in this action.  The United States challenges Mr. Johnson's credibility based on a civil action he was involved in more than fifty years ago.  The court had the opportunity to judge Mr. Johnson's credibility while he testified at trial.  Although his memory was not always perfect on every detail, the court found Mr. Johnson both knowledgeable on the subjects he addressed and credible.  The court therefore gives credit to his testimony.

[12]  The Pink Cliffs area is further north of the current gate at the north end of Upper Mill Creek.

family in his grandfather's passenger car to picnic near the junction of the Tenny Creek segment and the Upper Mill Creek road sometime between 1955 and 1958 to celebrate his birthday.  *Id.*

90.     Mr. Roy Mackelprang is a rancher and has lived in Kane County for almost all of his life.  He was born in 1939.  Trial Tr., at 327.

91.     Roy Mackelprang is the current owner of the private ranch located at the end of the Oak Canyon segment and his family began purchasing the parcels and homesteads comprising this ranch as early as 1925.  Trial Tr., at 331–34.  He spent a significant amount of time at the ranch as a youth and was able to observe others using the Upper Mill Creek segment.  Trial Tr., at 336.  Mr. Mackelprang testified that "[i]t was a very nice common place to go over the top of when it was hot down in Kanab" due to its elevation.  *Id.* at 342.

92.     Mr. Mackelprang also learned about the area's local historical reputation as he sat and listened to "old timers" talking around a camp.[13]  Trial Tr., at 341–42.  He testified that Mill Creek had the reputation of being an old road and that people traveled Upper Mill Creek as far back as the late 1800s.  *Id.* at 330, 340–45.  Mr. Mackelprang understood that John D. Lee cut timber and ran a saw mill in the Upper Mill Creek area in the late 1800s, which is how Mill Creek reportedly got its name.  *Id.* at 344.  To this day, there are physical remnants of a mill having been located about a quarter to a half mile above the terminus of Upper Mill Creek.  *Id.* at 344–46. Mr. Mackelprang has been to that area over ten times.  *Id.* at 345.

---

[13] The court accepts Mr. Mackelprang's testimony about the historical reputation of Upper Mill Creek based on Rule 803(20) of the Federal Rules of Evidence.  The reputation of the road arose before this controversy and was of sufficient importance that its general historical nature was told and retold by one generation to the next.

93.     Mr. Mackelprang further testified that as a youth he would travel north beyond the terminus of Upper Mill Creek.  He said it was an "awfully pretty place" and a trail existed that led to the headwaters of the east fork of the Sevier River where he could go fishing.  Trial Tr., at 339–41.

94.     Mr. Mackelprang also testified that, as early as the 1940s, people traveled Mill Creek to visit his family's ranch at the end of the Oak Canyon spur, but that such visitations were intermittent.  Trial Tr., at 351–52.  Mr. Mackelprang further testified that during the 1940s and 1950s, he saw hunters in the area, including camping at a location near the junction of the Mill Creek and Oak Canyon roads.  *Id.* at 353–55.  Further, Mr. Mackelprang testified that there was wood cutting in the area approximate to the Oak Canyon road, including in the 1940s, in the area west of Mill Creek road and south of Oak Canyon.  *Id.* at 355–56.  He also testified that he would see individuals in the 1950s "after wood or deer or sometimes cedar posts."  *Id.* at 379.

95.     Roger Holland testified that he traveled the Upper Mill Creek road in a vehicle with his grandfather prior to 1961 for purposes of exploring.  Trial Tr., at 510–12.  After he got his driver's license in 1961, he traveled Upper Mill Creek to the Oak Canyon spur about twenty times between 1961 and 1976 for deer hunting and other activities.  Trial Tr., at 513–14, 551–52.

96.     Kurt Brinkerhoff testified that he traveled the Upper Mill Creek road up to the Dixie National Forest boundary (north of the road) for the first time in the early 1950s with his father.  Deposition of Kurt Brinkerhoff, 33–35 (Dkt. No. 209, Ex. 6) (hereinafter "Brinkerhoff Depo.").  Mr. Brinkerhoff recalled a trip with his father in which they were repairing a water pipeline in the Upper Mill Creek area, and his father accidently cut his own wrist, requiring Mr. Brinkerhoff, prior to

-28-

having his driver's license (*i.e.* early 1950s), to drive his father down the Upper Mill Creek road and back to town. *Id*. at 34.

97.     Norman Carroll testified that he traveled the Upper Mill Creek road in a vehicle for the first time in the early 1950s.  Norman Carroll Deposition, 32–35 (Dkt. No. 209, Ex. 3).  He used the road in the early 1950s to access the Brinkerhoff property where he would cut cedar posts. *Id*. at 33.

98.     Witnesses testified that they saw other members of the public traveling the Upper Mill Creek road prior to 1976 for the apparent purposes of gathering firewood, cutting cedar posts, hunting and scouting for deer, gathering pine nuts, and general sight-seeing. Trial Tr., at 379–83 (R. Mackelprang); Trial Tr., at 517–18 (R. Holland); Brinkerhoff Depo. at 38–39; Arlene Goulding Deposition, 30-32 (Dkt. No. 209, Ex. 4).

99.     Several witnesses testified that the members of the public traveling the road to scout and hunt for deer was not, in any sense, limited to a specific season.  In the '40s, '50s and '60s deer hunting was a big thing and deer meat provided food whenever it was needed.  Trial Tr., at 350 (R. Mackelprang); Brinkerhoff Depo. at 104-05; Trial Tr., at 108 (C. Johnson); Trial Tr., at 232–33, 252 (A. Wright).

**Oak Canyon Segment**

100.     The Oak Canyon segment diverges off of the Upper Mill Creek segment in the southeast quarter of the northeast quarter (SE¼ NE¼) of Section 6, Township 40 South, Range 4.5 West, S.L.M., and proceeds southwesterly across federal public land for approximately 0.6 miles to the boundary of private property in the southeast quarter of the southwest quarter (SE¼ SW¼) of Section 6, Township 40 South, Range 4.5 West, S.L.M.  *See* Pretrial Order, at 28, ¶ 13.

101.   The United States conveyed the private property at the end of the Oak Canyon segment into private ownership on August 8, 1957, by Patent 1173972.  Pretrial Order, at 28, ¶ 13.

102.   The general course of the Oak Canyon segment is shown on the map and centerline data in Plaintiffs' Exhibit 4.  The parties do not dispute the accuracy of the map or data.  *See* Pretrial Order, at 27.

103.   The Oak Canyon segment has appeared on the USGS Skutumpah Creek, Utah 7.5 minute quadrangle map since at least 1966 (as compiled from aerial photographs taken in 1964).  Trial Tr., at 780–85 (M. Peters); Pl. Ex. 47B.

104.   The Oak Canyon segment appears on USGS orthophoto quad aerial photography taken on August 14, 1976.  Trial Tr., at 820–23 (M. Peters); Pl. Ex. 262B.

105.   As evidenced by USGS maps and 1976-era aerial photography, the historically traveled course of the Oak Canyon segment, as it existed before 1976, is substantially the same as the currently traveled course of the road.  Trial Tr., at 780–85, 820–23 (M. Peters); Pl. Exs. 47A, 47B, 262A, 262B, 262C.

106.   The 1911 survey plat prepared in connection with a cadastral survey of Township 40 South, Range 4.5 West, S.L.M., also depicts a road consistent with, although not identical to, the entire present course of the Oak Canyon segment.  Trial Tr., at 968, 971 (J. Harja); Pl. Ex. 109.

107.   Except for a reservation that existed between 1904 and 1906, the BLM's Historical Index for Township 40 South, Range 4.5 West, S.L.M., shows that the public lands crossed by the Oak Canyon road were not reserved from the operation of R.S. 2477.  Pl. Ex. 126; Trial Tr., at 972 (J. Harja).

108.    Anton Wright testified that he traveled the Oak Canyon segment as early as 1963 while hunting deer.  Trial Tr., at 257–61.  Mr. Wright specifically recalled that after he obtained his driver's license in 1963, up until he entered military service in October of 1966, he and his friends would routinely travel the Oak Canyon segment to hunt deer.  *Id*.  Mr. Wright testified that there was a parking area at the end of the Oak Canyon segment, next to the gate at the boundary of the public land and the Mackelprang ranch, and that he recalled seeing another vehicle parked in that parking area during one of these early trips.  *Id*. at 259.  Mr. Wright also recalled traveling the Oak Canyon segment once sometime between 1973 to 1975 with his family to picnic.  *Id*. at 261.  The road appeared to be maintained throughout the time he traveled on it.  *Id.* at 260–61.

109.    Roy Mackelprang, the current owner of the Mackelprang ranch located at the end of the Oak Canyon segment, testified that his family has traveled the Oak Canyon road since as early as 1925 to access their property, to carry out their ranching business, and to hunt deer.  *See* Trial Tr., at 333, 350.  In the 1940s and 1950s, Mr. Mackelprang saw many people on the Oak Canyon road hunting deer.  *Id.* at 351–54.  Periodically, people would travel the road to visit his family, camp, and gather firewood.  *Id.* at 352–57.

110.    Calvin Johnson testified that he traveled the Oak Canyon road several times prior to 1976 while working cattle on the Mackelprang ranch.  Trial Tr., at 106–07.

111.    Roger Holland testified that he traveled the Upper Mill Creek road to and across the Oak Canyon segment for the first time prior to 1961 in a Buick car, both to work on the Mackelprang's ranch and to hunt deer.  Trial Tr., at 512–15.  Mr. Holland traveled the Oak Canyon segment many times after that to work at the Mackelprang's ranch.  *Id*.  Prior to 1976, he also saw people cutting wood along the Oak Canyon segment.  *Id*. at 518.

-31-

112.   Kurt Brinkerhoff testified that he traveled the Oak Canyon segment with his parents in the early 1950s to visit their neighbors, the Mackelprangs, and to run their cattle and sheep operations in the Oak Canyon area.  Brinkerhoff Depo. at 50-52.

113.   Witnesses testified that they saw other members of the public traveling the Oak Canyon segment prior to 1976 for the apparent purposes of gathering firewood, cutting cedar posts, hunting and scouting for deer, and gathering pine nuts.  Trial Tr., at 351–57, 379–83 (R. Mackelprang); Brinkerhoff Depo. at 62-63.   Specifically, Mr. Mackelprang recalled seeing individuals, dating back to the 1940s, traveling the Oak Canyon segment to deer hunt and gather firewood.  Trial Tr., at 351–57.  Going back to the 1940s, Mr. Mackelprang saw other people camping off the side of the Oak Canyon segment near the gate of his ranch.  *Id*. at 352–53.

**Tenny Creek Segment**

114.   The Tenny Creek segment diverges off of the Upper Mill Creek segment in the southwest quarter of the southeast quarter (SW¼ SE¼) of Section 5, Township 40 South, Range 4.5 West, S.L.M., and proceeds northerly across federal public land for approximately 0.5 miles to the boundary of private property in the northwest quarter of the northeast quarter (NW¼ NE¼) of Section 5, Township 40 South, Range 4.5 West, S.L.M.  *See* Final Pretrial Order, at 28, ¶ 12.

115.   The United States conveyed the private property at the end of the Tenny Creek segment into private ownership on March 23, 1923, by Patent 9000384. Pretrial Order, at 28, ¶ 12.

116.   The general course of the Tenny Creek segment is shown on the map and centerline data in Plaintiffs' Exhibit 3.  The parties do not dispute the accuracy of the map or data.  *See id.* at 27.

117.    The Tenny Creek segment has appeared on the USGS Skutumpah Creek, Utah 7.5 minute quadrangle map since at least 1966 (as compiled from aerial photographs taken in 1964). Trial Tr., at 780–86 (M. Peters); Pl. Ex. 47B.

118.    The Tenny Creek segment appears on USGS orthophoto quad aerial photography taken on August 14, 1976.  Trial Tr., at 820–26 (M. Peters); Pl. Ex. 262B.

119.    As evidenced by USGS maps and 1976-era aerial photography, the historically traveled course of the Tenny Creek segment, as it existed before 1976, is substantially the same as the currently traveled course of the road.  Trial Tr., at 780–86, 820–26 (M. Peters); Pl. Exs. 47A, 47B, 262A, 262B, 262C.

120.    The 1911 survey plat prepared in connection with a cadastral survey of Township 40 South, Range 4.5 West, S.L.M., also depicts a road consistent with, although not identical to, the entire present course of the Tenny Creek segment.  Trial Tr., at 968, 970–71 (J. Harja); Pl. Ex. 109.

121.    Except for a reservation that existed between 1904 and 1906, the BLM's Historical Index for Township 40 South, Range 4.5 West, S.L.M., shows that the public lands crossed by the Tenny Creek road were not reserved from the operation of R.S. 2477.  Pl. Ex. 126; Trial Tr., at 972 (J. Harja).

122.    Kurt Brinkerhoff testified that he traveled the Tenny Creek segment as early as 1945 with his family.  Brinkerhoff Depo. at 9, 45.  The Tenny Creek segment accessed his family's ranch, and he would travel the road approximately once per week during the summers prior to 1976.  *Id*. at 45.

-33-

123.     Anton Wright testified that he traveled the Tenny Creek segment in the early 1960s while deer hunting.  Trial Tr., at 263.  Mr. Wright specifically recalled driving to the end of the Tenny Creek segment and seeing the gate at the private property boundary.  *Id.* at 264.

124.     Calvin Johnson testified that he traveled the Tenny Creek segment prior to 1976 while sight-seeing and scouting.  Trial Tr., at 107–08.

125.     Evan McAllister testified that he traveled the Upper Mill Creek road through the Tenny Creek segment when he was a teenager (*i.e.*, early 1950s) to visit the Tenny Creek ranch and to deer hunt with his cousin in a Model A car.  Evan McAllister Deposition, 95-98 (Dkt. No. 209, Ex. 1).  Mr. McAllister further testified that during the 1950s, 1960s, and 1970s, the Tenny Creek segment was known in the community as a road one could travel to hunt deer.  *Id*. at 96–97.

126.     Witnesses testified that other members of the public traveled Tenny Creek segment in the 1950s, 1960s, and 1970 for the apparent purposes of sight-seeing and hunting.  Trial Tr., at 381–83 (R. Mackelprang); Brinkerhoff Depo. at 46, 60 (Dkt. No. 209) (testifying it was a prime hunting area and a lot of people hunted deer there).

**Maintenance of Entire Mill Creek Road and Spurs to Class B Standards**

127.     The Oak Canyon segment, the Tenny Creek segment, and the main Mill Creek road, from its intersection with Skutumpah road to the Oak Canyon intersection, were all classified by Kane County as a Class B road prior to 1976, as evidenced by the 1950 General Highway Map of Kane County, Utah.  Trial Tr., at1111–12 (L. Pratt); Pl. Ex. 38.

128.     By 1965, Kane County added the northernmost segment of Mill Creek road—commencing at the Oak Canyon intersection and extending north to the road's end at private property—to its Class B road system, as evidenced by the 1965 General Highway Map of Kane

County, Utah. Trial Tr., at 1112–13 (L. Pratt); Pl. Ex. 41. The result is that by 1965, the entire Mill Creek road, including the Oak Canyon and Tenny Creek segments, had been designated as a Kane County Class B general highway. *Id.*

129.     Vane Campbell testified that by at least 1967, Kane County would regularly maintain the entire Mill Creek road, including the Oak Canyon and Tenny Creek segments, as a Kane County Class B road. Trial Tr., at 664–66, 690; *see generally* Pl. Exs. 163, 164, 169, 178, 180, and 181.

130.     The maintenance on Mill Creek road and its short branches included regular blading of the road so vehicles could turn around, keeping parking areas at the gates on private property, and installing cattle guards at certain locations on the road. *Id.* at 665–67, 709–10, 1116 (L. Pratt). Kane County's road maintenance crews used the turnaround loop and parking areas at the private property gates to maneuver its road maintenance equipment. *Id.* at 1115–18 (L. Pratt).

131.     Despite maintaining each of Mill Creek's segments as a Class B road, at times they are impassable during the winter. Trial Tr., at 302 (A. Wright); Trial Tr., at 338 (R. Mackelprang).

132.     To maintain Mill Creek (including Oak Canyon and Tenny Creek) to Class B road standards, Kane County used both its own funds and State funds. *See* Trial Tr., at 668 (V. Campbell) (prior to 1976, State and Kane County funds paid for Class B road maintenance); *see also* Trial Tr., at 677 (V. Campbell) (prior to 1976, Kane County funds were used for maintenance of all of the Class B roads in Kane County); Trial Tr., at 1062 (L. Pratt) (Class B roads were identified on Kane County's General Highway maps in order for Kane County to receive funds from the State for the maintenance of Class B roads).

133.    Because Kane County was using State Class B road funds, state personnel would travel and inspect Kane County's Class B roads to ensure they were being maintained to the proper Class B standards. Trial Tr., at 697–98 (V. Campbell).

134.    Kane County's maintenance of Upper Mill Creek, Oak Canyon, and Tenny Creek was personally witnessed by Roy Mackelprang going back to the 1950s and continuing through the present.  Trial Tr., at 375–77.

135.    After 1976, Kane County continued to maintain the Mill Creek road, including the Upper Mill Creek, Oak Canyon, and Tenny Creek segments that end at private property, to keep it open as a public highway for general travel and to provide a public road for the private property owners. Trial Tr., at 1110 (L. Pratt), Trial Tr., at 1307–08 (M. Habbeshaw).

136.    As stated previously, Mr. Campbell testified that on Class B roads, from 1967 to 1992, he tried to maintain the travel surface from 14 to 24 feet wide.  Trial Tr., at 655–56.

137.    Based on Kane County's GPS project, the County estimated Mill Creek's travel surface (including Upper Mill Creek) ranged from 16 to 20 feet wide and that the width of the prior disturbed area of the Mill Creek road ranged from 18 to 28 feet.  *Id.* at 1211–16; 1213–14.  The estimated travel surface for Tenny Creek ranged from 16 to 18 feet, with an estimated total disturbed area width of 18 feet.  *Id.* at 1216–17.  The estimated travel surface for Oak Canyon was 20 feet, with an estimated disturbed area width of 26 feet.  *Id.* at 1217.  *See also* Pl. Ex. 224-A.

138.    Kane County classifies Mill Creek's surface as native soil in seven of its eight sections surveyed and as gravel or improved crushed aggregate surface in the eighth section.  *See* Pl. Ex. 224-A.  The surface of the Oak Canyon and Tenny Creek spurs are also classified as native soil.  *Id.*

139.    Mr. Pratt assigned a road category rating of 3 and a maintenance category rating of 4 to the Mill Creek road, which indicated that it needed a smaller width for maintenance than roads with a higher rating like the Hancock road (discussed below), which was assigned a road category rating of 4 and a maintenance category rating of 5.  Trial Tr., at 1232–33; Pl. Ex. 224-A.

140.    At the time of the site visit in December of 2010, the Mill Creek road was a two lane gravel road, wider at its southern intersection with the Skutumpah road and narrower as it reaches the gates at the north.

**Swallow Park/Park Wash Road**

141.    The K4360 Swallow Park/Park Wash road ("Swallow Park/Park Wash") is located in western Kane County, Utah.  Pretrial Order, at 30, ¶ 21.

142.    The Swallow Park/Park Wash road commences at its intersection with the Skutumpah road in the center of Section 19, Township 30 South, Range 3 West, S.L.M., and proceeds southeasterly approximately 5 miles to where it ends at its intersection with the K4370 North Swag road in the northeast quarter (NE¼) of Section 9, Township 40 South, Range 3 West, S.L.M. Pretrial Order, at 30, ¶ 22.

143.    The general course of the Swallow Park/Park Wash road, as claimed by Plaintiffs in this litigation, is shown on the map and centerline data in Plaintiffs' Exhibits 9 and 16.  The parties do not dispute the accuracy of the map or data.  *See* Pretrial Order, at 30.

144.    The Swallow Park/Park Wash road crosses private and public land within Townships 39 and 40 South, Range 3 West, S.L.M., but Plaintiffs do not seek to quiet title in this litigation to the portions of the road located over private land.

145.    The northern half of the Swallow Park/Park Wash road has appeared on the USGS Rainbow Point, Utah 7.5 minute quadrangle map since at least 1966 (as compiled from aerial photographs taken in 1963).  Trial Tr., at 789–91 (M. Peters); Pl. Ex. 49B; Pretrial Order, at 31, ¶ 24.

146.    The southern half of the Swallow Park/Park Wash road has appeared on the USGS Deer Spring Point, Utah 7.5 minute quadrangle map since at least 1966 (as compiled from aerial photographs taken in 1963).  Trial Tr., at 796–98 (M. Peters); Pl. Ex. 48B; Pretrial Order, at 31, ¶ 24.

147.    The Swallow Park/Park Wash road appears on USGS orthophoto quad aerial photography taken on October 7, 1976, and on October 13, 1976.  Trial Tr., at 844 (M. Peters); Pl. Ex. 264B.

148.    As evidenced by USGS maps and 1976-era aerial photography, the historically traveled course of the Swallow Park/Park Wash road, as it existed in 1976, is substantially the same as the currently traveled course of the road.  Trial Tr., at 793–95, 798–800, 844-51 (M. Peters); Pl. Exs. 48A, 48B, 49A, 49B, 264A, 264C.

149.    With the exceptions noted below and prior to R.S. 2477's repeal on October 21, 1976, the BLM's Historical Indexes for Township 39 South, Range 3 West, S.L.M., and Township 40 South, Range 3 West, S.L.M., reveal that the public lands crossed by the Swallow Park/Park Wash road were not reserved from the operation of R.S. 2477 during the relevant time period.  Trial Tr., at 959–60, 964 (J. Harja); Pl. Exs. 121, 124.

150.    Swallow Park/Park Wash traverses through private property for part of its length. *See* Pl. Ex. 20.  The top north west end of the private property is owned by the Brinkerhoffs.  Trial

Tr., at 409 (J. Ott); Pl. Ex. 20.  The remainder of the private property is owned by the Otts.  *Id.*  The

Ott property is alternatively known as "Swallow Park Ranch."  Trial Tr., at 409.

151.     Starting at its intersection with the Skutumpah road and proceeding to the unlocked

gate on the Swallow Park Ranch, Kane County designated approximately the first mile of the

Swallow Park/Park Wash road as a Class B road by 1965, as shown on the 1965 General Highway

Map of Kane County, Utah.  Trial Tr., at 1061–62 (L. Pratt); Pl. Ex. 41C.

152.     Kane County then regularly maintained this portion of the Swallow Park/Park Wash

road prior to October 21, 1976, to meet the Class B road standards.  *See* Trial Tr., at 643, 651–52

(V. Campbell).  In conformance with the Class B road designation, it spent its own funds and State

funds to carry out the continued maintenance and improvement of the road prior to October 21,

1976.  *See generally* Trial Tr., at 668, 677, 698 (V. Campbell); Trial Tr., at 1062 (L. Pratt).

153.     Vane Campbell testified that he also bladed the Swallow Park/Park Wash road below

(south of) the Swallow Park Ranch property upon request.  Trial Tr., at 652–53.

154.     Mr. Campbell installed cattle guards on the road in May of 1973, as recorded in his

maintenance log book.  *Id.* at 687; Pl. Ex. 163 (entries on May 21 and 22, 1973).

155.     From about 1956 to 1960, Calvin Johnson had part ownership of the Swallow Park

Ranch.  He testified that he personally witnessed Kane County graders on the Swallow Park/Park

Wash road prior to 1976.  Trial Tr., at 135.

156.     James Ott was born in 1938 and is the current owner of Swallow Park Ranch.  Trial

Tr., at 404 (J. Ott).  Mr. Ott's uncle acquired part of the ranch in the late 1940s, and Mr. Ott's father

acquired part of the ranch in the 1950s.  *Id.* at 408.  Mr. Ott first traveled on the northern portion of

Swallow Park/Park Wash road in 1948 with his father and uncle.  *Id.* at 411.  The road was rough

and used primarily by Jeeps, tractors, horses, or wagons.  *Id.* at 417.  While his father and uncle checked on the cattle and looked for coyotes, he and a cousin went sight seeing.  *Id.* at 411, 413.

157.   At the time of Mr. Ott's first visit to the Swallow Park Ranch, there was an old homestead cabin on the property that Mr. Ott knew as the Adams' cabin.  Trial Tr., at 413 (J. Ott). The 1914 cadastral survey plat for Township 39 South, Range 3 West, shows "a cabin of one Geo Adams" in Section 30, which is the  same section location as the Swallow Park Ranch.  Pl. Ex. 104; Trial Tr., at 946–48.  It also shows a road leading to the cabin, although the road does not appear to follow the same route as the present Swallow Park/Park Wash road.  *See id.*

158.   Mr. Ott returned to the property in subsequent years and saw ranchers and other workers traveling Swallow Park/Park Wash to get down to the Nipple Lake Ranch from Tropic, Utah.  Trial Tr., at 417 (J. Ott).  The nature of their transportation progressed from wagons to pickups over the years.  *Id.* at 418.  The ranchers also moved their cattle between Swallow Park and Nipple Lake roads.  *See id.* at 418–19.

159.   Mr. Ott saw other people traveling down Swallow Park/Park Wash to cut posts.  *Id.* at 424, 427.  He further testified that logging occurred along the Swallow Park/Park Wash road, which is still evidenced by large Ponderosa pine stumps in the area. Trial Tr., at 449–50.  Mr. Ott estimated that the logging occurred in the mid to late 1950s.  Trial Tr., at 449.  Mr. Ott did not see when the logging specifically occurred.  He did, however, live away from the area between 1954 and 1961, so it is reasonable to estimate that the logging occurred during that era.  *See* Trial Tr., at 424, 429, 449.

160.    From approximately 1948 and 1952, his father worked as a trapper.  He hunted coyotes and traveled down the Swallow Park/Park Wash road to areas further south.  Trial Tr., at 421 (J. Ott).

161.   From about 1954 until 1961, Mr. Ott did not spend much time at the ranch.  *Id.* at 421–22.  He did recall, however, that Kane County brought a bulldozer "Cat" down the road in 1957 or 1958 to bulldoze through the deep snow to help ranchers recover trapped cattle.  Trial Tr., at 446–47.

162.    In October 1961, Mr. Ott returned to the ranch.  He traveled the Swallow Park/Park Wash road with his father and cousin while they were guiding deer hunters from California.  *Id.* at 430–33.  They took twelve to fourteen hunters down the Swallow Park/Park Wash road and over the connecting North Swag road (including Sand Ridge)[14] towards the Nipple Lake on a Case tractor pulling a two-wheel wagon behind it to carry their hunting gear and to set up a camp.  *Id.* at 433–34.  While on the hunting trip, Mr. Ott saw other people on the roads who had traveled up from the south end by Kitchen Corral road.  *Id.* at 435–36.

163.    Mr. Ott testified that this group of California hunters returned every fall for the following two or three years to hunt deer.  *See id.* at 431, 437.   He also testified that he later (1965 or 1966) drove a group of hunters from Texas into the same camp to hunt deer, and that the group used a 1962 or 1963 four-wheel drive GMC pickup to travel down the Swallow Park/Park Wash road and across the connecting North Swag road.  *Id.* at 437–40.

164.    Calvin Johnson testified that he traveled the Swallow Park/Park Wash road most of his life, going back to the late 1930s, while ranching, hunting, and generally sight-seeing.  *See* Trial

---

[14]  Sand Ridge is discussed further below in paragraph 207.

Tr., at 41–45, 71, 73–74, 85.  Mr. Johnson specifically recalled traveling the Swallow Park/Park Wash road in his father's two-wheel drive 1937 Dodge pickup when he was a youth.  *Id.* at 73–76.

165.     Mr. Johnson testified that during the period between 1956 and 1960, he would move cattle every spring and fall along the Swallow Park/Park Wash road using Jeeps, tractors, and four-wheel drive pickups.  *Id.* at 41–45.  As with Mr. Ott, Mr. Johnson also testified that during this time period, his ranching partners from Tropic, Utah would travel the Swallow Park/Park Wash road on their way to access the Nipple Lake Ranch.  *Id.*  Once Mr. Johnson no longer owned an interest in the Swallow Park Ranch his usage of part of the Swallow Park/Park Wash road decreased.  *Id.* at 119.  Nevertheless, he still continued to use the road to go deer hunting and to take others on the road.  *Id.*

166.     Que Johnson testified that, as a young boy, he traveled the Swallow Park/Park Wash road from 1956 to 1961 while ranching, deer hunting, and cutting cedar posts.  Trial Tr., at 139, 157–60.  He saw other vehicles on the road during these years.  *Id.* at 159.

167.     Anton Wright testified that he traveled the Swallow Park/Park Wash road as early as the early 1970s for the purposes of sight-seeing and picnicking.  Trial Tr., at 244–45.

168.     Roger Holland testified that he first traveled the Swallow Park/Park Wash road as early as the spring of 1961, while looking for coyote dens with his grandfather in his grandfather's Jeep.  Trial Tr., at 503–05.

169.     Brent Owens testified that he first traveled the Swallow Park/Park Wash road with several friends as early as 1964 while deer hunting.  Trial Tr., at 577–79.  The road appeared to be like an old logging road.  *Id.* at 580, 583.  He knew logging had occurred in the area because his brother worked for Pearson and Croft, a company logging in the Swallow Park/Park Wash area

-42-

before 1964.  Trial Tr., at 581–83.  Mr. Owens also saw a lot of stumps and old stash piles that confirmed the location of the logging.  *Id.* at 583.

170.    During the 1964 hunting trip, Mr. Owens traveled with his friends in two Jeeps from Cedar City, Utah, to Cannonville, Utah.  They then traveled on Skutumpah until they reached its junction with the Swallow Park/Park Wash road, where they turned and continued down the Swallow Park/Park Wash road to its junction with the North Swag road.  Trial Tr., at 578–79 (B. Owens).  *Id.*  From the North Swag road, they traveled down the Nipple Lake road to a cabin on the Nipple Lake Ranch.  *Id.*  The group then returned to Cedar City following the same route along the Nipple Lake road, the North Swag road (including Sand Ridge), and through the Swallow Park/Park Wash road.  *Id.* at 586.

171.    Witnesses testified that they saw other members of the public traveling the Swallow Park/Park Wash road prior to 1976 for the apparent purposes of ranching, gathering firewood, cutting cedar posts, hunting deer, searching for artifacts, general sight-seeing, accessing hiking areas, picnicking, and picking pine nuts.  Trial Tr., at 85 (C. Johnson); Trial Tr., at 159–61, 214–15 (Q. Johnson); Trial Tr., at 251 (A. Wright); Trial Tr., at 417, 424–26, 449–50 (J. Ott).

**Reserved Lands Along Swallow Park/Park Wash**

172.    On April 17, 1926, the President of the United States issued Public Water Reserve No. 107 ("PWR 107"), which ordered that "every smallest legal subdivision of the public land surveys which is vacant unappropriated unreserved public land and contains a spring or water hole, and all land within one quarter of a mile of every spring or water hole located on unsurveyed public land be, and the same is hereby, withdrawn from settlement, location, sale, or entry, and reserved for public use."  Pretrial Order, at 31, ¶ 25.

173.    On April 11, 1929, the Secretary of the Interior, by Interpretation No. 92, construed PWR 107 to include two parcels of land located along Swallow Park/Park Wash.  The first parcel is the north half of the southeast quarter (N½ SE¼) of Section 31, Township 39 South, Range 3 West, S.L.M.  Interpretation No. 92 (Def. Ex. N, at 2); *see also* Pretrial Order, at 32, ¶ 26.  The second parcel is the northwest quarter of the northeast quarter (NW¼ NE¼) and the northeast quarter of the northwest quarter (NE¼ NW¼) of Section 5, Township 40 South, Range 3 West, S.L.M. *Id.*

174.    The BLM Historical Indexes for these two townships show that once Interpretation No. 92 was entered against these lands on April 11, 1929, it remained without revocation.  Pl. Exs. 121, 124.

175.    This means that approximately one-half mile of the Swallow Park/Park Wash road crosses lands that have been subject to PWR 107 since 1929.  Pretrial Order, at 12; *see also* Pl. Ex. 35.

176.    On February 1, 1952, the BLM issued oil and gas lease U 05309 on the same land (in Section 31, Township 39 South, Range 3 West, S.L.M.), that was already subject to PWR 107.  Trial Tr., at 954 (J. Harja); *see also* Pl. Ex. 121, at 2.

177.    These same lands, among others, also were subject once to Coal Withdrawal No. 1.  Trial Tr., at 950–53 (J. Harja); *see also* Pl. Ex. 144.  Coal Withdrawal No. 1, stated that it "withdrew from settlement, location, sale or entry, and reserved" this same land for "classification and appraisement with respect to coal values." Pl. Ex. 144.

178.    The Tenth Circuit Court of Appeals has held that Coal Withdrawal No. 1 did not reserve public lands from the operation of R.S. 2477.  *SUWA*, 425 F.3d at 784-85.  While Coal

-44-

Withdrawal No. 1 expressly stated that it "reserved" the lands, this reservation did not actually reserve the lands from R.S. 2477's grant of rights-of-way. *Id.*

179.     Besides the above reservations, a short segment of the Swallow Park/Park Wash road crosses a former SITLA parcel in Section 32, Township 39 South, Range 3 West, S.L.M. ("SITLA Parcel Five"). *Kane County*, 2011 U.S. Dist. LEXIS 66218, at *4.

180.     Plaintiffs contend they have a right-of-way across the water reserve sections and SITLA Parcel Five. Whether Plaintiffs have a right-of-way across these sections is a matter of law that the court addresses below.

**Scope of Swallow Park/Park Wash**

181.     Vane Campbell testified that on Class B roads from 1967 through 1992, he tried to maintain the travel surface from 14 to 24 feet wide. Trial Tr., at 655–56. Kane County only maintains the first mile of the Swallow Park/Park Wash road as a Class B road to keep it open as a public highway for general travel and to provide a public road for the private property owners who use the road for access. Trial Tr., at 1308–09 (M. Habbeshaw). Otherwise, Swallow Park/Park Wash is a Class D road.

182.     Several times, the county had to blade the Swallow Park/Park Wash road to allow cattle to trail out. Trial Tr., at 446 (J. Ott). Specifically, in 1957 or 1958, the county bladed the entire length of the Swallow Park/Park Wash road to clear snow and allow trailing. Trial Tr., at 447–48 (J. Ott); *see also* Trial Tr., at 510 (R. Holland) ("vaguely" recalling the road had been bladed).

183.     Kane County's measurements, made during its GPS project, estimated the travel surface of the Class B road section was 10 feet wide, with a disturbed area width of 14 feet. Mr.

Pratt testified, and the United States concurred, the estimated width for that section appeared to be underestimated.  Trial Tr., at 1223 (L. Pratt).  For the remainder of Swallow Park/Park Wash, the estimated travel surface was 10 to 12 feet wide, with a disturbed area width of 14 feet.  *Id.* at 1224.

184.    Mr. Mahoney is in a unique position to testify as to the appearance of the Swallow Park/Park Wash, North Swag, and Nipple Lake routes shortly after October 1976, because he traveled these routes in the summer of 1979 as part of his work on BLM's wilderness inventory project.  Specifically, Mr. Mahoney first traveled on the Swallow Park/Park Wash route in the summer of 1979 in a four-wheel drive Jeep.  *Id.* at 1365.  Mr. Mahoney testified that the first mile or two coming south from Skutumpah road was graded and maintained, but then coming off the upper bench, about a half mile south of the private lands, the route became less-obviously maintained, sandier and narrower so that it was only the width of one vehicle, and the southern-most part of the route traveled for a portion of its distance in a wash.  *Id.* at 1365–66; 1369–70.

185.    During the court's site visit in December of 2010, the Swallow Park/Park Wash road generally appeared to be a maintained road where two vehicles could pass along the northernmost mile of the road.  The remainder of the road was a single lane dirt road.

**North Swag Road**

186.    The K4370 North Swag road ("North Swag") is located in western Kane County, Utah.  Pretrial Order, at 32, ¶ 28.

187.    The North Swag road commences at its intersection with the Swallow Park/Park Wash road in the northeast quarter (NE¼) of Section 9, Township 40 South, Range 3 West, S.L.M., and proceeds approximately 5 miles southeasterly to its intersection with the K4200 Kitchen Corral

-46-

road in the southwest quarter of the northwest quarter (SW¼ NW¼) of Section 30, Township 40 South, Range 2 West, S.L.M.  Pretrial Order, at 32, ¶ 29.

188.    The general course of the North Swag road, as claimed by Plaintiffs in this litigation, is shown on the map and centerline data in Plaintiffs' Exhibit 11.  The parties do not dispute the accuracy of the map or data.  *See* Pretrial Order, at 32.

189.    The west end of the North Swag road has appeared on the USGS Deer Spring Point, Utah 7.5 minute quadrangle map since at least 1966 (as compiled from aerial photographs taken in 1963).  Pl. Ex. 48B; Pretrial Order, at 33, ¶ 32.

190.    The east end of the North Swag road has appeared on the USGS Deer Range Point, Utah 7.5 minute quadrangle map since at least 1966 (as compiled from aerial photographs taken in 1963), but with some variations in course.  Trial Tr., at 801–05 (M. Peters); Pl. Ex. 55B; Pretrial Order, at 33, ¶ 32.

191.    The North Swag road generally appears on USGS orthophoto quad aerial photography taken on October 13, 1976.  Trial Tr., at 848–54 (M. Peters); Pl. Ex. 264B.  The aerial photography lacks the same clarity as the maps referenced above.  Consequently, not all portions of the road are visible.[15]  Additionally, there are some variations between the disturbances on the ground and the claimed route.  The photography nevertheless shows the North Swag road was sufficiently defined to appear in the aerial shots, following substantially the same course claimed by Plaintiffs.

---

[15]  Although not all portions were visible in the aerial photography, witness testimony discussed herein established that North Swag existed as one continuous route.

192.     As evidenced by USGS maps and 1976-era aerial photography, the historically traveled course of the North Swag road, as it existed in 1976, is substantially the same as the currently traveled course of the road.  Trial Tr., at 801–05, 848–54 (M. Peters); Pl. Exs. 48A, 48B, 55A, 55B, 264A, 264B, 264C; Pretrial Order, at 33, ¶ 32.

193.     Additionally, the survey plat prepared in connection with the 1959 cadastral survey of Township 40 South, Range 3 West, S.L.M., identified a road at the location of the North Swag road.  Trial Tr., at 960–62 (J. Harja); Pl. Ex. 107.  The survey was done to identify the location and characteristics of the SITLA parcels (Section 2, 16, 32, and 36 of every township).  Trial Tr., at 960. The survey also shows the midpoint line of the township, that runs north to south.  *Id.*  The surveyor noted the topography and other items of interest located at that midpoint line.  On the midpoint line, north of Section 16, at the identifying point of "NO° 02 and 80.00," there is a symbol for a road traversing the midpoint line.  *Id.* at 960–61.  The present course of North Swag crosses the midpoint line in substantially the same location.  The remainder of the township was unsurveyed, and thus, does not reflect the full route of the road.

194.     Likewise, the BLM's survey engineer field notes, taken during the 1959 cadastral survey, note the presence of a "Jeep road."  Pl. Ex. 60, at 23.  The location of the Jeep road corresponds to the road symbol on the survey plat map.  Trial Tr., at 962–63 (J. Harja).

195.     The North Swag road crosses two different ranges in Township 40.  Prior to R.S. 2477's repeal on October 21, 1976, the BLM's Historical Index for Township 40 South, Range 3 West, S.L.M., indicates that the public lands crossed by the North Swag road were not reserved from the operation of R.S. 2477 during the time period at issue here.  Trial Tr., at 964 (J. Harja); Pl. Ex. 124; Pretrial Order, at 33, ¶ 30.  Likewise, prior to R.S. 2477's repeal on October 21, 1976, the

-48-

BLM's Historical Index for Township 40 South, Range 2 West, S.L.M., indicates that the public lands crossed by the North Swag road were not reserved from the operation of R.S. 2477.[16]  Trial Tr., at 968 (J. Harja); Pl. Ex. 123; Pretrial Order, at 33, ¶ 30.

196.    Calvin Johnson testified that he traveled the North Swag road on horseback when he was 10 or 12 years old (i.e., the mid 1930s) while running cattle with his neighbor Frank Farnsworth. Trial Tr., at 27–28.  During one of these early trips with Mr. Farnsworth, in the mid-1930s, Mr. Johnson witnessed people traveling the North Swag road with teams and wagons.  *Id.*  In the 1940s and 1950s, Mr. Johnson testified that he traveled the North Swag road in a Jeep to hunt deer personally and to guide other deer hunters from California.  *Id.* at 69–70.  Mr. Johnson further testified that during the period between 1956 and 1960, he moved cattle every spring and fall along the North Swag road using Jeeps, tractors, and four-wheel drive pickups.  During this time period, his ranching partners would travel from Tropic, Utah, down the North Swag road, on their way to the Nipple Lake Ranch.  *Id.* at 41–45.

197.    Que Johnson testified that, as a young boy, he traveled the North Swag road from 1956 to 1961 while ranching, hunting deer, and cutting cedar posts. Trial Tr., at 157–58.  He saw other vehicles on the road during these years.  *Id.* at 158–59.

198.    Anton Wright testified that he traveled North Swag from about 1956 to 1961 while helping Calvin Johnson with his cattle operation.  *See* Trial Tr., at 229–30.  He then traveled North

---

[16]  Part of the North Swag road traverses through the Paria-Hackberry WSA.  Another part of North Swag adjoins the WSA.  As stated above, however, the public lands crossed by North Swag were not reserved prior to October 1976.  Consequently, even though North Swag may  traverse the Paria-Hackberry WSA, this factor does not preclude establishing an R.S. 2477 road over such lands. Accordingly, the court will not address the WSA in its analysis other than to note the nature of the land traversed by North Swag.

Swag in 1964 as part of a family reunion.  Mr. Wright recalled that he and his relatives from

California took a four-wheel drive Bronco and a Volkswagen Baja Bug across the North Swag so

they could go picnicking and sightseeing.  *Id*. at 241–42.  The Volkswagen got stuck in the sand just

before Sand Ridge, but eventually made it over.  *Id.* at 242.

      199.   As stated above, from about 1961 to 1963, James Ott traveled the North Swag road

when he and his relatives acted as a guide to deer hunters from California.  Trial Tr., at 430–33 (J.

Ott).  During part of one trip, they went on "an old oil road" off of North Swag and set up a

campsite.  *Id.* at 432.  In 1965 or 1966, he took another set of deers hunters from Texas on North

Swag.  On the earlier trips, Mr. Ott loaded the hunting and camping gear in a trailer and pulled it

behind a Case tractor.  On the later trip, the group used a four-wheel drive GMC pickup.  *Id*. at

437–40.

      200.   As stated in paragraph 170 above, when Brent Owens and several of his friends

decided to skip school and go deer hunting in 1964, they traveled the full length of the North Swag

road (including Sand Ridge) down to the Nipple Lake Ranch and then back up North Swag to

connect with Swallow Park/Park Wash and Skutumpah.  Trial Tr., at 577–79 (B. Owens).  The group

traveled in two Jeeps on the trip.

      201.   Roger Holland testified that he traveled at least part of the North Swag road by 1961

with his grandfather, in his grandfather's Jeep, while looking for coyote dens in the spring.  Trial

Tr., at 486–87.  He also testified that he believed he had traveled the eastern portion of the North

Swag road prior to 1962 with his uncle while guiding deer hunters in the area.  *Id.* at 497–98.  Mr.

Holland further testified that he traveled the North Swag with his friend, Nyle Willis, sometime

between 1963 and 1971.  On that trip they were generally exploring, rock hunting, hiking, taking

photographs, and looking for artifacts.  *Id.* at 499–502.

202.    Louis Pratt testified that he traveled the North Swag road as early as 1974 or 1975

with his family.  Trial Tr., at 1056–58.  On his first trip on the North Swag road in 1974 or 1975, he

was traveling with his parents and grandparents in their Jeeps, and they were attempting to locate

the antlers of a deer that his grandfather had shot in a prior year in the North Swag area.  *Id.* at

1056–58, 1065.  They also looked for arrowheads.  *Id.* at 1066.  Subsequently, they traveled North

Swag every fall for scouting and deer hunting.  *Id.*  During those trips, they saw other people on the

road also scouting and deer hunting.  *Id.* at 1066–67.  They further saw horse trailers and camping

trailers parked along North Swag.  *Id.* at 1067.

203.    Witnesses testified that other members of the public were also seen using the North

Swag road prior to 1976 for the apparent purposes of ranching, gathering firewood, hunting deer,

picking pine nuts, sight-seeing, and searching for artifacts.  Trial Tr., at 85 (C. Johnson); Trial Tr.,

at 158–59 (Q. Johnson); Trial Tr., at 435–36 (J. Ott); Trial Tr., at 1066–67 (L. Pratt).

**Scope of North Swag**

204.    North Swag is a Class D road.  Consequently, Mr. Pratt assigned a road category

rating of 1 and a maintenance category rating of 1 to it.  This is the lowest rating on his scale.  Ex.

224-A; Trial Tr., at 1233–34 (L. Pratt).  Other than the blading and maintenance work noted below,

Kane County has not maintained the North Swag road.

205.    Kane County bladed the North Swag road in 1996.  Trial Tr., at 502 (R. Holland).

206.    A small section of the North Swag road, near the Nipple Lake road, is regularly hit

with flash floods.  Kane County previously maintained a catchment pond next to North Swag to

-51-

prevent flood waters from damaging other roads and flooding the Nipple Lake Ranch.  Trial Tr., at

1078 (L. Pratt).  On two occasions since 1986, Kane County took in a front-end loader to clean out

the sand accumulated in the pond and to reinforce the dike.  *Id.* at 1077–78.  Subsequently, the BLM

has not permitted this maintenance work.  *Id.*

207.    The North Swag road crosses a feature called the "Sand Ridge," which is less than

a mile from where the North Swag road intersects with the Swallow Park/Park Wash road.  Trial Tr.,

at 45–47 (C. Johnson).  It is a rock ledge in a sandy area that makes travel over this section of North

Swag difficult, particularly in summer when the soil is dry.  *Id.* at 47.  As discussed in the following

paragraphs, at times vehicles traveling down from Swallow Park/Park Wash road, or up from the

Nipple Lake and Kitchen Corral roads, stop at the Sand Ridge and turn around to avoid traversing

it.  Trial Tr., t 1365, 1367–68  (K. Mahoney).  When soil conditions are moist, however, there is not

a problem going over Sand Ridge.  *Id.* at 48.

208.    Ken Mahoney first traveled North Swag in summer of 1979 as an employee of the

BLM.  He traveled a half to one mile south of Swallow Park/Park Wash then stopped to camp for

the night.  *Id.* at 1365, 1367–68.  He did not travel further that day because he could not get over

Sand Ridge despite being in a four-wheel drive vehicle.  *Id.* at 1367–68.  Mr. Mahoney recalled

North Swag being a two track route through the surrounding sagebrush that got very sandy as one

went southeast.  *Id.* at 1368.

209.    Later that same summer, Mr. Mahoney testified that he used the Kitchen Corral road

to come up North Swag from the south end.  Trial Tr., at 1370 (K. Mahoney).  When he reached

Sand Ridge, it was steeper on the south side.  *Id.* at 1371.  Consequently, he again could not traverse

Sand Ridge despite being in a four-wheel drive vehicle. *Id.*; *see also* Def. Ex. UU (photographs of North Swag taken on the 1979 trip).

210.    Kane County's measurements, made during its GPS project, estimated the travel surface of North Swag was 10 feet wide. Trial Tr., at 1224 (L. Pratt); Pl. Ex. 224-A. Mr. Pratt stated the 1996 photographs showed the travel width was a little more than 8 feet. *Id.* at 1224–25. The estimated width of the prior disturbed area was 14 feet. *Id.* at 1224; Pl. Ex. 224-A.

211.    During the court's site visit in December of 2010, the North Swag road was a primitive single lane road crossing dirt and sand.

**Nipple Lake Road**

212.    The K4290 Nipple Lake road ("Nipple Lake") is located in western Kane County, Utah. Pretrial Order, at 33, ¶ 33.

213.    The Nipple Lake road commences in the northeast quarter of the southwest quarter (NE¼ SW¼) of Section 30, Township 40 South, Range 2 West, S.L.M., and proceeds approximately 0.4 miles northwesterly to where it ends at an intersection with the K4200 Kitchen Corral road in the southwest quarter of the northwest quarter (SW¼ NW¼) of Section 30, Township 40 South, Range 2 West, S.L.M. Pretrial Order, at 33, ¶ 34.

214.    The general course of the Nipple Lake route, as claimed by Plaintiffs in this litigation, is shown on the map and centerline data in Plaintiffs' Exhibit 10. The parties do not dispute the accuracy of the map or data. *See* Pretrial Order, at 33–34.

215.    The Nipple Lake road has appeared on the USGS Deer Range Point, Utah 7.5 minute quadrangle map since at least 1966 (as compiled from aerial photographs taken in 1963). Trial Tr., at 801–05 (M. Peters); Pl. Ex. 55B; Pretrial Order, at 34, ¶ 36.

-53-

216.     The Nipple Lake road appears on USGS orthophoto quad aerial photography taken on October 13, 1976.  Trial Tr., at 854 (M. Peters); Pl. Ex. 264B.

217.     As evidenced by USGS maps and 1976-era aerial photography, the historically traveled course of the Nipple Lake road, as it existed in 1976, is substantially the same as the currently traveled course of the road.  Trial Tr., at 801–05, 854 (M. Peters); Pl. Exs. 55A, 55B, 264A, 264B, 264C.

218.     The southern terminus of the Nipple Lake road extends at least to the Nipple Lake Ranch.[17]  The BLM's 1904 Cadastral Survey plat for Township 40 South, Range 2 West, S.L.M. shows a road exiting at the Nipple Lake Ranch about a quarter mile east of Nipple Lake road's current alignment.  Trial Tr., at 966–67 (J. Harja); Pl. Ex. 106.

219.     At the time of the 1904 Cadastral Survey plat for Township 40 South, Range 2 West, S.L.M., two cabins were located in the Nipple Lake area, and are represented to have been owned by Edward Reynolds and Abner N. Potter.  Trial Tr., at 967 (J. Harja); Pl. Ex. 106.

220.     Prior to R.S. 2477's repeal on October 21, 1976, the BLM's Historical Index for Township 40 South, Range 2 West, S.L.M., indicates that the public lands crossed by the Nipple Lake road were not reserved from the operation of R.S. 2477.  Trial Tr., at 968 (J. Harja); Pl. Ex. 123; Pretrial Order, at 34, ¶ 34.

221.     Calvin Johnson testified that he traveled the Nipple Lake road on horseback when he was 10 or 12 years old (*i.e.*, the mid-1930s) while running cattle with his neighbor, Frank Farnsworth.  Trial Tr., at 27–28.  During these early trips with Mr. Farnsworth in the mid-1930s, Mr.

---

[17]  The court does not address whether any portion of the Nipple Lake road extends onto private property because Plaintiffs have not sought a determination on that issue.

-54-

Johnson witnessed people traveling with teams and wagons down the Nipple Lake road to the Nipple Lake Ranch.  *Id.*  He mainly saw livestock people, some wood haulers, and deer hunters.  *Id.* at 85. During the 1940s and 1950s, Mr. Johnson testified that he frequently used the Nipple Lake road to access the Nipple Lake Ranch.  *Id.* at 81–82.

222.    By 1956, Mr. Johnson acquired part ownership in the Nipple Lake Ranch.  As early as 1956, Mr. Johnson moved cattle every spring and fall along the Nipple Lake road using Jeeps, tractors, and four-wheel drive pickups.  Trial Tr., at 41–45.  During this same time period, his ranching partners would travel from Tropic, Utah, down the Nipple Lake road on their way to the Nipple Lake Ranch.  *Id.*

223.    By 1966, Mr. Johnson testified the Nipple Lake road was used by Pan Am Company when it drilled a well north of the Nipple Lake Ranch.  Trial Tr., at 55–56.  The drilling company traveled Nipple Lake road to access water on the Nipple Lake Ranch for use in its drilling operations.  *Id.* at 55–56.

224.    On the Nipple Lake Ranch, there is a location of interest called the Monkey House. Mr. Johnson saw sightseers travel down the Nipple Lake road to see the Monkey House.  Trial Tr., at 89.  After obtaining full ownership of the Nipple Lake Ranch, Mr. Johnson on occasion would lock the gate to his property.  *Id.* at 59–60; 188–89.  By the 1980s, Mr. Johnson kept the gate locked due to vandalism on his property.  *Id.* at 59–60.

225.    Brent Owens testified that he traveled the Nipple Lake road as early as 1964 while deer hunting with his friends from Cedar City, Utah. Trial Tr., at 577–79.  On that trip, they traveled the full length of Swallow Park/Park Wash, North Swag, and Nipple Lake before reaching the cabin on Nipple Lake Ranch.  *Id.* at 578–79.

226.    Roger Holland testified that he traveled the Nipple Lake road prior to 1961 with his grandfather, in his grandfather's Jeep, while searching for coyote dens in the spring.  Trial Tr., at 476–78, 487.  He recalled traveling all the way to the private property before turning around.  *Id.* at 478.  Mr. Holland further testified that he traveled Nipple Lake road with his friend, Nyle Willis, prior to 1971.  *Id.* at 487–88.  On this trip with Mr. Willis, the two traveled the Nipple Lake road, parked at the Nipple Lake Ranch, and hiked to the top of Mollie's Nipple.  *Id.* at 488.  Before 1976, Mr. Holland returned to the Nipple Lake road with Mr. Willis.  *Id.* at 548.  On that trip, the two went out to the Monkey House.  *Id.*  After 1976,  Mr. Holland traveled with a group of ten people to see the Monkey House again.  *Id.* at 492–93, 548–49.

227.    James Ott testified that he traveled the Nipple Lake road as early as 1965 while scouting for signs of deer and sight-seeing.  Trial Tr., at 445.

228.    Louis Pratt testified that he traveled the Nipple Lake road prior to 1976 with his father, in his father's Jeep, while exploring, visiting the Monkey House on the Nipple Lake Ranch, and searching for arrowheads and shed deer antlers.  Trial Tr., at 1067–68.  He further testified that the Monkey House is a famous location and people have and continue to travel the Nipple Lake road to access the Monkey House.  *Id.* at 1085.

229.    Anton Wright testified that he traveled the Nipple Lake road as early as 1956 while helping Calvin Johnson with his cattle operation.  *See* Trial Tr., at 225.  Mr. Wright recalled that Calvin Johnson's ranching partners from Tropic, Utah, would travel the Nipple Lake road in a Ford tractor pulling a trailer to bring supplies to the Nipple Lake Ranch in approximately 1956.  *Id.*  From 1956 to 1961, Mr. Wright also saw a few deer hunters on Nipple Lake road.  *Id.* at 232.  Further, as part of a family reunion in 1964, Mr. Wright recalled that he and his relatives from California took

a four-wheel drive Bronco and a Volkswagen Baja Bug sight-seeing and traveled the Nipple Lake road to see the Monkey House and the Nipple Lake Ranch. *Id.* at 241–43. Mr. Wright continued to use Nipple Lake road almost every year after 1968 to hunt and sightsee. *Id.*

**Scope Nipple Lake Road**

230.    In the 1980's, Kane County designated the Nipple Lake road as a Class B road, and thereafter maintained the road to that standard. Trial Tr., at 130–31 (C. Johnson). Kane County keeps the road open for general travel and to provide a public road for the private property owners. Trial Tr., at 1308 (M. Habbeshaw).

231.    Prior to the 1980s, Kane County maintained the Nipple Lake road upon request. Trial Tr., at 131 (C. Johnson) (testifying that "in the wintertime, we would have snows and have livestock and the county would help us out there").

232.    Kane County measurements, made during its GPS project, estimated the travel surface of Nipple Lake was 20 feet wide and the width of the prior disturbed area was 22 feet. Trial Tr., at 1225 (L. Pratt).

233.    When Anton Wright first traveled Nipple Lake road in 1956, he also estimated the travel surface was 20 feet wide. Trial Tr., at 227–28 (A. Wright). Other witnesses testified it was just a sandy two track road. *See, e.g., id.* at 585–86 (B. Owens).

234.    Mr. Johnson testified that Nipple Lake road was upgraded in 1966 by the Pan Am Company when they drilled a well north of the Nipple Lake Ranch. Trial Tr., at 55–56.

235.    During the court's site visit in December of 2010, the Nipple Lake road appeared to be wide enough for two lanes of travel and had a sandy surface.

**Cave Lakes Road**

236.     The K1070 Cave Lakes road ("K1070") is located in southwestern Kane County, Utah. Pretrial Order, at 34, ¶ 37.

237.     The K1070 road commences at private property in the northwest quarter of the northeast quarter (NW¼ NE¼) of Section 2, Township 43 South, Range 7 West, S.L.M., and proceeds a little over a mile northwesterly to its intersection with the Hancock road in the southeast quarter of the northeast quarter (SE¼ NE¼) of Section 34, Township 42 South, Range 7 West, S.L.M.  Pretrial Order, at 34, ¶ 38.

238.     The general course of the K1070 road, as claimed by Plaintiffs in this litigation, is shown on the map and centerline data in Plaintiffs' Exhibit No. 12.  The parties do not dispute the accuracy of the map or data.  *See* Pretrial Order, at 33-34.

239.     The K1070 road has appeared on the USGS Kanab, Utah-Arizona 7.5 minute quadrangle map since at least 1985.  Trial Tr., at 807–08 (M. Peters); Pl. Ex. 56B.  The map was compiled from aerial photographs taken in 1976.  Pl. Ex. 56B.

240.     The K1070 road also appears on USGS orthophoto quad aerial photography taken on October 7, 1976.  Trial Tr., at 832–33 (M. Peters); Pl. Ex. 278B.

241.     As evidenced by USGS maps and 1976-era aerial photography, the historically traveled course of the K1070 road, as it existed in 1976, is substantially the same as the currently traveled course of the road.  Trial Tr., at 808, 833 (M. Peters); Pl. Exs. 56A, 56B, 278A, 278B, 278C.

242.    The BLM's Historical Index for Township 42 South, Range 7 West, S.L.M., reveals that the public lands crossed by the K1070 road were not reserved from the operation of R.S. 2477 at the time of the uses discussed below.  Trial Tr., at 973–74 (J. Harja); Pl. Ex. 131.

243.    Anton Wright testified that he traveled the K1070 road as early as 1959 while hiking and hunting rabbits.  Trial Tr., at 268–70.  On his first trip in 1959, Mr. Wright recalled traveling with friends down the K1070 road in a station wagon.  *Id.*  Eventually, they had to turn the station wagon around because of the deep sand.  *Id.*  Mr. Wright continued to travel the road almost every year after that, except from 1966 to 1968 when he was in military service.  *Id.* at 275.  He would travel the K1070 road to scout and hunt.  *Id.* at 276.

244.    Roger Holland testified that he traveled the K1070 road in a vehicle sometime between 1961 and 1963 while exploring and visiting Indian ruins in the area.  Trial Tr., at 522–23.

245.    James Mace was born in 1952 and lived in Kanab until he left for two years of post-secondary education in Provo, Utah, in 1970.  Trial Tr., at 888–89 (J. Mace).  While living in Provo, Mr. Mace usually returned to Kanab every weekend to help his father with the farm and ranch.  *Id.* at 889.

246.    Mr. Mace testified that he traveled the K1070 road in a vehicle every year from the time that he was 16 (i.e., 1968) until 1973 while hunting deer and visiting his neighbors that lived at the end of the K1070 road.  Trial Tr., at 900–01.  On most occasions when he was on K1070, Mr. Mace saw other people on the road.  He observed them hunting, sightseeing, cutting firewood and cedar posts, and occasionally hiking.  *Id.* at 902–03.

247.    Louis Pratt testified that he traveled the K1070 road between 1974 and 1976 with his father, in his father's 1974 CJ5 Jeep while jeeping, hunting and scouting for deer, and searching for

-59-

arrowheads. Trial Tr., at 1124–26. Mr. Pratt would generally travel K1070 a couple times per year. *Id.* at 1126.

248.    Theo McAllister was born in 1929 and is a lifelong resident of Kanab. Theo McAllister Deposition, 7–8 (Dkt. No. 209, Ex. 7) (hereinafter "T. McAllister Depo."). He testified that he traveled the K1070 road as early as the 1950s in a Jeep station wagon while visiting Indian ruins located in a cave south of the end of the road. *Id.* at 52–54. Mr. McAllister also testified that he traveled the K1070 road "two or three times a year" throughout the 1950s, 1960s, and 1970s. *Id.* at 54–55.

249.    Benny Cornell testified that he traveled the K1070 road as early as 1973 in a pickup truck while accessing his father-in-law's property and hunting deer. Benny Cornell Deposition, 13–16 (Dkt. No. 209, Ex. 5) (hereinafter "Cornell Depo.").

250.    Witnesses testified that they saw other members of the public traveling the K1070 road prior to 1976 for the apparent purposes of hunting deer, accessing residences in the area, sight-seeing, gathering firewood, and cutting cedar posts. Trial Tr., at 284 (A. Wright); Trial Tr., at 902–03 (J. Mace), Trial Tr., at 1127 (L. Pratt). Mr. Wright testified that prior to 1976 he saw over one hundred people on the K1070 road. *Id.* at 284–85.

251.    At trial, the parties stipulated that a state court determined that the portion of K1070 that traverses private land was not a public road. Trial Tr., at 1247–49, 1252–53; *see also* Def. Exs. LL & OO. The fact that a locked gate exists where K1070 extends onto private lands, so as to interrupt use of that portion of the road, appears to have been a factor in the determination. *Id.* at 1249.

**Scope of K1070**

252.     The K1070 road had been bladed before 1959 when Mr. Wright first traveled the road.  Trial Tr., at 269 (A. Wright).  The K1070 road crosses sand, and there were berms along the sides of the road.  *Id.*  Mr. Holland also testified that it appeared the road had been bladed when he traveled on it in the 1960s.  *Id.* at 525–26 (R. Holland).  Likewise, Mr. Owens testified the road had been bladed when he traveled it in the 1970s, which was evident because there was no brush growing up in the middle between two tracks.  *Id.* at 595, 618–19.  More recently, Kane County has bladed this road at the request of private property owners.  *Id.* at 1140 (L. Pratt).  Otherwise, the road is not maintained because it is only a Class D road.  *Id.*

253.     Kane County's measurements, made during its GPS project, estimated the travel surface of K1070 was 20 feet wide and the width of the prior disturbed area was 30 feet.  Trial Tr., at 1221; Pl. Ex. 224-A.  Mr. Pratt acknowledged, however, the width likely varied along different places of the road.  Trial Tr., at 1221.

254.     Mr. Holland testified that K1070 was about 16 feet wide in the 1960s and sandy. Trial Tr., at 525, 561.

255.     During the court's site visit in December of 2010, the K1070 road was a single lane road crossing sand, where vehicles could pass each other on some sections.

**K1075 Cave Lakes Road**

256.     The K1075 Cave Lakes road ("K1075") is located in southwestern Kane County, Utah.  Pretrial Order, at 34, ¶ 37.

257.     The K1075 road commences at private land in the northeast quarter of the southeast quarter (NE¼ SE¼) of Section 35, Township 42 South, Range 7 West, S.L.M., and proceeds

approximately 1.5 miles westerly to its intersection with the Hancock road in the southeast quarter

of the northeast quarter (SE¼ NE¼) of Section 34, Township 42 South, Range 7 West, S.L.M.

Pretrial Order, at 34, ¶ 39.

258.    The general course of the K1075 road, as claimed by Plaintiffs in this litigation, is

shown on the map and centerline data in Plaintiffs' Exhibit 13. The parties do not dispute the

accuracy of the map or data. *See* Pretrial Order, at 33-34.

259.    The K1075 road has appeared on the USGS Kanab, Utah-Arizona 7.5 minute

quadrangle map since at least 1985.  Trial Tr., at 807–08 (M. Peters); Pl. Ex. 56B.  The map was

compiled from aerial photographs taken in 1976.  Pl. Ex. 56B.

260.    The K1075 road appears on USGS orthophoto quad aerial photography taken on

October 7, 1976.  Trial Tr., at 832–38 (M. Peters); Pl. Ex. 278B.

261.    As evidenced by USGS maps and 1976-era aerial photography, the historically

traveled course of the K1075 road, as it existed in 1976, is substantially the same as the currently

traveled course of the road.  Trial Tr., at 807–08, 832–38 (M. Peters); Pl. Exs. 56A, 56B, 278A,

278B, 278C.

262.    The BLM's Historical Index for Township 42 South, Range 7 West, S.L.M., reveals

that the public lands crossed by the K1075 road were not reserved from the operation of R.S. 2477

at the time of the foregoing uses prior to R.S. 2477's repeal on October 21, 1976.  Trial Tr., at

973–74 (J. Harja); Pl. Ex. 131.

263.    Anton Wright testified that he traveled the K1075 road in a vehicle as early as 1962

to hunt and scout for deer.  Trial Tr., at 271–77.  Beginning in approximately 1972, Mr. Wright

would also regularly travel the road with family and friends to picnic in a large meadow on the

private property that is accessed by the K1075 road. *Id.* at 276–77. Prior to 1976, Mr. Wright sometimes saw others traveling the K1075 road to hunter deer, check livestock, gather firewood, and cut cedar posts. *Id.* at 285.

264.    Roger Holland testified that he traveled the K1075 road as early as 1961 in a two wheel drive 1949 pickup truck. Trial Tr., at 530–31. He recalled traveling the road at least three times between 1961 and 1971 to hunt deer, explore, and visit archeological sites. *Id.* at 530–37. He did not recall seeing anyone else on the road during his trips. *Id.* at 537.

265.    Brent Owens testified that he traveled the K1075 road in a vehicle as early as 1973 while hunting deer. Trial Tr., at 594–95. He also recalled seeing other deer hunters on the road prior to 1976. *Id.* at 594–95.

266.    James Mace testified that the K1075 road has been the primary access to his ranching property, and that he has traveled the road since he was approximately eight-years-old with his father (i.e., 1960). Trial Tr., at 897, 904. Mr. Mace also testified that he traveled the road for his family ranching business, and that he and his father would hunt deer while they were out gathering cows. *Id.* at 904–05. Mr. Mace saw members of the public using K1075 during the 1950s and 1960s for purposes of hunting, gathering wood, hiking, and sightseeing. *Id.* at 909–10.

267.    Louis Pratt testified that he traveled the K1075 road in a Jeep possibly as early as 1974 with his father for the purpose of jeeping up Cave Lakes Canyon. Trial Tr., at 1127–30. They would start at Utah State Highway 89 and travel up Cave Lakes Canyon and connect to K1075 where it travels west to the intersection with the Hancock road. *Id.*

268.    Benny Cornell became a Kanab resident in about 1970. Cornell Depo., 6. He first traveled the K1075 road in 1973 to hunt deer and to access grazing allotments. *Id.* at 17.

269.     Theo McAllister testified that he traveled the K1075 twice, to his recollection, back during the 1950s.  T. McAllister Depo. at 100–04.  He recalled traveling the road with Lester Johnson, an employee for Kanab City, to check the city water system while the two men were on a hunting trip.  *Id.*

**Scope of K1075**

270.     Mr. Wright testified that K1075 had been bladed when he first traveled it in the 1960s.  Trial Tr., at 277–78.  Mr. Owens also testified that K1075 had been bladed when he first traveled it in the 1970s.  *Id.* at 595–96.

271.     The Kane County measurements, made during its GPS project, estimated the travel surface of K1075 was 12 feet wide and the width of the prior disturbed area was 16 feet.  Trial Tr., at 1222, Pl. Ex. 224-A.

272.     Mr. Holland testified that K1075 was more of a two-track road in comparison to K1070 when he traveled it in the early 1960s.  Trial Tr., at 534 (R. Holland).  He further testified that it was about 8 feet wide, but some areas along the road were wider than 8 feet.  *Id.* at 569–70.

273.     During the court's site visit in December of 2010, the K1075 road was a single lane road crossing sand, and vehicles could pass each other on some sections.

**K1087 Cave Lakes Road**

274.     The K1087 Cave Lakes ("K1087") road is located in southwestern Kane County, Utah.  Pretrial Order, at 34, ¶ 37.

275.     At trial, the court accepted a stipulation by the parties to amend Plaintiffs' Ninth Cause of Action as it relates to the K1087 road.  Trial Tr., at 1687–88.  The parties stipulated that

the Complaint be amended to be made consistent with the evidence presented at trial, which added

an additional 0.1991 miles to K1087's eastern end. *See id.*

276. As stipulated to by the parties, and accepted by the court during trial, the K1087 road

commences at its boundary with private property in the southwest quarter of the southwest quarter

(SW¼ SW¼) of Section 19, Township 42 South, Range 6 West, S.L.M., and proceeds approximately

1 mile northwesterly to its intersection with the Hancock road in the northeast quarter of the

southwest quarter (NE¼ SW¼) of Section 24, Township 42 South, Range 7 West, S.L.M. Pretrial

Order, at 35, ¶ 40; Trial Tr., at 1687–88; Pl. Ex. 300.

277. The general course of the K1087 road, as claimed by Plaintiffs in this litigation, is

shown on the map and centerline data in Plaintiffs' Exhibit 14. *See also* Pl. Ex. 300. The parties

do not dispute the accuracy of the map or data. *See* Pretrial Order, at 34; Trial Tr., at 1687–88.

278. The K1087 road has appeared on the USGS White Tower, Utah 7.5 minute

quadrangle map since at least 1985. Trial Tr., at 809–11 (M. Peters); Pl. Ex. 56(b)B. The map was

compiled from aerial photographs taken in 1976. Pl. Ex. 56(b)B.

279. The K1087 road appears on USGS orthophoto quad aerial photography taken on

October 7, 1976. Trial Tr., at 839–40 (M. Peters); Pl. Ex. 260B.

280. As evidenced by USGS maps and 1976-era aerial photography, the historically

traveled course of the K1087 road, as it existed in 1976, is substantially the same as the currently

traveled course of the road. Trial Tr., at 809–11, 839–40 (M. Peters); Pl. Exs. 56(b)A, 56(b)B,

260A, 260B, 260C.

281. The BLM's Historical Index for Township 42 South, Range 7 West, S.L.M., reveals

that the public lands crossed by the K1087 road were not reserved from the operation of R.S. 2477,

at the time of the foregoing uses, prior to R.S. 2477's repeal on October 21, 1976.  Trial Tr., at 973–74 (J. Harja); Pl. Ex. 131.

282.    Anton Wright testified that he first traveled the K1087 road in 1958 or 1959.  Trial Tr., at 278, 281.  He was out with his grandfather hunting deer and they traveled the road in a two-wheel drive pickup truck.  *Id.* at 280–81.  Mr. Wright testified that there was an area just west of K1088 that they called the Buck Knoll, and nearly every year following the first trip in 1959 he would travel down K1087 to its junction with K1088, travel down K1088, and would hunt the Buck Knoll.  *Id.* at 279–281.  Mr. Wright further testified that on his first trip in 1959, he and his grandfather then traveled north on K1088 to its junction with K1087, then followed K1087 easterly to the private property.  *Id.* at 280.  At times, Mr. Wright traveled the K1087 road with groups in two to three vehicles, but he typically did not see many people on the road.  *Id.* at 282–83, 286.

283.    Roger Holland testified that he first traveled the K1087 road in 1961 or 1962 to go exploring in a two-wheel drive 1949 Dodge pickup.  Trial Tr., at 538–39.  Mr. Holland next traveled K1087 the subsequent year to go deer hunting, but did not find it a very good place to hunt.  *Id.* at 541.  Before 1971, Mr. Holland traveled K1087 a third time, which trip also was for deer hunting.  *Id.* at 542–43.  On one of the trips, he saw other hunters on the road.  *Id.* at 543.

284.    Louis Pratt testified that he traveled the K1087 road with his father in a 1974 Jeep as early as 1974 or 1975 while scouting for signs of deer and searching for arrowheads.  Trial Tr., at 1131–33.  Mr. Pratt further testified that he and his father traveled from Utah State Highway 89 on K1087 to its junction with K1088 and then traveled to the end of K1088 to hike out to the rim of Cave Lakes Canyon.  *Id.* at 1132.  On this first trip, Mr. Pratt specifically recalled stumbling and falling on some sandstone and splitting his kneecap open while hiking on the rim of Cave Lakes

-66-

Canyon, which required stitches. *Id.* Mr. Pratt testified that they likely drove the remaining western

portion of K1087 that connects with the Hancock road to return home that first trip. *See id.* at 1133.

285.    Benny Cornell testified that he first traveled the K1087 road in 1974 while deer

hunting. Cornell Depo. at 19-20. Mr. Cornell further testified that he traveled the K1087 road prior

to 1976 in the summers to sight-see and cut firewood. *Id.* at 27–28.

**Scope of K1087**

286.    The K1087 is designated a Class D road, and consequently, has not been formally

maintained. Trial Tr., at 128–29.

287.    The Kane County measurements, made during its GPS project, estimated the travel

surface of K1087 was 8 feet wide and the width of the prior disturbed area was 10 or 12 feet. Trial

Tr., at 1222; Pl. Ex. 224-A.

288.    Mr. Holland testified that K1087 was about 8 feet wide and that he had to pull off to

the side of the road to let another vehicle pass him on it. Trial Tr., at 543, 559–560.

289.    Mr. Cornell testified that K1087's width was a little less than 10 to 12 feet. Cornell

Depo., 27.

290.    During the court's site visit in December of 2010, the K1087 road was a single lane

road crossing sand, where vehicles could pass each other on some sections.

**K1088 Cave Lakes Road**

291.    The K1088 Cave Lakes ("K1088") road is located in southwestern Kane County,

Utah. Pretrial Order, at 34, ¶ 37.

292.    The K1088 road commences in the northwest quarter of the southeast quarter (NW¼

SE¼) of Section 25, Township 42 South, Range 7 West, S.L.M., and proceeds approximately 0.6

miles northwesterly to its intersection with the K1087 road in the southwest quarter of the southeast quarter (SW¼ SE¼) of Section 24, Township 42 South, Range 7 West, S.L.M.  Pretrial Order, at 35, ¶ 41.

293.    Of the four Cave Lake Roads, K1088 is the only road that does not connect directly with the Hancock road.  Instead, it connects only to K1087 and is the shortest of the Cave Lake Roads.  *See* Pl. Ex. 32; Pl. Ex. 56(b)(A).

294.    The general course of the K1088 road, as claimed by Plaintiffs in this litigation, is shown on the map and centerline data in Plaintiffs' Exhibit 15. The parties do not dispute the accuracy of the map or data.  *See* Pretrial Order, at 34.

295.    The K1088 road has appeared on the USGS White Tower, Utah 7.5 minute quadrangle map since at least 1985.  Trial Tr., at 809–12 (M. Peters); Pl. Ex. 56(b)B.  The 1985 map was compiled from aerial photographs taken in 1976, which were field checked in 1981.  Trial Tr., at 809–10 (M. Peters); Pl. Ex. 56(b)B.

296.    The K1088 road appears on USGS orthophoto quad aerial photography taken on October 7, 1976. Trial Tr., at 840–42 (M. Peters); Pl. Ex. 260B.

297.    As evidenced by USGS maps and 1976-era aerial photography, the historically traveled course of the K1088 road, as it existed in 1976, is substantially the same as the currently traveled course of the road. Trial Tr., at 811–12, 840–42 (M. Peters); Pl. Exs. 56(b)A, 56(b)B, 260A, 260C.  The aerial photograph shows a slight deviation where K1088 intersects with K1087.  Pl. Ex. 260C.  Additionally, when current GPS data is overlaid on the 1985 map, the southern part of the road is slightly offset.  Pl. Ex. 56(b)A.  Mr. Peters testified at trial that the offset is so minor that it could fall within the permissible range of error that exists in map making.  Trial Tr., at 811–12.

298.    The BLM's Historical Index for Township 42 South, Range 7 West, S.L.M., reveals that the public lands crossed by the K1088 road were not reserved from the operation of R.S. 2477 at the time of the foregoing uses prior to R.S. 2477's repeal on October 21, 1976. Trial Tr., at 973–74 (J. Harja); Pl. Ex. 131.

299.    Due to how K1087 and K1088 are situated, the testimony of Anton Wright, Roger Holland, Louis Pratt, and Benny Cornell regarding K1088's use by the public is essentially the same as their testimony about K1087.  Accordingly, the court will not repeat it.

**Scope of K1088**

300.    The K1088 road is a Class D road, and consequently, is not formally maintained.

301.    The Kane County measurements, made during its GPS project, estimated the travel surface of K1088 was 8 feet wide and the width of the prior disturbed area was 10 feet.  Trial Tr., at 1222–23; Pl. Ex. 224-A.

302.    By 1961, the K1088 road was a two-track road. Trial Tr., at 540 (R. Holland).

303.    During the court's site visit in December of 2010, the K1088 road was a single lane road, where vehicles could pass each other on some sections, and crossed sand.

**General Width of Rights-of-Way and Road Maintenance Issues**

304.    R.S. 2477 does not specify the width of any granted right-of-way.  Consequently, the BLM has issued various manuals and instructions to provide guidance about determining the width of an R.S. 2477 road.  The BLM's nationwide Instruction Memorandum No. 90-589 provides: "State law which specifically addresses highway widths under R.S. 2477 shall be used to determine the width of the R/W."  Pl. Ex. 149, at 2.

305.    From 1898 until 1917, Utah statutes provided that the "width of all public highways, except bridges, alleys, lanes, and trails, shall be at least sixty-six feet. . . . *provided*, that nothing in this title shall be so construed as to increase or diminish the width of [a] highway already established or used as such." Utah. Rev. Stat., Title 25, Ch. 1, § 1117 (1898) (emphasis in original).

306.    In 1917, this law was revised to provide that "the widths of rights-of-way to be used for county roads, alleys, lands, trails, private highways, and by-roads shall be such as may be deemed necessary by the board of county commissioners; provided, that nothing in this section shall be so construed as to increase or diminish the width of either kind of highways already established or used as such." Utah Rev. Stat., Title 41, Ch. 1, § 2803 (1917); *see also* Utah Code Ann. § 36-1-4 (1943) (accord); Utah Code Ann. § 72-5-108 (2011) (accord).

307.    On July 20, 1950, the Kane County Board of Commissioners convened a special commission meeting to discuss county road rights-of-way and formally adopted a 75-foot standard width for county road rights-of-way. "And at the conclusion of the discussion, all present were agreeable to the following. That a Standard width of 75 feet be disignated (sic) for all county road right-of-ways including the one in question (Glendale Bench)." Kane County Commission Minutes, July 20, 1950 (Pl. Ex. 94).

308.    In 1972, Kane County and the BLM entered into a Memorandum of Understanding ("1972 Road MOU") allocating road maintenance responsibilities on federal land and, as amended in 1977, represented that "[t]here is no definitely established road right-of-way width for county roads.  For a two lane road, a right-of-way width of 66 feet will be established per the attached memo."  Pl. Ex. 89, at 12.  The text of this document originally stated "60" feet, but was

interlineated to state "66" feet. *Id.* It is unknown when this occurred. Trial Tr., at 1194–95 (L. Pratt).

309.     Mr. Pratt testified that enforcing a standard 66-foot right-of-way is necessary to accommodate future travel, and that this width "retains the standard width that we can be allowed to work in and not encroach on any private or federal lands." Trial Tr., at 1035. Securing this right-of-way provides for "the safe construction of safer roads, would allow for an adequate width to be able to use fill material, to build up roads, to replace washout areas, to install culverts, to slope – to kick back slopes for safety visibility, for sight distance." *Id.* at 1034; *see also* Pl. Ex. 83, at 387.

310.     Plaintiffs introduced into evidence a number of Kane County Commission Minutes documenting numerous instances where the county addressed the widths of rights-of-way for various roads. These Commission Minutes reflect that the county has consistently established either a 75-foot or 66-foot right-of-way for county roads. Pl. Exs. 90–92.

311.     For instruction on BLM's own roads, Plaintiffs introduced into evidence a copy of the BLM's Roads Manual 9113 (1985). Pl. Ex. 85. This manual states that a "minimum width of 50 feet or the width of construction plus 10 feet on each side (whichever is greater) is generally required. Maintain uniform widths through varying ownerships or legal subdivisions whenever possible, rather than allowing frequent width changes." Pl. Ex. 85, at 11 (subsection .29 in text).

312.     As stated previously, Mr. Campbell testified that at least since 1967, Kane County has attempted to maintain its Class B roads to a travel width of 14 to 24 feet. Trial Tr., at 655, 659. Due to the rough topography in Kane County, it was not always possible to keep the roads wider, but where a road crosses flat terrain, 24 feet is the desired travel surface. *Id.* at 656, 659–60; *Id.* at 1047 (L. Pratt).

-71-

313.    Mr. Pratt and Mr. Campbell further testified about the need for a right-of-way to extend beyond a road's travel surface.  This is so for a variety of reasons.  Kane County attempts to keep 2 to 3 feet clear on each side of a road.  Trial Tr., at 656 (V. Campbell).  Kane County installs culverts where necessary and clears out the drainage areas around the culverts.  *Id*. at 657–58. Depending on the terrain, Kane County sometimes constructs drainage runouts for many yards away from the road.  *Id*. at 659.

314.    On some portions of road, washouts headcut the sides of the roads and people travel around the headcuts.  Trial Tr., at 660, 663 (V. Campbell).  Kane County tries to go back and fill in these areas.  *Id*. at 660–61.  To do so, Kane County moves fill material from along the side of the roads to fill in the washouts and restore the travel surface.  *Id*. at 661.

315.    In some instances, Kane County has realigned the relevant roads to avoid hazards, sharp turns, blind corners, and to reduce the grade of the road.  Trial Tr., at 661–62, 756–57 (V. Campbell).  For example, Louis Pratt testified that the Sand Dunes road was realigned approximately 200 to 300 feet from its old traveling course.  *Id*. at 1163–65; Pl. Ex. 280.  Kane County realigned the Hancock road in about 1992 by about 100 feet.  *Id*. at 674–75 (V. Campbell). This was done to reduce the grade of the road.  *Id*. at 675.  Kane County further cut deeper banks into a portion of the Skutumpah road and used the fill to reduce the grade near the Deer Springs Ranch.  *Id*. at 1094–97 (L. Pratt).

316.    In some places, Kane County's practice has been to create berms along the roads to prevent vehicles from sliding off.  *Id*. at 1099–1100 (L. Pratt).

317.    Kane County also has the practice of pulling fill material from the borrow ditch along the roads, and then pushing it back out to maintain a crowned surface.  This allows water to run off

the road.  Trial Tr., at 1043–45, 1120–21 (L. Pratt).  Some of the relevant roads are below grade, so the county tries to slope the surface to shed water.  *Id*. at 1045.  In other circumstances, lateral fill from the borrow ditch is pulled up to provide support for the road and to provide a clear zone where cars will be able to recover if they fade off the side.  *Id*. at 1150–51, 1153–54, 1159–60.  This lateral area is sometimes filled in to raise the grade of intersecting side roads so they meet at the same level.  *Id*. at 1154–55, 1157–58.  In other places, the lateral area along the road is laid back to improve visibility and channel water.  *Id*. at 1167–68.

318.    For the Class B roads, Kane County tries to maintain them twice per year, in the spring and fall, and clears snow from the roads that access private property.  Trial Tr., at 1046 (L. Pratt).  Sometimes, Kane County has to maintain a road three or four times per year.  *Id*.  While Kane County does not clear the snow from many roads in the winter, it has had to change where it clears snow over time as people have begun living year round in new locations.  *Id*. at 1198.

319.    Weather events significantly impact the roads in different ways.  Some storms will flood sand across the top of a road that has to be removed and deposited along the side.  Trial Tr., at 1046 (L. Pratt). Other storms will gouge large deep cuts in the road.  *Id*.

320.    When a storm leaves a deep cut across the road, Kane County uses the lateral right-of-way—the borrow ditch—to collect fill material to fill in the gap.  Trial Tr., at 1047–48 (L. Pratt). Kane County also uses this lateral fill material to build up the grade of the road, including where the roads cross cattle guards.  *Id*. at 1048.  Some sections of road are frequently flooded out, and Kane County has to regularly repair them—even where culverts have been installed to prevent washouts. *See id*. at 1122.  Kane County has installed an 8-foot culvert on the Sand Dunes road, and it still fills in about every year.  *Id*. at 1160–61.

321.    In the locations where Kane County has installed culverts, which often fill in, the county will use the 8-foot bucket of a front-end loader to clear out a basin allowing water to flow. Trial Tr., at 1049 (L. Pratt).

322.    Kane County further clears the vegetation from the sides of the road within the right-of-way to provide better sight distances and improve safety.  Trial Tr., at 716 (V. Campbell); Trial Tr., at 1050, 1148–50 (L. Pratt).

323.    Rather than hauling equipment to and from a job site every day, Kane County typically parks the equipment off the road, away from traffic, overnight, when it is working on a road.  Trial Tr., at 1050–51 (L. Pratt).  Previously, Kane County was allowed to maintain several gravel pits in the back country to provide road base material.  *Id.* at 1051–52.  Because the BLM will not renew Kane County's permit for two of the distant gravel pits, it is even more necessary for Kane County to be able to collect fill material from along the roads to avoid the expense of having to purchase and haul gravel long distances.  *Id*. at 1052–53.

324.    Kane County introduced into evidence a number of photographs of the roads at issue in this case.  Pl. Exs. 204, 205, 207-11, 281, 286, 294.  These photographs, and Mr. Pratt's testimony, substantiated Kane County's road maintenance practices as having extensively relied upon a right-of-way beyond the travel surface of the roads for the purposes just discussed.

**The Monument and Exchange Patent**

325.    The Grand Staircase-Escalante National Monument (the "Monument") was created on September 18, 1996, and encompasses approximately 1.7 million acres.  61 Fed. Reg. 50,223, 225 (Sept. 24, 1996).  The designation of these federal lands as a national monument curtailed development.  Scattered throughout the Monument were SITLA parcels owned by the State of Utah.

-74-

By law, SITLA parcels are to be managed "in the most prudent and profitable manner possible" for the benefit "of common schools and other beneficiary institutions." Utah Code Ann. § 53C-1-102(1)(a), (2)(b) (2012). To ensure the purpose of the SITLA parcels could be carried out, the State agreed to transfer SITLA parcels located within the Monument to the United States in exchange for equivalent parcels located outside of the Monument.

326.    On May 8, 1998, the United States and the State entered an Agreement to Exchange SITLA parcels (the "Exchange Agreement"). It recognized that some SITLA parcels within the Monument had legal encumbrances on them. Consequently, the Exchange Agreement stated the conveyances to the United States "shall be subject to valid existing rights and interests outstanding in third parties." Pretrial Order, 35–36, ¶¶ 43–44.

327.    On December 11, 1998, the State executed the Exchange Patent No. 19232 (the "Exchange Patent"). The Exchange Patent also stated the SITLA parcels shall be "[s]ubject to any valid, existing easement or right of way of any kind." Pl. Ex. 67, at 42. Moreover, it stated the exchange was subject to the terms of the Exchange Agreement, "including, without limitation, Section 4(A) (Valid Existing Rights), Section 7 (Grazing Permits) and Section 9 (Surface Use and Rights of Way)." *Id.*

328.    Specifically, the Exchange Patent conveyed Parcel No. 2274 to the United States, which is SITLA Parcel One discussed in paragraph 77 above. It also conveyed Parcel No. 2249, which is SITLA Parcel Five discussed in paragraph 179 above. *See* Exchange Agreement, at 17, 19 (Pl's Ex. Pl. Ex. 67); *see also Kane County*, 2011 U.S. Dist. LEXIS 66218, at *4–5. These parcels are discussed further below.

## CONCLUSIONS OF LAW

### I.      JURISDICTION, VENUE, AND APPLICABLE LAW

This action is brought under the Quiet Title Act.  28 U.S.C. § 2409a.  For the reasons stated in its Memorandum Decision issued concurrently herewith, the court has subject-matter jurisdiction pursuant to that act.  *Id.* §§ 2409a(a), 1346(f).

Venue is proper in the United States District Court for the District of Utah because the property at issue is located in the State of Utah.  28 U.S.C. § 1391(e)(1).  Venue lies in the Central Division of the judicial district because the property is located in Kane County.  28 U.S.C. § 125(2).

In *SUWA*, the Tenth Circuit Court of Appeals held that "federal law governs the interpretation of R.S. 2477, but that in determining what is required for acceptance of a right-of-way under the statute, federal law 'borrows' from long-established principles of state law, to the extent that state law provides convenient and appropriate principles of effectuating the congressional intent."  *SUWA*, 425 F.3d at 768.  In Utah, acceptance of a public highway right-of-way requires "continuous public use for a period of ten years."  *Id.* at 771; *see also Kane County*, 2011 U.S. Dist. LEXIS 66218, at *11–12.  Separately, a public highway right-of-way may be accepted when the road has been "laid out or erected as such" by a public authority.  *Id.* at *13–15.

### II.     BURDEN OF PROOF

The parties disagree about what burden of proof applies in this case.  Kane County asserts the appropriate burden of proof is preponderance of the evidence.  The United States asserts that Utah law should be borrowed on this issue, which requires proof by clear and convincing evidence. Specifically, Utah's dedication statute provides, "[a] highway is dedicated and abandoned to the use of the public when it has been continuously used as a public thoroughfare for a period of ten

years."[18]  Utah Code Ann. § 72-5-104(1)(a) (2012).  When a party seeks to establish the existence

of a public road by dedication across the property of a private land owner, the Utah Supreme Court

has declared the party must do so by clear and convincing evidence.  *Draper City v. Estate of*

*Bernardo*, 888 P.2d 1097, 1099 (Utah 1995) (citations omitted).  It noted "[t]he law does not lightly

allow the transfer of property from *private* to public use."  *Id.* (emphasis added).  Thus, "[t]his

higher standard of proof is demanded since the ownership of property should be granted a high

degree of sanctity and respect," and "the presumption is in favor of the property owner."  *Id.*

(quotations and citation omitted).

Kane County contends, however, this standard should not apply to R.S. 2477 cases because

"[t]here is a fundamental difference between cases involving the taking of property, and cases—such

as this one—that instead involve an open-ended grant of property."  Kane County's Trial Brief, 33

(Dkt. No. 210).  Nevertheless, the United States contends that federal "land grants are construed

favorably to the Government, that nothing passes except what is conveyed in clear language, and

that if there are doubts they are resolved for the Government, not against it."  *Watt v. W. Nuclear,*

*Inc.*, 462 U.S. 36, 59 (1983) (quotations and citations omitted).  This articulation of the law derives

---

[18]  In the court's 2011 memorandum decision, it noted that this is just but one method by
which an R.S. 2477 road may be established.  *Kane County*, 2011 U.S. Dist. LEXIS 66218, at
*12–15.  The United States has requested that the court reconsider its decision.  The court declines
to do so.  In *Memmott*, the Utah Supreme Court stated that an R.S. 2477 "offer could be accepted
in any appropriate way authorized by state law."  *Memmott v. Anderson*, 642 P.2d 750, 753 (Utah
1982) (citation omitted).  When a county classifies a road as a Class B county road and maintains
and improves it to that standard, one can rationally conclude that the county is not expending county
and state funds on the hope that ten years hence it will be granted an R.S. 2477 right-of-way.
Instead, the county is expending funds because it accepted the R.S. 2477 offer when it classified the
road as a county road and then acted in conformance with that classification by maintaining and/or
improving it.  Moreover, it would not be consistent with congressional intent, as expressed in the
R.S. 2477 statute, to deny recognition of a right-of-way accepted by state or county action well
before repeal of R.S. 2477.

from *Caldwell v. United States*, wherein the Supreme Court stated "that nothing passes but what is conveyed in clear and explicit language—inferences being resolved not against but for the Government."  *Caldwell v. United States*, 250 U.S. 14, 20 (1919) (citations omitted).  In other words, statutes are construed in favor of the United States and if there is a question about the statutory language, all inferences are drawn in favor of the United States.

The statutory language at issue in this case, however, is an unambiguous grant.  Congress intended to grant rights-of-way across federal lands.  Moreover, the statute was passed in 1866, during a time when Congress not only granted rights-of-way, but encouraged them.  One could therefore argue that the inference favorable to the United States would be a lower burden of proof so congressional intent could be effectuated.  Indeed, in *Leo Sheep Co.*, the Supreme Court stated that when Congress authorizes public grants, "they are not to be so construed as to defeat the intent of the legislature, or to withhold what is given either expressly or by necessary or fair implication."  *Leo Sheep Co. v. United States*, 440 U.S. 668, 682–83 (1979) (quotations and citation omitted).  Moreover, "[t]he pertinent inquiry . . . is the intent of Congress when it granted" the rights-of-way, and not its present sentiment.  *Id.* at 681.  Requiring a heightened burden of proof to establish that a grant was accepted, arguably, could defeat congressional intent if the standard is placed too high.  Consequently, were all R.S. 2477 claims strictly against the United States for roads across federal land, one might conclude the "preponderance of the evidence" standard is most appropriate to give effect to the congressional grant.

At times, however, an R.S. 2477 claim may be brought against a private land owner.  For example, say a route was used by the public across federal land between 1940 and 1950, but the land then passed to a private owner in 1960, and that owner has precluded public use of the road since

he acquired the property. Under this scenario, a plaintiff could show tens years of public use while the land was in federal ownership, but not ten years of use while the land was in private ownership. The plaintiff's claim would be that the private owner took title to the land subject to a right-of-way that was established while the land was still in federal ownership. Under such circumstances, a plaintiff would have to bring a claim against the private landowner under R.S. 2477, rather than Utah's dedication statute, because Utah's statute, standing alone, lacks the authority to declare that a road is a public highway when use of that road occurred on federal land.

This is so because the public typically cannot adversely possess against the sovereign. *Cassity v. Castagno*, 347 P.2d 834, 835 (Utah 1959) (citation omitted) ("One may not adverse the sovereign."); *see also* 28 U.S.C. § 2409a(n) (declaring nothing in the Quiet Title Act "shall be construed to permit suits against the United States based upon adverse possession"); *United States v. Balliet*, 133 F. Supp. 2d 1120, 1128 (W.D. Ark. 2011) (citations omitted) (stating "adverse possession can not be used to establish title as against the United States"); *Fries v. Martin*, 2006 UT App 514, ¶ 7, 154 P.3d 184 (citations omitted) (stating even if normal requirements for adverse possession are met, one cannot adversely possess public land); Utah Code Ann. § 78B-2-216(2) (2012). This means that only the United States can consent to possession of federal land; possession and dedication of federal land cannot be accomplished through a state statute. As a result, Utah's dedication statute would be inapplicable in the scenario described above, and R.S. 2477 would be applied against the private landowner.

Because a public highway across private property can impose a significant burden on the landowner, *see SUWA*, 425 F.3d at 741–42 (stating that "private landowners express the fear that expansive R.S. 2477 definitions will undermine their private property rights by allowing strangers

-79-

to drive vehicles across their ranches and homesteads"), a heightened burden of proof would be appropriate under this circumstance.

Moreover, it would be unworkable to apply the heightened burden standard only when an R.S. 2477 claim is brought against a private party. As is shown by this case, an R.S. 2477 road may pass through both private and federal land. If a party seeks to quiet title in the road's full length, one standard would apply against the private land owner and another standard would apply against the United States. This would complicate litigation and potentially result in a piecemeal road if the evidence was sufficient to prove a public way by a preponderance of the evidence but not by clear and convincing evidence.

The potential burden on private landowners, the litigation complications, and the potential for piecemeal roads are factors that weigh against using two different standards for R.S. 2477 claims. Additionally, while the clear and convincing evidence standard does impose a greater burden, the court concludes that the burden is not so high as to defeat congressional intent. Finally, prior case law supports that the appropriate burden of proof in an R.S. 2477 case is by clear and convincing evidence. *See San Juan County v. United States*, Case No. 2:04-cv-552BSJ, 2011 U.S. Dist. LEXIS 58460, at *19 (D. Utah May 27, 2011). Accordingly, the court concludes that Kane County must prove its R.S. 2477 claims by clear and convincing evidence.

## III. CONGRESSIONAL INTENT RE: PUBLIC USERS UNDER AN R.S. 2477 GRANT

### A. Congressional Grant Versus Adverse Possession

The parties also disagree about who is a member of the public and what constitutes public use of a road. The Utah Supreme Court has declared that if a person has a documentary right or permission to use a road, that person does not constitute a member of the public for purposes of

Utah's dedication statute.  *See Draper City*, 888 P.2d at 1099.  Consequently, any use by such person is not considered when determining if a road has been created through public use.  *Id.*

Utah has broadly defined "permissive" users.  They include adjoining landowners whether they be residential or commercial; residential and business invitees; employees of the adjoining landowners; those with prescriptive rights; and any other person or entity who has been granted permission to use the road.  *See id.*; *Kohler v. Martin*, 916 P.2d 910, 913 (Utah Ct. App. 1996).  All such persons are *not* members of the public, and therefore, any use by them does not constitute a public use under Utah's dedication statute.  Because Utah's dedication statute is adversarial to the landowner, this definition helps ensure that property will not be easily transferred "from private to public use."  *Draper City*, 888 P.2d at 1099.  Based upon this law, the United States contends that "use by individuals accessing their private property or grazing operations on public lands," cannot constitute public use of a road.  United States Proposed Conclusions of Law, 163 (Dkt. No. 212).[19]

To support its contention, the United States cites to case law involving homesteaders.  The cited cases address whether a homesteader was granted a right-of-way when Congress authorized individuals to establish a homestead on federal land.  The courts concluded that homesteaders were granted an implied right of access, but such access was subject to regulation and control of the federal government because it was only a right of access and not a vested right-of-way.  *See United States v. Jenks*, 129 F.3d 1348, 1354 (10th Cir. 1997); *Fitzgerald Living Trust v. United States*, 460 F.3d 1259, 1265 (9th Cir. 2006); *McFarland v. Kempthorne*, 545 F.3d 1106, 1112 (9th Cir. 2008).  Consequently, the United States contends such access rights were "in the nature of an authorized

---

[19]  The page number references the CM/ECF number at the top of the page rather than the page number at the bottom of the page.

private use rather than public use."  United States Proposed Conclusions of Law, 164 (Dkt. No. 212).

Similarly, those granted grazing, mineral, or other rights were also private rather than public users

of federal land.  Hence, according to the United States, any roads created by such individuals cannot

constitute an R.S. 2477 road because it was not created by "public use."  The court disagrees.

The Homestead Act was passed in 1862.  *See* Act of May 20, 1862, ch. 75, 12 Stat. 392.

Although the Homestead Act had been in place four years before Congress passed R.S. 2477,

Congress did not state that homesteaders were excluded from the provision.  Rather, the Act of 1866

focused on expanding property rights on federal lands.  Section 1 stated, "the mineral lands of the

public domain, both surveyed and unsurveyed, are hereby declared to be free and open to

exploration and occupation by all citizens of the United States."  Act of July 26, 1866, ch. 262, § 1,

14 Stat. 251, 251.  Section 9 granted a right-of-way to create ditches and canals so water could be

used for "mining, agricultural, manufacturing, or other purposes."  *Id.* § 9, 14 Stat. 251, 253.  And

Section 8 granted the right-of-way to create public highways.  It would be anomalous to conclude

that the very individuals Congress invited to enter, explore, and occupy the land under Section 1 of

the Act cannot constitute members of the public under Section 8 of the same act.

It would likewise be anomalous to exclude homesteaders, farmers, and their invitees from

being members of the public simply because they were permissive users of the land.  As stated

above, typically one cannot adversely possess against the Sovereign.  Hence, all rights acquired in

the public domain had to be by permission of the United States.  This includes roads created under

R.S. 2477.  Only by granting members of the public a right-of-way could such roads come into

existence.  Mere use alone, no matter how long, would not have created the right.  To say, therefore,

that homesteaders, farmers, and their invitees cannot be members of the public because they were

permissive users ignores the fact that every member of the public who helped create an R.S. 2477 road was a permissive user.

Moreover, to view R.S. 2477 solely through the lens of Utah's dedication statute ignores the fundamental difference between a congressional grant and an adverse possession.  R.S. 2477 only pertains to land owned by the United States, and through that Act, the United States chose to open its land to mining, ditches, and canals.  Other congressional acts opened federal land to railways, agricultural use, and settlement.  If this were all that Congress did, then perhaps the argument about access rights versus rights-of-way might hold sway.  But, Congress did more.  When inviting the public to enter, use, and take land in the public domain, Congress also encouraged the public to create roads.

By 1866,[20] western migration had resulted in "large scale trespass on federal lands."  Harry R. Bader, *Potential Legal Standards for Resolving the R.S. 2477 Right of Way Crisis*, 11 Pace Envtl. L. Rev. 485, 486 (Spring 1994).  Passage of R.S. 2477 "legitimized the paths and roads made by America's frontiersman" and set forth "a system for future access."  *Id.* at 486.  Hence, rather than declaring that roads created by homesteaders would not be recognized, Congress granted authorization to create roads across federal land to assist "miners, farmers, ranchers and homesteaders . . . in developing the West."  *Id.* at 485.  Early case law supports this conclusion.

_____

[20]  The Supreme Court has stated when "construing a statute, [a court] may with propriety recur to the history of the times when it was passed; and this is frequently necessary, in order to ascertain the reason as well as the meaning of particular provisions in it."  *Smith v. Townsend*, 148 U.S. 490, 494 (1893) (quotations and citations omitted).  Because the present era is unlike the time when the Act of 1866 was passed, the court finds it appropriate to look to history to understand Congress's intent.

The case of *Flint & Pere Marquette Railway Co. v. Gordon*, 2 N.W. 648 (Mich. 1879) was

issued thirteen years after passage of the 1866 Act.  The court states the following:

> [I]t is [a] matter of notoriety that in the absence of legislation roads
> have been freely laid out across the public lands, without objection
> or controversy, wherever the lands were not appropriated or desired
> for other public uses.  Such roads *facilitate the settlement* of the
> country, and *benefit the neighborhood*, and in both particulars *they
> further a general policy of the Federal government*.  But they also
> tend to *increase the value of the public lands*, and for this reason are
> *favored*.

*Id.* at 653 (emphasis added).  Thus, rather than being a blight, public highways were viewed as

valuable to the expanding nation.

This fact was reiterated by the Supreme Court in 1932.  In *Central Pacific Railway Co. v.

Alameda County*, the Court stated:

> We cannot close our eyes to the fact that long before the Act of 1866,
> highways in large number had been laid out by local, state and
> territorial authority, upon and cross the public lands.  The practice of
> doing so had been so long continued, and the number of roads thus
> created was so great, that it is impossible to conclude otherwise than
> that *they were established and used with the full knowledge and
> acquiescence of the national government*.  These roads, in the fullest
> sense of the words, *were necessary aids to the development and
> disposition of the public lands*.

284 U.S. 463, 472–73 (1932) (citations omitted) (emphasis added).  The Court then concluded that

because public highways so clearly helped to further "the general policies of the United States,"

there was a "moral obligation to protect them against destruction or impairment as a result of

subsequent grants."  *Id.* at 473; *see also Wilkenson v. Dep't of Interior*, 634 F. Supp. 1265, 1275 (D.

Colo. 1986) (stating the federal government "encouraged expansion, exploitation and development

of the public lands" during the 1860s).

R.S. 2477 and these cases are in stark contrast to Utah's case law that seeks to limit public roads by dedication. As stated above, state law is only borrowed if it provides "appropriate principles [for] effectuating the congressional intent." *SUWA*, 425 F.3d at 768. The court concludes that Utah law does not provide appropriate principles for defining who constitutes a member of the public when determining public use under R.S. 2477. Accordingly, the court will not borrow that part of Utah law that states use of a road by adjoining landowners, invitees, and other permissive users does not constitute public use.

### B.    Nature of the Road

This does not mean, however, that a public road was created every time one homesteader created a path to his property. The Tenth Circuit has stated "it is unlikely that a route used by a single entity or used only a few times would qualify as a highway, since the route must have an open public nature and uses." *SUWA*, 425 F.3d at 783. In *Petersen v. Combe*, the Utah Supreme Court posed the following question to determine if a road was public in nature:

> Was there sufficient evidence by competent testimony, . . . to show by clear and convincing evidence, that the public generally—not just a few having their own special and private interests in the road, had used the road continuously for 10 years?

*Petersen*, 438 P.2d 545, 546–47 (Utah 1968). In other words, was the road used merely like a private lane or did the public treat the road as open and make use of it as often as they deemed necessary?

Notably absent from Utah law is the requirement that use must be frequent for it to be public. In *Boyer v. Clark*, the Utah Supreme Court summarized the specific testimony of only one witness. The witness testified he had used a road for more than "50 years when hauling coal, crossing the open range, driving cattle, sheep and courting the girl he later married." *Boyer*, 326 P.2d 107, 108

-85-

(Utah 1958).  Having traveled that road, he was able to testify that anyone who wanted to use it could do so.  *Id.*  The Court then stated "a number of other witnesses" testified,

> anyone who wanted to use it to go deer hunting or visiting with people living in the vicinity or to dances which were held in Grass Creek did so, as well as those who used it to trail sheep or cattle.  No one testified that . . . permission was asked or obtained from any owner to travel the trail.  *The use of the road was not great because comparatively few people had need to travel over it*, but those of the public who had such need did so.

*Id.* (emphasis added).  Based on such testimony, the court concluded "the public, *even though not consisting of a great many persons*, made a continuous and uninterrupted use of [the road at issue]." *Id.* at 109 (emphasis added).  Consequently, it declared the road was a public way under R.S. 2477. *Id.*  The case illustrates the nature and extent of use that may be sufficient to establish a road is a public way.

In 2008, the Utah Supreme Court again reiterated that use of a road does not have to be frequent before it can be a public way.  In *Wasatch County v. Okelberry*, 2008 UT 10, 179 P.3d 768, the Court stated, "[c]ontinuous use may be established as to heavily *or lightly used roads*, as long as the use is as frequent as the public finds it convenient or necessary."  *Id.* at ¶ 17 (emphasis added). Thus, if a month or a season passes between use, the road may still be a public way, as long as the landowner did not interrupt the use.  *Id.* at ¶ 16; *see also Richards v. Pines Ranch, Inc.*, 559 P.2d 948, 949 (Utah 1977) (stating the frequency of use is "immaterial, provided it occurred as often as the [public] had occasion or chose to pass. . . .  Mere intermission is not interruption.") (quotations and citation omitted)).

Congress granted the right to create "highways."  This terms embodies a road traveled by the public, but it does not mean it must be heavily traveled.  The court concludes the Utah cases

cited in this section support congressional intent about what constitutes a highway. Accordingly, the court borrows this law to determine whether an R.S. 2447 road has been established.

## IV.   STATUS OF REMAINING ROADS

On summary judgment, the court previously concluded that some of the roads at issue in this case are R.S. 2477 roads. Based on the law articulated above and the evidence presented at trial, the court now addresses whether the remaining segments of Mill Creek (i.e., Upper Mill Creek, Oak Canyon, and Tenny Creek segments) are also R.S. 2477 rights-of-way. Additionally, the court addresses whether Swallow Park/Park Wash, North Swag, Nipple Lake, and the four Cave Lake roads are R.S. 2477 roads.

### A.   Upper Mill Creek, Oak Canyon, Tenny Creek

Under Utah law, "published maps or charts, when made or published by persons having no interest in a proceeding, are prima facie evidence of facts of general notoriety and interest." Utah Code Ann. § 78B-5-605 (2012). The Upper Mill Creek road has appeared on a United States geological survey map since at least 1966. The map was compiled from aerial photographs taken in 1964. This means a visible road, substantially following the present course of Upper Mill Creek, was present for more than ten years prior to the Act of 1866's repeal. It is also relevant that Kane County has maintained Upper Mill Creek as a Class B road since 1965, using County and State funds. This evidence is clear and convincing that the County actively accepted Upper Mill Creek as a County road.

Upper Mill Creek has a historical reputation of existing well before 1964. It derived its name from an old mill that existed above the northernmost end of the road. Remnants of the mill corroborate the road's reputation of being an "old" road. The northern end of the road terminates

at property that was conveyed into private ownership in 1937.  At other places along or in the vicinity of the road, homesteads were located.  Hence, adjoining landowners and people visiting them have used the road to access private property over the decades.

In *Boyer*, the Utah Supreme Court listed "visiting with people living in the vicinity" as a relevant factor to show road use by the public.  *Boyer*, 326 P.2d at 108.  In a different case, the Court listed providing "access to surrounding ranch lands" as another relevant factor.  *Blonquist v. Blonquist*, 516 P.2d 343, 343 (Utah 1973).  These factors do not always prove that a road is public.  Indeed, many private lanes are used by adjoining landowners and visitors.  The factors become relevant, however, when coupled with other uses that show the road was more than a private lane.  Under such circumstances, use by adjoining landowners and visitors becomes community use of a public road.

Testimony was presented to show Upper Mill Creek was more than a private lane.  Dating back to the late 1930s, witnesses testified about using the road to access fishing and hunting.  During the 1940s, '50s, and '60s, "deer season" extended beyond the official time allocated for it.  It essentially was whenever people needed food for their table.  Moreover, when people went hunting, some camped overnight by Upper Mill Creek.  Others used the road to go picnicking and exploring.  When the temperature was hot in Kanab, Upper Mill Creek was a nice common place to go.  Additionally, a logging company operated in the area in the 1950s.  Again, these activities were noted as relevant factors in *Blonquist* to show public use.  *Id.*

Finally, at no time were members of public precluded from using Upper Mill Creek road.  No gates exist along it, no signs bar access, and no one testified that they needed permission to travel

-88-

on it.  In other words, the public was able to use Upper Mill Creek as often as it deemed it necessary or convenient.  The fact that seasonal weather precluded use at times does not negate this fact.

Much of the evidence cited for Upper Mill Creek road also applies to the Oak Canyon and Tenny Creek spurs.  Both have appeared on a United States geological survey map since at least 1966 and in aerial photography by 1964.  Both have been maintained as a Class B road since at least 1965.  Witnesses testified to use of Oak Canyon to access hunting, to visit neighbors, camp, picnic, and gather firewood.  Witnesses testified to use of Tenny Creek to access ranching, to scout and hunt for deer, and generally to sightsee.  Witness testimony about these spurs dates back to the 1940s and the uses attested to by them continue to this day.  Moreover, no evidence was presented that the public has ever been precluded from using these spurs.  Thus, while use may not have been as frequent as other parts of Mill Creek, it has been as often as the public has deemed it convenient or necessary.

The court concludes that the evidence clearly and convincingly demonstrates that the Upper Mill Creek, Oak Canyon, and Tenny Creek segments of Mill Creek have been accepted by public recognition and use for the required period as a public road.  Based on the evidence presented, the court further concludes that Upper Mill Creek, Oak Canyon, and Tenny Creek, collectively, are an R.S. 2477 road.  Accordingly, the court hereby quiets title in favor of Kane County and the State of Utah for these road segments.

SITLA Parcel One is located on the lower part of Mill Creek.  As discussed further below, R.S. 2477 cannot operate over that parcel, but the State of Utah had an established right-of-way across it.  The court therefore quiets title to SITLA Parcel One in favor of the State, but not Kane County.

### B.    Swallow Park/Park Wash

As with Mill Creek, the Swallow Park/Park Wash road has appeared on United States geological survey maps since at least 1966.  The maps were based on aerial photographs taken in 1963, and the present route of Swallow Park/Park Wash follows substantially the same course today as that depicted on the maps.  The road is about 5 miles long.  Approximately the first mile of the road has been designated and maintained as a Class B road by Kane County, using county and state funds.  The remainder has been designated as a Class D road.  Accordingly, Kane County has only bladed the Class D section upon request.  While infrequent, such action shows Kane County's acceptance of responsibility for the road.

In *Blonquist*, the Utah Supreme Court affirmed that a road was a public way.  In so doing, it noted the road was used to "travel to various other connecting roads in the area." *Blonquist*, 516 P.2d at 343.  The same holds true for Swallow Park/Park Wash.  It is part of a road system on which individuals traveling from Cedar City, Cannonville, Tropic, and other locations can turn off of Skutumpah, travel Swallow Park/Park Wash, then North Swag, and connect to the Kitchen Corral or Nipple Lake roads.  There is a vast area between Skutumpah on the north and Kitchen Corral on the south.  The road system of which Swallow Park/Park Wash is a part provides access to this area.

This road system provides access to ranch and grazing lands.  Witnesses testified they moved cattle along the road using horses, Jeeps, tractors, and pickups between 1956 and 1960.  Again, *Blonquist* listed "driving of cattle" and "access to surrounding ranch lands" as relevant factors to show public use. *Id.*  Moreover, people have used this road to go hunting for decades.  One witness testified that for four or five years in the 1960s, he took hunting groups from California or Texas on the road to hunt and camp.  Permission was never needed to take the hunting groups on the road.

The area has many points of interest such as No Mans Mesa, Mollie's Nipple, and the Monkey House. Swallow Park/Park Wash allows access to these areas from the north. Due to the natural beauty of the area, people have traveled the road to go sightseeing, access picnic spots, and look for artifacts. In approximately the late 1950s and early 1960s, the road provided access to logging. Witness testimony established use of this road by the public dating back to the 1930s, although much of the testimony focused on the 1950s and 1960s and was not as extensive as other roads at issue in this case. The road is well-defined, however, both on the ground and on the maps.

Along Swallow Park/Park Wash is SITLA Parcel Five and two parcels reserved under Public Water Reserve No. 107 ("PWR 107"). As discussed further below, R.S. 2477 cannot operate over any of these three parcels. Nevertheless, a road does exist over them that, but for the reservations, is no different from other segments of Swallow Park/Park Wash. In other words, SITLA Parcel Five and the PWR 107 parcels did not interrupt the continuity of the road, only who may claim title to it. Moreover, no evidence was presented that the public has been denied access to those portions of the road crossing SITLA Parcel Five or the PWR 107 parcels. Thus, the public was able to travel the full length of Swallow Park/Park Wash as often as it found it convenient or necessary prior to the repeal of the 1866 Act. Because such use was continuous for more than 10 years, the court concludes the evidence clearly and convincingly establishes that Swallow Park/Park Wash road is an R.S. 2477 road, except for SITLA Parcel Five and the two PWR 107 parcels, and hereby quiets title in favor of Kane County and the State of Utah. The court quiets title to SITLA Parcel Five in favor of the State of Utah, but not Kane County. As for the PWR 107 parcels, the court quiets title in favor of the United States.

### C.      North Swag

The North Swag road commences where the Swallow Park/Park Wash road ends, and is part of the road system that connects between Skutumpah on the north end to the Kitchen Corral road on the south end.  It is approximately 5 miles in length.  The 1959 cadastral survey plat map makes a brief reference to a "Jeep road" that corresponds to the present course of North Swag. Additionally, North Swag has appeared on United States geological survey maps since at least 1966, which maps were compiled from 1963 aerial photography.  It also appears on photography taken in 1976.  Due to the quality of the photography and the fact that North Swag is more primitive, portions of the road are not visible in the photographs.  Moreover, the present course of the road has some variation from that shown on the aerial photography.  That said, given how sandy the soil conditions are in the area and the washouts that have occurred, it is striking that the maps and photographs show North Swag following substantially the same route over the decades.

The  North Swag has a particularly troublesome spot called Sand Ridge by the locals.  Due to its grade and sandy condition, it is difficult to traverse when the soil is dry, and at times, the public has been unable to travel it.   As stated above, however, seasonal interruptions, or more particularly, weather interruptions do not break continuity of use.  Instead, continuity is broken when the landowner precludes members of the public from using the road.   In this case, there is no evidence that the United States ever attempted to preclude use of the North Swag road prior to the repeal of the 1866 Act.  Nor would the court expect such evidence because the United States had a policy, during the relevant time period, of encouraging the establishment and use of roads across public lands.

In the 1930s, North Swag was traveled on horseback and by teams and wagons.  By the 1940s, people were on it in Jeeps.  Some witnesses testified they moved cattle along it every spring and fall, from 1956 to 1960.  No Mans Mesa is located along North Swag and the road leads to the Monkey House further south.  Again, due to the area's beauty, the public traveled the road to sightsee, picnic, and camp.  One person traveled the road as part of a family reunion in 1964.  The same hunting groups that used Swallow Park/Park Wash also used North Swag between 1961 and 1966.  People hunted for deer and coyote dens.  Another person traveled the road every year with his family not only to hunt deer, but to look for arrowheads starting in 1974.  On such trips they saw horse trailers and camping trailers parked along North Swag.

While use of North Swag dates back to the 1930s, most of the evidence pertained to the 1950s and 1960s, with some testimony extending into the 1970s.  The witnesses established use not just by themselves, but by the public in general.  The court notes the witnesses consistently testified that while use of North Swag was not frequent, it was as often as the public found it convenient or necessary.  Due to the road's presence on United States maps and aerial photography, its position as part of a longer road system, and the specific uses testified about at trial (as well as the length and continuity of those uses) the court concludes the evidence clearly and convincingly establishes that North Swag is an R.S. 2477 road.  Title is therefore quieted in favor of Kane County and the State of Utah.

### D.    Nipple Lake

The Nipple Lake road commences where North Swag ends and is only about 0.4 miles long.  It appears, however, on a 1966 United States geological survey map that was compiled from aerial photography taken in 1963.  The route on the map is substantially the same as the road's present

course.  The road leads to the Nipple Lake Ranch where sightseers are drawn to the Monkey House.

Homestead cabins, dating back at least to 1904, also were located by the road.  The Nipple Lake

road differs in character from North Swag and most of Swallow Park/Park Wash.  In part, this is

because the Pan Am Company improved the road in 1966 so it could access water more easily for

its drilling operation.  Prior to the 1980s, Kane County bladed the road upon request.  In the 1980s,

however, Kane County designated the road as a Class B road.  While that designation was after the

Act of 1866's repeal, it nevertheless shows the nature of the road and its use before this litigation

commenced.

Witness testimony dates back to the 1930s establishing use of the road by cattlemen running

cattle in the area.  In the 1940s and 1950s, one witness used the road often to access the Nipple Lake

Ranch.  The road has also been used by ranchers traveling from Tropic, Utah, down to the Nipple

Lake Ranch because the road is part of one continuous road system that extends off of Skutumpah.

Moreover, witness testimony established that the public has used the road to access hunting at least

since 1964.  The public also has used it while out sightseeing or to reach hiking spots.

Although much of Nipple Lake road's use has been by the ranchers who have owned Nipple

Lake Ranch, the road does not have the character of a private lane.  It is wide and improved.  There

are no signs posted for the public not to trespass on it.  Nor was any evidence presented that the

public has been precluded from using it.  Instead, Kane County has bladed the road upon request

before 1980 and then has regularly maintained it after the 1980s.  Again, while use of the road has

not been frequent, it has been as often as the public deemed it necessary or convenient.  The court

therefore concludes the evidence clearly and convincingly establishes that the Nipple Lake road is

an R.S. 2477 road and hereby quiets title in favor of Kane County and the State of Utah.

### E.    Four Cave Lake Roads

From an evidentiary standpoint, the Cave Lake roads present a different situation than the other roads discussed above.  Under Utah law, to prove a road is a public way, Plaintiffs typically must show public use of the road continuously for at least ten years prior to October 21, 1976.  Official maps and aerial photography provide strong evidence about a road's existence.  When those maps and photographs are consistent with the present course of a road, it provides further evidence that the road one sees today is the same road that existed when the maps were issued or the aerial photographs were taken.  Each of the roads discussed above appeared on United States geological survey maps by at least 1966.  Moreover, they appeared in aerial photographs by 1964.  When such evidence is coupled with witness testimony corroborating public use of those roads for more than ten years, Plaintiffs have met their burden of proof.

None of the Cave Lake roads, however, appeared on United States geological survey maps prior to 1985.  The earliest aerial photography of them was 1976.  While the aerial photography supports the roads existed by 1976, it provides no information about how long the roads existed before 1976.  Thus, the court must rely solely on witness testimony to establish ten years of public use before the Act of 1866's repeal.

#### i.    *K1070*

Regarding K1070, multiple long-time residents of Kanab testified about use of the road.  It is important to note that when testifying about their use, they also testified about others they saw on the road and the general public nature of the road.  It has been used by members of the public when hunting deer, sight-seeing, gathering firewood, cutting cedar post, accessing residences in the area, and occasionally hiking.

The testimony of one witness's use dates back to the early 1950s.  From that point forward, Plaintiffs provided evidence that members of the public consistently used the road.  Prior to 1976, one witness testified he saw over one hundred people using K1070 when he traversed it.  The overall testimony about K1070 showed use by the public for more than ten years prior to the Act of 1866's repeal.  Although such use was light, the court concludes it was sufficient to establish clearly and convincingly that K1070 is an R.S. 2477 road.  Accordingly, the court quiets title in favor of Kane County and the State of Utah.

    ii.    *K1075*

Evidence about K1075 shows less usage than K1070.  Most witnesses testified to using the road only two or three times.  Starting in about 1972, Mr. Wright testified he traveled the road regularly with family and friends to access a picnic spot.  On such trips, he sometimes saw other members of the public hunting, ranching, and wood cutting.  This testimony, however, only spans a four year period.  Another witness testified to using the road three times between 1961 and 1971.  A third witness used the road twice in the 1950s.  With the exception of Mr. Mace, the remaining witnesses testified only to use in the 1970s, which is again less than ten years before 1976.

Unlike the other witnesses, Mr. Mace testified to using the road in the 1950s, 1960s, and 1970s, but it  was to access his family's ranch.  Through a series of leading questions, Mr. Mace testified he saw other members of the public in the 1950s and 1960s using the road to hunt, hike, sight-see and gather wood, but there was no indication about the frequency of use.  Consistent with other witness testimony, use of K1075 increased in the 1970s, where public use appeared to be more consistent.  Consistent use in the 1970s, however, cannot prove continuous use for a ten year period.  Prior to the 1970s, the evidence does not show clearly and convincingly that the public continuously

used the K1075 for ten years.  While the court recognizes that use does not have to be frequent, and that the public simply needs to use a route as often as it finds it convenient or necessary, the evidence is insufficient to meet this standard.  Instead, prior to the 1970s, K1075 appeared to more in the nature of a private lane rather than a public highway.  The court therefore quiets title in favor of the United States for K1075.

### iii.  *K1087 and K1088*

The evidence for K1087 and K1088 also shows use of the road as far back as the late 1950s or early 1960s.  Mr. Wright used the roads nearly every year go hunting.  No other witness testified to use more than two or three times.  When the roads were used, such use was of a limited nature. The court concludes the evidence was insufficient to show clearly and convincingly that these two roads were used by the public continuously for at least ten years before 1976.  The court therefore quiets title to K1087 and K1088 in favor of the United States.

## IV.  SITLA PARCELS

Although the court has found that an R.S. 2477 road exists for most of the length of Mill Creek and Swallow Park/Park Wash roads, each road contains a segment that traverses a former SITLA parcel.  Plaintiffs did not present evidence from which the court could conclude that the Mill Creek road predated the vesting of SITLA Parcel One in the State in 1896,[21] or that the Swallow Park/Park road predated the vesting of SITLA Parcel Five in the State in 1914.[22]  Since these parcels

---

[21]  Approximately 0.2 miles of the Mill Creek road traverse SITLA Parcel One, in Section 32, Township 40 South, Range 4.5 West, S.L.M.  *Kane County*, 2011 U.S. Dist. LEXIS 66218, at *4; Pl. Ex. 2, at 3, 6.

[22]  Approximately 0.5 miles of the Swallow Park/Park Wash road traverse SITLA Parcel Five in Section 32, Township 39 South, Range 3 West, S.L.M.  *See generally Kane County*, 2011 U.S. Dist. LEXIS 66218, at *4.

were owned by the State when the roads were created, R.S. 2477 is inapplicable because it only applied to federal lands.  Plaintiffs nevertheless contend they have a right-of-way across the parcels by operation of state law and the 1998 exchange documents that transferred the SITLA parcels to the United States.

In 1992, the Utah "Legislature recognize[d] that highways provide tangible benefits to private and public lands of the state by providing access, allowing development, and facilitating production of income."  1992 Utah Laws 289, § 1 (codified at Utah Code Ann. § 27-12-103.2 (1992)).[23]  Consequently, the Legislature granted a temporary easement "for each highway existing prior to January 1, 1992" that traversed state land, including SITLA parcels.  *Id.* § 3.  For a highway to be recognized, it had to have "been constructed and maintained or used by a responsible authority."  *Id.*  The act defined "responsible authority" as "a private party, the State of Utah, or a political subdivision of the state claiming rights to a highway right-of-way, easement, or right of entry across state lands."  *Id.* § 2.  Kane County, as a political subdivision of the State, had used the roads traversing SITLA Parcel One and SITLA Parcel Five and claimed a right-of-way.  Moreover, the evidence shows these road segments existed prior to 1992.  The court therefore concludes that Kane County had a temporary easement across both parcels pursuant to Utah statutory law.

When the United States acquired SITLA Parcel One and SITLA Parcel Five in December 1998, however, the statute provided that the temporary "easement shall remain in effect through June 30, 2004, or until a permanent easement or right of entry has been established [through a formal application process], whichever is less."  1998 Utah Laws 42, § 2.  The statute put the United States

---

[23]  The statute has since been renumbered as Utah Code Ann. § 72-5-201 (2011) *et seq*.  The court uses the prior numbering, however, because that legislation was in effect at the time these SITLA parcels were transferred to the United States.

on notice that Kane County had a temporary easement and had the right to perfect that easement before 2004.  Kane County concedes, however, that it never submitted an application for a permanent easement across either SITLA parcel, and accordingly, was never granted a permanent easement by the State.  Pretrial Order, at 37.

Nevertheless, Kane County contends that its easement remains because in March 2003, the Legislature modified the term of the temporary easement so that it would "remain in effect through June 30, 2004, or until a permanent easement or right of entry [is granted by SITLA], whichever is *greater*."  2003 Utah Laws 192, § 6 (emphasis added).  Because its temporary easement was extended before it expired, Kane County contends it still has an easement.  The court cannot accept this argument because the State did not own SITLA Parcel One and SITLA Parcel Five when it modified the law in 2003.  It therefore had no authority to extend the scope of Kane County's easement.  Moreover, nothing in the 1998 exchange documents put the United States on notice that Kane County could extend the term of its temporary easement.  It only informed the United States that Kane County had the right to perfect its easement until 2004.  Those are the terms the United States agreed to when it took the parcels subject to existing rights.  The court therefore concludes that Kane County's temporary easements across SITLA Parcel One and SITLA Parcel Five have expired and that it has no vested property right in these parcels.

The State, however, does have a valid right-of-way across the two parcels.  It owned SITLA Parcel One from 1896 until 1998.  It owned SITLA Parcel Five from 1914 until 1998.  Similar to the federal government, because the State is a sovereign, no person or entity could adversely possess against it.  Hence, any "highways" created on its land were owned by the State absent an express grant.  When the Utah Legislature chose to recognize these roads, it did not divest itself of

ownership.  Rather is only granted temporary easements or rights of entry across the "highways,"

so that others could lawfully use them.  Consequently, at the time the State transferred the SITLA

parcels to the United States, the United States took the parcels subject to these highways by express

reservation in the Exchange Patent.  S*ee* Exchange Patent, at 42 (Pl. Ex. 67) (stating the SITLA

parcels shall be "subject to any valid, existing easement or right of way *of any kind*") (emphasis

added)); *see also Potter v. Chadaz*, 1999 UT App 95, ¶ 8, 977 P.2d 533 (stating under Utah law, an

easement may be expressly created by agreement between two parties through either an express

grant or an express reservation).[24]

Even if the Exchange Patent did not have an express reservation of the State's rights-of-way

across these former SITLA parcels, an implied reservation would exist.  An implied reservation

exists when the following elements are met:

> [1] previous unity of title, followed by severance; [2] that at the time
> of the severance the servitude was so plainly apparent that any
> prudent observer should have been aware of it; [3] that the easement
> was reasonably necessary to the use and enjoyment of the dominant

---

[24] *Potter* states that an easement cannot be reserved unless the granting document specifies "the boundaries of the easement or its exact location."  *Potter*, 1999 UT App 95, ¶ 11.  While this may be a sound policy decision in a contract involving a private party, it fails to recognize the unique situation where a sovereign either grants or reserves a right across its own lands.  Each of the proclamations, management plans, and granting documents at issue in this case simply state that all existing rights-of-way are reserved.  Given that the Monument encompasses 1.7 million acres, and the exchange patent involves hundreds of parcels, it is not surprising that each right-of-way is not identified with specificity.  What is clear is that the State intended to reserve its rights-of-way and the United States agreed to accept the encumbrances when the SITLA parcels were transferred.  Accordingly, there was "mutual assent by the parties manifesting their intention to be bound by [the patent's] terms." *Id.* ¶ 9 (quotations and citation omitted).  Moreover, the rights-of-way at issue are open, visible routes that have followed a set course for many years.  This further mitigates the lack of specificity in the granting documents.  *See also Evans v. Bd. of County Comm'rs*, 2004 UT App 256, ¶ 12, 97 P.2d 697 (distinguishing *Potter* and stating "a deed should be construed so as to effectuate the intentions of and desires of the parties," even if the deed does not include the location of an easement with specificity).

> estate; and [4] it must have been continuous, at least in the sense that
> it is used by the possessor whenever he desires.

*Ovard v. Cannon*, 600 P.2d 1246, 1247 (Utah 1979) (citation omitted).

Here, the State previously owned the SITLA parcels on which the rights-of-way are located. It then transferred the parcels to the United States, but reserved existing rights-of-way across them. This severed the unity of title.  Second, at the time of severance, the rights-of-way were apparent to any prudent observer.  The right-of-way across SITLA Parcel One was maintained as a Class B road and the right-of-way across SITLA Parcel Five was a well-defined Class D road.  Third, the rights- of-way are necessary to the use and enjoyment of the dominant estate.  The rights-of-way across the SITLA parcels were part of and connected to longer road segments, in which the State holds a non-possessory interest.  Absent an easement across the SITLA parcels, the State could not access its non-possessory interests in the longer road segments, which would defeat the State's interest in the other road segments.  Finally, as discussed above, use of the rights-of-way has been continuous.   Therefore, the court alternatively concludes that the State has an easement by implication.

## V.   PUBLIC WATER RESERVE 107

"R.S. 2477 rights of way may be established only over lands that are 'not reserved for public uses.'"  *SUWA*, 425 F.3d at 784.  The United States contends that Plaintiffs cannot prove the existence of an R.S. 2477 right-of-way for about a half mile of the Swallow Park/Park Wash road where it crosses two parcels that were reserved under PWR 107.  President Calvin Coolidge created this water reserve by Executive Order of April 17, 1926.  It states:

> It is hereby ordered that every smallest legal subdivision of public
> land surveys which is vacant, unappropriated, unreserved public land
> and contains a spring or water hole, and all land within one quarter

> of a mile of every spring or waterhole located on unsurveyed public
> land, be and the same is hereby withdrawn from settlement, location,
> sale or entry, and *reserved for public use in accordance with the*
> *provisions of Section 10 of the Act of December 29, 1916.*

(Emphasis added.)  Three years later, the Secretary of the Interior construed PWR 107 to include

the two parcels of land through which the Swallow Park/Park Wash road now traverses.[25]

Interpretation No. 92 (Def. Ex. N).  It is not disputed that the Secretary properly identified that PWR

107 applies to these parcels.  The only question presented by the parties is whether PWR 107 is the

type of reservation that acts to make R.S. 2477 inoperative over the reserved lands.  The court

concludes that PWR 107 is such a reservation.

In *SUWA*, the Tenth Circuit addressed whether the 1910 Coal Withdrawal precluded

operation of R.S. 2477 on lands reserved for classification and appraisal of coal values.  The text

of the coal withdrawal states:

> Subject to all of the provisions, limitations, exceptions, and
> conditions contained in [the Pickett Act and the Coal Lands Act],
> there is hereby withdrawn from settlement, location, sale or entry,
> and reserved for classification and appraisal with respect to coal
> values all of those certain lands of the United States . . . described as
> follows: [describing over 5.8 million acres of land in Utah].

*SUWA*, 425 F.3d at 784 (alteration in original).  In analyzing the coal withdrawal, the Court noted

a "withdrawal" operates differently than a "reservation."  "A withdrawal makes land unavailable for

certain kinds of private appropriation under the public land laws." *Id.* "A reservation, on the other

hand, goes a step further: it not only withdraws the land from operation of the public land laws, but

---

[25]  As stated previously, the first parcel is the north half of the southeast quarter (N½ SE¼)
of Section 31, Township 39 South, Range 3 West, S.L.M.  Def. Ex. N, at 2.  The second parcel is
the northwest quarter of the northeast quarter (NW¼ NE¼) and the northeast quarter of the
northwest quarter (NE¼ NW¼) of Section 5, Township 40 South, Range 3 West, S.L.M. *Id.*

also dedicates the land to a particular public use." *Id.* Thus, a reservation both withdraws the land and reserves it for a specific public use. *Id.* Because the coal withdrawal did not have both aspects, the Court concluded the lands were not reserved.

Unlike the coal withdrawal, PWR 107 both withdraws and reserves land "for public use in accordance with the provisions of Section 10 of the Act of December 29, 1916." The Act of 1916 is known as the Stock-Raising Homestead Act (the "Stock-Raising Act"). Acts Dec. 29, 1916, ch. 9, 39 Stat. 862. The Stock-Raising Act authorized lands to be reserved which contained "water holes or other bodies of water needed or used by the public for watering purposes." *Id.* § 10. Additionally, while the lands were reserved, they had to "be kept and held open to the public for such purposes" prescribed by the Secretary of the Interior. *Id.* Subsequent regulations prescribed the water "for human and animal consumption." *See United States v. Denver*, 656 P.2d 1, 31 (Colo. 1982). PWR 107 therefore withdrew lands from entry and reserved them for a particular public purpose.

Because PWR 107 parcels were reserved for public uses, an R.S. 2477 right-of-way cannot be established across them unless the right existed before the PWR 107 reservation. Here, the Secretary of the Interior determined in 1929 that PWR 107 applied to the two relevant parcels. Plaintiffs did not present any evidence that the Swallow Park/Park Wash road existed prior to 1929. Accordingly, the court concludes Plaintiffs do not have an R.S. 2477 right-of-way across these two discrete parcels of land reserved under PWR 107.

This conclusion does not negate the fact, however, that a road does exist across the PWR 107 parcels and that the road links one end of Plaintiffs' R.S. 2477 right-of-way to the other. The fact that a road exists across the parcels is not surprising in light of why PWR 107 was implemented.

-103-

It has been said that "water control[s] the range."  James Muhn, The State of the Law: Public Water

Reserves: The Metamorphosis of a Public Land Policy, 21 J. Land Resources & Envtl. L. 67, 68

(2001) (hereinafter "Muhn Article").  As the West developed, ranchers and homesteaders learned

that "[a] person could patent forty acres and then control thousands more simply because he had the

only water."  *Id.* at 75.  This was contrary to then existing public policy that lands were to "be held

open for free and unrestricted use to everyone."  *Id.* at 83–84 (citation omitted).  To mitigate

monopolization of water sources, Congress authorized the president to create water reserves to

ensure access by the public.  *Id.* at 84, 98.  "[I]t was not the intent of the withdrawals to deny any

stockraisers access to the water sources affected, but to ensure that everyone had access."  *Id.* at 94,

126.  Moreover, the water reserves were not meant "to retard the settlement and development of the

public domain."  *Id.* at 94, 98.

      Because access to water was crucial for the survival of settlers and livestock, and PWR 107

was meant to ensure access, common sense suggests that roads would be established by the public

to access the water sources that were being kept open for them and their livestock.  Indeed, "it would

make little sense for Congress to open public [water sources] but forbid settlers to construct

highways to access [them]."  *SUWA*, 425 F.3d at 786.  Here, the evidence shows a long existing road

(the Swallow Park/Park Wash road) that leads to and through two PWR 107 parcels.  Although

Plaintiffs have no R.S. 2477 right-of-way across the two quarter-of-a-mile stretches that make up

these parcels, federal agencies must still adhere to the purpose for which the land was and continues

to be reserved.  Thus, should Plaintiffs seek a Title V permit[26] for a right-of-way across the PWR

---

[26] Section 501 of FLPMA granted authorization to issue rights-of-way for roads, trails, and
highways.

107 parcels, the government's analysis must necessarily focus on the purpose of the reservation and determine whether a right-of-way would defeat that purpose.

It further bears noting that Plaintiffs are the holders of a dominant estate that adjoins the PWR 107 parcels, and the United States is the owner of the servient estate.  Under Utah law,[27] "the rights of the dominant and servient tenants must be balanced" and a servient tenant may not use its property in a manner "inconsistent with the easement."  *United States v. O'Block*, 788 F.2d 1433, 1436 (10th Cir. 1986) (citing *North Union Canal Co. v. Newell*, 550 P.2d 178, 179–80 (Utah 1976)).  Likewise, the United States may not use its ownership of PWR 107 as a sword to unburden itself of being the servient estate of the adjoining land parcels, and thereby defeat the dominant estate held by Plaintiffs.

## VI.   THE REALIGNMENTS

Skutumpah has existed at least since the 1870s and the court previously quieted title to it in favor of Plaintiffs.  *Kane County*, 2011 U.S. Dist. LEXIS 66218, at *5, 8, 24.  Thus, the issue before the court is not whether Skutumpah is a R.S. 2477 road.  Instead, the issue is whether The Realignments constitute permissible variances, such that title should be quieted in those variance.

Non-possessory interests in land, like rights-of-way and easements, are not necessarily static.  Rugged terrain, slides and water erosion can move the traveling surface of public roads.  This is especially so in southern Utah.  The question remains, however, about what constitutes a permissible variance.  In 1929, the Utah Supreme Court stated the following:

---

[27] "Absent controlling federal legislation or rule of law, questions involving real property rights are determined under state law, even when the United States is a party."  *United States v. O'Block*, 788 F.2d 1433, 1435 (10th Cir. 1986) (citations omitted).  When addressing dominant and servient estates, courts have looked to state law to decide the relevant issues.  *Id.*

> While the public cannot acquire a right by use to pass over a tract of
> land generally, but only in a certain line or way, it is not
> indispensable to the acquisition of the right that there should be no
> deviation in the use from a direct line of travel.  If the travel has
> remained substantially unchanged, and the practical identity of the
> road preserved, it is sufficient, although there may have been slight
> deviations from the common way to avoid encroachments, obstacles,
> or obstructions upon the road.

*Lindsay Land & Live Stock Co. v Churnos*, 285 P. 646, 649 (1929).

In one case, a judge in this court addressed whether improvements could be made to an R.S.

2477 road.  The court reviewed the history of the road and noted the following:

> The evidence shows that over the years both the traveled path and the
> width of the road have varied by as much as *several hundred feet*
> from the current roadway.  Moreover, periodic flooding of the road
> has required realignment in many places.  Most of these former paths
> are still visible off to the sides of the current road.

*Sierra Club v. Hodel*, 675 F. Supp. 594, 601 (D. Utah 1987), overruled on other grounds, *Village

of Los Ranchos De Albuquerque v. Marsh*, 956 F.2d 970 (10th Cir. 1992) (emphasis added).  The

court then stated that under Utah law a road "may deviate from [its] present path, as long as such

extensions are reasonable and necessary."  *Hodel*, 675 F. Supp. at 606.

Four of The Realignments resulted in significant modifications to Skutumpah.[28]  Kane

County, however, has historically realigned a number of roads, including the Sand Dunes road (by

about 200 feet), the Hancock road (by about 100 feet), and a different section of Skutumpah near

Deer Springs Ranch.  The road by Deer Springs previously had a steep narrow cut.  Trial Tr.,

1094–95 (L. Pratt).  During a two year project, Kane County widened the road and lowered the

grade to improve safety and the sight distance.  *Id.* at 1093–96.  The Realignments were of the same

---

[28]  The four segments to which the court is referring are Sheep Creek, Averett Canyon, Willis
Creek, and Bull Run Creek.

nature and character as Kane County's previous actions.  While four of The Realignments were significant, the deviations were consistent with those permitted in prior case law.  *See Hodel*, 675 F. Supp. at 601, 606.

Moreover, these realignments occurred prior to the Tenth Circuit's decision in *SUWA*.  This is significant because the decision clarified the parties' rights and interests in R.S. 2477 roads. Previously, it was unclear what actions required notice and what role the BLM could play when improvements were sought within the scope of an existing right-of-way.  Kane County's Transportation Director testified that Kane County knows about the *SUWA* clarification, namely, that Kane County must first consult and then work with the BLM before it may upgrade or improve a road beyond its historical maintenance practices.  Trial Tr., at 1053–55 (L. Pratt).

*SUWA's* importance is further reflected in the stipulated dismissal of the 1996 trespass action.  As a condition of dismissal, the United States did not require Kane County to restore Skutumpah to its historical path.  Nor has it subsequently required Kane County to take such action. Rather, the stipulated dismissal acknowledged the clarifications provided by *SUWA* and stated that in light of those clarification, it did not wish to proceed with its claims.  Accordingly, in 2006, the United States chose to voluntarily dismiss the 1996 trespass action with prejudice.

This puts The Realignments in a unique posture.  They have been the subject of previous litigation that was dismissed with prejudice.  They have existed for almost twenty years.  The purpose of The Realignments was to improve safety and the condition of the road.  Were the court to declare now that the variances are not recognized, substantial effort would have to be undertaken to restore the route to its original location and condition of steep grades, sharp curves, and

washouts.[29] The court fails to see what purpose this would serve other than stating again that Kane County may not unilaterally undertake road improvements.  Given that this point has been made in previous litigation, and Kane County has abided by it, making the point a second time serves little purpose.[30]

The court is aware that allegations have been made that some of The Realignments are by, or intrude into, the Paria-Hackberry WSA.  Testimony from the United States' witnesses declared that the WSA commences at the edge of disturbance of Skutumpah's former traveled surface.  This view ignores the need for a right-of-way to extend beyond the road's travel surface to accommodate normal maintenance procedures and emergency pull-off areas.  Moreover, the testimony appears to be contradicted by the BLM's own Statewide Wilderness Final Environmental Impact Statement for Utah, wherein it stated "a border would be from 100 to 300 feet from the edge of the road travel surface, depending upon the nature of the road and the adjacent terrain."  Depending on the border established for Skutumpah, which is a major thoroughfare, one may reasonably question whether any of The Realignments intruded into the Paria-Hackberry WSA.  Finally, were Kane County required to restore the road to its original path, the work would newly disturb landscape and vegetation that has been in place for almost twenty years.

Based on the totality of circumstances, the court concludes that The Realignments were permissible variances.  The court therefore also quiets title to the realigned sections along

---

[29]  Contrary to what the United States appears to be arguing, were the court to declare The Realignments are impermissible variances, Plaintiffs would have the right to reclaim the prior route. They had a vested right in the prior route and did not formally abandon it.

[30]  The court cautions, however, that if Kane County were to unilaterally undertake road improvements in the future, it well may have to restore those improvements to their previous condition because it is on notice that unilateral improvements require consultation with the BLM.

Skutumpah in favor of Plaintiffs.  This ruling is not meant to afford Plaintiffs two alternative routes in Skutumpah.  Instead, this ruling necessarily vacates Plaintiffs' rights in the old route since those rights have been superseded by their right-of-way in the realigned sections.

## VII.   SCOPE OF THE RIGHTS-OF-WAY

### A.      Ripeness

Having determined that certain roads in Kane County vested under R.S. 2477, the court must now determine the scope of the rights-of-way.[31]  The United States contends this question is not ripe and cites to *SUWA* in support of its argument.  In *SUWA*, the Tenth Circuit held that "[t]he initial determination of whether the construction work falls within the scope of an established right of way is to be made by the federal land management agency."  *SUWA*, 425 F.3d at 748.  This statement was made, however, in the context of admonishing a right-of-way holder that before it improves an R.S. 2477 road, the BLM must make an initial determination about whether the "proposed *improvement* is reasonable and necessary in light of the traditional uses of the right of way."  *Id.* (emphasis added).  Then if there is "disagreement, the parties may resort to the court."  *Id.*  The Court's holding only pertains to situations where a right-of-way holder is seeking to improve a road on a project specific basis.

---

[31]  There is some support in case law that when determining the scope of a right-of-way the burden of proof is by preponderance of the evidence.  *See McClellan v. United States*, 2011 U.S. Dist. LEXIS 21318, at *22 (D. Utah Mar. 1, 2011) (citing *Merrill v. Bailey & Sons Co.*, 99 Utah 323, 106 P.2d 255, 258 (Utah 1940)); *see also McBurney v. Pacquin*, No. X09cv14027736, 2008 Conn. Super. LEXIS 2085, at *9 (Conn. Super. Ct. Aug. 6, 2008); *Pendarvis v. Cook*, 706 S.E.2d 520, 538 (S.C. Ct. App. 2011); *see generally Boone v. United States*, 743 F. Supp. 1367, 1373 (D. Haw. 1990); *Fruin Colnon Corp. v. Vogt*, 541 F. Supp. 1264, 1266 (S.D. Ill. 1982).  In this case, however, sufficient evidence has been presented to prove scope by clear and convincing evidence. It is therefore not necessary to resolve what standard applies when proving scope.

"Scope," as used by the court in this case, does not address whether a particular improvement is appropriate. Instead, it pertains to road width. In *SUWA*, the Tenth Circuit held that a right-of-way holder does *not* need to consult with the BLM prior to conducting routine maintenance. *See id.* at 745, 748. It provided the following definition about "maintenance:"

> "Maintenance" preserves the existing road, including the physical upkeep or repair of wear or damage whether from natural or other causes, maintaining the shape of the road, grading it, making sure that the shape of the road permits drainage, and keeping drainage features open and operable—essentially preserving the status quo.

*Id.* at 749 (citation and alteration omitted). To accomplish this routine maintenance, Kane County regularly must use an area wider than a road's travel surface. Unless the parties know a road's width, however, Plaintiffs will have to consult continually with the BLM about whether a maintenance project falls within the width of a right-of-way or constitutes trespass.

For example, the United States contends there should only be a 6-foot clear zone along Sand Dunes. This is the *minimum* amount needed for safety. At times, Kane County has cleared the vegetation further out to increase visibility and safety. Clearing vegetation typically would be in the nature of maintenance to preserve the status quo. Absent a determination about "scope," the United States could cite Kane County for trespass if it chose to do a 7-foot clear zone. To avoid uncertainty by the right-of-way holder about the area in which it may conduct routine maintenance, a determination about width is necessary.

A determination about width is also necessary to establish whether a proposed improvement would be operating within the area of the right-of-way or trespassing. This is particularly important in this case where some of the roads traverse in or by a wilderness study area. Although Plaintiffs must consult with the BLM before undertaking an improvement, *SUWA* contemplated that the

-110-

parties would already know "the physical boundaries of the right of way." *SUWA*, 425 F.3d at 747–48. This is logical given that generally a right-of-way is legally described by both its width and length.[32] Without a determination about width, it leaves an indeterminate right-of-way that can vary based on the nature of a proposed project. The court therefore concludes the issue of "scope" is ripe for its determination.

**B.     Road Width**

R.S. 2477 does not specify the width of the granted right-of-way. The court therefore turns to Utah law to determine the proper width of the roads as issue. Under Utah law, "the width of a public road is determined according to what is reasonable and necessary under all the facts and circumstances." *Memmott v. Anderson*, 642 P.2d 750, 754 (Utah 1982) (citations omitted). Relevant facts and circumstances include what is currently necessary to maintain the roads and what possible future changes may be made to "the character of the roadway when needed to accommodate traditional uses." *SUWA*, 425 F.3d at 748. When making this determination, "width of a dedicated highway is not limited to the beaten path." *Leo M. Bertagnole, Inc. v. Pine Meadow Ranches*, 639 P.2d 211, 213 (Utah 1981) (citation omitted). Instead, the road must be "of sufficient width for safe and convenient use thereof by . . . traffic." *Id.* (quotations and citation omitted).

Plaintiffs claim a standard 66-foot right-of-way is needed for all of the roads in this action. They contend this width is supported by Utah law, Kane County ordinances, and is reasonable and necessary. The United States requests that the court only confirm such width of right-of-way as is

---

[32] Earlier the court noted that an exception exists to this general rule when governmental entities are preserving rights-of-way over a vast area, such as when the parties entered into the Exchange Agreement. Under those circumstances, each right-of-way is not described in a particular manner.

currently used for each of the roads, leaving for another day any further request or need for a wider right-of-way.  Due to the character differences that exist in the roads, and the need for a width greater than the travel surface, the court adopts neither position in full.

i.      *Scope of Sand Dunes, Hancock, and Skutumpah*

Sand Dunes and Hancock are both paved roads with higher travel speeds.  Skutumpah, though not paved, is an improved Class B road and a major thoroughfare.  The width of the travel surface is not consistent along the roads, but this does not mean that the total width likewise must be inconsistent.  As noted in the BLM's own manual, maintenance of uniform widths is preferable to frequent width changes.  BLM's Roads Manual 9113 (1985) (Pl. Ex. 85, at 11 (subsection .29 in text)).  Moreover, it would be unduly cumbersome both to declare and administer different widths along different stretches of the roads.  Accordingly, the court concludes that establishing a set width for the full length of these roads is appropriate.

Because Sand Dunes, Hancock, and Skutumpah are major two-lane thoroughfares, the court concludes that a 66-foot right-of-way is appropriate for them.  This is a standard width for many highways.  *See Hunsaker v. State*, 509 P.2d 352, 353–54 (Utah 1973) (looking at other highways in the area and prior statute and concluding that a 66-foot width was appropriate); Trial Tr., at 1034–35 (L. Pratt) (testifying that Kane County requires a 66-foot right-of-way when new projects are developed); Def. Ex. JJJJJ (showing that the BLM granted a 66-foot right-of-way for an alternate route along Bald Knoll); *see also* Pl. Ex. 90 (directing that all county roads be "made the legal width of four rods"), Pl. Ex. 91 (finding that a county road needed to be widened to 66 feet).  Moreover, it is the width agreed upon by the parties in the 1972 Memorandum of Understanding.  Pl. Ex. 89, at 12.

-112-

Sand Dunes' present travel surface ranges from 24 to 30 feet; Hancock's travel surface ranges from 24 to 28 feet; and Skutumpahs' travel surface ranges from 24 and 28 feet.  The 66-foot right-of-way will allow room to maneuver equipment, repair culverts, clear vegetation, obtain fill, and divert water to maintain the roads to their present travel surface.  It further allows for shoulders along the road for emergency pull-offs and room to address any future realignments or other improvements needed to increase safety.[33]  Thus, the court concludes that a 66-foot right-of-way is reasonable and necessary under all the facts and circumstances for Sand Dunes, Hancock, and Skutumpah.  The right-of-way shall extend 33 feet on both sides of the center line for these roads.

ii.     *Scope of Mill Creek, Bald Knoll, and Old Leach Ranch Road*

Mill Creek and Bald Knoll are improved Class B roads.  They differ in character, however, from Sand Dunes, Hancock, and Skutumpah.  At times, weather makes portions of them impassable.  Their travel surface is not as wide, and though public in nature, they are not major thoroughfares.  The court therefore concludes that a 66-foot right-of-way is inappropriate for them.

They are nevertheless substantial roads.  Mill Creek's travel surface ranges from 16 to 20 feet.  The Tenny Creek spur's travel surface ranges from 16 to 18 feet and the Oak Canyon spur's travel surface is 20 feet.  Similarly, Bald Knoll's travel surface ranges from 16 to 20 feet.  The Old Leach Ranch road has been in disuse since 1980 due to the alternate Title V route.  Based on vegetative growth in the area, however, the travel surface appeared to be about 14 feet.

As Class B roads, they require regular maintenance, similar to that noted above.  Moreover, because Mill Creek terminates at private property in three separate locations, maintenance efforts

---

[33]   The court notes again that any such realignments or improvements would require consultation with the BLM before they are undertaken.

on Mill Creek have included blading the road so vehicles could park or turn around.  Bald Knoll is prone to washouts and must be wide enough to safely support heavy haul trucks on a two-lane road.

In 1985, the BLM issued instructions regarding its own roads.  It stated that a "minimum width of 50 feet or the width of construction plus 10 feet on each side (whichever is greater) is generally required."  BLM's Roads Manual 9113 (1985) (Pl. Ex. 85, at 11 (subsection .29 in text)).  The court concludes a 50-foot right-of-way for Mill Creek (including Tenny Creek and Oak Canyon) and Bald Knoll is both reasonable and necessary.  It allows Plaintiffs to perform routine maintenance and make improvements consistent with the roads' historical uses and safety needs.[34]  Should Old Leach Ranch road ever have to come into use again, it would just be the southern extension of Bald Knoll.  Thus, to ensure consistency with Bald Knoll, the court concludes a 50-foot right-of-way likewise is appropriate for Old Leach Ranch road.  The right-of-way shall extend 25 feet on both sides of the center line for these roads.

iii.    *Scope of Swallow Park/Park Wash, North Swag, and Nipple Lake Roads*

Swallow Park/Park Wash is a Class B road for approximately one mile of its length.  The remainder of it is a Class D road.  The travel surface for the Class D portion ranges from 10 to 12 feet and does not generally allow for vehicles to pass one another.  In contrast, vehicles can pass one another in portions of the Class B section.  The Class D section is not regularly maintained by Kane County, although Kane County has performed work on it when requested.  Due to the road's condition, travel is necessarily slower than on some of the other roads at issue in the case.  At trial, evidence was introduced from the American Association of State Highway and Transportation

---

[34] This determination does not alter the width of the Title V permits issued by the BLM for Bald Knoll.

Officials regarding Guidelines for Geometric Design of Very Low-Volume Local Roads.  Pl. Ex. 82.  According to those guidelines, when speeds are between 20 and 30 miles per hour, the right-of-way should range from 18 feet (when providing access to recreational and scenic areas) up to 24 feet (when providing agricultural access).  *Id.* at 17–18.

The guidelines do not precisely fit Swallow Park/Park Wash road because they pertain to local roads that typically do not provide through traffic.  *Id.* at 1.  Nevertheless, the guidelines provide insight about the width that is reasonably necessary to ensure safety and allow for maintenance and improvements.  Swallow Park/Park Wash provides access not only to recreational and scenic areas, but also to ranching and grazing lands.  The court therefore concludes a 24-foot right-of-way is reasonable and necessary for Swallow Park/Park Wash.

The court further concludes that the same analysis applies to North Swag.  It is a single lane, primitive road, with a travel surface width of 10 feet.  Typically the road is low maintenance due to its classification as a Class D road.  At times, however, North Swag has to be repaired due to water and erosion damage.  Despite its primitive condition, it supports the same uses as Swallow Park/Park Wash.  Accordingly, the court concludes a 24-foot right-of-way is reasonable and necessary for North Swag as well.

In contrast to Swallow Park/Park Wash and North Swag, the Nipple Lake road is an improved road.  It was improved in 1966 to support a drilling operation and then classified as a Class B road in the 1980s.  Since that time it has been maintained to a Class B road standard.  Nipple Lake is wide enough for two lanes of travel, with a travel surface about 20 feet wide.  That said, the public uses of Nipple Lake are no greater than those for Swallow Park/Park Wash and North Swag.  Moreover, it is part of that particular road system.  As such, the court finds no reasonable basis to

conclude its width should be wider than the other two roads.  The court therefore concludes the right-of-way for Nipple Lake is also 24 feet wide.  The right-of-way shall extend 12 feet on both sides of the center line for these three roads.

        iv.    *Scope of Cave Lake K1070 Road*

Cave Lake K1070 road is a Class D road.  Its estimated travel surface ranges from 16 to 20 feet wide.  While a portion of the road may be this wide, during the court's site visit, K1070 was largely a single lane road.  Moreover, the road's nature is recreational rather than agricultural.  Given the speed at which the road is traveled, the recreational nature of the road, and that it is largely a single land road, the court concludes that an 18-foot right-of-way is sufficient.  This width is consistent with the guidelines for low-volume roads discussed above.  *See* Pl. Ex. 82, at 18.  The right-of-way shall extend 9 feet on both sides of the center line for the K1070 road.

## **CONCLUSION**

Prior to trial, the court concluded that the lower portion of Mill Creek was an R.S. 2477 road.  For the reasons stated above, the court concludes the remainder of Mill Creek (i.e. Upper Mill Creek, Tenny Creek, and Oak Canyon) is also an R.S. 2477 road.  The court quiets title in favor of Kane County and the State of Utah for all portions of Mill Creek except SITLA Parcel One.  As for that section, the court only quiets title in favor of the State.

The court further concludes that Swallow Park/Park Wash, North Swag, Nipple Lake, and Cave Lake K1070 are also R.S. 2477 roads and quiets title in favor of Kane County and the State of Utah for all portions of them except SITLA Parcel Five and the two PWR 107 parcels.  SITLA Parcel Five is quieted only in favor of the State.  The two PWR 107 parcels are quieted in favor of

the United States.  Additionally, Cave Lake roads K1075, K1087, and K1088 are quieted in favor of the United States.

With respect to scope, the court concludes that a 66-foot right-of-way is reasonable and necessary for Sand Dunes, Hancock, and Skutumpah.  The court further concludes a 50-foot right-of-way is reasonable and necessary for Mill Creek, Bald Knoll, and the Old Leach Ranch road.  As for Swallow Park/Park Wash, North Swag, and Nipple Lake, the court concludes a 24-foot right-of-way is reasonable and necessary.  Finally, for Cave Lake K1070, the court concludes an 18-foot right-of-way is reasonable and necessary.  The quieted titles shall reflect these widths.

Finally, on January 26, 2012, the court heard final oral argument on this case.  At the hearing, the court addressed the United States' motion in limine to exclude part of Evan McAllister's testimony.  For the reasons stated on that record and herein, the court DENIES the United State's motion.[35]

## ORDER

The court requests that Plaintiffs submit a proposed order that reflects the court's ruling in this case.  The order shall be submitted on or before April 3, 2013.  If the United States has any objections to Plaintiffs' proposed order, it shall file its objection on or before April 17, 2013.  Plaintiffs shall file any reply on or before May 1, 2013.

DATED this 20th day of March, 2013.

BY THE COURT:

Clark Waddoups
United States District Judge

---

[35] Dkt. No. 165.