Shawn T. Welch (7113)
Richard D. Flint (7525)
Michelle Quist (13559)
HOLLAND & HART LLP
222 South Main, Suite 2200
Salt Lake City, UT 84101
Telephone: 801-799-5800
stwelch@hollandhart.com
rdflint@hollandhart.com
MQuist@hollandhart.com

*Attorneys for Kane County, Utah*

Anthony L. Rampton (2681)
Kathy A.F. Davis (4022)
K. Tess Davis (15831)
Assistant Attorneys General
SEAN D. REYES (7969)
Utah Attorney General
1594 W. North Temple, Ste. 300
Salt Lake City, UT 84116
Telephone: (801) 537-9801
arampton@agutah.gov
kathydavis@agutah.gov
kaitlindavis@agutah.gov

*Attorneys for the State of Utah*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| KANE COUNTY (1), UTAH a Utah political subdivision,<br><br>    Plaintiff,<br><br>STATE OF UTAH,<br><br>    Plaintiff-Intervenor,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>    Defendant,<br><br>SOUTHERN UTAH WILDERNESS ALLIANCE and THE WILDERNESS SOCIETY,<br><br>    Defendant-Intervenors. | **KANE COUNTY'S AND THE STATE OF UTAH'S JOINT PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**<br><br>Case No. 2:08-cv-00315-CW<br><br>Judge Clark Waddoups |

## INTRODUCTION

Plaintiff Kane County, Utah ("Kane County") and Intervenor-Plaintiff the State of Utah ("State") (referred to collectively as "Plaintiffs"), filed this lawsuit under the Quiet Title Act ("QTA"), 28 U.S.C. § 2409a. The QTA waives the sovereign immunity of the United States to allow claimants to confirm their existing title interests on lands owned by the United States. Plaintiffs' public highway rights-of-way are claimed under a statute commonly referred to as R.S. 2477. *See* Mining Law of 1866. 14 Stat. 253, section 8, later codified as Revised Statute 2477, and 43 U.S.C. § 932 (repealed in 1976) ("R.S. 2477"). R.S. 2477 provides "that the right of way for the construction of highways over public lands, not reserved for public uses, is hereby granted." *See* Final Pretrial Order, Dkt. No. 384 ("FPO") at 2.

On June 21, 2011, the Court granted in part, and denied in part, Plaintiffs' motion for partial summary judgment. *See Kane County (1) v. United States*, No. 2:08-cv-0315, 2011 WL 248819 (D. Utah June 21, 2011) ("*Kane County MSJ*"). The remaining claims were tried to the Court in August of 2011, and on March 20, 2013, the Court issued its jurisdictional decision and its merit decision. *See Kane County (1) v. United States*, 934 F. Supp. 2d 1344 (D. Utah 2013) ("*Kane County Juris.*") and *Kane County (1) v. United States*, No. 2:08-cv-0315, 2013 WL 1180764 (D. Utah March 20, 2013) ("*Kane County Merits*"). FPO at 2-3.

Following cross appeals taken by the parties, the United States Court of Appeals for the Tenth Circuit issued its decision as reported in *Kane County (1) v. United States*, 772 F.3d 1205 (10th Cir. 2014) ("*Kane County 1*"). This Court's *Kane County Merits* decision determined that "Plaintiffs held 24-foot rights-of-way on Swallow Park and North Swag Road and a 66-foot right-of-way on Skutumpah Road." *Id*. at 1223. On appeal, the Tenth Circuit reversed and

remanded for the Court to redetermine the scope of these three roads. The Tenth Circuit found that the basis for the scope of the roads employed by this Court, which allowed for future improvements in advance of a specific proposal, placed "the cart before the horse." *Id*. at 1224.

> A court can find, as did the court in *Hodel*, that certain proposals for improvement are "reasonable and necessary" in light of the traditional uses of the road, so long as the BLM was consulted in advance. But to allow for unspecified improvements ex ante deprives the BLM of the opportunity to perform its duties effectively. The process set forth in *SUWA* contemplates a precise order of actions for holders of rights-of-way seeking improvements. First, they consult with the BLM as to the proposed improvements; then, "[i]n the event of a disagreement, the parties may resort to the courts." Thus, we find the district court erred in allowing for unspecified improvements in setting the widths of the rights-of-way on Skutumpah, Swallow Park and North Swag Roads. Therefore, we remand the question of the scope of the R.S. 2477 rights-of-way on these roads.

*Id*. at 1224-25 (citations omitted; internal quotation marks original). FPO at 3.

The Court traveled each of the three roads with counsel and representatives of the parties during a site visit on September 14, 2022. This site visit included numerous stops at locations chosen by both parties and the Court was able to observe the roads, their features, their destinations, and the topography of the land they cross. The Court held a bench trial from December 7, 2022 through December 9, 2022, and now enters its Findings of Fact and Conclusions of Law.

## **FINDINGS OF FACT**

### A.    **The Parties.**

1.    Plaintiff Kane County is a Utah political subdivision of the State of Utah. 2011 Final Pretrial Order, Dkt. No. 174, ("2011 FPO") at 26, ¶ 1.

2.      Plaintiff-Intervenor the State of Utah is one of fifty sovereign states forming the United States of America, having been admitted to the Union on January 4, 1896. 2011 FPO at 26, ¶ 2.

3.      Defendant the United States of America ("United States") is the federal government and owns the lands crossed by the three roads in this remanded action. 2011 FPO at 26, ¶ 3.

4.      Defendant-Intervenors the Southern Utah Wilderness Alliance and The Wilderness Society (collectively "SUWA") were granted intervention in this matter on June 25, 2019, as stated in *Kane Cnty., Utah v. United States*, 928 F.3d 877 (10th Cir. 2019).

**B.      Jurisdiction.**

5.      This is a civil action to quiet title to public highway rights-of-way under the QTA, 28 U.S.C. § 2409a. The Court's jurisdiction is provided in 28 U.S.C. § 1346(f). The jurisdiction of the Court is not disputed and is hereby determined to be present.

**C.      Venue.**

6.      Venue is proper pursuant to 28 U.S.C. § 1391(e)(2) in that the property at issue is located in the State of Utah. Venue lies in the Central Division of the District of Utah because the property is in Kane County, Utah. 28 U.S.C. § 125(2).

**D.      The Quiet Title Act Statute of Limitations.**

7.      Plaintiffs timely filed this action within the QTA's 12-year statute of limitations in 28 U.S.C. § 2409a(g). FPO at 2, ¶ 1; *see also Kane Cnty.*, 772 F.3d at 1219 (timely filed).

**E.      K5000 Skutumpah Road.**

8.      The K5000 Skutumpah Road ("Skutumpah") is located in western Kane County, Utah. 2011 FPO at 29, ¶ 17.

9.      Skutumpah commences at its southern intersection with the K3000 Johnson Canyon road in the NESE of Section 11, Township 41 South, Range 5 West, S.L.M., and proceeds approximately 33 miles northeasterly to where it ends at its intersection with the K7000 Cottonwood Road in the SENW of Section 6, Township 38 South, Range 2 West, S.L.M. 2011 FPO at 29, ¶ 17; *see generally* Pl. Ex. 6.

10.      Skutumpah has been shown as a road on a state-wide map since the late 1800s. Tr. 158; Pl. Ex. 57 (Pratt). As the Court noted in *Kane County MSJ*, "[a]n 1877 cadastral survey plat map shows the 'Skumpah Settlement' along the south end of Skutumpah," "the entire length of the road appears on the Froiseth's New Sectional and Mineral Map of Utah in 1878 [Pl. Ex. 57]," and "the road's path on these early maps generally follows the same path of Skutumpah today despite the passage of more than 100 years." *Kane County MSJ*, at *2; *see also* Dkt. 160 at 3-4 (same).

11.      Skutumpah is a Class B road. Tr. 45 (Harris). Class B roads regularly receive county maintenance approximately twice a year; Class D roads receive county maintenance infrequently—it could be 2-4 years apart, or it could be twice a year. Tr. 172 (Pratt). Class D roads are maintained or repaired only as needed. *Id.*; Tr. 55 (Harris).

12.      Kane County has been maintaining Skutumpah as a Class B road since 1967. *Kane County MSJ*, at *2; Dkt. 160 at 4; *see also* Pl. Ex. 42.

13.     Kane County acted in conformity with the Class B road classification of the Skutumpah Road by expending Kane County and State funds to carry out the continued maintenance and improvement of the road prior to October 21, 1976. *See* Dkt. 390-2 TT_0627 (V. Campbell) (prior to 1976, State and Kane County funds paid for Class B road maintenance), TT_0698-700 (V. Campbell) (because State road funds were used to maintain Class B roads, State employees verified the maintenance with periodic field checks).

14.     The Court previously found that Skutumpah's "travel surface ranges from 24 and 28 feet" and that the right-of-way is 66 feet wide. *Kane County Merits*, at *64; Dkt. 236 at 113 (same). "The 66-foot right-of-way will allow room to maneuver equipment, repair culverts, clear vegetation, obtain fill, and divert water to maintain the roads to their present travel surface. It further allows for shoulders along the road for emergency pull-offs and room to address any future realignments or other improvements needed to increase safety." *Id.*

15.     Vane Campbell testified that he worked for the County roads department from 1967 until 1992, with a brief period away. Dkt. 390-2 TT_0603-06. From 1967 to 1970 the County used two or three small dump trucks, a loader, two graders, and two blades—a Series 12-E and a 12-F—to perform maintenance on the County roads. *Id.*

16.     Mr. Campbell testified in 2011 that the County maintained Skutumpah prior to 1976 twice a year in the spring and fall, and then depending on the flood seasons, they would go back two or three times during the summer "just to fix special places." *Id.* at 0618. He also testified that the county liked to keep a 24-foot running surface, but was not able to do it on all sections of the Skutumpah Road because "[t]he bank was too high and it would take too much or else you would be going along a wash that would be 20 or 30 feet deep." *Id.* at 0618-619. He

testified there would be wash outs on the northern end of Skutumpah, and they would take material out of the bank. *Id*. at 0620. He testified that there were also wash outs on the south end of Skutumpah Road with some frequency. *Id*. at 0622.

17. Kane County's witness, Louis Pratt, started working for the Kane County Road Department as an equipment operator in 1986, and was promoted to Kane County Road Department Supervisor in 1996. He retired from Kane County employment in 2020. Tr. 142-43.

18. Mr. Pratt testified he would blade Skutumpah and have need to use the borrow ditch twice a year. *Id*. at 145-46. Using the borrow ditches encompassed pulling material out of one side and taking it across to the other side. *Id*. The County would also periodically "brush the slopes" to clear vegetation away from the travel surface. *Id*.

19. Kane County roads maintenance director Bert Harris testified that the County often parks its equipment in the disturbed width that is not the travel surface on the side of the road, "off a safe distance away from the road." Tr. 63. Additionally, he testified that "the outside edges of the tires [of a grader] are about 8 foot 6." *Id*.

20. Mr. Harris also testified that the drainage runouts along Skutumpah "have been established for many, many years." *Id*. These drainage features are necessary to assure that the water runs off the road to maintain a safe travel surface. *Id*. at 83. The drainage ditches may run more than 30 feet from the borrow ditch. *Id*.

21. Arlene Goulding was born in 1930 in Kanab, Utah, and lived at Tenny Creek from 1930 to 1946. Dkt.390-1 Depo_0009-0014. She testified in a deposition that she would use Skutumpah to go hunting and to move their livestock. *Id.* at 0012-0022. Her family would take horses or a drive a truck along Skutumpah to Mill Creek Road where they lived. *Id.* at 0025-26;

7

Pl. Ex. 191. She also testified she would see other people traveling along the road to hunt and gather wood. *Id*. at 0031, 0042

22. The K4400 Mill Creek Road connects to Skutumpah and proceeds north to several other roads and an intersection with the K3935 Bald Knoll Road. Pl. Ex. 20.

23. Mill Creek and Bald Knoll, which directly and indirectly connect to the Skutumpah, both have 50-foot rights-of-ways. *Kane County Merits*, at *64; Dkt. 236 at 114. ("The court concludes a 50-foot right-of-way for Mill Creek (including Tenny Creek and Oak Canyon) and Bald Knoll is both reasonable and necessary" for safety and maintenance.).

24. Evan McAllister was born in 1934 in Kanab, Utah. Dkt. 390-1 Depo_0063-64. Mr. McAllister was very familiar with Skutumpah and has spent a lot of time on it, engaged in recreation and sightseeing, and has traveled the road a lot. *Id*. at 0073. Additionally, Mr. McAllister's dad had a ranch there that he sold in 1955. *Id*. at 0077. He would drive a farm tractor along Skutumpah to get to the family's ranch. *Id*. at 0083. Mr. McAllister would travel along Skutumpah at least weekly in the 1950s. *Id*. at 0086-87. He would also see his uncle traveling the road. *Id.*

25. Mr. McAllister testified that the County would blade the road. *Id.* The road was "steep and narrow and bumpy and muddy" and two cars could pass each other "[i]f we were very careful." *Id.* at 0087-88. The road was improved by the county in the 1960s. *Id*. He would hunt and recreate on Skutumpah in the 1970s, but less frequently, and used the road for his cattle operations on the lower portion of Skutumpah. *Id*. He testified that he saw old pickups on the road in the 1950s and 1960s and more types of vehicles in the 1970s. *Id*. at 0089.

26.     Kurt Brinkerhoff was born in 1939 in Kanab, Utah, and had family with property near Skutumpah since the 1930s. He testified in a deposition that he would travel Skutumpah multiple times a week during the summer to access his family's property. Dkt. 390-1 Depo_0154-160. He would also see hunters from California and also saw neighbors and individuals cutting cedar fence posts and gathering firewood, hunting, and a lot of activity in general. *Id*. at 0181; 227; Pl. Ex. 199. Mr. Brinkerhoff also testified there was a coal vein in the area of Mill Creek Road, for which they had "big equipment for drill rigs and whatnot." *Id*. at 0211. "And they fixed the road a little bit so they could take some test loads of coal out of there. … they hauled some [coal] out of there" and brought it out the Mill Creek Road. *Id*. at 0211-0212. The Mill Creek and Bald Knoll roads were used as access for drilling with large machines in the early 1960's. *Id*. at 0216-17. As noted, the Mill Creek Road connects to Skutumpah. Pl. Ex. 20.

27.     Norman Carroll was born in 1930 in Kanab, Utah, and worked on a family ranch near Johnson Canyon. Dkt. 390-1 Depo_0273. Mr. Carroll testified that he would haul cattle on Skutumpah in the early 1960s. *Id*. at 0287-88. He testified it "was a good enough road to take a semi across it, load cattle and haul out of there." *Id*. He testified it had been bladed or graded at some point. *Id*. He traveled the road 10-12 times. *Id*.

28.     Trevor Leach was born in 1920 in Alton, Utah, and lived on a cattle ranch at Bald Knoll Road. Dkt. 390-1 Depo_0304. Mr. Leach testified he would travel on Skutumpah to go hunting and to access his ranch. *Id*. at 0337-38, 0341. He also testified that people in Kanab knew Skutumpah "as having been there a long time," as a road they could travel during the deer hunt, and as a road they could take to get to the town of Tropic, Utah. *Id*. at 0343-44. Mr. Leach

testified that he worked for Exxon and that "through most of the '40s" he worked "on exploring and drilling … fixing drill sites and things for them." *Id.* at 306-07. He also worked for Utah International, which was "drilling wells to get the water to slurry the coal" on wells on Mr. Leach's ranch. *Id.* He also testified he was in charge of heavy equipment and "fixing drill sites" *Id*. They drilled wells "over to Skutum and then to – at the forks of the road up Kanab Creek." *Id*. at 307.

29.     In 2007 the County obtained a Federal Land Policy and Management Act ("FLPMA") Title V right-of-way permit. *See* 43 U.S.C. § 1761. The Title V permit authorized the County to change the course of part of the Bald Knoll Road to avoid a steep grade that posed a safety hazard for mining haul trucks. Tr. 162; Dkt. 390-1 Depo_00111 (E. McAllister); Pl. Ex. 35. The rerouted Bald Knoll Road intersects with the Mill Creek Road, after which the mining haul trucks travel down the Mill Creek Road and on down Skutumpah. Tr. 162.

30.     The BLM Title V right-of-way is 66-feet-wide. *Id*.; Pl. Ex. 87. The mining haul trucks travel down the Bald Knoll Road, down the Mill Creek Road, and out on Skutumpah. Dkt. 390-1 Depo_0111 (E. McAllister); *see also* Pl. Ex. 20.

31.     Mr. Pratt testified about another BLM Title V right-of-way near Skutumpah, which rerouted the road near the Leach Family Ranch. Tr. 164; Pl. Ex. 86. Mr. Pratt testified that right-of-way is 100 feet in width. *Id*.

32.     Mr. Pratt testified that in the late 1980's, without any known involvement of the BLM, Kane County poured concrete footings and installed an upgraded metal bridge on BLM land on Skutumpah within the proposed Skutumpah Road project area. Tr. 146-149; Pl. Ex. 410.

33.     In 1987, Kane County obtained a 66-foot-wide Title V right-of-way for the Johnson Canyon Road, which connects to Skutumpah's southernmost end in Section, 11, Township 41 South, Range 5 West, S.L.M. Pl. Ex. 295; *see also* Pl. Ex. 35 (map stop #20).

34.     Further, Mr. Pratt testified that 66 feet is the "standard nationwide" width that is utilized for rights-of-ways. Tr. 166. He noted that the County's "general standard is 28-foot surface and 66-feet right-of-way" for Class B roads. *Id*.

35.     Mr. Pratt also testified that the County could do routine maintenance within the existing travel surface only "when the road is still intact." Tr. 170. If there is a "major washout or blowout" the County would need to exceed the existing travel surface for routine maintenance. *Id*.

**F.     K4360 Swallow Park/Park Wash Road.**

36.     The K4360 Swallow Park/Park Wash Road ("Swallow Park/Park Wash") is located in western Kane County, Utah. 2011 FPO at 30, ¶ 21.

37.     Swallow Park/Park Wash (RD130624) commences at its intersection with the K4370 North Swag Road (RD130626) in the NE of Section 9, Township 40 South, Range 3 West, S.L.M., and proceeds approximately 5 miles northwesterly to where it ends at its intersection with Skutumpah in the center of Section 19, Township 39 South, Range 3 West, S.L.M. 2011 FPO at 30, ¶ 22; Pl. Ex. 11.

38.     From its intersection with Skutumpah, Kane County designated approximately the first mile of Swallow Park/Park Wash as a Class B road by 1965, as shown on the 1965 General Highway Map of Kane County, Tr. 171-72 (Pratt); Pl. Ex. 41.

39.     Kane County maintained that portion of the road prior to October 21, 1976, to meet the Class B road standards.[1] To maintain the Class B portion of Swallow Park/Park Wash, Vane Campbell testified that the County would "try to keep the middle high and pull the inside in and smooth it out in the middle" in order to keep the water off the road. Dkt. 390-2 TT_0612. Vane Campbell also testified that the county would have to take three or four passes with the grader to achieve the desired results. *Id*. at 0613. The graders had "14 feet" blades, which the workers would turn "a little as [they] were driving." *Id*. at 0614. Mr. Campbell testified he tried to keep the roads 14 or 24 feet wide, and "two or three feet on each side" if there was room. *Id*. at 0615.

40.     Vane Campbell also testified in 2011 that he would use the grader with the 14-foot blade on the Swallow Park/Park Wash Road beyond (south of) the Class B section when requested. *Id*. at 610-612.

41.     Current Kane County Roads Maintenance Director, Bert Harris, testified that every four or five years the sage brush grows into the Swallow Park/Park Wash Road and needs to be cleared out. Tr. 43. Additionally, the County will need to go in and reestablish the width of the road periodically. *Id.*

42.     Former County Roads Supervisor, Louis Pratt, also testified "very high sage brush" would grow into the right-of-way and the County would need to cut it back and that "[t]he grader was wide enough that it pretty well kept it the width for normal traffic to travel." Tr. 144. He also testified that the County's maintenance work exceeded the 10 to 12 feet of the

---

[1] The width of the Class B section of the Swallow Park Road was not challenged on appeal and is not before the Court. *Kane Cnty. (1)*, 772 F.3d at 1223, n.4.

existing travel surface. Tr. 171. Kane County's grading on Swallow Park/Park Wash "could be 2, 3, 4 years apart, it could be twice a year. Just depends on the weather." Tr. 172.

43.      Calvin Johnson testified in 2011 that he personally witnessed Kane County graders on Swallow Park/Park Wash prior to 1976. Dkt. 390-2 TT_0120. Sometimes Kane County would not proceed east of the sandy ridge, but other times it would work all of the way to the Nipple Lake Ranch. *Id*. at 0120-0122.

44.      James Ott testified in 2011 that Kane County brought a bulldozer "Cat" down the road in 1957 or 1958 to bulldoze through the deep snow to help ranchers recover trapped cattle. Dkt. 390-2 TT_0415-416.

45.      Witnesses established through testimony at the 2011 trial that Swallow Park/Park Wash was continuously used as a public thoroughfare by members of the public for a period in excess of ten years prior to the repeal of R.S. 2477 in 1976.

46.      Swallow Park/Park Wash was traveled by motor vehicles at least as early as the 1930s for the purposes of ranching, gathering firewood, cutting cedar posts, logging, hunting and scouting for deer and coyotes, searching for artifacts, general sight-seeing, accessing hiking areas, picnicking, and picking pine nuts. *Kane County Merits*, at * 22-24.

47.      Calvin Johnson testified at the 2011 trial that he traveled Swallow Park/Park Wash most of his life, going back to the late 1930s, while ranching, hunting, and generally sight-seeing (recreating). *See* Dkt. 390-2 TT_0026-0030, TT_0055, TT_0058-0059, TT_0070. Mr. Johnson specifically recalled traveling Swallow Park/Park Wash in his father's two-wheel drive 1937 Dodge pickup when he was 10 or 12 years old. *Id*. at TT_0058-60.

48.     Mr. Johnson testified that during the period between 1956 and 1960, he would move cattle every spring and fall along Swallow Park/Park Wash using Jeeps, tractors, and four-wheel drive pickups. *Id*. at TT_0026-0030. Mr. Johnson also testified that during this time period, his ranching partners, coming from the town of Tropic, Utah, would travel Swallow Park/Park Wash on their way to access the Nipple Lake ranch. *Id*.

49.     James Ott testified in 2011 that he traveled the northern section of Swallow Park/Park Wash as early as 1948 while ranching and sightseeing, and traveled the entire stretch of the road in a vehicle as early as 1961. Dkt. 390-2 TT_0380-0382, TT_400-401. At the 2011 trial Mr. Ott recalled traveling Swallow Park/Park Wash in 1961 with his father and cousin while they were guiding deer hunters from California. *Id*. at TT_0399-402. They took the hunters down Swallow Park/Park Wash and over the connecting North Swag Road towards the Nipple Lake in a Case tractor pulling a two-wheel wagon behind it to carry their hunting gear and to set up a camp. *Id*. Mr. Ott testified that this group of California hunters returned every fall for the following few years to hunt deer. *See id*. at TT_0400, TT_0406. He also testified that he later (in 1965 or 1966) drove a group of hunters from Texas into the same camp to hunt deer, and that the group used a 1962 or 1963 four-wheel drive GMC pickup to travel down Swallow Park/Park Wash and across the connecting North Swag Road. *Id*. at TT_406-409.

50.     Que Johnson testified that he traveled Swallow Park/Park Wash from 1956 while ranching, deer hunting, and cutting and hauling cedar fence posts. *Id*. at TT_0142. He saw other vehicles on the road during these years. *Id*. at TT_0149.

51.     Anton Wright testified that he traveled Swallow Park/Park Wash as early as the early 1970s for the purposes of sight-seeing and picnicking. *Id*. at TT_0229-0230.

52.     Roger Holland testified that he first traveled Swallow Park/Park Wash as early as the spring of 1961, while hunting coyotes with his grandfather in his grandfather's Jeep. *Id.* at TT_0470-472.

53.     Brent Owens testified that he first traveled Swallow Park/Park Wash with several friends as early as 1964 while deer hunting. *Id*. at TT_0535-0537. The group traveled in two Jeeps from Cedar City, Utah, to Cannonville, Utah, then traveled Skutumpah until they reached its junction with Swallow Park/Park Wash, and then down Swallow Park/Park Wash to its junction with the North Swag Road. *Id*. From the North Swag Road, they traveled down the Nipple Lake Road to their final destination at the cabin on the Nipple Lake. *Id*. The group then returned to Cedar City following the same route along the Nipple Lake Road, the North Swag Road, and through Swallow Park/Park Wash. *Id*. at TT_0544. Mr. Owens testified it was a two-track road, 12-15 feet wide. *Id*.

54.     Witnesses testified that they saw other members of the public traveling Swallow Park/Park Wash prior to 1976 for the apparent purposes of ranching, gathering and hauling firewood, cutting and hauling cedar fence posts, hunting deer, searching for artifacts, general sight-seeing, accessing hiking areas, picnicking, and picking pine nuts. Dkt. 390-2 TT_0070 (C. Johnson), TT_0144-146, TT_0199-0200 (Q. Johnson), TT_0236 (A. Wright), TT_0386, TT_0393-395, TT_0418-419 (J. Ott).

55.     James Ott testified that people logged wood along Swallow Park/Park Wash in the mid-to-late 1950s, which is still evidenced by large Ponderosa pine stumps in the area. *Id*. at TT_0418-419.

56.     Brent Owens testified that his brother worked for Pearson and Croft, a company logging in the Swallow Park/Park Wash area before 1964. *Id.* at TT_0540-0541.

57.     Before and after 1976, the entire length of the Swallow Park/Park Wash Road was bladed with a bulldozer. *Id.* at TT_0416-0417 (J. Ott), TT_0477 (R. Holland).

58.     During the Court's site visit in September 2022, the Swallow Park/Park Wash Road, south of the Class B section, generally appeared to be a single lane dirt road.

**G.     K4370 North Swag Road.**

59.     The K4370 North Swag Road ("North Swag") is located in western Kane County, Utah. 2011 FPO at 32, ¶ 28.

60.     North Swag (RD130626) commences at its intersection with the K4200 Kitchen Corral road in the SWNW of Section 30, Township 40 South, Range 2 West, S.L.M., and proceeds approximately 5 miles northwesterly to its intersection with Swallow Park/Park Wash in the NE of Section 9, Township 40 South, Range 3 West, S.L.M. 2011 FPO at 32, ¶ 29; *see also* Pl. Ex. 11.

61.     Witnesses established through testimony at the 2011 and 2022 trials that North Swag was continuously used as a public thoroughfare by members of the public for a period in excess of ten years prior to the repeal of R.S. 2477 on October 21, 1976. North Swag was used by motor vehicles at least as early as the 1940s for the purposes of ranching, gathering firewood, cutting cedar fence posts, hunting for deer and coyotes, picking pine nuts, sight-seeing, searching for artifacts, exploring, rock hunting, and taking photographs (recreation), and traveling from Skutumpah to Kitchen Corral Road.

62.     Kane County Public Lands GIS Director Taylor Glover testified in the 2022 trial that two vehicles cannot pass each other at speed on North Swag. Tr. 106. In order to pass a vehicle, one vehicle would have to pull off and stop to let the other vehicle go by. *Id*.

63.     Louis Pratt also testified two vehicles could not pass each other while moving on North Swag. Tr. 144. Mr. Pratt stated that "18 [feet] would allow [the County] to maintain [a single lane road] without causing degradation to the surrounding area." Tr. 167.

64.     Mr. Pratt also explained that a clear zone on a D road is used for people to get around each other—for people to pull off the road for others to get around them—and that the extra eight feet—four feet on each side—would help. Tr. 168-69. Somebody could pull off to the side to let the person through on the two-track. Tr. 169.

65.     Mr. Harris testified that the wheels on the Kane County road grader "are about 8 foot 6" inches wide. Tr. 63.

66.     Brent Owens testified that he traveled North Swag as early as 1964 while deer hunting. Dkt. 390-2 at TT_0535. Mr. Owens and several friends decided to skip school and go deer hunting. *Id.* at TT-0536. The group traveled in two Jeeps from Cedar City, Utah, to Cannonville, Utah, then traveled Skutumpah until they reached its junction with Swallow Park/Park Wash. They traveled down Swallow Park/Park Wash to its junction with North Swag, then across North Swag and down the Nipple Lake Road to their final destination at the cabin at the Nipple Lake ranch. *Id*. at TT_0536-37. The group then returned to Cedar City following the same route. *Id*. at TT_0544.

67.     Calvin Johnson testified that he traveled North Swag on horseback when he was 10 or 12 years old (*i.e.*, the mid-1930s) while running cattle with his neighbor Frank Farnsworth.

*Id*. at TT_0012-13. During one of these early trips in the mid-1930s with Mr. Farnsworth, Mr. Johnson witnessed people traveling North Swag with teams and wagons. *Id*. In the 1940s and 1950s, Mr. Johnson testified that he traveled North Swag in a Jeep to hunt deer personally and to guide other deer hunters from California. *Id*. at TT_0054-55.

68.     Mr. Johnson further testified that during the period between 1956 and 1960, he would move cattle every spring and follow along North Swag using Jeeps, tractors, and four-wheel drive pickups. During this time period, his ranching partners would travel North Swag on their way to the Nipple Lake Ranch, coming from the town of Tropic, Utah. *Id*. at TT_0026-0030. On another occasion in the 1950s, Mr. Johnson traveled with his son-in-law, Van Sawyer, in a Jeep from the Nipple Lake Ranch along the Nipple Lake Road, across North Swag, and up Swallow Park/Park Wash to show his son-in-law the general area. *Id*. at TT_0055-57.

69.     Que Johnson testified that he traveled North Swag from 1956 while ranching, deer hunting, and cutting cedar posts. *Id.* at TT_0142-144. He saw other vehicles on the road during these years. *Id*.

70.     Anton Wright testified that he traveled North Swag as early as 1956 and after while helping Calvin Johnson with his cattle operation. *Id*. at TT_0214-215. By 1963, North Swag had been maintained by "a grader or something" and others were using the road. *Id*. at TT_0222. Further, as part of a family reunion in the 1960's, Mr. Wright recalled that he and his relatives from California traveled North Swag, along the Nipple Lake Road, and into the Nipple Lake area to see the Monkey House and the Nipple Lake Ranch. *Id*. at TT_0226-228.

71.     James Ott testified that he traveled North Swag as early as 1961 guiding deer hunters. *Id.* at TT_0399-403. Mr. Ott testified that he traveled North Swag in 1961 with his

father and cousin, who were guiding deer hunters from California. *Id*. They took the hunters down the Swallow Park/Park Wash Road and along North Swag towards the Nipple Lake ranch in a Case tractor, pulling a two-wheel wagon behind it to carry their hunting gear and to set up a camp. *Id*.

72.     Mr. Ott recalled that the group of California hunters returned every fall for the following few years to hunt deer. *See id.* at TT_0400, 0406. He also testified that he later (in 1965 or 1966) took a group of hunters from Texas into the same camp to hunt deer, and that the group used a 1962 or 1963 four-wheel drive GMC pickup to travel North Swag. *Id*. at TT_0406-409.

73.     Roger Holland testified that he traveled at least part of North Swag by 1961 with his grandfather, in his grandfather's Jeep, while looking for coyote dens in the spring. *Id*. at TT_0453-54. He also testified that he believed he had traveled the eastern portion of North Swag prior to 1961 with his uncle while guiding deer hunters in the area. *Id*. at TT_0464-65. Mr. Holland testified that he traveled North Swag between 1963 and 1971 with his uncle and separately with his friend, Nyle Willis, generally exploring, rock hunting, taking photographs, and looking for artifacts. *Id*. at TT_0466-469.

74.     Witnesses testified that other members of the public were also seen using North Swag prior to 1976 for the apparent purposes of ranching, gathering and hauling firewood, hunting deer, picking pine nuts, sight-seeing, and searching for artifacts. Dkt. 390-2 at TT_0070 (C. Johnson), TT_0143-144 (Q. Johnson), TT_0404-405 (J. Ott).

75.     Kane County bladed North Swag in 1996. TT_0469. (R. Holland). Additionally, Lou Pratt testified that Kane County bladed North Swag "a couple of times up over the top of the Swallow Park/Park Wash Road to North Swag." Tr. 143-144.

76.     During the Court's site visit in September 2022, North Swag was a single lane road crossing dirt and sand.

**H.     The R.S. 2477 Rights-of-Way And State Law.**

77.     R.S. 2477 does not specify the width of any right-of-way granted. However, as early as 1939, the BLM recognized the role of State law by regulations confirming that the grant of an R.S. 2477 right-of-way "becomes effective upon the construction or establishing of highways, in accordance with the State laws, over public lands." 43 C.F.R. § 244.55 (1939). Subsequent regulations continued to apply "State laws" as governing R.S. 2477 rights-of-way. *See, e.g.*, 43 C.F.R. § 2822.2.1 (1974).

78.     The BLM's 2801 Right-of-Way Manual, Rel. 2-229 (1986), provided: "An R.S. 2477 grant has taken place when a constructed highway is freely open to everyone." Pl. Ex. 152, p. 5. "Road maintenance over several years may equal construction. Increments of road maintenance over several years may equal construction." Pl. Ex. 152, p. 4. "State law specifying widths of public highways within the State shall be utilized by the authorized officer to determine the width of the R.S. 2477 grant." *Id*.

79.     This 1986 version of the BLM's manual was superseded by another which provided: "The inclusion of a highway in a State, county, or municipal road system constitutes being a public highway." Pl. Ex. 212, p. 3. "For those highway R/Ws in the State, county or municipal road system, *i.e.*, the R/W is held and maintained by the appropriate government body,

the width of the R/W is as specified for the type of highway under State law, if any, in force at the latest time the grant could be accepted." Pl. Ex. 212, p. 4.

80.     The BLM's nationwide Instruction Memorandum No. 90-589 provides: "State law which specifically addresses highway widths under R.S. 2477 shall be used to determine the width of the R/W." Pl. Ex. 149, p. 2.

81.     After incorporating State law since 1939, the BLM changed course in 1994 and "proposed comprehensive regulations governing R.S. 2477 rights of way." *S. Utah Wilderness All. v. BLM*, 425 F.3d 735, 756 (10th Cir. 2005) ("*SUWA*"), citing 59 Fed. Reg. 39216, 39219-27 (August 1, 1994). "These rules proposed, for the first time, an administrative procedure by which the BLM would adjudicate the validity of R.S. 2477 claims." 425 F.3d at 756.

82.     In 1996, however, Congress passed a law expressly blocking any federal R.S. 2477 regulations: "No final rule or regulation of any agency of the Federal Government pertaining to the recognition, management, or validity of a right-of-way pursuant to [R.S. 2477] shall take effect unless expressly authorized by an Act of Congress subsequent to the date of enactment of this Act [Sept. 30, 1996]." *SUWA*, 425 F.3d at 756. The 1996 congressional prohibition against federal R.S. 2477 regulations is still in effect.

83.     From 1898 until 1917, Utah statutes provided that the "width of all public highways, except bridges, alleys, lanes, and trails, shall be at least sixty-six feet [] provided that nothing in this title shall be so construed as to increase or diminish the width of [a] highway already established or used as such." Utah. Rev. Stat., Title 25, Ch. 1, § 1117 (1898).

84.     In 1917, this law was revised to provide that "the widths of rights-of-way to be used for county roads, alleys, lands, trails, private highways, and by-roads shall be such as may

be deemed necessary by the board of county commissioners; provided, that nothing in this section shall be so construed as to increase or diminish the width of either kind of highways already established or used as such." Utah Rev. Stat., Title 41, Ch. 1, § 2803 (1917); *see also* Utah Code Ann. § 36-1-4 (1943) (accord); Utah Code Ann. § 72-5-108 (2011) (accord).

85.     On July 20, 1950, the Kane County Board of Commissioners convened a special commission meeting to discuss county road rights-of-way and formally adopted a 75-foot standard width for county road rights-of-way. "And at the conclusion of the discussion, all present were agreeable to the following. That a Standard width of 75 feet be disignated (sic) for all county road right-of-ways (sic) including the one in question (Glendale Bench)." Kane County Commission Minutes dated July 20, 1950. Pl. Ex. 94. The Glendale Bench Road connects to the Skutumpah Road at its intersection with the Johnson Canyon Road. Pl. Ex. 20.

86.     In 1972, Kane County and the BLM entered into a Memorandum of Understanding ("1972 Road MOU") allocating road maintenance responsibilities on federal land and, as amended in 1977, represented that "[t]here is no definitely established road right-of-way width for county roads. For a two lane road, a right-of-way width of 66 feet will be established per the attached memo." Pl. Ex. 89, p. 12. The text of this document originally stated "60" feet, but was interlineated to state "66" feet. *Id*. It is unknown when this interlineation occurred. 2011 Tr. 1194-95 (Pratt).

87.     In 1993, Kane County adopted Resolution 1993-5 to formally recognize a 66-foot right-of-way for county roads on any land. In doing so, Kane County's Board of Commissioners expressed their purpose of providing a sufficient right-of-way to promote public safety and

welfare, and to provide sufficient area for road maintenance crews to maneuver their vehicles. Pl. Ex. 95.

88.     Since 2003, a Utah statute confirms that "an R.S. 2477 right-of-way is presumed to be at least 66 feet wide if that is the usual width of highway rights-of-way in the area." Utah Code Ann. § 72-5-302.

89.     Kane County's former Road Department Supervisor, Mr. Pratt, testified that Kane County has enforced the 66-foot right-of-way within Kane County as a "standard nationwide." Tr. 166. Mr. Pratt testified that the County may need more than 66 feet if there was a major washout but also that the County could typically maintain in less than 66 feet. *Id* at 170.

90.     Mr. Pratt cited to the guidelines published by the American Association of State Highway and Transportation Officials ("AASHTO"), which counsel that the "provision of right-of-way width that accommodates construction, adequate drainage, and proper maintenance of a highway is a very important part of the overall design." Tr. 157; Pl. Ex. 83, p. 1 (p. 387 of text).

91.     Plaintiffs introduced into evidence a number of Kane County Commission Minutes documenting numerous historical instances where the county addressed the widths of rights-of-way for various roads. These Commission Minutes reflect that the County has consistently established either a 75-foot or 66-foot right-of-way for County roads. Tr. 25; Pl. Exs. 90-94.

92.     Beyond Kane County's actions, the BLM has issued several road right-of-way permits to Kane County under FLPMA Title V. 43 U.S.C. § 1761. R.S. 2477 was repealed in 1976, so Kane County requests FLPMA Title V permits when it constructs a new section of road. Tr. 162 (Pratt).

93.     In 1980, Kane County acquired a Title V right-of-way permit to construct a new section of the west end of the Bald Knoll Road to reroute the road off of the Leach ranch private property. Tr. 164 (Pratt). This Title V permit granted Kane County a right-of-way 100 feet wide. *Id.*; Pl. Ex. 86. The traveled surface of the road is not 100 feet wide, just the right-of-way.

94.     Plaintiffs also introduced into evidence a copy of the BLM's Roads Manual 9113 (1985). Tr. 167-69; Pl. Ex. 85. For BLM roads, this manual states that a "minimum width of 50 feet or the width of construction plus 10 feet on each side (whichever is greater) is generally required. Maintain uniform widths through varying ownerships or legal subdivisions whenever possible, rather than allowing frequent width changes." Pl. Ex. 85, p. 11 (subsection .29 in text).

95.     Plaintiffs also introduced into evidence an excerpt from a 1979 BLM management framework plan for lands in Kane County. Tr. 165-66 (Pratt); Pl. Ex. 88. This document reinforces the BLM's recognition of a 66-foot right-of-way for Kane County R.S. 2477 roads. *Id.*

96.     Mr. Campbell testified that at least since 1967, Kane County has attempted to maintain its Class B roads to a traveled width of 14 to 24 feet. Dkt. 390-2 TT_0614, 0618. Due to the rough topography in Kane County, it was not always possible to keep the roads wider, but where the roads cross flat terrain, a 24-foot travel surface was desired. *Id.* at TT_0615, TT_0618-619 659-60 (V. Campbell).

97.     Along the travel surface, Kane County would try to keep two to three feet clear on each side. *Id.* at TT_0615 (V. Campbell). Kane County would install culverts where necessary and clear out the drainage areas around the culverts. *Id.* at TT_0616-617 (V. Campbell).

98.     On some portions of road, washouts would headcut the sides of the roads and people would travel around the headcuts. *Id.* at TT_0619, 0622 (V. Campbell). Kane County

24

would try to go back and fill in these areas. *Id*. at 619-620 (V. Campbell). Kane County would

move fill material from along the side of the roads (the borrow ditch) to fill in the washouts and

restore the travel surface. *Id*. at TT_0620 (V. Campbell).

99.     In many instances, Kane County would realign the roads to avoid hazards, sharp

turns, blind corners, and to reduce the grade of the road. *Id*. TT_0620-621, TT_0716-717 (V.

Campbell).

100.     Kane County further clears the vegetation from the sides of the road within this

right-of-way to provide better sight distances and improve safety. TT_0676 (V. Campbell). And

because of the distances needed to be traveled to maintain the roads, Kane County uses the right-

of-way to park its road equipment along the roads, but away from traffic. *Id*. at 187 (Pratt).

101.     Kane County road maintenance director Bert Harris testified that the County often

parks its equipment in the disturbed width that is not the travel surface on the side of the road,

"off a safe distance away from the road." Tr. 63. Additionally, "the outside edges of the tires [of

a grader] are about 8 foot 6." *Id*. He also testified that the drainage runouts along Skutumpah

Road "have been established for many, many years." *Id*.

**I.     Improvement Project on Skutumpah Road.**

102.     Kane County can conduct routine maintenance within its right-of-way, but it must

first consult with the BLM before it can upgrade or improve a road beyond its historical

maintenance practices. Kane County has proposed such an improvement to the Skutumpah Road.

103.     Specifically, Kane County seeks to pave the southern 2.6 miles of the Skutumpah

Road, a part of which crosses federal land within the BLM's Kanab Field Office. Tr. 130, 311.

Kane County seeks this Project in order to minimize the current safety hazards on this section of

Skutumpah caused by the increased traffic brought about by the increased visitation since the opening of the Grand Staircase-Escalante National Monument (the "Monument") in 1996. In addition, the County seeks to minimize the impacts and safety risks caused by large haul trucks that frequently travel Skutumpah back and forth from a gravel pit and an architectural shale pit. Current traffic, along with the low-moisture and drought in the area, has resulted in safety issues caused by extreme washboarding and reduced visibility from fugitive dust. *See infra.*

### *Testimony of Kane County Commission Chair Andrew Gant*

104.    Kane County Commission Chair Andrew Gant testified that the level of use on the Skutumpah Road has "dramatically" increased in the 33 years he has been in Kane County, especially after the creation of the Monument; visitor numbers have increased every year on Skutumpah, particularly in the last couple of years. Tr. 16-18. In addition to the creation of the Monument, Commissioner Gant testified that the increased traffic has been caused in part by year-round cabins in Deer Springs Ranch a few miles north of where the upgrade is proposed. Pl. Ex. 78; *see also* Pl. Ex. 20 ("DSR").

105.    Moreover, after creation of the Monument in 1996, the BLM has installed trailheads, parking, and restrooms in the Monument and along Skutumpah, and "ATV/UTV numbers are also off the charts in the last 10 years as … side by sides have added a whole new dynamic as older people can travel these – the ATV clubs and stuff love these kind of roads." Tr. 16-18. Kane County did not sponsor the increased travel, but it is the product of new Monument visitation, recreation, and residential growth in the Deer Springs Ranch. *Id.*

106.    Additionally, Commissioner Gant testified that the number of trucks hauling gravel on Skutumpah has increased, often including double-semi trucks hauling heavy loads. Tr.

at 19-20. The trucks are hauling gravel from an old gravel pit near Skutumpah, as well as shale from a commercial shale operation on Mill Creek Road and out onto Skutumpah Road. *Id.* Commissioner Gant testified that those big trucks are causing continuing maintenance problems on Skutumpah Road. *Id*.

107.    The gravel pit adjacent to Skutumpah is shown on the Skutumpah Creek, 7.5 minute United States Geological Survey map, which was created from 1964 aerial imagery and field checked in 1966. Pl. Ex. 47. While the number of gravel trucks on Skutumpah has increased, the gravel pit was in operation prior to October 21, 1976, when FLPMA repealed R.S. 2477.

108.    Commissioner Gant testified that the County worked with the State of Utah to get funding and an engineering firm to design the layout for the paving of the southern portion of Skutumpah to a point just past the Mill Creek Road (the "Project"). Tr. at 20-23; *see also* Pl. Ex. 20. Skutumpah crosses private land near the Mill Creek Road intersection and part of the Project would include paving the road on private land. *Id*.

109.    Commissioner Gant testified that Kane County "desperately need[ed] to get those semis on to a solid surface as quickly as we can." Tr. at 21. He testified that the incline on that portion of Skutumpah going to the gravel pit was "not a good situation." Tr. at 22. The trucks and traffic create a washboard surface on the road, which Kane County could then blade but "without a lot of moisture and it will be in [the] prior condition in the same week" … "[b]ack to washboard" … "[a]nd they just keep getting deeper and deeper." Tr. at 22. Even more, Commissioner Gant testified there is a safety issue with the dust on this southern portion of Skutumpah. Tr. at 23.

110.    Commissioner Gant testified that the Project would allow the trucks and traffic to travel on pavement on the last few miles on Skutumpah "where they meet heavy travel," to make "less dust," to eliminate washboards, eliminate mud in the winter, and where "everybody would be much safer." Tr. at 23. Commissioner Gant testified that the County has no present plan to extend the pavement beyond Mill Creek Road or into the Monument. Tr. at 24.

### *Testimony of Kane County Roads Maintenance Director Bert Harris*

111.    Bert Harris has been the Kane County Roads Maintenance Director since 2006. Tr. at 38-40. He has held various positions in the county since 1991. *Id*. He personally started blading Skutumpah in the early 90s. Tr. 44.

112.    Mr. Harris testified he has also noticed a "tremendous[]" increase in tourism traffic on Skutumpah since the creation of the Monument in 1996 "[a]long its entire length." Tr. 45-46. He has noticed increased traffic in all types of vehicles, "from little sedans, little cars, to Jeeps to pickups, to ATVs, UTVs. They all use this road for tourism." *Id.* at 46.

113.    Mr. Harris also described the different trucks that were regularly traveling on Skutumpah, including "10 wheel dump trucks, 10 wheel dump trucks with trailers, … semis with belly dumps, semis with belly dumps and pups, side dumps," and "pretty much any kind of truck that will haul material." *Id*. at 48.

114.    Mr. Harris testified that the washboarding "creates a safety situation where your tires are only touching the road a part of the time. And as you go up the road, you will start to find yourself kind of floating back and forth. And if you are going around a turn, sometimes it will push you off to the edge of the road." *Id*. at 48-49. Mr. Harris testified he considered the washboarding on Skutumpah Road a "serious," "safety consideration." *Id*. at 49. Mr. Harris also

explained that the haul trucks on the road and the lack of moisture have a "huge effect" in creating dust. *Id*. at 48.

115.    Kane County attempts to blade the washboarding out of Skutumpah Road "to make a smooth surface for the travel of the road." *Id*. at 50. But the washboarding comes back "within three or four days in some times[,]" depending on the conditions. *Id.*

116.    Mr. Harris also testified the County had to blade Skutumpah Road on 55 days in 2022, and the focus of this maintenance was on the first two and a half miles in the Project area. Tr. at 47. Skutumpah maintenance costs have a significant impact on Kane County's road maintenance budget. *Id*. at 51.

117.    Mr. Harris testified that in his opinion and experience with Skutumpah and other County roads, completing the Project would reduce the County's maintenance costs on the road. *Id*. at 69. The financial burden of repeatedly grading Skutumpah "would stop." *Id*. at 62.

118.    The Project would include an initial grant of $2,000,000 from the Utah Department of Transportation ("UDOT"), with a $170,000 match from Kane County, to design and install the pavement. Pl. Ex. 402R, at 6. After the pavement, "[b]asically we wouldn't have to touch that road with a grader again. We would come in every five to seven years and put a chip seal on top of it. But if that road is paved, my grader doesn't have any work to do on that section of the road." *Id*. at 62.

119.    Regarding washouts, the Court asked Mr. Harris if it was possible for the County to maintain the road within the existing travel surface and Mr. Harris noted it was not always possible. Tr. 70-71. When it is not possible, the County "would find material close by to where the washout is, use a front-loader to pack the material … back [to] where the washout is." Tr. 71.

Mr. Harris noted the County is typically not able to find that fill material within the travel surface of the road but must go to the slope next to the road." Tr. 71. Mr. Harris testified that 30 feet from the center line would be adequate to have sufficient access to fill material. *Id*. at 72. He also testified that if the County did not have such access, the County would have to either take the road surface down in the surrounding area, which would then have to be replaced itself, or import material, "which is sometimes impossible." *Id*. at 72-73. The Monument plan closed some of the historic gravel sources formerly used by Kane County for its road maintenance work. *Id*. at 78.

120.    Finally, Mr. Harris testified that 60 feet would be necessary "in order to safely maintain the road" "[n]ot in every situation but in a lot of situations it gives us a buffer so that we can use the material to put it back into the washouts." *Id*. at 76-77.

***Testimony of Kane County Sheriff Tracy Glover***

121.    Sheriff Tracy Glover has been the elected sheriff of Kane County for eight years. Tr. 87-88. He has been with the sheriff's office for 23 years, and his current duties include public safety on county roads, which he patrols on a regular basis. *Id*.

122.    Sheriff Glover testified he's traveled Skutumpah significantly more than 100 times in his lifetime and has seen an increase in travel particularly in the last 20 years for recreational uses and camping, residential use for the Deer Spring Ranch, and commercial uses related to the gravel and shale pits that the haul trucks use. *Id*. at 90-92. He also testified that "all kinds of vehicles" are using Skutumpah, including "anything from motorcycles and ATVs to vans, [] and passenger cars, rentals cars, [] and then, of course, [], cattle trucks, haul trucks, cattle trailers, and those kinds of things." *Id*.

123.     Sheriff Glover testified the increased traffic has "increased the safety issues" and is "more dangerous." *Id*. Additionally, the road "has fairly significant dust issues and when there [are] more vehicles it becomes more of a hazard … muddy conditions, weather events, … those kinds of things also cause quite a bit of problems when people get stuck" and need help from the County or other travelers on the road. *Id*.

124.     Sheriff Glover also testified about the safety hazards caused by washboarding and the fact that it is worse on the southern portion of Skutumpah than on the rest of the road. *Id*. at 92-93.

125.     Relevant to the Project, Sheriff Glover testified that he has had conversations with county commissioners and others about the safety problems on the southern portion of Skutumpah and has advised them that "the dust problem, in particular, and the washboarding problem are a safety hazard with the traffic levels that [the County has] now.". *Id*. at 94. Sheriff Glover also testified that he had a similar conversation about the safety hazards with the road engineers. *Id*.

### *Testimony of Kane County Public Lands GIS Director Taylor Glover*

126.     Taylor Glover is the Public Lands GIS Director for Kane County and has been in that position since March 2021. Tr. 102-103. His duties include managing GIS data for the County and serving as its liaison with federal agencies such as the BLM, Forest Service, and other agencies. *Id*. Mr. Glover testified that he grew up recreating on the County roads generally. *Id*. at 104-05.

127.     Mr. Glover testified that he has personally experienced the washboarding on Skutumpah as well as dust on the road that impaired visibility. Tr. 106-107. Mr. Glover recorded

two videos of the dust kicking up on Skutumpah in the Project area that impaired his vision, despite the vehicles traveling at low speeds. *See* Pl. Ex's 414 and 425. One of the exhibit videos, Pl. Ex. 425, shows an approaching vehicle that had to pull over to evade the dust cloud.

128.    Mr. Glover testified that he took a picture of a banner in the lobby of the Paria River District BLM Headquarters which noted that the Monument had experienced a "98 percent increase in visitation" 1996 - 2021. Tr. at 117; Pl. Ex. 400.

129.    Relating to the Project, Mr. Glover testified that he was the designated liaison between the County and the engineering firm as well as the County and the BLM related to the Project. *Id*. at 107. By the time he became involved, the County had already obtained initial funding from the Utah Department of Transportation ("UDOT"). Mr. Glover testified that the UDOT funding must be committed soon or it will expire (in October or November 2023). *Id*. at 107.

***Meetings and Communications with the BLM Related to the Project***

130.    Mr. Glover testified that his primary contact at the BLM relating to consultation for the Project was Whit Bunting. *Id*. Mr. Glover testified about an informational meeting that took place at the Paria River District Headquarters office in Kanab, Utah where the parties discussed the needs for the Project and Mr. Bunting provided information on what the BLM would need from the County. Tr. 108-109, 113. At that initial meeting, the parties discussed the fact that travel had increased on Skutumpah, that washboarding and dust were problems on the southern end of Skutumpah in the Project area, and Mr. Glover testified Mr. Bunting indicated he was aware of the washboarding and dust problems. *Id.*

131.   Mr. Glover testified that he received a letter dated July 27, 2021 from Mr. Bunting on behalf of the BLM requesting "additional information" related to the Project on Skutumpah Road. Tr. 111-112, 123-24 Pl. Ex. 408. The letter stated, "For example, are there current safety issues or other considerations for why paving this section of road is needed to support the traditional uses of Skutumpah Road?" *Id*. The letter also stated, "please explain whether the proposed work will stay within the previously disturbed surface of the roadway, or if not, what areas might be proposed for new disturbance and why the new disturbance is needed to support the traditional uses of the Skutumpah Road?" *Id*.

132.   Mr. Glover responded to the letter with a letter from the County, noting that "[p]aving the roadway will eliminate fugitive dust and washboarding, which will increase driver safety and reduce the County's maintenance needs. The proposed improvements will also eliminate substandard vertical curves from the roadway geometry, further increasing driver safety." *Id*.; Pl. Ex. 404. Mr. Glover noted that any additional disturbance would "remain within the area that has been disturbed by previous grading, buried utilities, and OHV tracks parallel to the roadway." *Id*.

133.   Mr. Bunting sent a response letter on December 17, 2021 requesting "further information needed to help BLM fully evaluate whether the proposed improvement is reasonable and necessary in accordance with applicable caselaw." *Id*., Pl. Ex. 409. First, the BLM requested "details about the standards identified in the County's preliminary engineering plans … referencing the need to meet current AASHTO standards." *Id*. Second, the BLM asked for "data or other evidence showing an increase in traffic, fugitive dust and washboarding … and/or further information on how the proposed improvement will eliminate these safety concerns." *Id*.

134.     Mr. Glover sent a letter back to the BLM on May 5, 2022 providing the Project information requested by the BLM. *Id*.; Pl. Ex. 415.

135.     Mr. Glover testified that on November 10, 2022, the County received a letter from Mr. Harry Barber, the Manager of BLM's Paria River District, denying approval of the Project after concluding that the proposed improvement to Skutumpah was outside the scope of the right-of-way. *Id*. at 114-115; Pl. Ex. 421. The letter stated that the Project was not within the scope of the Skutumpah right-of-way because it was not "reasonable and necessary." *Id*. The letter included the BLM's Reasonable and Necessary Determination as an attachment. *Id*. at 116; Pl. Ex. 420.

136.     Mr. Barber's letter did not provide any suggestions or solutions for the traffic, safety and maintenance problems, nor did he offer to pay for the increased maintenance costs on Skutumpah. *Id*.

### *Testimony of Former Kane County Roads Supervisor Louis Pratt*

137.     Mr. Pratt testified about the washboarding along the southern portion of Skutumpah up to Mill Creek where there was "truck traffic," which was "destroying" the road, as well as causing accidents. Tr. 189-90.

138.     Mr. Pratt testified that county officials decided against gravel and in favor of pavement because it would not deteriorate as fast as gravel would. *Id.* Further, Mr. Pratt testified that pavement would provide a harder surface for the traffic. *Id*.

### *Testimony of BLM Kanab Field Office Field Manager Whit Bunting*

139.     Mr. Bunting has been the BLM Kanab Field Office Field Manager since 2019. Tr. 213-14. His duties include overseeing field staff, the resource specialist, and generally manages

the field office. *Id*. The section of Skutumpah where the Project would occur is within the Kanab Field Office jurisdiction, before it later enters the Monument near the Deer Spring Ranch. *Id*.; Pl. Ex. 20 ("DSR").

140.    Mr. Bunting has also noticed increased traffic on Skutumpah Road, consisting of residential traffic to the Deer Springs Ranch area, more haul truck traffic, including truck traffic on Skutumpah from Mill Creek Road, and out Johnson Canyon, and a general increase in recreational traffic consisting of the public going to various trailheads within the Monument. *Id*. at 215-17, 221-24.

141.    Due to this increased traffic, Mr. Bunting has observed "fugitive dust" and washboarding on the southern end of Skutumpah. *Id*. He believes that the dust is a "problem" "that includes visibility where you can't see coming traffic if you get caught up in the dust clouds" and that it "can be" a safety hazard. Tr. 226-27.

142.    Notably, Mr. Bunting testified that the creation of the Monument changed the visitation and travel in Kane County on the public roads. Tr. 224. He believed that traffic has increased in the Monument, including on Skutumpah. *Id*.

143.    Mr. Bunting testified of his personal involvement with the proposals between Kane County and the BLM related to the Project approval process, first at a meeting on January 14, 2021 with representatives from Jones and DeMille, Commissioner Gant, Bert Harris, a representative from UDOT, and Brandon Johnson—a BLM realty specialist. *Id*. at 217-18.

144.    The parties discussed the dust and washboarding problems at that initial meeting. *Id*. at 218. Mr. Bunting also testified that he recalled another meeting in the spring of 2021 with Mr. Glover, Commissioner Gant, and Brandon Johnson where they discussed the Project further,

including the dust and washboarding. *Id*. Mr. Bunting testified that he agreed that the dust and washboarding were problems on Skutumpah. *Id*.

145.    Mr. Bunting testified that the BLM does not pay for any road maintenance on public roads in Kane County. Tr. 228.

146.    Mr. Bunting further testified that he, as the Kanab Field Office Manager, does not have a problem with paving the southern end of Skutumpah (the Project), nor does he personally have a problem with the Project. Tr. 227-228. "I think it's reasonable." *Id*. at 228.

147.    Mr. Bunting agreed that Kane County is having significant difficulties maintaining the road and it would not have to grade the road if the Project proceeds. Tr. at 229. He also agreed that having to grade the road more often increases the impact on the ground. Tr. at 230-231.

### *Plaintiffs' Expert Witness Lydon Friant*

148.    The State and Kane County called Mr. Lyndon Friant as an expert witness for roads and road engineering. Mr. Friant is a professional engineer and land surveyor licensed by the State of Utah. Tr. 245-52. He worked for UDOT in road engineering and design for 12 years. In 2011 he started work with Jones & DeMille Engineering as a Director over construction and materials and rural roads. *Id*.

149.    Mr. Friant testified relating to the plan and bid Jones & DeMille prepared for the Project for Kane County—Skutumpah Road Improvements Project Design. Tr. 253-55; Pl. Ex. 417R. The Project contemplated a 66-foot right-of-way as the standard road width. *Id*. at 255. Mr. Friant confirmed that the Project design complies with AASHTO standards and the Roadside Design Guide within a 66-foot right-of-way. Tr. 266-67.

150.     Mr. Friant testified that the Project was designed within a 66-foot right-of-way. Tr. at 260-67. In fact, Mr. Friant testified if he could have "moved the … alignment and affected new disturbances, … you could have increased the speed. But [he] didn't run or analyze each curve but these curves that based on the existing alignment would allow for even a much higher speed for this section of roadway." *Id*. at 267.

151.     Mr. Friant also testified that he observed the same safety concerns that the other witnesses observed, being dust, washboarding, grading and parked graders, and haul truck traffic. Tr. 268-71.

152.     In Mr. Friant's opinion, the Project is "reasonable and necessary" to control dust and prevent washboarding on Skutumpah. Tr. 272.

153.     Even more, in Mr. Friant's professional opinion, the Project is "the least maintenance possible option [] to minimize dust" and will "improve public safety on the southern end of Skutumpah Road." Tr. 272.

154.     Finally, Mr. Friant testified it would be safer to drive on a paved Skutumpah Road at 40 mph than an unpaved, washboarded road with dust at 25 mph. Tr. 294.

### *BLM Paria River District Manager Harry Barber*

155.     Mr. Barber is the Manager of BLM's Paria River District. Tr. 300. Mr. Barber oversees the Kanab Field Office manager and the Monument manager. Mr. Barber's background and training is as a wildlife biologist. *Id*.

156.     Mr. Barber testified that there was a "substantial" increase in the number of visits on Skutumpah Road since the opening of the Monument. Tr. 312; Pl. Ex. 405R. For comparison, Mr. Barber testified BLM recorded 26,787 visits on Skutumpah Road in 2001 and 108,023 visits

in 2021. Tr. 313. In another report, the BLM recorded 63,775 visits from October 1, 2011 to September 30, 2012, and 108,023 from October 1, 2020 to September 30, 2021. Tr. 317-319; Pl. Ex. 418R, 419R.

157.    Mr. Barber testified the southern portion of Skutumpah can become dusty and "washboardy," which he attributes to the increased traffic. Tr. 321. Mr. Barber testified he is unaware of anything the BLM has done to alleviate the dust or washboard problems on the road, nor does the BLM intend to do anything. Tr. 328-29.

158.    Mr. Barber testified he is not aware of the BLM doing any maintenance or repair work on any roads that Kane County has claimed as a public highway except for a little work on the Brigham Plains Road that is not at issue in this lawsuit. Tr. 325-26.

159.    Regarding the determination made by the BLM relating to the Project, Mr. Barber testified the BLM found that aspects of the Project were reasonable but the BLM did not find it necessary. Tr. 330.

160.    Mr. Barber also testified that he could not remember whether there was a statute that gives the BLM authority to do a consultation relating to an R.S. 2477 road. Tr. 333. He also testified that he did not know whether he had ever been involved in a consultation for an R.S. 2477 road. *Id*. Instead, Mr. Barber testified that he "relied on [his] leadership to give [him] that guidance." Tr. 335.

161.    Mr. Barber testified that he signed the determination letter on November 10th and it "became [his] decision" after he talked with others and was "encouraged" to sign the document, even though he felt that "components of [the Project] were a good idea." Tr. 336-37.

162.     Mr. Barber also testified he signed the draft that was given to him, and he was told that what was in the document "was considered fair," and "[s]o [he] signed it." Tr. 343-46.

163.     When asked what he would do to improve the conditions on Skutumpah Road, Mr. Barber testified, "I don't know that I would do anything." Tr. 339.

164.     Mr. Barber also testified that he came to his reasonable and necessary determination based on his understanding of pre-1976 traditional uses. Tr. 341-43. Mr. Barber could not explain how Monument visitor travel on the Skutumpah, which is post-1976 use, could qualify as being within the scope of Kane County's right-of-way. *Id*.

165.     In response to the Court's questioning, Mr. Barber testified that the BLM had no evidence that the washboarding was not hazardous. Tr. 364. Similarly, Mr. Barber testified the BLM had no information that there was not a dust problem. *Id*. Mr. Barber also testified he was unaware of whether the BLM asked Kane County to look at any alternatives besides paving the road. *Id*.

### *Jacob Slyder*

166.     Jacob Slyder testified as an expert witness for the United States. Tr. at 376. Mr. Slyder is a geospacial analyst for the BLM. *Id*. at 376-77.

167.     Mr. Slyder inventoried and analyzed various aerial imagery exhibits and orthomosaics depicting the width and the historical disturbance related to Skutumpah from 1953 to 1997 imagery, as well as 2006 and 2018 imagery. *Id*. at 387-

168.     He also plotted the data from those images onto graphs and charts. *Id*.

169.     Mr. Slyder also reviewed imagery for the Swallow Park/Park Wash, *id*. at 464, as well as North Swag, *id*. at 470-71.

170.     Mr. Slyder testified that all of his measurements related to the historical travel surface and the width of disturbance on Skutumpah were conclusions drawn from subjective interpretations of data from images. *Id*. at 476. Related to his subjective interpretation of the 1976 imagery, he noted that "his observation may have been off on something that is as wide as 12 feet." *Id*. at 479-81.

171.     Mr. Slyder also admitted there were limitations in his data in that it did not capture the total disturbed width of the travel surface on Skutumpah. *Id*. at 483-86.

### *Denis Davis*

172.     Denis Davis testified as an expert witness for SUWA. Tr. at 497. Mr. Davis is a former Environmental Specialist and Park Planner for the National Park Service. *Id.* Mr. Davis's primary duties and experience involved reviewing proposals and prioritizing projects according to available budgets. *Id*. at 526-27.

173.     Mr. Davis testified that as a project manager he often left projects undone, that he would have rather fixed, because of budget shortfalls. *Id*. at 527.

174.     Mr. Davis testified that he visited Skutumpah Road on one day in June 2020 to prepare for his expert testimony. *Id.* at 528.

175.     Visiting the actual site of the proposed project once is insufficient to understand the annual maintenance requirements and recurring safety issues, especially for Skutumpah where a summer rainstorm or heavy truck traffic can change the condition of the road overnight.

176.     Mr. Davis testified, in his opinion, that the washboarding on Skutumpah was "a nuisance" but not "a safety hazard." *Id*. at 519. He testified that he thought the washboarding was not a "significant safety issue." *Id*. at 525.

## CONCLUSIONS OF LAW

### A.    Jurisdiction And Venue.

177.    The QTA waives the sovereign immunity of the United States for a claimant to confirm its title to real property in which United States claims an interest. 28 U.S.C. § 2409a. This Court's jurisdiction is provided by 28 U.S.C. § 1346(f), and venue is proper under 28 U.S.C. § 1391(e)(2) in that the property at issue is located in the State of Utah. Venue lies in the Central Division of the District of Utah because the property is located in Kane County, Utah. 28 U.S.C. § 125(2).

178.    Plaintiffs timely filed this action within the QTA's statute of limitations. *See* 28 U.S.C. § 2409a(g), (i).

### B.    The Burden Of Proof.

179.    The Court previously applied a "clear and convincing evidence" burden of proof. *See Kane County Merits*, at **43-45. While the State and Kane County challenged the burden of proof on appeal, arguing that the burden should be by a preponderance of the evidence, the Tenth Circuit chose not to address the issue. *Kane County (1)*, 772 F.3d at 1222-23. Thus, the Court will continue to apply the "clear and convincing evidence" burden of proof for the reasons set forth in *Kane County Merits*.

### C.    The Law Of R.S. 2477 Public Highways.

180.    Congress enacted R.S. 2477 in 1866. In "construing a statute, [a court] may with propriety recur to the history of the times when it was passed; and this is frequently necessary, in order to ascertain the reason as well as the meaning of particular provisions in it." *Smith v. Townsend*, 148 U.S. 490, 494 (1893) (citations omitted).

181.     R.S. 2477 rights-of-way were an integral part of the congressional pro-

development lands policy." *SUWA*, 425 F.3d at 740-41. R.S. 2477 implemented the United

States' policy, in effect for 110 years, "to encourage the building of highways over the public

domain, thereby facilitating its settlement and use." *Central Pac. Ry. Co. v. County of Alameda*,

299 P. 75, 77 (Cal. 1931) (citation omitted).

182.     This land grant vested "as soon as it was accepted in an appropriate manner by the

agents of the public, or the public itself, a highway was established." *Streeter v. Stalnaker*, 85

N.W. 47, 48 (Neb. 1901).

183.     R.S. 2477 "was enacted by Congress in 1866 to assist in the development of the

West by granting rights-of-way for construction of highways over public lands to miners,

farmers, ranchers, and homesteaders." *Southwest Four Wheel Drive Ass'n v. BLM*, 271 F. Supp.

2d 1308, 1313 n.8 (D.N.M. 2003) (citation omitted), *aff'd on other grounds*, 363 F.3d 1069 (10th

Cir. 2004).

184.     R.S. 2477 borrows from long-established principles of state law to determine

what constitutes a public highway. *SUWA*, 425 F.3d at 768.

> The purpose of [R.S. 2477] was to give every settler, however unable to build a
> road, lawful access to whatever land he chose to enter. . . . A road may be a
> highway though it reaches but one property owner. He has a right to access to
> other roads and the public has a right of access to him. Its character is not
> determined by the fact that but few persons use it.

*Nicolas v. Grassle*, 267 P. 196, 197 (Colo. 1928) (citations omitted). *See also Leach v. Manhart*,
102 Colo. 129, 133, 77 P.2d 652, 653 (1983) (for purposes of R.S. 2477 use "may be by any who
have occasion to travel over the public lands, and if the use be by only one, still it suffices").

185.     The settlement and use of the public domain is "the intended use" of public

highways, which includes "the promotion of economic development." *Sierra Club v. Hodel*, 848

F.2d 1068, 1084 (10th Cir. 1988), citing *Sierra Club v. Hodel*, 675 F. Supp. 594, 608 (D. Utah

1987). "[P]romotion of tourism is a form of economic development." 675 F. Supp. at 608.

186.    Long ago this court recognized that the Burr Trail was "first blazed" by a cattle

rancher, and its continuing use "for that purpose for several decades, [was] ostensibly under the

authority of R.S. 2477." *Hodel*, 675 F. Supp. at 601. Additionally, the Burr Trail was used for oil

exploration, uranium mining, and search and rescue. *Id*.

187.    These types of public highway uses have been historically recognized in Utah

law. *See Boyer v. Clark*, 326 P.2d 107, 109 (Utah 1958) (driving cattle); *Jeremy v. Bertagnole*,

101 Utah 1, 8 116 P.2d 420, 421 (1941) (moving cattle and sheep); *Lindsay Land & Live Stock

Co. v. Churnos*, 285 P. 646, 648 (Utah 1929) (moving livestock and logging).

188.    As shown above, the three roads remanded to the Court were established and used

prior to 1976 for the traditional uses of cattle hauling, cutting cedar fence posts, logging, mining,

hunting, pine nut harvesting, exploration, sight-seeing, and other forms of recreation. These are

traditional economic purposes. "The fact that the nature of the economy has evolved from sheep

and cattle-driving to meeting the public's recreational needs does not alter this result." *Hodel*,

675 F. Supp. at 608. "[T]ourism is a form of economic development." *Id*.

189.    "Rights-of-way are a species of easements and are subject to the principles that

govern the scope of easements." *Hodel*, 848 F.2d at 1083. Under Utah law, the subjective

purpose of the user of an easement does not define its scope. "Although, in determining the

scope of a prescriptive easement, courts may consider a wide variety of factors, the subjective

purpose for which a prescriptive easement is used should be considered only to the extent it is

helpful in determining *the nature of the burden historically placed on the servient estate*." *SRB Inv. Co. v. Spencer*, 2020 UT 23, ¶ 24; 463 P.3d 654 (emphasis added).

190.   Here, however, the Court is considering an express grant of a public highway right-of-way that can be upgraded and improved to meet the exigencies of increasing travel. *SUWA*, 425 F.3d at 746.

191.   The "'reasonable and necessary' standard in light of traditional uses does not mean, however, that the County's right-of-way is limited to the uses to which the [road] was being put when it first became an R.S. 2477 road." *Hodel*, 848 F.2d at 1083. "[E]ach each new use of the [road] automatically vested as an incident of the easement." *Id*.

192.   "Thus, the scope of [the] right-of-way is that which is reasonable and necessary to ensure safe travel for the uses above-mentioned, including improving the road to two lanes so travelers could pass each other." *Id*. at 1084.

**E.     The Proper Width of the Rights-of-Way is What is Reasonable and Necessary Under State Law.**

193.   R.S. 2477 does not specify the width of the right-of-way granted. However, as with the existence of a public highway, the width is determined under state law.

194.   Historically, the Department of the Interior ("DOI") agreed that state law provides the width of R.S. 2477 roads. In 1986, the BLM recognized that "[s]tate law specifying widths of public highways within the State shall be [used] . . . to determine the width of the R.S. 2477 grant." Ex. 152. In 1990, BLM again directed that "[s]tate law which specifically addresses highway widths under R.S. 2477 shall be used to determine the width of the R/W." Ex. 149. In 1996, a BLM guidance manual confirmed that state law determines the width of R.S. 2477 rights-of-way. Ex. 84.

195.     DOI has also repeatedly recognized a standard width of 66 feet for such roads. A

1972 road maintenance agreement between Kane County and BLM used a standard 66-foot

right-of-way. Ex. 89.[2] A BLM planning document from 1979 recognized that a "66-foot right-of-

way [was] granted under RS-2477." Ex. 88. As recently as 2007 BLM issued a "66 feet wide"

FLPMA Title V right-of-way to Kane County. Ex. 87.

196.     "Utah case law define[s] the width of an R.S. 2477 right-of-way to be that which

is reasonable and necessary for the type of use to which the road has been put." *Sierra Club v.

Hodel*, 848 F.2d 1068, 1083 (10th Cir. 1988) (cleaned up).

197.     As the Utah Supreme Court held in *Jeremy v. Bertagnole*, in a suit to quiet title, it

is "proper and necessary for the court in defining the road to determine its width, and to fix the

same according to what was reasonable and necessary, under all the facts and circumstances, for

the uses which were made of the road." *Jeremy v. Bertagnole*, 101 Utah 1, 8, 116 P.2d 420, 423

(1941).

198.     The Court notes, on the other hand, that the Tenth Circuit approved an extensive

improvement project on the Burr Trail Road as being "reasonable and necessary," and therefore

within the scope of an R.S. 2477 right-of-way, without finding the width of the right-of-way.

*Hodel*, 848 F.2d at 1084.

199.     "The width of the road, however, is not limited to the actual beaten path as of

October 21, 1976." *Kane Cnty. (1)*, 772 F.3d at 1223. Courts look to state law to determine the

---

[2] Due to the passage of time, it is unknown when or who crossed out the "60" foot
number and hand wrote "66."

appropriate width, and under Utah law, the width of a public road is that which is reasonable and necessary under all the facts and circumstances. *Id.* (cleaned up).

200.   Moreover, R.S. 2477 rights-of-way "should be wide enough to allow travelers to pass each other." *Hodel*, 594 F. Supp. at 606.

201.   In remanding this matter, the Tenth Circuit noted that AASHTO guidelines "may be relevant to the determination of what width is reasonable and necessary in light of the pre-1976 uses," but the Court should set the road widths according to what is reasonable and necessary in light of traditional pre-1976 uses. *Kane Cnty. (1)*, 772 F.3d 1224.

   **(1)   The Swallow Park/Park Wash And North Swag Roads.**

202.   As shown above, the Swallow Park/Park Wash and North Swag Roads essentially form a single road connecting the Kitchen Corral Road to Skutumpah. *See also* Pl. Ex. 35.

203.   The evidence presented at trial to establish the pre-1976 traditional uses of these roads was largely identical. Some travelers turned south down Park Wash and did not continue on North Swag, however, the types of pre-1976 uses of both roads included hauling cattle and gear in trucks, cutting and hauling cedar fence posts, hauling equipment on trailers behind tractors, hunting in trucks, exploring and sightseeing.

204.   Swallow Park/Park Wash was also used prior to 1976 for purposes including pine nut harvesting and logging.

205.   The Court concludes that the pre-1976 traditional uses of Swallow Park/Park Wash and North Swag roads were similar and involved "economic development" and "tourism" in trucks and motor vehicles. *Hodel*, 675 F. Supp. at 608. The Court also notes that older pre-

1976 trucks, such as those used to haul cattle and fence posts, were larger and heavier that today's standard trucks. *See*, e.g., Pl. Ex. 191.

206.    Swallow Park/Park Wash and North Swag do not receive routine maintenance, but these roads have been graded when necessary to preserve the traveling surface and knock back encroaching sagebrush—both before and after 1976.

207.    During the Court's first site visit in December of 2010 and its second site visit in September 2022, Swallow Park/Park Wash and North Swag appeared as single lane roads crossing mountainous terrain and dropping to lower, sandy ground at the southern end of North Swag.

208.    The Court did not observe any aspect of the roads that seemed unreasonable or unnecessary for the operation of a single lane road.

209.    The AASHTO Guidelines for Geometric Design of Very Low-Volume Local Roads ("Guidelines") provide a minimum roadway width of 18 feet. Tr. 167; Pl. Ex. 82, at 18.

210.    Having reviewed the roads, the difficult topography, and understanding that Kane County's road grader is eight and a half feet wide, the Court finds that an 18-foot right-of-way is a reasonable and necessary width in light of the pre-1976 uses of Swallow Park/Park Wash and North Swag. This width of a right-of-way is reasonable and necessary for the operation of a single lane road and provides the minimal amount of room for one vehicle to pull to the side to allow oncoming vehicles to pass.

**(2)    The North Section Of The Skutumpah Road.**

211.    The North Section of Skutumpah (that section north of the Project area) is defined to be the section of the road commencing at the cattleguard near the Mill Creek Road intersection

and running a little over 30 miles north to the end of Skutumpah at the K7000 Cottonwood Road.

212.     In remanding Skutumpah, the Tenth Circuit determined that this Court must determine the reasonable and necessary width of the right-of-way in light of pre-1976 traditional uses and not allow "room for unspecified future improvements." *Kane Cnty. (1)*, 772 F.3d 1224.

213.     Skutumpah is a major thoroughfare that crosses significant, mountainous terrain. Skutumpah, as noted above, appears as a road on an 1877 statewide map. Pl. Ex. 57.

214.     With a history dating back as far as the 1870s, Skutumpah would qualify for a statutory 66-foot right-of-way. From 1898 until 1917, Utah statutes provided that the "width of all public highways, except bridges, alleys, lanes, and trails, shall be at least sixty-six feet [] provided that nothing in this title shall be so construed as to increase or diminish the width of [a] highway already established or used as such." Utah. Rev. Stat., Title 25, Ch. 1, § 1117 (1898).

215.     Kane County may change its roads to respond "to the changing needs of the public by providing for safe travel, as [they are] obliged to do." *Hodel*, 675 F. Supp. at 608. Over time, segments of Skutumpah have been realigned and in the late 1980's, the County installed a new cement and steel bridge on the road near Skutumpah Creek. Tr. 147-149; Pl. Ex. 410.

216.     Testimony and evidence adduced at trial confirmed that Skutumpah was used as a highway for many traditional uses including hauling cattle in semis and trucks (*see* Pl. Ex. 191); cutting and hauling cedar fence posts; logging; mining; oil exploration; pine nut harvesting; hunting; exploring; sight-seeing; and other forms of recreation. These pre-1976 uses of Skutumpah were quite extensive.

217.     As discussed above, the travel surface of the southern end of Skutumpah has been maintained to a width of roughly 28 feet, while the northern section is narrower. Over time Kane

County has installed culverts and constructed drainage runouts to direct water away from the surface. *Kane County Merits*, at * 12. Clearing obstructions often requires "an area 60 feet wide (and continuing for 100 feet along the road)." *Id.*

218.     Kane County has also brushed-back vegetation at times, well beyond the disturbed barrow pit and clear zones, to improve sight distances. Tr. 146 (Pratt).

219.     Since 1996, the Monument has drawn substantially more visitors to the area, many of whom travel Skutumpah. The right-of-way for Skutumpah must be sufficient to meet the exigencies of this increased travel. *Hodel*, 848 F.2d at 1083.

220.     BLM road manual states that a "minimum width of 50 feet or the width of construction plus 10 feet on each side (whichever is greater) is generally required. Maintain uniform widths through varying ownerships or legal subdivisions whenever possible, rather than allowing frequent width changes." Pl. Ex. 85, at 11.

221.     During the Court's site visits in December 2010 and September 2020, the width of the travel surface, the disturbed areas, the bridges, culverts, and drainage runouts appeared to be reasonable and necessary. The Court did not observe any excessive use or impact caused by the road and its features.

222.     The Mill Creek Road and the Bald Knoll Road are near or connect to Skutumpah. Pl. Ex. 35. Both of these R.S. 2477 roads have adjudicated 50-foot rights-of-way. *Kane County Merits*, at * 64.

223.     The Court finds that a 50-foot right-of-way is reasonable and necessary in light of the pre-1976 uses of the northern section of Skutumpah. A 50-foot right-of-way is also

reasonable and necessary to meet the exigencies of existing travel, including the increased travel caused by the Monument.

### (3)   The Project Section Of The Skutumpah Road.

224.    The Project section of Skutumpah is defined to be the first 2.6 miles, more or less, running from the paved Johnson Canyon Road at the south and proceeding northeasterly to the cattleguard near the Mill Creek Road intersection.

225.    The Court notes that the northern end of the Project, including the cattleguard, is on private land and is not subject to this title decision. Kane County has separately obtained the necessary rights-of-way from the private landowners for the northern end of the Project.

226.    The specific features of the Project are shown in Pl. Ex. 417R, which were prepared by Jones & DeMille Engineering, Inc. Mr. Lyndon Friant is the lead engineer on the Project, and testified at trial as Kane County's expert witness.

227.    The Project section of Skutumpah has historically been the most heavily traveled section of the road, as it is the closest to the cities in Kane County, Utah. The United States' 1877 Cadastral Survey Plat "shows the 'Skumpah Settlement' along the south end of Skutumpah, and an 1878 map shows the Skutumpah ending at Clarkston, Utah. . . . Thus, from its early existence, Skutumpah has connected towns and provided access to other road systems." *Kane County MSJ*, at * 2.

228.    Other roads historically accessed by Skutumpah include the Millcreek Road and Bald Knoll Road, along with the Oak Canyon and Tenny Creek Roads. Pl. Ex. 35.

229.    The extensive testimony of the pre-1976 uses of Skutumpah (and the connected roads) included traditional uses of hauling cattle, cutting cedar fence posts, coal exploration and

hauling, oil exploration, hunting, pine nut harvesting, accessing private property, sight-seeing and other forms of recreational use. Additionally, the 1966 U.S.G.S. Skutumpah Creek 7.5 minute topographic map shows a "Gravel Pit", and several other roads connecting to the Project section of Skutumpah. Pl. Ex. 47.

230.    The types of vehicles used for these pre-1976 traditional uses included semis, drilling equipment, trucks and cars. *See*, *e.g.* Pl. Exs. 191 and 199.

231.    At trial, Kane County witnesses testified to the dramatic increase in travel on the Project section of Skutumpah. This increase can be attributed to increased hauling from the private gravel and shale pits, increased residential use farther north at the Deer Spring Ranch, and a dramatic increase in recreational travel arising after the creation of the Monument in 1996. From 1996 to 2021, the BLM documented essentially a four-fold increase in visitation to the Monument, and that increase matches the documented increase in traffic on the south end of Skutumpah. Pl. Exs. 403R, 405R, 418R, 419R.

232.    This travel on the Project section of Skutumpah continues to cause significant washboarding, dust and maintenance problems. The washboarding and dust are recognized safety hazards on this section of road. The BLM has also closed public gravel pits formerly used by Kane County to maintain its roads, which has increased the burden on the County's road budget. Tr. 19-18.

233.    The United States' witnesses confirmed the drastic increase in travel on the Project section of Skutumpah, and they agreed that the current situation presents safety concerns and causes fugitive dust, which is safety as well as an environmental concern.

234.    The United States' witnesses recognized that the current situation on the Project section of Skutumpah is a problem, including a significant maintenance problem for Kane County.

235.    As Kane County developed its pavement Project, it obtained a commitment from UDOT for grant funding for the initial cost of the engineering design and pavement.

236.    Recognizing that the Project would be an improvement, Kane County engaged in consultation with the BLM. County representatives and its design engineer met with BLM representatives onsite and later responded to the written questions presented by the BLM.

237.    At no point in the consultation did the BLM express any objection or propose any modification of the Project. In fact, the United States' witnesses agreed that the Project seemed reasonable.

238.    By letter dated November 10, 2022, the BLM wrote to Kane County and, while agreeing that the "the proposed improvement is reasonable, it is not necessary in light of the traditional uses of the right-of-way as of October 21, 1976." Pl. Ex. 421R. Thus, the BLM determined that "Kane County's proposed improvement to Skutumpah Road is outside the scope of its [right-of-way]." *Id.*

239.    At trial, the United States' witnesses were questioned about this decision. The United States' witnesses confirmed that the Project section of Skutumpah continues to present safety problems (washboarding and fugitive dust), continues to strain Kane County's road department because of the increased need for maintenance, and that the Project would solve these problems.

240.    The United States' witnesses confirmed that they do not pay for maintenance on Kane County's public highways and that Monument travel on the Project section of Skutumpah is causing impacts. And yet the United States offers no assistance or solution for the recognized problems.

241.    "Utah adheres to the general rule that the owners of the dominant and servient estates must exercise their rights so as not unreasonably to interfere with the other." *SUWA*, 425 F.3d at 746 (cleaned up). "The Court thus concluded that the BLM needed to make an 'initial determination' regarding the reasonableness and necessity of any proposed improvements beyond mere maintenance of the previous condition of the road." *Id*. (citation omitted).

242.    "Where rights-of-way and easements are concerned, one party cannot serve as the sole judge of scope and extent, or as the sole arbiter of what is 'reasonable and necessary.'" *Id*. at 747 (citation and quotation marks omitted).

243.    "The principle that the easement holder must exercise its rights so as not to interfere unreasonably with the rights of the owner of the servient estate, derives from general principles of the common law of easements rather than the peculiar status of [federal land]." *Id*. at 747.

244.    In considering a proposed improvement, "[t]he agency may not use its authority, either by delay or by unreasonable disapproval, to impair the rights of the holder of the R.S. 2477 right of way. In the event of disagreement, the parties may resort to the courts." *SUWA*, 425 F.3d at 748.

245.    Here, the question of the scope of Skutumpah was directly remanded to this Court, remains under its jurisdiction, and was the subject of a full trial on the merits in December of 2022. *See Kane Cnty. (1)*, 772 F.3d at 1223.

246.    Kane County duly, and in good faith,  consulted with the BLM regarding the proposed improvements described in the Project, and the BLM made its initial determination. Notably, the BLM cannot make any formal or final determination regarding the scope of a State and Kane County R.S. 2477 right-of-way. The BLM previously attempted to do that— specifically including Skutumpah—and the Tenth Circuit resoundingly rejected the effort. "R.S. 2477 creates no executive role for the BLM to play." *SUWA*, 425 F.3d at 754.

247.    Congress has separately confirmed that the BLM cannot make any final decision on the scope of an R.S. 2477 right-of-way.

> No final rule or regulation of any agency of the Federal Government pertaining to the recognition, management, or validity of a right-of-way pursuant to Revised Statute 2477 (43 U.S.C. [§] 932) shall take effect unless expressly authorized by an Act of Congress subsequent to the date of enactment of this Act [Sept. 30, 1996].

U.S. Department of the Interior and Related Agencies' Appropriations Act, 1997, § 108, enacted by the Omnibus Consolidated Appropriations Act, 1997, Pub. L. No. 104-208, 110 Stat. 3009 (1996).

248.    "[U]nder Utah common law, the road could be widened as necessary to meet the exigencies of increased travel, at least to the extent of a two-lane road." Hodel, 848 F.2d at 1083.

249.    The Project section of Skutumpah does "not have to be maintained in precisely the same condition it was in on October 21, 1976; rather, it [can] be improved as necessary to meet the exigencies of increased travel, so long as this [is] done in the light of traditional uses to which the right-of-way was put as of repeal of [FLPMA] in 1976." SUWA, 425 F.3d at 746.

"[T]he right-of-way holder may sometimes be entitled to change the character of the roadway when needed to accommodate traditional uses." *Id*. at 748.

250.    The Project was carefully designed to stay within the historical disturbance of Skutumpah, and any new disturbance is de minimus. Beyond reducing the economic burden of maintaining this section of road, paving this section will reduce the impact on the servient estate of the United States by eliminating the need to grade the surface multiple times per year and will prevent fugitive dust. Thus, the impact to the servient estate will be reduced. *See SRB Inv. Co. v. Spencer*, 2020 UT 23, ¶ 24.

251.     The overwhelming and uncontradicted evidence adduced at trial confirms that the Project is reasonable and necessary to accommodate the exigencies of increased travel—including the increases in visitation and travel attributable to the Monument—in light of the pre-1976 traditional uses of Skutumpah.

252.    The State and Kane County have requested the Court to establish a 66-foot width of the right-of-way for the Project Section of Skutumpah. FPO at 4. However, as stated in *Hodel*, it may not be necessary for this Court to set a fixed width of the right-of-way for the Project. *Hodel*, 848 F.2d at 1084.

253.    The Court finds by clear and convincing evidence that the State and Kane County have proven the scope of the Project section of Skutumpah to include a 66-foot right-of-way. With or separate from that specific finding, the Court finds by clear and convincing evidence that the Project is reasonable and necessary and within the scope of the State's and Kane County's right-of-way for Skutumpah. "As long as the project stays within the county's right-of-way, no BLM authorization is needed for construction to proceed." *Hodel*, 675 F. Supp. at 605, n.31.

DATED this 1st day of May 2023.

HOLLAND & HART LLP

/s/ Shawn Welch
Shawn T. Welch
Richard D. Flint
Michelle Quist

*Attorneys for Kane County, Utah*

UTAH ATTORNEY GENERAL'S OFFICE

/s/ Anthony L. Rampton*
Anthony L. Rampton
Kathy A.F. Davis
Kaitlin Tess Davis
Assistant Attorneys General

*Attorneys for Plaintiff State of Utah*
* Signed with permission given to filing counsel

21005412_v5