TODD KIM, Assistant Attorney General
JOSEPH H. KIM, Trial Attorney
Natural Resources Section
Environment & Natural Resources Division
United States Department of Justice
P.O. Box 7611
Washington, D.C. 20044-7611
(202) 305-0207

TRINA A. HIGGINS, United States Attorney (7349)
MELINA SHIRALDI, Assistant United States Attorney (13110)
CAMERON B. JOHNSON, Special Assistant United States Attorney (13996)
MICHAEL D. SMITH, Special Assistant United States Attorney
111 South Main Street, Suite 1800
Salt Lake City, UT 84111
(801) 524-5682

Attorneys for Defendant United States of America

---

## UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| KANE COUNTY (1), UTAH a Utah political subdivision,<br><br>       Plaintiff,<br><br>STATE OF UTAH,<br><br>       Plaintiff-Intervenor,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>       Defendant,<br><br>SOUTHERN UTAH WILDERNESS ALLIANCE and THE WILDERNESS SOCIETY,<br><br>       Defendant-Intervenors. | **UNITED STATES' POST-TRIAL BRIEF**<br><br><br>Case No. 2:08-cv-00315 CW<br><br>Judge Clark Waddoups |

**TABLE OF CONTENTS**

INTRODUCTION ......................................................................................................... 1

I.      LEGAL BACKGROUND ................................................................. 2

II.     BURDEN OF PROOF ....................................................................... 4

III.    SCOPE FOR SKUTUMPAH ROAD (K5000)................................. 4

        A.      Scope in 1976........................................................................ 4

        B.      Current Scope........................................................................ 5

IV.     SCOPE FOR SWALLOW PARK / PARK WASH ROAD (K4360D) (Class
        D Portion)....................................................................................... 21

        A.      Scope in 1976...................................................................... 21

        B.      Current Scope...................................................................... 21

V.      SCOPE FOR NORTH SWAG ROAD (K4370).............................. 23

        A.      Scope in 1976...................................................................... 23

        B.      Current Scope...................................................................... 24

CONCLUSION........................................................................................................ 26

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Kane County (1) v. United States*,
No. 2:08-cv-315, 2013 WL 1180764 (D. Utah Mar. 20, 2013)4, 7, 9, 10, 17, 20, 21, 22, 23, 24, 25, 26

*Kane County, Utah (1) v. United States,*
772 F.3d 1205 (10th Cir. 2014) ........................... 2, 3, 5, 6, 8, 11, 12, 14, 16, 18, 20, 22, 25, 26

*Kane County, Utah (1) v. United States*,
928 F.3d 877 (10th Cir. 2019) ...................................................................................... 2, 6

*Lindsay Land & Live Stock Co. v. Churnos*,
75 Utah 384, 285 P. 646 (1929) ......................................................................................... 9

*Sierra Club v. Hodel*,
675 F. Supp. 594 (D. Utah 1987) ....................................................................................... 9

*Sierra Club v. Hodel*,
848 F.2d 1068 (10th Cir. 1988) ...................................... 3, 6, 12, 13, 16, 17, 18, 19, 23, 25, 26

*Southern Utah Wilderness Alliance v. U.S. Bureau of Land Mgmt.*,
425 F.3d 735 (10th Cir. 2005) ............................................... 3, 12, 13, 17, 19, 23, 25

*Village of Los Ranchos De Albuquerque v. Marsh*,
956 F.2d 970 (10th Cir.1992) ........................................................................................... 9

Pursuant to the Court's scheduling orders, *e.g.*, ECF No. 412, and in response to Plaintiffs' Post-Trial Brief [ECF No. 409] ("Pls. PTB") and Plaintiffs' Proposed Findings of Fact and Conclusions of Law [ECF No. 408] ("Pls. FoF"), the United States of America submits this Post-Trial Brief.[1]

## INTRODUCTION

The focus of this remand is limited to the scope of three R.S. 2477 rights-of-way ("ROWs") -- the K5000 Skutumpah, the Class D portion of the K4360 Swallow Park/Park Wash, and the K4370 North Swag roads -- and Kane County's proposed improvement to the Skutumpah road.  But as with the bellwether trial in the related case *Kane County, Utah (2) v. United States*, No. 2:10-cv-01073-CW, the rulings in this case may provide a template for resolving certain legal issues that may recur in the thousands of claims that Plaintiffs and other Utah counties have brought in over twenty lawsuits to quiet title for asserted R.S. 2477 ROWs across federal public lands.

As previously established by the Tenth Circuit, to determine the scope of an R.S. 2477

---

[1]    Although Plaintiffs have submitted both a Post-Trial Brief and a separate Proposed Findings of Fact and Conclusions of Law, the United States has not submitted a separate Proposed Findings of Fact and Conclusions of Law.  The United States acknowledges that it did submit a separate Proposed Findings of Fact and Conclusions of Law after the bellwether trial in *Kane County, Utah (2) v. United States (Kane (2))*, No. 2:10-cv-01073-CW (D. Utah), but in that case the scheduling orders specifically required this.  *See, e.g., Kane (2)*, ECF No. 605 at 3.  No similar order has issued in this case.  *See, e.g., Kane (1)*, ECF No. 388.  Nor does any local rule clearly apply.  *See* DUCivR 54-1(c) (discussing Proposed Findings of Fact and Conclusions of Law to be filed "before . . . the trial is scheduled to begin").  The United States has omitted this seemingly optional filing to attempt to reduce the amount of papers filed in this post-trial briefing, as such a filing would be consistent with, and largely redundant with, this post-trial brief.  However, if the Court would find a separate filing helpful, the United States stands ready to provide a separate filing on request.

1

ROW,

> the district court [must] proceed in three steps.  First, the court must make the binary determination of whether a right-of-way exists at all.  Second, the court must determine the pre-1976 uses of the right-of-way.  And third, the court must decide whether, based on the pre-1976 use, the right-of-way should be widened to meet the exigencies of increased travel.

*Kane County, Utah (1) v. United States*, 928 F.3d 877, 884 (10th Cir. 2019) (citations omitted).

For the purposes of this case, the Court has already completed steps one and two -- determining that a ROW exists for each of the three roads at issue in this remand and identifying the pre-1976 uses for these ROWs.  This remand focuses on the third step.

Critical to that step, a right-of-way cannot be expanded beyond its 1976 width unless that expansion is "reasonable and *necessary* in light of pre-1976 uses."  *See Kane County, Utah (1) v. United States,* 772 F.3d 1205, 1223-24 (10th Cir. 2014) (emphasis in original).  Thus, in order to reach a decision on this third step, the court must resolve, based on evidence proffered, both the physical width and conditions of a ROW in 1976, and whether post-1976 improvements and widening were reasonable and necessary in light of pre-1976 uses of the ROW.

Here, Plaintiffs have failed to meet their burden of proving that any expansion in width of these three R.S. 2477 ROWs beyond that established in 1976 is both reasonable and necessary in light of the pre-1976 uses of the road.  Accordingly, based on the evidence at this time, the scope for these three R.S. 2477 ROWs should be set based on this court's prior findings of the dimensions of the road in 1976.

I.     LEGAL BACKGROUND

As with any R.S. 2477 ROW, the scope of these three ROWs begins with their width and uses as of October 21, 1976 (i.e., when R.S. 2477 was repealed, subject to valid existing rights).

2

*See Kane (1)*, 772 F.3d at 1223 ("[T]he scope of an R.S. 2477 right of way is limited by the established usage of the route as of the date of the repeal of the statute." (quoting *Southern Utah Wilderness Alliance v. U.S. Bureau of Land Mgmt.* (*SUWA*), 425 F.3d 735, 746 (10th Cir. 2005)). As this Court has since observed, although scope "is not limited to the actual travel surface (i.e., the 'beaten path'), it is still bounded by pre-1976 uses." *Kane (2)*, ECF No. 727 at 16 (Memorandum Decision and Order Denying SUWA's Fifth Motion to Intervene as of Right and Retaining Fourth Amended Permissive Intervention Order) (June 6, 2022) (citations omitted). Thus, "pre-1976 events fix in place the type of road that may be had and an approximate boundary for that road." *Id.*

The scope of an R.S. 2477 ROW, however, may allow for expansion of the physical dimensions of the ROW established by 1976, if that expansion is both "reasonable and necessary in light of the pre-1976 uses of the road." *Kane (1)*, 772 F.3d at 1223; *see also Sierra Club v. Hodel*, 848 F.2d 1068, 1083-84 (10th Cir. 1988). Such an expansion commonly occurs through road work, and case law has established a "distinction between 'routine maintenance' and 'improvements' to R.S. 2477 rights-of-way." *Kane (1)*, 772 F.3d at 1224 (citing *SUWA*, 425 F.3d at 749). However, there is "a precise order of actions for holders of rights-of-way seeking improvements. First, they consult with the BLM as to the proposed improvements; then, '[i]n the event of a disagreement, the parties may resort to the courts'." *Id.* (quoting *SUWA*, 425 F.3d at 748). Of course, the fact that improvements of these roads may have occurred since 1976 does not excuse Plaintiffs from their burden of showing that such expansion is both reasonable and necessary in light of the pre-1976 uses.

II.     BURDEN OF PROOF

Plaintiffs correctly acknowledge that they carry the burden of proof in this case, that this Court has already determined they must meet the "clear and convincing evidence" standard, and that this Court has already rejected Plaintiffs' proposed alternative "preponderance of the evidence" standard. *See*, *e.g.*, Pls. FoF at ¶ 179 (citing *Kane County (1) v. United States*, No. 2:08-cv-315, 2013 WL 1180764, **43-45 (D. Utah Mar. 20, 2013)).  The United States agrees with Plaintiffs that this Court should "continue to apply the 'clear and convincing evidence' burden of proof." *Id.*

III.    SCOPE FOR SKUTUMPAH ROAD (K5000)

A.      Scope in 1976

This Court appears to have previously determined, at least approximately, the scope of this road in 1976:

> In 1967, the south end of the Skutumpah road was approximately 15 to 20 feet wide while parts of the north end was only about 8 to 12 feet wide in places.  By 1976, however, the south end was approximately 20 feet wide and the north end was not quite as wide as 20 feet.

*Kane (1)*, 2013 WL 1180764, *12 (March 20, 2013) (citations omitted).  It is not clear, however, whether these figures represent the travel surface or total disturbed width.

Evidence presented at the remand trial provides greater clarity and specificity regarding the physical width and conditions of the Skutumpah road in 1976, including the identification of features, e.g., ditches, borrow pits, and drainage runouts.  Based on 1974 aerial photographs, it appears that the south end of the Skutumpah road ranged from 16.6 to 36.4 feet (travel surface), and from 16.6 to 71.5 feet (total disturbance), *see, e.g.,* D526R; D532R, and the north end of the Skutumpah road ranged from 9.9 to 49.6 feet (travel surface) and from 11.6 to 100.7 feet (total

4

disturbance), *see, e.g.,* D535R; D537R.  *But cf.* Pls. FoF at ¶ 16 (noting "that the county liked to keep a 24-foot running surface, but was not able to do it on all sections of the Skutumpah Road" due to topographical conditions), ¶ 96 (similar).  Aerial photographs taken in 1976 are in accord, but of lesser resolution, making these 1974 aerial photographs the most accurate evidence available of the scope as of the date of the repeal of the statute.  *See* Trial Tr. 393:16-394:13; D520R.  This evidence is sufficient to establish the width and conditions of the ROW in 1976, and Plaintiffs have the burden to prove that any change or improvement beyond this baseline from 1976 to present was both reasonable and necessary.

B.       Current Scope

It is uncontested that the Skutumpah road has grown since 1976.  What remains to be determined is whether this growth is part of the scope (i.e., is part of the rights associated with the ROW), or whether this growth was merely permissive.  *Cf.* Pls. PTB at 12-13 ("There is no evidence that the BLM disproved [*sic*] of any of Kane County's roadwork, save for the realignments related to the trespass lawsuit, and those realignments were not challenged on appeal").  To the extent that Plaintiffs want to claim an expanded scope (i.e, that the scope includes a right to physically expand the dimensions of the roadway or other disturbed areas), it is their burden to prove that such an expanded scope is both reasonable and necessary in light of the pre-1976 uses of the road.  *E.g.*, *Kane (1)*, 772 F.3d at 1223.

Rather than offering evidence to show how each of the improvements and changes to Skutumpah road between 1976 and present are both reasonable and necessary to support pre-1976 uses, Plaintiffs merely suggest the court should presume what exists now is reasonable and necessary.  Such an argument is contrary to Tenth Circuit case law and would impermissibly

5

shift Plaintiffs' evidentiary burden to the United States.  The Tenth Circuit reaffirmed its earlier

finding regarding a plaintiff's burden to prove whether an expanded width is within the rights of

a holder, noting that

> because the district court . . . failed to consider the pre-1976 uses of these roads, we remanded for it to redetermine the width of the roadways . . . .  Specifically, we recognized that while a 'road can be widened [beyond its pre-1976 boundaries] to meet the exigencies of increased travel, including where necessary to ensure safety,' the reasonableness and necessity of any expansion beyond the pre-1976 right-of-way must be read '*in the light of traditional uses to which the right-of-way was put*.'

*Kane (1)*, 928 F.3d at 885 (quoting *Kane (1)*, 772 F.3d at 1223 (emphasis in original)).  There,

the Tenth Circuit underscored what the court must examine in order to make scope

determinations, including the evidence a plaintiff must present.  *Id.* at 893 ("In deciding scope,

the district court must determine whether it is reasonable and necessary to widen the roads to

'meet the exigencies of increased travel . . . in light of traditional uses to which the right-of-way

was put.'" (quoting *Kane I*, 772 F.3d at 1223)); *id.* at 894 ("In other words, even upon deciding

the R.S. 2477 title issue on the rights-of-way, the district court still needed to decide under Utah

law whether Kane County and the State of Utah were entitled to widen the scope of the rights-of-

way beyond the beaten path existing before October 21, 1976, when R.S. 2477 was repealed."

(citing *Hodel*, 848 F.2d at 1083)).  Thus, it is Plaintiffs' burden to present evidence to show the

improvements between 1976 and present are both reasonable and necessary.  But Plaintiffs have

failed to meet their burden here.  In the absence of any such evidence, the district court should

decline Plaintiffs' invitation to conclude that the current use and width of Skutumpah road

should define the scope of the associated ROW.

6

**Width**

The aerial photographs taken in 2018 were the most recently available for use on remand, and these aerial photographs reveal several changes to this road since 1976. For example, the road has generally widened. By 2018, it appears that the south end of the Skutumpah road ranged from 20.8 to 34.5 feet (travel surface), and from 27.8 to 73.5 feet (total disturbance), *see* D526R; D532R, and the north end of the Skutumpah road ranged from 14.2 to 39.2 feet (travel surface) and from 20.0 to 65.6 feet (total disturbance), *see* D535R; D537R. Other available post-1976 evidence is in accord. For example, this Court has already noted that in 1998 and 1999, members of the Kane County road crew worked with BLM employees to measure and document features they found along the Skutumpah road. *Kane (1)*, 2013 WL 1180764 at *12 (citation omitted). This work was captured in a document admitted as Defendant's Exhibit NNNN. The exhibit includes aerial photographs of each segment of the Skutumpah road, on which various data (including centerline GPS data) were overlaid. It also includes tables that recorded measurements such as travel surface width and total width. These data show the Skutumpah road ranged from 12 to 35 feet (travel surface) and from 12 to 40 feet (total disturbance) in 1998/99, meaning the road generally widened between 1999 and 2018. Similarly, the Court has already noted that in approximately 2007/08, *see* PX 6, 9, 11, as part of the County's efforts to GPS the centerline of several R.S. 2477 ROW claims, the County estimated that the road had a 28-foot travel surface, with a 40-foot disturbed area width for the widest segments, and a 24-foot travel surface, with a 28-foot disturbed area width for the other segments. *Kane (1)*, 2013 WL 1180764 at *12 (citations omitted). This indicates that the road generally widened between 2008 and 2018.

Certain specific areas of widening are particularly discernable from the aerial photographs.  Sometime between 1974 and 1994, there were four notable instances of road widening, and four other notable instances of shoulder widening.  *See* Trial Tr. 446:17-447:24; D538R.  Sometime between 1994 and 2006, there was another notable instance of road widening.  *See* D538R.  Sometime between 2006 and 2018, there was another notable instance of road widening, and three other notable instances of shoulder widening.  *See id.*

It is theoretically possible that some or all of this widening of Skutumpah road was both reasonable and necessary in light of the pre-1976 uses of the road.  If so, this widening would be part of the current scope.  But it is Plaintiffs' burden to so demonstrate, and Plaintiffs have failed to meet their burden here.  And the Court may not simply presume that changes occurring over time served to expand the scope because, for example, it is possible that some of the changes seen in aerial photography were only temporary in nature.  As Plaintiffs concede, sometimes they need to temporarily disturb ground for repairs "if there was a major washout."  Pls. FoF at ¶¶ 35, 89.  Such temporary disturbances are better handled through temporary construction or repair easements, rather than permanent easements under R.S. 2477.  *See Kane (1)*, 772 F.3d at 1224-25 (proper scope does not include room for unspecified future improvements).[2]  And even if the changes seen in aerial photography may reflect longer-term construction, and even have been reasonable, this construction still might not be "necessary in light of the pre-1976 uses of the road."  *Id*. at 1223.  Plaintiffs' evidence is insufficient to allow for discernment between these or

---

[2]    Alternatively, even assuming that any such temporary ground disturbing activities are within the scope of the ROW, that does not mean that the ROW should be described as permanently including such temporary disturbances.  As discussed below, such a potential problem may be avoided with a largely qualitative scope.

other possible reasons.  At most, one can infer that Plaintiffs found this widening convenient and, presumably (for the sake of argument), reasonable.  But they have not presented any evidence that any of this widening was necessary to allow any of the pre-1976 uses of the road to continue.

**Alignment**

In addition to widening this road over time, several changes to the alignment of this road have occurred since 1976.  For example, the western end of this road (where it intersects with Johnson Canyon Road) has changed.  *See, e.g.,* D541R.  Overall, aerial photography reveals that this road has been realigned in 10 places between 1974 and 1994.  *See, e.g.,* D533R; D538R; D544R.  This Court has already considered at least some of these realignments, to attempt to determine whether these certain realignments "constitute permissible variances, such that title should be quieted in those variance[s]."  *Kane (1)*, 2013 WL 1180764 at \*60.  But, the Court also noted that it "is significant" that "these realignments occurred prior to the Tenth Circuit's decision in *SUWA"* (and, obviously, prior to the Tenth Circuit's subsequent decision in *Kane (1)*).  *Id.* at \*61.  As the Court correctly recognizes, deviations or realignments may be permissible, and within the scope of the ROW, if necessary "to avoid encroachments, obstacles, or obstructions upon the road."  *Kane (1)*, 2013 WL 1180764 at \*60 (quoting *Lindsay Land & Live Stock Co. v. Churnos*, 75 Utah 384, 285 P. 646, 649 (1929)).  In other words, "under Utah law a road 'may deviate from [its] present path, as long as such extensions are reasonable and necessary'."  *Kane (1)*, 2013 WL 1180764 at \*60 (quoting *Sierra Club v. Hodel*, 675 F. Supp. 594, 606 (D. Utah 1987), overruled on other grounds, *Village of Los Ranchos De Albuquerque v. Marsh*, 956 F.2d 970 (10th Cir.1992)).

9

Previously, this Court has "fail[ed] to see what purpose [it] would serve" for "the court to declare now that the variances are not recognized." *Kane (1)*, 2013 WL 1180764 at *61. In this regard, the Court found it significant that BLM "did not wish to proceed with its [trespass] claims" and "stipulated [to] dismissal of the 1996 trespass action," without any "require[ment for] Kane County to restore Skutumpah to its historical path." *Id*. But the question presently before the Court is *not* whether Kane County may ever need "to restore Skutumpah to its historical path." At least to date, Plaintiffs have not been asked to restore or remediate these realignments, and no part of the pleadings in this case involve this situation. Rather, the question before the Court is whether Plaintiffs have rights to the current alignment, or whether that current alignment is merely permissive. As this Court has correctly noted, the answer to that question turns on whether those realignments are both reasonable and necessary, such as "to avoid encroachments, obstacles, or obstructions upon the road." *Id.* at *60 (citations omitted). Again, it is theoretically possible that these realignments of Skutumpah road were both reasonable and necessary in light of the pre-1976 uses of the road. However, Plaintiffs have failed to meet their burden here. At most, one can infer only that Plaintiffs found these realignments convenient and, presumably (for the sake of argument), reasonable. *See Id.* at *61 (noting that "[t]he purpose of The Realignments was to improve safety and the condition of the road"). But Plaintiffs have not presented any evidence that these realignments (even if to "improve safety and the condition of the road") were necessary to allow any of the pre-1976 uses of the road to continue. Simply "improv[ing] safety" cannot be enough. Many improvements (such as road widening, or upgrading the surface) may improve safety. But not every possible safety enhancement or other improvement is within the scope of the ROW. Plaintiffs need to establish not only that safety

10

may be improved, but that this improvement is both "reasonable and necessary in light of the pre-1976 uses of the road." *Kane (1)*, 772 F.3d at 1223. Because Plaintiffs have not even attempted to establish this, the Court should not include these realignments in the current scope.

### Features

The size and number of ancillary features (such as drainage runouts) has also changed since 1976. Aerial photography reveals that forty-eight additional features have been created between 1974 and 2018, and that many of the features existing in 1976 have been altered or improved (such as by lengthening). *See* Trial Tr. 446:1-447:19; D529R; D538R; D539R; D542R; D543R.

It is theoretically possible that these improvements associated with the Skutumpah road were both reasonable and necessary in light of the pre-1976 uses of the road. However, as previously discussed, Plaintiffs have failed to meet their burden here. At most, one can only infer that Plaintiffs found these additional or improved features convenient and, presumably (for the sake of argument), reasonable. But Plaintiffs have not presented any evidence that any of these specific changes were necessary to allow any of the pre-1976 uses of the road to continue. Because Plaintiffs have not even attempted to establish this, the Court should not include any new or improved features in the current scope.

### The presently specified proposed improvement

The above questions of current scope all involve changes to the road already made since 1976, and the question of whether these changes should be included in the present scope. But this particular claim also presents an additional issue -- whether the present scope should include a presently specified proposed improvement. This proposed improvement seeks to undertake

11

some realignment of the southern portion of the road and, most significantly, seeks to pave this section of road. *See, e.g.,* Pls. FoF at ¶ 103; P417R. As with the above questions of scope, to the extent that Plaintiffs want to claim that an improvement is within the scope of the right-of-way, it is their burden to prove that such a change is both reasonable and necessary in light of the pre-1976 uses of the road. Again, Plaintiffs have failed to meet their burden here.

This question of scope differs slightly, however, from the above questions involving only changes already made to the road between 1976 and today. That is because there is "a precise order of actions for holders of rights-of-way seeking improvements. First, they consult with the BLM as to the proposed improvements; then, '[i]n the event of a disagreement, the parties may resort to the courts'." *Kane (1)*, 772 F.3d at 1224 (quoting *SUWA*, 425 F.3d at 748). *See also Hodel*, 848 F.2d at 1084 ("[T]he initial determination of whether activity falls within an established right-of-way is to be made by the BLM and not the court" (citation omitted)); Pls. PTB at 5 (quoting *Hodel*); Pls. FoF at ¶ 102. That order has practical consequences. In particular, this means that this Court will effectively be limited to reviewing evidence that had previously been before BLM as part of the consultation. Otherwise, this "precise order of actions" cannot hold.

Plaintiffs' suggestion -- that the United States is arguing "that a challenge to that decision must by-pass the Court and be taken as an administrative appeal limited to the evidence in the record before the agency" -- is incorrect. Pls. PTB at 3. The United States has never advanced this position in this litigation. Rather, the United States has simply advocated within the bounds of the above established principles -- i.e., that there is "a precise order of actions for holders of rights-of-way seeking improvements." *Kane (1)*, 772 F.3d at 1225 (quoting *SUWA*, 425 F.3d at

748).  *See also Hodel*, 848 F.2d at 1084; Pls. PTB at 5 (quoting *Hodel*).  Plaintiffs' argument is not clear, but to the extent that they take the position that they can bring some pro forma application to BLM for consultation, then proceed to court using evidence never considered by BLM, such an argument should be rejected.  It would fail to honor the consultation requirement.

This also seems to be an academic issue not currently presented by this case, as Plaintiffs do not appear to advocate for their scope based on any evidence not first brought to BLM as part of the consultation.  Instead, Plaintiffs appear to rely on the statement in *SUWA* that, "[o]n remand, the parties are permitted to introduce evidence regarding the validity and scope of the claims, including, but not limited to, the evidence contained in the administrative record before the BLM."  Pls. PTB at 7 (quoting *SUWA*, 425 F.3d at 758).  Reliance on this statement from *SUWA* puts too much weight onto the "not limited to" clause.  As an academic matter, perhaps it is possible that some proper evidence on remand may not have already been before BLM.  And perhaps that will relate to scope, or perhaps that will just relate to validity.  But even if it is somehow possible that some evidence about scope may not have already been before BLM, this cannot change the more fundamental and general requirement that the "precise order of actions" be followed and the holder first consult with BLM, and only then "resort to the courts."  As explained herein, while Plaintiffs did first consult with BLM, they failed to present sufficient evidence of the necessity of the proposed improvement, and have still failed to present sufficient evidence of the necessity of the proposed improvement to this Court.  That is enough to resolve this issue in the United States' favor.

Here, Plaintiffs have presented evidence that this proposed improvement would be convenient for them, and objectively reasonable.  *See, e.g.*, Pls. PTB at 14 (noting testimony

13

from their expert that only established that, "from an engineering standpoint, none of the proposed construction is unreasonable or unwarranted"). But Plaintiffs have not presented evidence that the proposed improvement would be "necessary" to allow any of the pre-1976 uses of the road to continue. To be sure, there is some evidence that the proposed improvement would improve safety. *See, e.g.*, Pls. FoF at ¶¶ 103, 109, 114. But, as discussed above, that alone is insufficient. Plaintiffs need to establish not only that safety may be improved, but that this improvement is both "reasonable and necessary in light of the pre-1976 uses of the road." *Kane (1)*, 772 F.3d at 1223. Because Plaintiffs have not even attempted to establish this, the Court should not include the proposed improvement as part of the current scope for this ROW.

The United States notes that this does not mean that Plaintiffs are without the ability to improve this road, including by pursuing the specific improvement they currently propose. Plaintiffs have other options. *See, e.g.*, Pls. FoF at ¶¶ 29, 31, 33 (noting Title V ROWs obtained to make certain road improvements). This just means that Plaintiffs have failed to prove that they have a *right* to this specific proposed improvement and, thus, they may need to work with BLM in order to undertake this work.

Plaintiffs also appear to misunderstand the nature of their R.S. 2477 rights when they discuss the more recent increases in "ATV/UTV numbers." Pls. FoF at ¶ 105. These ATV uses post-date their rights, which accrued no later than 1976, and thus are themselves outside of these rights. Plaintiffs' complaints about BLM management of the area, *see, e.g., id*. at ¶¶ 103-05 (complaining about "increased visitation" to the Monument, and noting that "BLM has installed trailheads, parking, and restrooms"), are similarly misplaced. The United States remains in charge of the overall management of the lands traversed by the Plaintiffs' R.S. 2477 rights-of-

14

way.  Plaintiffs' R.S. 2477 rights do not somehow make it also in charge of management of the area.  These rights simply allow Plaintiffs to continue pre-1976 uses of the easement across federal lands.

To be sure, if federal management or post-1976 uses impinge upon the ability to continue the pre-1976 easement uses, then that may make certain improvements both reasonable and necessary to allow for the continuation of the pre-1976 uses in light of these changed circumstances.  But although Plaintiffs have presented evidence of various pre-1976 uses (such as hunting or ranching), they have failed to present any evidence showing that any of these pre-1976 uses cannot reasonably continue without the proposed improvement.[3]  Indeed, the evidence presented uniformly shows that these uses can and do continue, even without the proposed improvement.  Perhaps that is because the County has increased its maintenance work on this road beyond the bare minimum required under State law for a Class B road.  In fact, an attempt to reduce maintenance costs appears to be a major driver of this project.  *See, e.g.*, Pls. FoF at ¶¶ 106, 116-17, 153.  But Plaintiffs' reasonable desire to reduce their maintenance costs does not by

---

[3]    The United States does not concede that uses for hunting or ranching qualify for protection under R.S. 2477 unless they are also somehow germane to the rights granted for the construction of highways.  *Cf.* Pls. PTB at ¶ 181 (noting the purpose of R.S. 2477 was "to encourage the building of highways over the public domain" (citation omitted)); *id.* at ¶ 183 (similar).  But this issue of qualifying uses is not well presented here, where the existence of a right-of-way has already been determined, and remand is limited to questions of scope.  This issue is better presented in the parallel "bellwether" litigation in *Kane (2)*, and the United States reserves its arguments on this issue for that case.  For present purposes, as discussed herein, even assuming that pre-1976 uses for things like hunting and ranching are protected under R.S. 2477, Plaintiffs have nonetheless failed to establish that the proposed improvement is necessary to allow for the continuation of these uses.

itself also make the improvement "necessary in light of the pre-1976 uses of the road." *Kane (1)*, 772 F.3d at 1223.

**Defining scope**

In light of the above issues, the United States suggests that the scope be defined qualitatively, rather than quantitatively, such as by noting that "Skutumpah Road is a major two-lane thoroughfare with a travel surface of 24-28 feet," *Kane (1)*, 772 F.3d at 1223, and leaving specific questions of alignment or realignment for when those questions actually arise. In any event, Plaintiffs' proposed scope is not supported by the record, and thus must be rejected.[4] Indeed, while the United States has presented some level of quantitative details, Plaintiffs appear to reject them, *see, e.g.,* Pls. FoF at ¶¶ 170-71 (calling these measurements "subjective interpretations" that "may have been off on something that is as wide as 12 feet" and based on "limitations in [the] data"), and, in any event, quantitative scopes will be more time consuming. While not an insurmountable task for these three road claims, that task may be too unwieldy to be replicated over potentially thousands of claims. Moreover, this time-consuming level of detail seems unnecessary at this time.

Notably, a qualitative scope has already been used by the Tenth Circuit in *Hodel*, where the Court declined to set "the precise width [for] this road easement." *Hodel*, 848 F.2d at 1084; *see also* Pls. PTB at 15 (similarly quoting *Hodel*); Pls. FoF at ¶ 198 (similar). Here, the evidence

---

[4]    Plaintiffs' proposal for "a 50-foot right-of-way for the north section of the Skutumpah Road," Pls. PTB at 12, is all the more curious given that it is a radical departure from what they proposed in the *Kane (2)* bellwether. In that case, Plaintiffs proposed no more than "a standard right-of-way of 26 feet" for what they called "Category 4 roads." *Kane (2)*, State of Utah's Post Trial Brief [ECF No. 668] at 47; *id.*, Kane County's Post Trial Brief [ECF No. 670] at 8 (adopting the State's proposal).

supports a scope for the Skutumpah Road as an improved dirt and gravel two-lane road (with less improvement at its northern end), generally following a historic alignment. *See, e.g.*, D516R (1974 photomosaic); DX NNNN.

If, however, the Court seeks a quantitative scope, the width for this road should be set at its 1976 values -- using either this Court's prior holding in this regard -- "the south end was approximately 20 feet wide and the north end was not quite as wide as 20 feet," *Kane (1)*, 2013 WL 1180764 at *12; or using the 1974 aerial photographs -- ranging at the south end of the Skutumpah road from 16.6 to 36.4 feet (travel surface), and from 16.6 to 71.5 feet (total disturbance), *see* D532R, and at the north end of the road from 9.9 to 49.6 feet (travel surface) and from 11.6 to 100.7 feet (total disturbance), *see* D537R. Of course, this is not to suggest that Plaintiffs can do whatever they want within this width. They cannot. And this limitation has been well established since at least *SUWA v. BLM*. In that case, the Tenth Circuit rejected an argument that Plaintiffs are simply free to do whatever they want within a ROW, "as long as their activities are conducted within the physical boundaries of a right of way." *SUWA*, 425 F.3d at 747. As the Tenth Circuit noted, "this misconceives the nature of a right of way. A right of way is not tantamount to fee simple ownership of a defined parcel of territory. Rather, it is an entitlement to use certain land in a particular way." *Id.; see also* Pls. PTB at 9 ("Rights-of-way are a species of easements and are subject to the principles that govern the scope of easements" (quoting *Hodel*, 848 F.2d at 1083)); Pls. FoF at ¶ 189 (same). Thus, to the extent that this Court sets the overall boundaries of this ROW based on the width of the travel surface and overall surface disturbances present in 1976, that does not mean that Plaintiffs can do whatever they

17

want within this scope.  Rather, this simply means that within this overall scope, Plaintiffs are further limited to using this "land in a particular way."

Plaintiffs attempt to make something of the fact that the Tenth Circuit in *Hodel* approved of a limited expansion beyond the 1976 footprint of a road in question as "'reasonable and necessary to ensure safe travel' in light of the pre-1976 uses[.]"  Pls. PTB at 8 (quoting *Kane (1)*, 772 F.3d at 1223, quoting *Hodel*, 848 F.2d at 1083).  Plaintiffs appear to argue that since the pre-1976 uses of the roads now at issue appear to be similar to those pre-1976 uses of the road at issue in *Hodel*, and since a court has done this before, this Court can simply approve broader present-day scopes for these three roads now at issue.  Indeed, Plaintiffs' argument for scope in their post-trial brief is essentially nothing but this apparent argument.  *See* Pls. PTB at 11-15 (repeatedly citing *Hodel*).  But this apparent argument misunderstands *Hodel*.

In *Hodel*, the Tenth Circuit noted the deficiencies in the record created there made it such that the court could "not decide the precise width of this road easement[.]"  *Hodel*, 848 F.2d at 1084; *see also* Pls. PTB at 15 (similarly quoting *Hodel*).  And Plaintiffs face the same problem here.  While they were entitled to try to make a record on remand that could support a precise width for their scope, they have failed to do so.  Indeed, the best evidence in the record comes from the United States' measurements for this road.  But, as discussed above, while these measurements show expansion in certain areas after 1976, they do not show that any of this expansion was both "reasonable and necessary in light of the pre-1976 uses of the road." *Kane (1)*, 772 F.3d at 1223.  Yet such a showing by the Plaintiffs is required to obtain rights for an expanded width.

To be sure, in *Hodel*, the Tenth Circuit did uphold a general right (i.e., without any "precise width") to a specified improvement to "extend the roadway and its accoutrements (e.g., ditches, culverts) physically beyond the boundaries of the existing right-of-way" -- effectively "widening to two lanes[.]" *Hodel*, 848 F.2d at 1084 (emphasis removed). But, as the Tenth Circuit noted, that was because "the initial determination of whether activity falls within an established right-of-way is to be made by the BLM and not the court," *id.* (citation omitted), and, in that case, "[t]he district court [could] base[] its finding of fact largely on the testimony and exhibits of several BLM experts . . . [which] found that the entire proposal fell within [the scope of] the right-of-way," *id.* at 1084-85. The present situation, by contrast, is quite dissimilar from the situation in *Hodel*. Here, as Plaintiffs admit, BLM considered the proposed improvement but "decided the Project is reasonable but not necessary." Pls. PTB at 15; Pls. FoF at ¶¶ 135, 159; PX 420, 421. Thus, rather than support Plaintiffs' claimed scope, *Hodel* instead amply illustrates the deficiencies of Plaintiffs' case on remand.

A closer question is whether the scope should include the effectively abandoned prior alignments. But *Hodel* also provides an answer to this question -- it should not. As *Hodel* noted, "all uses before October 21, 1976, *not terminated or surrendered*, are part of an R.S. 2477 right-of-way." *Hodel*, 848 F.2d at 1084 (emphasis added). Here, the evidence is clear that certain pre-1976 uses have been terminated. Which means that certain specific aspects of the scope established in 1976 have since been "terminated or surrendered" through non-use. But this is only a problem for Plaintiffs if they attempt to establish a quantitative scope. As noted above, with the decree of a right-of-way already made, Plaintiffs have "an entitlement to use certain land in a particular way." *SUWA*, 425 F.3d at 747. Qualitatively, that means Plaintiffs have a

19

scope that supports their right for the Skutumpah Road as an improved dirt and gravel two-lane road (with less improvement at its northern end), generally following a historic alignment. *See, e.g.*, D516R (1974 photomosaic); DX NNNN.

Such a qualitative scope is fully consistent with this Court's prior statements that Plaintiffs should not have "two alternative routes in Skutumpah." *Kane (1)*, 2013 WL 1180764 at *62. If Plaintiffs could prove specific rights to the realigned sections, then the United States would agree that the Court should "vacate[] Plaintiffs' rights in the old route" if "those rights have been superseded by their right-of-way in the realigned sections." *Id.* But, as noted, at present, Plaintiffs are unable to prove they have any specific rights to the realigned sections, because they have failed to show that any of these realignments were both "reasonable and necessary in light of the pre-1976 uses of the road." *Kane (1)*, 772 F.3d at 1223. A qualitative scope avoids these present difficulties.

Similarly, at this time, the Court should not include in the qualitative scope any of the specific additional or improved features. Rather, the qualitative scope should include the historic features (to the extent that they have continued to the present), and the general, qualitative right to drainage features, but to the extent that any new or different features are proposed, they would need to be analyzed like any other proposal to determine whether they constitute routine maintenance or an improvement and, if an improvement, whether they are both "reasonable and necessary in light of the pre-1976 uses of the road." *Kane (1)*, 772 F.3d at 1223.

20

IV.    SCOPE FOR SWALLOW PARK / PARK WASH ROAD (K4360D) (Class D Portion)

A.    Scope in 1976

This Court's previous rulings about the scope of the Swallow Park / Park Wash road in 1976 were largely qualitative.  The Court described the road in the summer of 1979 as "less-obviously maintained, sandier and narrower so that it was only the width of one vehicle, and the southern-most part of the route traveled for a portion of its distance in a wash." *Kane (1)*, 2013 WL 1180764 at *25.

The United States presented some quantitative evidence at the remand trial.  Based on 1974 aerial photographs, it appears that this road had an average travel surface width of 12.2 feet, with a range from 5.8 to 22.3 feet, and with no visibly different range of total disturbance. *See* Trial Tr. 462:5-7; 22-23; D545R; D546R.  No design features (such as drainage features) were observed. *See* Trial Tr. 463:10-14; D547R.  Aerial photographs taken in 1976 are in accord, but of lesser resolution, making these 1974 aerial photographs the most accurate evidence available of the scope as of the date of the repeal of the statute. *See* Trial Tr. 393:16-394:13; D520R.

B.    Current Scope

The Court has already noted that at the time of a County GPS project in approximately 2007/08, *see* PX 6, 9, 11, "the estimated travel surface was 10 to 12 feet wide, with a disturbed area width of 14 feet." *Kane (1)*, 2013 WL 1180764 at *25.  The Court also noted that in December of 2010, "the road was a single lane dirt road." *Id.* at *26; *see also* Pls. FoF at ¶¶ 58, 207 (similar description for the Court's subsequent site visit in 2022).

21

Based on 2018 aerial photographs, it appears that this road had largely narrowed slightly, with an average travel surface width of 10.1 feet, with a range from 7.5 to 19.2 feet, and still with no visibly different range of total disturbance.  *See* Trial Tr. 462:11-25, 463:3-4; D545R; D546R. There were still no design features (such as drainage features) observed.  *See* Trial Tr. 463:10-14; D547R.  There were however, some signs of realignments, road widening in spots, and side road creation.  *See* Trial Tr. 463:15-23; D547R.

As with the Skutumpah Road, Plaintiffs have failed to meet their burden here to prove whether any of these post-1976 changes should be considered as part of the scope of their ROW (as opposed to merely being permissive changes not part of their rights).  That is because Plaintiffs cannot establish that any of these post-1976 changes were both reasonable and necessary in light of the pre-1976 uses of the road.  *E.g.*, *Kane (1)*, 772 F.3d at 1223.

Similar to the Skutumpah Road, the United States suggests that the scope be described more qualitatively than quantitatively.  Here, the evidence supports a scope for the Class D portion of the Swallow Park / Park Wash Road (K4360D) as already described by this Court -- "a single lane dirt road."  *Kane (1)*, 2013 WL 1180764 at *26; *see also* Pls. FoF at ¶¶ 58, 207.  If, however, Plaintiffs seek a quantitative scope, the width for this road should be set at its 1976 values (as established by the 1974 aerial photographs), notwithstanding Plaintiffs complaints about the analysis of this photography, *see* Pls. FoF at ¶¶ 170-71.

The United States does agree with Plaintiffs that although this is a one lane road, the evidence also establishes the ability to pass, *so long as* one party pulls over and, importantly, does not create any new lasting ground disturbance.  But if that is all Plaintiffs mean when they seek an 18-foot right-of-way for this road, then a qualitative scope would seem the better way to

22

establish this limited right of passage.  Moreover, as noted above, if scope is described in this way, that does not mean that Plaintiffs can do whatever they want within this scope.  Rather, this simply means that within this overall scope, Plaintiffs are further limited to using this "land in a particular way."  *See SUWA*, 425 F.3d at 747; Pls. PTB at 9 (quoting *Hodel*, 848 F.2d at 1083); Pls. FoF at ¶ 189 (same).  Which means (among other things) that they are generally limited to ground disturbances already established in 1976, to the extent that those ground disturbances have continued to the present day rather than be terminated or surrendered through non-use, but that users may pull over to allow for passage so long as they both stay within this quantitative scope and do not create any new lasting ground disturbances.

V.      SCOPE FOR NORTH SWAG ROAD (K4370)

        A.      Scope in 1976

        This Court's previous rulings about the scope of the North Swag road in 1976 were largely qualitative.  The Court described the road in the summer of 1979 as "a two track route through the surrounding sagebrush that got very sandy as one went southeast."  *Kane (1)*, 2013 WL 1180764 at *29.  The Court also noted that the "road crosses a feature called the 'Sand Ridge,' which is less than a mile from where the North Swag road intersects with the Swallow Park/Park Wash road.  It is a rock ledge in a sandy area that makes travel over this section of North Swag difficult, particularly in summer when the soil is dry."  *Id.* (citation omitted).

        The United States presented some quantitative evidence at the remand trial.  Based on 1974 aerial photographs, it appears that this road had an average travel surface width of 8.9 feet, with a range from 5.4 to 21.4 feet, and with no visibly different range of total disturbance.  *See* Trial Tr. 467:10-15; D548R; D549R.  Three drainage features were also observed.  *See* D550R.

23

Aerial photographs taken in 1976 are in accord, but of lesser resolution, making these 1974 aerial photographs the most accurate evidence available of the scope as of the date of the repeal of the statute. *See* Trial Tr. 393:16-394:13; D520R.

### B.    Current Scope

This Court has already noted that at the time of a County GPS project in approximately 2007/08, *see* PX 6, 9, 11, the County had "estimated the travel surface of North Swag was 10 feet wide" and "[t]he estimated width of the prior disturbed area was 14 feet." *Kane (1)*, 2013 WL 1180764 at *29. Although one of Plaintiffs' witnesses also testified that "1996 photographs showed the travel width was a little more than 8 feet." *Id.* The Court also noted that in December of 2010, the road "was a primitive single lane road crossing dirt and sand." *Id. See also* Pls. FoF at ¶¶ 76, 207 (similar description for the Court's subsequent site visit in 2022); *id.* at ¶¶ 62-64 (noting that one would have to pull over to allow another vehicle to pass).

Based on 2018 aerial photographs, it appears that this road had largely widened slightly, with an average travel surface width of 9.6 feet, with a range from 5.6 to 17.9 feet, and still with no visibly different range of total disturbance. *See* Trial Tr. 467:16-23; D548R; D549R. But only one drainage feature was then observed. *See* D550R. There were also some signs of realignments, pullout or shoulder expansion, and side road creation. *See* Trial Tr. 470:4-10; 470:22-471:6; D550R, D551R.

As with the other roads discussed above, Plaintiffs have failed to meet their burden here to prove whether any of these post-1976 changes should be considered as part of the scope of their ROW (as opposed to merely being permissive changes not part of their rights). That is

24

because Plaintiffs cannot establish that any of these post-1976 changes were both reasonable and necessary in light of the pre-1976 uses of the road. *E.g.*, *Kane (1)*, 772 F.3d at 1223.

Similar to the other roads discussed above, the United States suggests that the scope be described more qualitatively than quantitatively. Here, the evidence supports a scope for the North Swag Road (K4370) as already described by this Court -- "a primitive single lane road crossing dirt and sand." *Kane (1)*, 2013 WL 1180764 at *29; *see also* Pls. FoF at ¶¶ 76, 207. If, however, Plaintiffs seek a quantitative scope, the scope for this road should be set at its 1976 values (as established by the 1974 aerial photographs), notwithstanding Plaintiffs complaints about the analysis of this photography, *see* Pls. FoF at ¶¶ 170-71.

The United States again agrees with Plaintiffs that although this is a one lane road, the evidence also establishes the ability to pass, *so long as* one party pulls over and, importantly, does not create any new lasting ground disturbance. *See* Pls. FoF at ¶¶ 62-64 (noting that one would have to pull over to allow another vehicle to pass). But if that is all Plaintiffs mean when they seek an 18-foot right-of-way for this road, then a qualitative scope would seem the better way to establish this limited right of passage. Moreover, as noted above, if scope is described in this way, that does not mean that Plaintiffs can do whatever they want within this scope. Rather, this simply means that within the ROW, Plaintiffs are further limited to using this "land in a particular way." *See SUWA*, 425 F.3d at 747; Pls. PTB at 9 (quoting *Hodel*, 848 F.2d at 1083); Pls. FoF at ¶ 189 (same). Which means (among other things) that they are generally limited to ground disturbances already established in 1976, to the extent that those ground disturbances have continued to the present day rather than be terminated or surrendered through non-use, but

25

that users may pull over to allow for passage so long as they both stay within this quantitative scope and do not create any new lasting ground disturbances.

## CONCLUSION

This remand trial presented an opportunity to apply the correct standard for scope set out by the Tenth Circuit in this case, *Kane (1)*, 772 F.3d 1205.  And the correct application of this standard to these three claims could have helped guide any and all remaining valid claims, among the many related lawsuits and their thousands of claims to quiet title for asserted R.S. 2477 rights-of-way across federal public lands.  But Plaintiffs have failed to take advantage of this opportunity, and they have done nothing to define their scope beyond the 1976 width already established earlier in this case in *Kane (1)*, 2013 WL 1180764.  That is because, although the current width of an R.S. 2477 ROW may be expanded beyond that as it existed in 1976, such an expansion must be proved, by clear and convincing evidence, to be both "reasonable and necessary in light of the pre-1976 uses of the road."  *Kane (1)*, 772 F.3d at 1223; *see also Hodel*, 848 F.2d at 1083-84.  Plaintiffs here have failed to meet their burden of establishing that post-1976 improvements are both reasonable and necessary.

While this remand trial failed to fulfill its potential to help guide any expanded (post-1976) scope claims for any and all remaining valid claims, it nonetheless should help guide these future claims by even more clearly establishing the requirements necessary for Plaintiffs to meet their burdens for any such future claims.

Respectfully submitted this 4th day of August, 2023,

TODD KIM
Assistant Attorney General

*/s/ Joseph H. Kim*

26

JOSEPH H. KIM, Trial Attorney
Natural Resources Section
Environment and Natural Resources Division
United States Department of Justice
P.O. Box 7611
Washington, D.C. 20044-7611
(202) 305-0207

TRINA A. HIGGINS (7349)
United States Attorney
District of Utah
MELINA SHIRALDI (13110)
Assistant U.S. Attorney
CAMERON B. JOHNSON (13996)
Special Assistant U.S. Attorney
MICHAEL D. SMITH
Special Assistant U.S. Attorney
111 South Main Street, Suite 1800
Salt Lake City, UT 84111
(801) 524-5682

*Attorneys for Defendant United States of America*

27