**SOUTHERN UTAH
WILDERNESS ALLIANCE**
Stephen H.M. Bloch (7813)
Michelle White (16985)
425 East 100 South
Salt Lake City, UT 84111
Telephone: (801) 486-3161

**MANNING CURTIS
BRADSHAW & BEDNAR PLLC**
Mitch M. Longson (15661)
201 South Main Street, Suite 750
Salt Lake City, UT 84111
Telephone: (801) 303-0036

**HOGGAN LEE HUTCHINSON**
Trevor J. Lee (16703)
1225 Deer Valley Dr.
Park City, UT 84060
Telephone: (435) 800-2096

Attorneys for Defendant-Intervenors
Southern Utah Wilderness Alliance and The Wilderness Society

---

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

---

| | |
|---|---|
| KANE COUNTY (1), UTAH a Utah political subdivision,<br><br>    Plaintiff,<br><br>STATE OF UTAH,<br><br>    Plaintiff-Intervenor,<br><br>v.<br><br><br>UNITED STATES OF AMERICA,<br><br>    Defendant,<br><br>SOUTHERN UTAH WILDERNESS ALLIANCE and THE WILDERNESS SOCIETY,<br><br>    Defendant-Intervenors. | **DEFENDANT-INTERVENORS' POST-TRIAL BRIEF**<br><br>Case No. 2:08-cv-00315 CW<br><br>Judge Clark Waddoups |

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................. ii

INTRODUCTION ......................................................................................................... 1

I.    STANDARD OF PROOF ...................................................................................... 2

II.   Limitations of the Mandate ................................................................................. 2

III.  Legal Framework ................................................................................................ 3

    A.    R.S. 2477 and the Federal Land Policy and Management Act. ..................... 3

    B.    Adjudicating R.S. 2477 rights-of-way: an integrated two-step process. ......... 5

        1.    Title .................................................................................................... 6

        2.    Scope .................................................................................................. 8

IV.   This Court should make both quantitative and qualitative scope determinations for pre-October 21, 1976 conditions. ........................................................................ 22

V.    Application to remaining Kane 1 claims ........................................................... 23

    A.    Skutumpah ................................................................................................ 24

        1.    Width of the Travel Surface and Highway Appurtenances. ................ 24

        2.    Physical Condition. ............................................................................ 24

        3.    Proposed Paving Project. ................................................................... 25

    B.    Swallow Park/Park Wash "D" segment. .................................................... 28

        1.    Width of the Travel Surface and Appurtenances. .............................. 28

        2.    Physical Condition. ............................................................................ 30

    C.    North Swag ............................................................................................... 31

        1.    Width of the Travel Surface and Appurtenances. .............................. 31

        2.    Physical Condition. ............................................................................ 32

CONCLUSION ............................................................................................................ 33

# TABLE OF AUTHORITIES

**Cases**

*Barber v. Int'l Bhd. of Boilermakers,* 841 F.2d 1067 (11th Cir.1988) ............................................ 2

*Heber City Corp. v. Simpson*, 942 P.2d 307 (Utah 1997) .......................................................... 7, 14

*Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.*, 448 U.S. 607 (1980) ............................... 27

*Jennings Inv. LC v. Dixie Riding Club, Inc.,* 208 P.3d 1077 (Utah Ct. App. 2009) ...................... 7

*Kane Cnty. v. United States*, 2011 WL 2489819 (D. Utah June 21, 2011) ................................... 6

*Kane Cnty. v. United States*, 772 F.3d 1205 (10th Cir. 2014) ............................................... passim

*Kane Cnty. v. United States*, 928 F.3d 877 (10th Cir. 2019) ......................................................... 5

*Lindsay Land & Livestock Co. v. Churnos*, 285 P. 644 (Utah 1929) ....................................... 7, 12

*Memmott v. Anderson,* 642 P.2d 750 (Utah 1982) ....................................................................... 15

*Morris v. Blunt*, 161 P. 1127 (Utah 1916) ............................................................................... 7, 14

*Newball v. Offshore Logistics Int'l,* 803 F.2d 821 (5th Cir.1986) ................................................ 2

*Nielson v. Sandberg,* 141 P.2d 696 (1943) ................................................................................. 11

*Petersen v. Combe*, 438 P.2d 545 (Utah 1968) ............................................................................. 7

*Procter & Gamble Co. v. Haugen*, 317 F.3d 1121 (10th Cir. 2003) .............................................. 2

*S. Utah Wilderness All. v. Bureau of Land Mgmt.*, 425 F.3d 735 (10th Cir. 2005) .............. passim

*San Juan Cnty. v. United States*, 2011 WL 2144762 (D. Utah May 27, 2011) ............................. 7

*San Juan Cnty. v. United States*, 754 F.3d 787 (10th Cir. 2014) ......................................... passim

*Sierra Club v. Hodel*, 848 F.2d 1068 (10th Cir.1988) .......................................................... passim

*SRB Investment Co., Ltd. v. Spencer*, 463 P.3d 654 (Utah 2020) ............................................... 13

*United States v. Garfield Cnty.*, 122 F. Supp. 2d 1205 (D. Utah. 2000) ............................... passim

*United States v. Jenks*, 22 F.3d 1513 (10th Cir. 1994) ............................................................... 16

*United States v. Union Pacific R. Co.*, 353 U.S. 112 (1957) ....................................................... 23

*Utah Cnty. v. Butler*, 179 P.3d 775 (Utah 2008) .......................................................................... 7

*Watt v. W. Nuclear, Inc.*, 462 U.S. 36 (1983) ............................................................................. 23

**Statutes**

43 U.S.C. § 1701 .............................................................................................................................. 4

43 U.S.C. § 1732 ......................................................................................................................... 4, 18

43 U.S.C. § 1761 ........................................................................................................................ 4

An Act granting the Right-of-way to Ditch and Canal Owners over the Public Lands, and for

    other Purposes, ch. 262, § 8, 14 Stat. 251, 253 (1866) ............................................................ 3

Utah Rev. Stat., Title 25, Ch. 1, § 1114 (1898) ...................................................................... 6

 **Rules**

Fed. R. Civ. P. 24(a) ................................................................................................................. 5

**Treatises**

28A C.J.S. Easements § 143, at 344 (1996)) ............................................................................ 5

**Other Authorities**

Mem. Decision, Findings of Fact, Conclusions of Law, and Order [ECF No. 236] ............. passim

**INTRODUCTION**

SUWA agrees with the United States that the Court has previously (1) determined that Plaintiffs have title to R.S. 2477 rights-of-way for the Skutumpah, Swallow Park/Park Wash, and North Swag roads, and (2) identified pre-1976 uses of the roads. U.S. Br. at 2. However, the remaining question before the Court is not whether the rights-of-way should be widened from the condition they existed in as of October 21, 1976. *See id*. Rather, this Court's role is to determine the scope of the rights Plaintiffs had acquired as of October 21, 1976, by accepting R.S. 2477's grant for the construction of highways.

As the Tenth Circuit reiterated in 2014 "R.S. 2477 rights-of-way were *preserved 'as they existed on the date of passage' of the FLPMA, October 21, 1976.*" *Kane Cnty. v. United States*, 772 F.3d 1205, 1223 (10th Cir. 2014) (quoting *Sierra Club v. Hodel,* 848 F.2d 1068, 1083 (10th Cir.1988)) (emphasis added). After that date, the public no longer had a right to engage in construction of highways across public lands, or to make changes or improvements thereto. *See id*. at 1224-25. Instead, to make changes or improvements to an R.S. 2477 right-of-way after October 21, 1976, the holder must coordinate with the federal land management agency and afford the agency an opportunity to both determine if the change or improvement is within the scope of the right-of-way and to carry out its statutory duties through a process known as consultation. *Id*. A federal court has no authority to determine if post-1976 changes or improvements to R.S. 2477 are within the scope of a right-of-way until consultation has been completed. *See id*.

Here, consultation has not occurred for any post-1976 changes or improvements to the rights-of-way, except for the proposed paving project for the southernmost end of the Skutumpah

1

Road. Therefore, this Court is limited to determining the scope of the rights-of-way as they existed on October 21, 1976 (aside from the proposed paving project for the Skutumpah Road). And, even if this Court could consider in the first instance post-1976 changes or improvements to the rights-of-way, Plaintiffs have failed to carry their burden to establish that any change or improvement is reasonable and necessary (including the proposed paving project).

## I.    STANDARD OF PROOF

SUWA agrees with Plaintiffs and the United States "that the Court should continue to apply the clear and convincing evidence burden of proof." U.S. Br. at 4 (internal quotations omitted).

## II.    LIMITATIONS OF THE MANDATE

Evidence of the public's uses of the R.S. 2477 rights-of-way should be limited to evidence that was part of the record during the original litigation because allowing Plaintiffs to introduce new evidence is outside the mandate of the Tenth Circuit.

The mandate rule is a corollary to the law of the case doctrine intended to prevent re-argument of issues already decided. *Procter & Gamble Co. v. Haugen*, 317 F.3d 1121, 1132 (10th Cir. 2003). On remand, the district court is bound to follow the mandate, which controls all matters either expressly or impliedly resolved on appeal. *See id*. at 1126 (citing *Newball v. Offshore Logistics Int'l,* 803 F.2d 821, 826 (5th Cir.1986)). "The mandate consists of our instructions to the district court at the conclusion of the opinion, and the entire opinion that preceded those instructions." *Id*. (citing *Barber v. Int'l Bhd. of Boilermakers,* 841 F.2d 1067, 1071 (11th Cir.1988)).

2

When the Tenth Circuit remanded this case, it expressly stated that this Court had already "made substantial factual findings regarding pre–1976 uses of Swallow Park and North Swag" as part of the title determination and remanded for the express purpose of allowing this Court to "consider [those] findings in evaluating [the] scope." *Kane Cnty.*, 772 F.3d at 1223–24.[1] The Circuit also remanded for the specific purpose of allowing this Court to set a scope for the rights-of-way that did not include consideration of unspecified, future improvements. *Id*. at 1225. The plain language of the Circuit's opinion makes clear that the facts necessary for this Court's scope determination were already established and that, on remand, this Court was limited to applying those facts to the correct legal standard. The mandate does not allow for this Court to permit Plaintiffs a second chance to carry their burden of proof by introducing new evidence regarding the public's use of the rights-of-way prior to October 21, 1976. Thus, to the extent Plaintiffs rely on any new evidence of such uses, the Court should disregard such evidence and rely only on its prior "substantial factual findings."

## III.   LEGAL FRAMEWORK

### A.   R.S. 2477 and the Federal Land Policy and Management Act.

R.S. 2477, a Reconstruction-era statute, provided "the right-of-way for the construction of highways over public lands, not reserved for public uses, is hereby granted." An Act granting the Right-of-way to Ditch and Canal Owners over the Public Lands, and for other Purposes, ch. 262, § 8, 14 Stat. 251, 253 (1866) (codified at 43 U.S.C. § 932), *repealed by* Federal Land Policy

---

[1] During the original litigation Plaintiffs also provided evidence of the uses of the Skutumpah Road that contributed to this Court quieting title of that road in their favor. *See* Kane Cnty. Mem. In Supp. of Mot. for Partial Summary Judgement, ECF 120 at 38-41.

and Management Act of 1976, Pub.L. No. 94–579, § 706(a), 90 Stat. 2743, 2793. Thus, R.S. 2477 was a "grant of public property to those who proved to be enterprising enough to construct a highway across the public domain." *United States v. Garfield Cnty.*, 122 F. Supp. 2d 1201, 1215 (D. Utah. 2000).

On October 21, 1976, Congress enacted the Federal Land Policy and Management Act ("FLPMA") as a comprehensive framework for managing the use, occupancy, and development of federal public lands. 43 U.S.C. §§ 1701, 1732(b). FLPMA consummated a marked shift in public land management, from a policy of disposal to a preference of retention, conservation, and preservation. *Kane Cnty.*, 772 F.3d at 1224. Accordingly, the Act charges BLM with a duty "to prevent unnecessary and undue degradation" to all the lands and resources it manages. 43 U.S.C. § 1732(b). Since 1976, BLM has exercised authority over new grants of rights-of-way across the public lands it manages pursuant to Title V of FLPMA, which replaced a variety of historical right-of-way statutes, including R.S. 2477. *See id.* § 1761(a); *S. Utah Wilderness All. v. Bureau of Land Mgmt.* ("*SUWA*"), 425 F.3d 735, 748 n.3 (10th Cir. 2005), *as amended on denial of reh'g* (Jan. 6, 2006).

When FLPMA was enacted, "R.S. 2477 rights-of-way were preserved as they existed on the date of passage of the FLPMA, October 21, 1976." *Kane Cnty.*, 772 F.3d at 1223 (internal quotations omitted). Because there was no requirement or formal process for recording R.S. 2477 rights-of-way, disputes as to the existence and scope of these rights-of-way have become a "flash point," requiring fact-intensive adjudication by federal courts. *See SUWA,* 425 F.3d at 742; *see also San Juan Cnty. v. United States*, 754 F.3d 787, 791 (10th Cir. 2014) (citing *SUWA*, 425 F.3d at 772–76).

Although the holder has certain property rights, an R.S. 2477 right-of-way "is not tantamount to fee simple ownership," but is instead an easement, or "an entitlement to use certain land in a particular way." *SUWA,* 425 F.3d at 747. In other words, the rights of the R.S. 2477 holder are not absolute but correlative and must be balanced with the rights of the servient estate holder. *Garfield Cnty.*, 122 F. Supp. 2d. at 1242 (quoting 28A C.J.S. *Easements* § 143, at 344 (1996)).

### B.    Adjudicating R.S. 2477 rights-of-way: an integrated two-step process.

R.S. 2477 rights-of-way are adjudicated by federal courts in two sequential, but closely related steps.[2] The court first determines if the claimant has proven acceptance of the right-of-way (i.e., if they have proven their title). Second, if the claimant proves their title then the court must determine what property rights the title encompasses (i.e., the scope of the right-of-way). Although these two determinations are made by the court in separate steps, the factual underpinning of the ultimate legal conclusions have significant overlap. Therefore, although this Court previously resolved title in Plaintiffs' favor for the three rights-of-way at issue on remand, a discussion of the legal requirements for proving both title and scope will be helpful to the Court's resolution of scope here.

---

[2] The United States cites to the 10th Circuit's description of adjudication of R.S. 2477 rights-of-way as involving a three-step process in the context of an opinion addressing intervention under Fed. R. Civ. P. 24(a). U.S. Br. at 2 (citing *Kane Cnty. v. United States*, 928 F.3d 877, 884 (10th Cir. 2019)). That opinion is consistent with describing the adjudication process as involving two steps, but the 2019 intervention opinion separately describes the process of identifying which pre-1976 uses are "traditional" as a distinct item.

### 1.   Title

During the initial step of adjudicating an R.S. 2477 right-of-way, claimants must show they have title to the right-of-way grant by proving through clear and convincing evidence that R.S. 2477's statutory requirements for acceptance were met. First, they must prove that the claimed route was "constructed." *See Sierra Club*, 848 F.2d at 1078 (acceptance of an R.S. 2477 right of way "became effective upon the construction or establishing of highways"); *Kane Cnty. v. United States*, 2011 WL 2489819, at *4 (D. Utah June 21, 2011) (discussing ways in which "an R.S. 2477 road may be created in Utah" (emphasis added)). Second, in Utah they must prove that the claimed route was used as a "highway" or "public thoroughfare" for ten continuous years. *San Juan Cnty.,* 754 F.3d at 799 (explaining that R.S. 2477's grant should be read as "congruent with the common-law understanding of 'public thoroughfare'") (citation omitted). Finally, the evidence must show that construction of the highway occurred over lands that had not been "reserved," and that the R.S. 2477 grant was accepted prior to October 21, 1976 (at the latest).[3] *Id*. at 790. The first and second statutory elements—construction and use as a highway or public thoroughfare—are especially relevant to this remand.

As to the first element, construction may be achieved either by public use or by the public's "la[ying] out or erect[ing]" roads over federal land. *See Kane Cnty*., 2011 WL 2489819, at *4 (quoting Utah Rev. Stat., Title 25, Ch. 1, § 1114 (1898)). Simply put, an R.S. 2477 right-of-way cannot be accepted until the road is formed. *See SUWA,* 425 F.3d at 779.

---

[3] Whether the federal land underlying the R.S. 2477 claim was reserved prior to the enactment of FLPMA is not at issue in this remand and is, therefore, not addressed further.

As to the second element of title, the existence of a highway (i.e., a public thoroughfare) requires proof of "(i) passing or travel, (ii) by the public, and (iii) without permission." *San Juan Cnty.*, 754 F.3d at 797, 800 (quoting *Jennings Inv. LC v. Dixie Riding Club, Inc.,* 208 P.3d 1077, 1081 (Utah Ct. App. 2009)). Neither private nor permitted use of the route is relevant to establishing an R.S. 2477 right of way. Indeed, under Utah law, and consistent with congressional intent, use for private endeavors does not constitute use of the route as a public highway or demonstrate acceptance by the public. *See San Juan Cnty.*, 754 F.3d at 800 (Judge Jenkins "did not err in disregarding use under private right in considering the existence of a public thoroughfare."); *San Juan Cnty. v. United States*, 2011 WL 2144762, at *34 n.95 (D. Utah May 27, 2011) ("If the thoroughfare is used as a private way, its use, however long, as a private way, does not make it a public way.") (quoting *Morris v. Blunt*, 161 P. 1127, 1131 (Utah 1916)); *Petersen v. Combe*, 438 P.2d 545, 546 (Utah 1968) ("Such [private] property owners cannot be considered members of the public generally")). Nor is permitted use "sufficient to demonstrate public use" as a highway. *San Juan Cnty.*, 754 F.3d at 800 (citing *Heber City Corp. v. Simpson*, 942 P.2d 307, 311 (Utah 1997)). Nor, more generally, is use by "individuals with a private right to use a road" or "who have been given permission." *Utah Cnty. v. Butler*, 179 P.3d 775, 782 (Utah 2008). Thus, where roads were traveled for private use, or were used with the federal government's permission or under a permit, for example for grazing, logging, or oil drilling, such use does not constitute public use of a "highway" for purposes of R.S. 2477, and is irrelevant to the title determination. Instead, claimants must demonstrate "use 'by many and different persons for a variety of purposes,'" which purposes must be "public." *San Juan Cnty.*, 754 F.3d at 800 (quoting *Lindsay Land & Livestock Co. v. Churnos*, 285 P. 644, 648 (Utah 1929)).

7

Assuming that the claimants prove their title to an R.S. 2477 right-of-way, the evidence of the public uses of the route (established during the title step), and highway construction become the foundation of the court's second inquiry: determining the scope of the right-of-way.

### 2.     Scope

"The 'scope' of the right-of-way refers to the bundle of property rights possessed by the holder of the right-of-way." *Sierra Club*, 848 F.2d at 1079 n.9. The scope of an R.S. 2477 right-of-way is comprised of at least three aspects: (a) the physical boundaries, *see id.* at 1079 n.9, 1083–84, (b) the physical condition of the right-of-way, and (c) the public uses of the right-of-way prior to R.S. 2477's repeal (i.e., "traditional uses"), *see SUWA*, 425 F.3d at 747-48. Finally, as explained below, in (d), this Court's authority is limited to determining the scope as of 1976; review of any post-1976 changes or improvements is both predicated on prior BLM review, and can only consider evidence that was presented to BLM. *See* U.S. Br. at 12-13.

### a)   *Defining the physical boundaries and condition of the right-of-way.*

All parties seem to agree that the physical boundaries of a right-of-way include the travel surface and any appurtenances (sometimes referred to as accoutrements)[4] that were constructed to facilitate use of the right-of-way as a highway by the public as of the date R.S. 2477 was repealed. *See* Pl.'s Br. at 10-11 (discussing the travel surface width of the rights-of-way); U.S. Br. at 2. Beyond that point, the parties diverge.

The United States uses the phrase "total disturbance" to describe scope but doesn't define the term or explain how the term relates to construction that facilitated highway travel before

---

[4] Highway appurtenances are limited to those that are integral to the functioning of the highway (for example, drainage ditches). *See SUWA*, 425 F.3d at 766 (discussing 1974 BLM regulations that clarified R.S. 2477 rights-of-way are limited to highway purposes).

8

1976. *See e.g.*, *id.* at 7. Unless there is clear and convincing evidence that some particular disturbance outside the bounds of the travel surface and highway appurtenances was "constructed" by the public to facilitate highway travel prior to October 1976, then that disturbance is not a relevant or appropriate measure of the physical boundaries of the right-of-way. *See Garfield Cnty.*, 122 F. Supp. 2d at 1231-32; *see also* U.S. Br. at 8 (explaining that temporary disturbances are not within the scope of an R.S. 2477 right-of-way).

For their part, Plaintiffs also incorrectly seek a scope that is greater than the physical boundaries of the highway that had been constructed as of October 21, 1976. *See* Pl.'s Br. at 10-11. As explained *infra*, Plaintiffs' theory, if accepted, would exceed R.S. 2477's grant for the *construction* of a *highway*, and violate FLPMA's effect of "freezing R.S. 2477 rights as they were in 1976." *See SUWA*, 425 F.3d at 741. And even if Plaintiffs (in theory) could obtain scope to post-1976 improvements without BLM consultation (they cannot), in practice Plaintiffs have failed to carry their burden to prove that a width greater than what was constructed as of R.S. 2477's repeal is reasonable and necessary for any of the rights-of-way. *See, e.g.*, U.S. Br. at 2-3.

b) *Describing the physical condition of the right-of-way.*

No less important than the physical boundaries, a description of the physical condition of the right-of-way is a critical component of scope. The United States correctly points out that setting a quantitative width of the physical boundaries does not allow Plaintiffs to do whatever they want within those bounds. U.S. Br. at 17; *see SUWA*, 425 F.3d at 747. Rather, while scope includes the right to maintain the right-of-way's physical condition as of October 21, 1976 (i.e., the "status quo"), it does not include the right to improve the physical condition of the right-of-way unless and until the improvement is deemed "reasonable and necessary" in a process

9

described *infra* as consultation. *Id*. 747-48. Indeed, the Tenth Circuit has made clear that simply because an activity is conducted within the physical boundaries of a right-of-way does not mean those activities cannot constitute trespass because: "To convert a two-track jeep trail into a graded dirt road, or a graded road into a paved one, alters the use, affects the servient estate, and may go beyond the scope of the right of way." *Id.* (citation omitted). Thus, SUWA agrees with the United States that a description of the physical condition of the right-of-way is a necessary component of scope and will help ensure that the holder of the dominant estate understands what activities it may, or may not, perform as of right. *See* U.S. Br. at 20, 24-25 (describing the physical condition of the routes). The Plaintiffs' post-trial brief is silent as to this issue, though its Proposed Findings of Fact implicitly acknowledge that the physical condition of the rights-of-way is a component of scope. *See, e.g.*, Pl.'s Proposed Findings of Fact and Conclusions of Law at 16, ¶ 58 (describing alleged current condition of North Swag Road).

### c)   Defining the traditional uses of the right-of-way.

The parties agree that the scope of an R.S. 2477 right-of-way is limited by the traditional uses that were occurring as of October 21, 1976. U.S. Br. at 3; Pl.'s Br. at 7-8 (citing *Kane Cnty*., 772 F.3d at 1223). Properly understood, "traditional uses" refers to the purposes for which the right-of-way was accepted, or, in other words, the public uses of the route that have not lapsed or been abandoned. Plaintiffs' assertion that the "subjective" purpose for traveling the right-of-way is immaterial to determining the traditional uses of the route, as well as their attempt to include all pre-1976 uses of the rights-of-way (regardless of whether the uses are public or not, or have been abandoned), contravenes both state and federal law. *See* Pl.'s Br. at 9.

The right to use "an easement is limited to the original use for which it was acquired." *SUWA*, 425 F.3d at 746 (citing *Sierra Club,* 848 F.2d at 1083) (internal quotations omitted); *Nielson v. Sandberg,* 141 P.2d 696, 701 (Utah 1943). As discussed *supra,* the grant for R.S. 2477 rights-of-way was intended for highway uses by the general public. *See San Juan*, 754 F.3d at 799-800 (The limiting phrase "for the construction of highways" should be read as congruent with the common-law understanding of "public thoroughfare," and explaining that Utah law has consistently held that use under private right is distinct from use by the "public"). And, just as R.S. 2477 rights-of-way themselves can lapse or become abandoned, particular uses to which an R.S. 2477 right-of-way has been put may be abandoned, in which case such uses cannot be considered a traditional use. *See SUWA*, 425 F.3d at 748 ("[T]he traditional uses to which the right-of-way had been put, fixed as of October 21, 1976.") (citing *Sierra Club,* 848 F.2d at 1084) ("Thus, all uses before October 21, 1976, *not terminated or surrendered*, are part of an R.S. 2477 right-of-way." (emphasis added)). Therefore, "traditional uses" refers *not to just any use* of the right-of-way prior to October 21, 1976, but to the *public highway uses* that the R.S. 2477 grant was intended to benefit and that have not lapsed or been abandoned.

Plaintiffs commit at least three errors when describing the traditional uses of the routes on remand. *First*, Plaintiffs argue that a user's "subjective"[5] reason for traveling over an R.S. 2477

---

[5] Plaintiffs' characterization of the use question as being based on a user's "subjective" purpose is misleading. Pls. Br. at 9. A road user's purpose is an *objective* fact, and it is one that Plaintiffs themselves have treated as objective throughout the long history of this litigation; indeed, when someone hauls or herds cattle down a route, hunts on the route, or hauls gravel, such purposes are hardly "subjective." Plaintiffs' witnesses routinely testified to seeing other people traveling the rights-of-way at issue and what the other person's purpose was because it can be objectively observed or inferred. Thus, rather than subjective intent, it is a traveler's objective purpose for using a right-of-way that is relevant to determining the traditional uses of the right-of-way.

right-of-way is immaterial to the determination of scope and that, instead, whether a use is "traditional" should be measured by the burden that a use places on the servient estate. Pl.'s Br. at 9. Contrary to Plaintiffs' assertion, the specific purpose of travel is integral to the public's acceptance of the R.S. 2477 grant in two ways: (1) to determine if the use is "public use" and (2) if public, whether the use is varied enough to deem the route a "public thoroughfare." *See San Juan Cnty.*, 754 F.3d at 797, 800 ("as *Lindsay Land* demonstrates, frequency and variety of use were critical common-law inquiries into the acceptance of an R.S. 2477 right-of-way") (citing *Lindsay Land,* 285 P. at 648). Both of these inquiries turn on the purpose of the use. For that reason, all state and federal cases that examine R.S. 2477 rights-of-way discuss the purpose of travel as necessary to establishing the title *and* scope of the highway. *See id*.

Even if Plaintiffs' novel argument were correct (that whether a use is "traditional" does not depend on the purpose(s) of the use but on the burden placed on the servient estate, *see* Pl.'s Br. at 9), that would mean that an improvement is *never* "reasonable and necessary." Indeed, improving a road necessarily increases the burden on the servient estate. *See SUWA,* 425 F.3d at 747. Thus, if a use (such as hauling gravel) requires that the right-of-way be improved, then that use would exert a greater burden on the servient estate and would, therefore, not be a traditional use within the scope of the right-of-way according to Plaintiffs. No federal court has adopted such a view, likely because it would swallow the "traditional use" and improvement analysis whole.

*Second*, Plaintiffs mistakenly lump together different specific travel purposes into broad categories such as "economic development," and then argue these uses are all traditional because they exert the same burden on the servient estate. This is incorrect because the specific purpose

of travel is intertwined with the burden placed on the servient estate. For example, "tourism," which Plaintiffs identify as a "form of economic development," Pl.'s Br. at 9, is a use that could be accomplished over a primitive two-track road, whereas other types of "economic development" such as logging or oil drilling are much more likely to require a wider, more developed and maintained traveled surface. Thus, not all "economic development" or "motor vehicle use" is created equal, despite Plaintiffs' attempt to argue otherwise.

In support of their argument, Plaintiffs cite a single Utah case that was decided in 2020 and which dealt with the scope of a prescriptive easement across private, not public, land. Pl.'s Br. at 9 (citing *SRB Investment Co., Ltd. v. Spencer*, 463 P.3d 654 (Utah 2020)). But post-1976 state law cannot enlarge pre-1976 R.S. 2477 rights-of-way. *See San Juan Cnty.*, 754 F.3d at 799. Nor can state law contravene federal law, which makes clear that the R.S. 2477 inquiry is focused on public, not private purposes. *See id*. at 798-99. *Cf. Kane Cnty.*, 772 F.3d at 1224 (highlighting FLPMA's preference of retention of the federal lands "with an increased emphasis on conservation and preservation … inform[s] [] determination[s] of the scope of R.S. 2477 rights-of-way."). And so even if Plaintiffs were correct that the specific purpose of travel is not relevant under current Utah state law, that principle cannot be applied to R.S. 2477 rights-of-way, which were granted for travel by the general public for public—not private or permitted—purposes. *See id*.

Plaintiffs' *third* error is comingling uses of the rights-of-way, regardless of whether the uses were undertaken by the general public or are in fact private or permitted uses, or have lapsed or been abandoned. Plaintiffs insist that these should all be considered "traditional" uses. *See, e.g.,* Pl.'s Br. at 8 (discussing ranching, gathering firewood, cutting cedar fence posts,

13

hunting, picking pine nuts and other uses as being "traditional"). This ignores state law and, again, if accepted would contravene settled federal law. *See San Juan* 754 F.3d at 798, 800 (citing *Heber City,* 942 P.2d at 311; quoting *Morris,* 161 P. at 1131) (additional state case citations omitted). In support, Plaintiffs rely on *Sierra Club v. Hodel, e.g.,* Pl.'s Br. at 8-9, a case that predates the Tenth Circuit's opinion in *San Juan County v. United States* by more than two decades and that does not identify any legal standards for determining either how an R.S. 2477 right-of-way is established nor discuss the meaning of the statutory term "highway." *See generally, Sierra Club*, 848 F.2d 1068.

Plaintiffs' argument also ignores that a lapsed or abandoned use is not a traditional use, as discussed above. *See SUWA*, 425 F.3d at 748 (citing *Sierra Club*, 848 F.2d at 1084). For example, logging had not occurred on the Swallow Park/Park Wash claim for more than a decade prior to the repeal of R.S. 2477. *E.g.*, TT_0076, 0418-19, 0425.

In sum, the traditional uses of the right-of-way are limited to those uses that the R.S. 2477 grant were intended to benefit, that have not lapsed or been abandoned, as of October 21, 1976.

> d) *This Court's scope determination is as of October 21, 1976, and review of any post-1976 improvements is limited and predicated on prior consultation.*

This Court's scope determination is limited to what had been established as of October 21, 1976. In this initial scope determination it is improper to consider any improvements that were made post-1976. Those improvements can become a part of a right-of-way's scope, if at all, only after going through consultation with the BLM (in this case, only the Skutumpah paving

14

project is at that stage). Further, this Court's review of the BLM's determination related to post-1976 improvements is also limited.

### *The Public Had a Right to Construct and Improve Highways Across Public Lands Only Up Until October 21, 1976, and an R.S. 2477's Initial Scope Determination is Limited to the Scope Exiting at that Time.*

As discussed *supra*, R.S. 2477 was a grant to the public for the construction of highways for use by the general public. Actual construction (whether by use or mechanical means) and use by the public (as distinguished from use that was private or permitted) was required to accept the grant for an R.S. 2477 highway. *See San Juan Cnty.*, 754 F.3d at 797. The enactment of FLPMA revoked that grant and charged BLM with, *inter alia*, protecting federal lands from unnecessary and undue degradation. *See SUWA*, 425 F.3d at 748. In other words, as of October 21, 1976, the public no longer had an unfettered right to construct highways or make improvements to them across federal lands, but could retain any rights-of-way accepted through construction and public use.

Thus, the width of any highway and highway appurtenances that had actually been constructed, the physical condition of the highway, along with the public's right to use the road in a "particular way," *id*. at 747-48, became fixed upon the date FLPMA was enacted. *See Kane Cnty.*, 772 F.3d at 1223-24; *Garfield Cnty.*, 122 F. Supp. 2d at 1228-29. This is consistent with Utah state law principles that the "width of a public road is that which is 'reasonable and necessary under all the facts and circumstances.' " *Kane Cnty*. 772 F.3d at 1224 (citing *Memmott v. Anderson,* 642 P.2d 750, 754 (Utah 1982)). If additional width, other highway accoutrements, or an improved physical condition of the right-of-way were *necessary* to accommodate the public uses that were taking place before the repeal of R.S. 2477, then they would have been

constructed prior to that date. *See SUWA,* 425 F.3d 780 ("if wagons could be conveyed across the land without altering the topography, *there was no need for more extensive construction work.* Typically, little more was done than move boulders, clear underbrush or trees, or dig the occasional crude dugway.") (citation omitted).(emphasis added).

In other words, the scope of R.S. 2477 rights-of-way in Utah have a "baseline" historic scope that is coextensive with the construction and use of the right-of-way for public highway purposes that became fixed on October 21, 1976. *See id.* at 1224. This is the scope the Court must determine in this litigation. After October 21, 1976, the repeal of R.S. 2477 and the enactment of FLPMA created a precise order of actions that the holder of an adjudicated right-of-way must follow before a Court can determine if post-1976 changes of improvements are within the scope of the right-of-way. This process is known as "consultation."

### BLM Must Initially Determine Whether post-1976 Changes or Improvements are Within the Scope of the R.S. 2477 Right-of-Way.

After the repeal of R.S. 2477, the holder of an adjudicated R.S. 2477 right-of-way may *sometimes* be entitled to change or improve the right-of-way from the physical condition in which it existed as of October 21, 1976. But the enactment of FLPMA simultaneously "had the effect of 'freezing' R.S. 2477 rights as they were in 1976" and mandated heightened protection of the servient estate by "institut[ing] … an increased emphasis on conservation and preservation." *Kane Cnty.*, 772 F.3d at 1224 (quoting *SUWA,* 425 F.3d at 741). And because R.S. 2477 rights-of-way are easements over public lands, the holder's rights cannot be understood in isolation and must consider and respect the rights of the United States, the servient estate holder. *See Kane Cnty.*, 772 F.3d.at 1224-25; *SUWA,* 425 F.3d at 746 (discussing cases); *id*. at 748 (citing Utah Code Ann. § 72–5–303); *id*. at 474 (citing *United States v. Jenks,* 22 F.3d 1513,

16

1518 (10th Cir. 1994)); *Sierra Club*, 848 F.2d at 1090-92. Therefore, determining if the scope of an R.S. 2477 right-of-way that existed on (or before) the date of FLPMA's enactment encompasses changes or improvements made post-1976 must be initially evaluated by the federal land manager of the servient estate. *See Kane Cnty.*, 772 F.3d at 1224 ("[FLPMA's] policies inform our determination of the scope of R.S. 2477 rights-of-way and call for caution in allowing improvements or expansions beyond the width of R.S. 2477 roads in 1976.").

This initial determination is made during "consultation"— a legal term of art for the process by which the dominant and servient estate holders coordinate to ensure each entity's correlative rights are respected prior to improving the right-of-way. *See id.*; *SUWA*, 425 F.3d at 746-47; *Garfield Cnty.* 122 F. Supp. 2d at 1254. During consultation, the holder "must advise the federal land management agency of [the] work in advance, affording the agency a fair opportunity to carry out its own duties." *SUWA*, 425 F.3d at 748. In turn, the federal land manager's duties include: (1) "determin[ing] whether the proposed improvement is reasonable and necessary in light of the traditional uses of the rights of way," (2) "study[ing] potential effects," and if appropriate, (3) "formulat[ing] alternatives that serve to protect the lands." *Id.*

Regarding the first step, the federal land manager must determine if a change or improvement is reasonable and necessary because, after the repeal of R.S. 2477, only changes or improvements that are both reasonable and necessary can be encompassed by the scope of the R.S. 2477 right-of-way. *Id.* at 746. An improvement may be reasonable and necessary due to "the exigencies of increased travel," if it is "*necessary* to ensure safe travel." *Kane Cnty.*, 772 F.3d at 1223 (emphasis added). At the same time, due to the correlative nature of rights-of-way, the proposed change or improvement cannot unreasonably interfere with the servient federal

17

lands. *SUWA*, 425 F.3d at 748. Rather, the conservation policies, embodied in FLPMA, including the mandate to prevent unnecessary and undue degradation, to public lands must be respected. *See Kane Cnty.*, 772 F.3d at 1224-25. Indeed, even improvements that BLM determines are within the scope of the R.S. 2477 right-of-way may be reasonably regulated by BLM through, for example, requiring a Title V permit with terms that prevent unnecessary and undue degradation to the surrounding lands. *See Sierra Club*, 848 F.2d at 1087-88.

After the land manager has completed their evaluation regarding whether an improvement is encompassed by the scope of the R.S. 2477 right-of-way, if there is a disagreement, then a court can address whether the change or improvement is part of the scope of the right-of-way. *Kane Cnty.*, 772 F.3d at 1225. This precise order of operations, consultation between the dominant and servient estate holders before resolution by a federal court, has been reiterated several times by the Tenth Circuit. *Id*.

> ### This Court Cannot Determine that Any Improvements Constructed After October 21, 1976 are Part of the Scope of the Right-of-Way Unless BLM Has Made the Determination as an Initial Matter.

It is the statutory duty of the federal land manager, in this case BLM, to protect the public lands that underlie and surround an adjudicated R.S. 2477 right-of-way that triggers its duty in the first instance to evaluate any changes or improvements to rights-of-way. *See Kane Cnty.*, 772 F.3d at 1224-25; *SUWA*, 425 F.3d at 747 ("Just as the National Park Service has obligations to protect National Park land, the BLM has obligations to protect the land over which the roads at issue here pass." (citing FLPMA § 302(b), 43 U.S.C. § 1732(b)); *Sierra Club*, 848 F.2d at 1085-87.

18

Plaintiffs' argument for a scope that includes improvements constructed after the repeal of R.S. 2477 and simultaneous enactment of FLPMA, without first consulting with BLM about those improvements, ignores the clear and consistent holdings from the Tenth Circuit just discussed, as does the United States' willingness to allow the Court to first determine in the first instance that post-1976 improvements are part of the scope of the right-of-way if Plaintiffs have proven that the improvements are reasonable and necessary. E.g., U.S. Br. at 2, 26. Congress charged BLM with a duty to manage federal lands, including preventing unnecessary and undue degradation to federal lands on the day that FLPMA was enacted. *Kane Cnty.*, 772 F.3d at 1224-25. *See SUWA*, 425 F.3d at 748. BLM's duty to prevent unnecessary and undue degradation does not spring into being on an arbitrary date when Plaintiffs' claims are (decades later) adjudicated in federal court. Should this be: Plaintiffs were not free to do as they pleased for the past nearly four decades, but instead, following the passage of FLPMA, either needed to consult with BLM, or seek a Title V right-of-way from BLM. See *Kane Cnty.*, 772 F.3d at 1223-25; *see also* U.S. Br. at 17-18. Thus, BLM's duty to consult is in regards to any changes or improvements constructed by Plaintiffs since the repeal of R.S. 2477, including those that exist on the ground today, as well as proposed future improvements.

Simply put, a court cannot find in the first instance that any change or improvement to the condition of the right-of-way that has occurred or will occur after October 21, 1976 is part of the R.S. 2477's scope until and unless the holder and the appropriate federal land manager engage in consultation. *See Kane Cnty.* 772 F.3d 1225.

> ***The Court's Review of BLM's Determination of Whether a Specific, Proposed Improvement is Within the Scope of an Adjudicated R.S. 2477 is Limited.***

19

SUWA agrees with the United States that this Court's review of the proposed paving project is limited to evidence that was presented to BLM. U.S. Br. at 12-13. Additionally, the Court should afford significant weight to BLM's determination that the proposed paving project is not necessary.

As explained above, a primary goal of consultation is to "afford[] the agency a fair opportunity to carry out its own duties" to protect the surrounding lands. *SUWA*, 425 F.3d at 748. In order to do so, the holder of the right-of-way must "'communicate its plans to the [federal land manager] in a meaningful fashion.'" *SUWA*, 425 F.3d at 747 (quoting *Garfield Cnty.*, 122 F. Supp. 2d 1243-44). As the United States points out, allowing the County to withhold information during the consultation process but present it at trial would turn consultation into a pro forma exercise. U.S. Br. at 13. This would deprive the federal land manager of the opportunity to effectively fulfill its duties, in violation of FLPMA and clear Tenth Circuit precedent. *See Kane Cnty.* 772 F.3d at 1224-25; *SUWA*, 425 F.3d at 748.

Another purpose of affording the federal land manager the opportunity to develop facts in the first instances is to will help guide a court's decision in the event of litigation. See *Sierra Club*, 848 F.2d at 1085. And the federal land manager's findings regarding whether an improvement is within the scope of the right-of-way should be accorded considerable weight by the court. *Id.* at 1084–85.

Plaintiffs' argument that BLM has no authority to decide the scope of R.S. 2477 rights-of-way misunderstands the Tenth Circuit's opinion in *SUWA*. *See* Pl.'s Br. at 3-7. Indeed, as Plaintiffs acknowledge from the outset, "this is the first known lawsuit where a proposed road improvement project is before a federal court on an adjudicated R.S. 2477 right-of-way." Pl.'s

20

Br. at 2. Thus, by Plaintiffs' own representation, *SUWA* did not address how this Court should evaluate BLM's initial determination that the proposed paving project for the Skutumpah Road is not "necessary." SUWA agrees with Plaintiffs in this regard.

Indeed, *SUWA* was a very different case. There, the United States had sued several Utah counties (including Kane County) for trespass due to road grading activities on unadjudicated, claimed R.S. 2477 rights-of-way. 425 F.3d at 742-43. The Tenth Circuit held that the central issue in that case was whether the counties in fact had title to their claimed rights-of-way and, if so, whether their road grading had maintained the "status quo" or improved the claims. *Id.* at 748-49. In other words, acceptance of an R.S. 2477 right-of-way and the associated baseline, historic scope (assuming acceptance of the grant) had not been determined and was necessary to deciding whether the counties had trespassed. *See id.* The Tenth Circuit accordingly based its decision on whether R.S. 2477 (which granted the counties the right to construct highways until October 21, 1976) provided BLM the authority to determine the questions relevant to that lawsuit: the existence of a validly accepted right-of-way and the historic, baseline scope. *See id.*[6]

As explained in *SUWA*, when the relevant legal issue is whether *changes or improvements post-1976 are encompassed by the scope* of the right-of-way, BLM has a very different role. Because the rights of the holder of the right-of-way cannot be viewed in isolation after the enactment of FLPMA, BLM *not only may, but must* make the initial determination regarding whether the change or improvement is within the scope of the right-of-way. *SUWA*, 425 F.3d at 748; *see Kane Cnty.*, 772 F.3d at 1224-1225. In this situation, BLM's authority flows

---

[6] The court in *SUWA* held that BLM lacks primary jurisdiction to determine if title to an R.S. 2477 right-of-way was validly accepted. 425 F.3d at 757.

from FLPMA and the "agency must be consulted to allow it an opportunity to determine if the improvement is reasonable and necessary and to study potential effects, and if appropriate, to formulate alternatives that serve to protect the lands." *Id*. at 1224 (citing *SUWA*, 425 F.3d at 748) (internal quotations omitted). BLM cannot be "deprive[d]" of the opportunity to "perform its duties effectively." *Id*. at 1225.

Therefore SUWA agrees with the United States that this Court's review of BLM's determination that the Skutumpah paving project is not reasonable and necessary is limited to the evidence that was provided to BLM at the time it made its decision. U.S. Br. at 12. Additionally, the Court should afford BLM's findings regarding whether an improvement is reasonable and necessary significant weight.

## IV.    THIS COURT SHOULD MAKE BOTH QUANTITATIVE AND QUALITATIVE SCOPE DETERMINATIONS FOR PRE-OCTOBER 21, 1976 CONDITIONS.

There are both quantitative and qualitative aspects of scope that are appropriate for resolution by this Court and that will assist both the dominant and servient estate holders in understanding their respective correlative rights.

First, a quantitative measure is appropriate to delineate the physical boundaries, including highway appurtenances, of the right-of-way as of October 21, 1976. This includes a measurement of the width of the travel surface; and the existence, size, and location of any highway appurtenances such as shoulders, borrow ditches, drainage features, and culverts.

Second, a qualitative description of the right-of-way's physical condition is also necessary to clarify the scope of the holder's property rights. As the United States correctly explains, simply setting a right-of-way's quantitative width does not identify what activities the right-of-way holder may undertake within the set width. U.S. Br. at 17. So a qualitative

22

description of the highway as of October 21, 1976, including the condition of the travel surface and what maintenance activities the public historically performed, will help clarify what maintenance activities are encompassed by the historic scope of the right-of-way.

Finally, Plaintiffs' scope in this case is limited to what was constructed for public highway purposes up until R.S. 2477 was repealed. With the exception of the proposed Skutumpah paving project section (which has already gone through the BLM consultation process), this Court cannot determine if any post-1976 improvements are reasonable and necessary. Therefore there is no need to identify which uses of the right-of-way are properly considered "traditional" uses, other than for the uses Plaintiffs claim cause the paving project to be reasonable and necessary.

## V.   APPLICATION TO REMAINING KANE 1 CLAIMS

With the exception of the Skutumpah paving proposal, BLM has not made an initial determination of whether any post-1976 improvements to the rights-of-way (including those that already exist) are reasonable and necessary. Therefore, this Court cannot determine that Plaintiffs' scope is greater than what the public had constructed as of October 21, 1976, for any of the claims, other than for the project section of the Skutumpah Road. *See Kane Cnty*, 772 F.3d at 1224; *SUWA*, 425 F.3d at 748. The Court should construe the scope narrowly, resolving any doubts in favor of the United States. *See Watt v. W. Nuclear, Inc.*, 462 U.S. 36, 59 (1983) (citing *United States v. Union Pacific R. Co.*, 353 U.S. 112, 116 (1957)).

Even assuming the Court could consider if presently existing improvements that were constructed after October 21, 1976 are encompassed by the scope of the right-of-way (it cannot),

23

Plaintiffs have failed to carry their burden to prove that those improvements are reasonable or necessary. *E.g.,* U.S. Br. at 2, 26.

### A.    Skutumpah

#### 1.    Width of the Travel Surface and Highway Appurtenances.

The evidence clearly and convincingly establishes that by October 21, 1976 the travel surface of the Skutumpah Road at "the south end was approximately 20 feet wide and the north end was not quite as wide as 20 feet." Mem. Decision, Findings of Fact, Conclusions of Law, and Order [ECF No. 236] ("Mem. Decision 2013") ¶ 66 (citing Trial Tr., at 726–27 (V. Campbell)). This width is sufficient to allow vehicles to pass. TT_0583 (B. Owens testifying that two cars could pass on the northern, more narrow end of the Skutumpah Road)). There is clear evidence that the Skutumpah Road has been generally widened and improved post-1976.

There is evidence that prior to October 21, 1976, highway appurtenances such as culverts existed along the Skutumpah Road, however, Plaintiffs have failed to carry their burden to establish which appurtenances existed or the condition they existed in (including the pre-1976 width). U.S. Br. at 11.

#### 2.    Physical Condition.

The evidence clearly and convincingly establishes that prior to 1976 the Skutumpah Road's travel surface was regularly maintained with a graded surface to benefit the general public. Mem. Decision 2013 ¶ 66. Because Plaintiffs have failed to present evidence sufficient to establish which highway appurtenances existed prior to October 21, 1976, they have failed to establish a right to maintain any appurtenances on the Skutumpah Road.

24

3.    Proposed Paving Project.

With regard to Kane County's requested "improvement" to pave the approximately 3.3 miles (approximately 2.6 on public lands managed by BLM) of the southern end of the Skutumpah Road, Kane County has presented insufficient evidence that the proposed improvement is "necessary to ensure safe travel" in light of pre-1976 uses. *Kane Cnty.*, 772 F.3d at 1223.

At the outset, Plaintiffs did not attempt to establish during the title determination that double-trailer haul trucks or hauling gravel was a pre-1976 use during the original litigation, and it is therefore improper to consider that use in the first instance now, on remand in the scope determination. *See supra* in part II.

But even if Plaintiffs could introduce new alleged pre-1976 uses in the scope determination, the Court cannot consider such use in determining what is reasonable or necessary to ensure safe travel because (1) Kane County fails to establish that either the use of double-trailer haul trucks carrying gravel or any gravel hauling as a pre-1976 use, and (2) the use is by a private land owner, not the general public. The weight of the evidence, including from Kane County's own expert and fact witnesses, is that the alleged safety hazards (washboards and "fugitive dust") that exist on the proposed paving segment are the result of relatively recent (certainly post-1976) increased traffic by the double-trailer haul trucks on the southern portion of the Skutumpah Road. Kane County also relies on the notion that paving is necessary to ensure the safe travel of the large haul trucks. However, because this is not a pre-1976 use, the Court should not consider the gravel hauling evidence in determining the reasonableness and necessity of the paving project.

25

Similarly, multiple witnesses also identified an increase in private usage by cabin owners at Deer Springs Ranch were a cause of the increased traffic, dust, and washboarding, and the reason why paving (according to Plaintiffs) is "necessary" for safe travel. However, again, these are not qualifying pre-1976 public uses (it is instead use by private landowners) that the Court may consider in making its "reasonable and necessary" determination. *See San Juan Cnty.*, 754 F.3d at 800 (discussing, in context of title determination, that purely "private" uses are not "public" for purposes of establishing an R.S. 2477 right of way). While there was evidence of increased travel following establishment of the Grand Staircase-Escalante National Monument in 1996 and recent tourism efforts by Kane County, the County does not establish that such use is the cause of any degradation of the southern portion of the Skutumpah Road, nor that conditions make such uses unsafe.

Second, Kane County's claim of purported "safety" concerns regarding the southernmost portion of the Skutumpah Road is unsupported by any evidence beyond self-serving assertions by Kane County witnesses that washboarding and fugitive dust are a "problem" on this portion of road. Kane County fails, for example, to present objective evidence like accident data or incident logs reflecting safety problems on this section of the Skutumpah Road. Kane County's Sheriff, Tracy Glover, testified that he was not aware of *any incident reports* regarding the entire length of the Skutumpah Road, notwithstanding the existence of call boxes along the road.

County witnesses' assertions about the unsafe character of the southern portion of the road are also contradicted by testimony from SUWA's expert, Denis Davis, who testified based on his decades of experience in public lands road maintenance, that this portion of the Skutumpah Road is an "extremely high quality aggregate road" with a "substantial base" and

"very few pot holes." Trial Tr. 520. Mr. Davis further testified that the Skutumpah segment's washboards and dust were an unremarkable "nuisance," typical of unpaved roads, but not a safety concern, and safety concerns would not justify paving the road portion. Trial Tr. 519, 516.

Mr. Davis's testimony is corroborated by objective, on-the-ground evidence that the only time the County has had to close the Skutumpah Road has been during winter due to ice and snow concerns, which have nothing to do with the dust or washboarding concerns upon which the County now relies. Further, there is no evidence that the current condition of the road has ever prevented any current uses—including post-1976 uses like gravel hauling and travel to private residences at Deer Springs Ranch—from occurring. Simply put, "safety" does not mean "risk free," *Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.*, 448 U.S. 607, 642 (1980) (Observing that "[t]here are many activities that we engage in every day—such as driving a car or even breathing city air—that entail some risk of accident or material health impairment; nevertheless, few people would consider these activities 'unsafe.'"), and Plaintiffs have failed to introduce any evidence to demonstrate the paving project is either reasonable or necessary for safety.

Indeed, Kane County's road engineer expert, Lyndon Friant, for his part, admitted that the question of whether to pave the segment—which is the crucial "improvement" at issue—was not part of his analysis or expertise. Rather, Mr. Friant's analysis *assumed* the road would be paved, based on his instructions from Kane County. Trial Tr. 279, 297. Further, Kane County witnesses, including its Sheriff, conceded that paving roads results in significantly higher traffic and increased speeds, and that higher traffic and greater speed result in more significant safety risks. *See, e.g.*, Trial Tr. 34–35, 87.

27

Finally, Kane County presented testimonial evidence regarding the costs and time necessary to maintain the southern portion of the Skutumpah Road as evidence of reasonability and necessity. Here again, however, Kane County presents no useful comparative evidence demonstrating that the paving is "necessary for safe travel." For example, the County presents no evidence regarding the costs of maintaining a paved road versus continuing to maintain the Skutumpah segment. County witnesses conceded that paved roads can be subject to washboard-like conditions and other problems that require maintenance, but absent a comparison with current grader maintenance on the unpaved surface, the Court is unable to determine whether paving is "reasonable and necessary" based on maintenance cost concerns.

For these reasons, Kane County fails to satisfy its burden of demonstrating that the proposed paving project is "reasonable and necessary to ensure safe travel." Should the Court conclude that Plaintiffs have proven the proposed paving project is reasonable and necessary, the appropriate remedy is to remand the issue to BLM so that it can complete its land management duties, including  "to study potential effects, and if appropriate, to formulate alternatives that serve to protect the lands." *SUWA*, 425 F.3d at 748.

In sum, Plaintiffs have only established the public's right to travel the Skutumpah Road and to maintain a graded travel surface of 20 feet wide on the south end and not quite 20 feet on the north end.

### B.    Swallow Park/Park Wash Road "D" segment.

#### 1.    Width of the Travel Surface and Appurtenances.

The evidence shows that Plaintiffs have clearly and convincingly established that the travel surface width for the Swallow Park/Park Wash Road "D" segment was at most 10 feet

wide as of October 21, 1976. TT_0584, TT_0280 (A. Wright testifying that a travel surface of 10 to 12 feet wide allows a single vehicle to travel the route without scraping its sides). This width is consistent with pre-1976 testimony from (1) witnesses who owned private land along the road, TT_0584, (2) a BLM employee who traveled the road in 1979, Mem. Decision 2013 ¶ 184, and (3) a Kane County employee who conducted a GPS survey of the road in about 2007 or 2008, *id.* ¶ 183, Pl.'s Ex 6, 9, 11.

The evidence does not establish a travel surface width sufficient for two vehicles to pass while both vehicles are within the travel surface and in motion. Nor does the evidence demonstrate construction (even through repeated public use) of particular areas in which vehicles would pull off the travel surface to pass another vehicle. *See* TT_0140-41 (testimony that if the travel surface is not wide enough vehicles can find a clear area to pull over and pass each other). Instead, the evidence simply supports a general right of use in which the public can pass another vehicle by pulling over where space allows. *See id.* So long as the public does not create a new, permanent surface disturbance, *Cf. SUWA*, 425 F.3d at 748-49, 781-82 (explaining that repeated use by the public that creates surface disturbance would result in construction which the public no longer has a right to conduct after R.S. 2477's repeal), vehicles may pass each other in same manner as has occurred historically.

There is no evidence that any highway appurtenances such as drainage features or borrow ditches were constructed as of October 21, 1976. *See* Trial Tr. 463-64; Def.'s Ex. 547; U.S. Br. at 22. Plaintiffs' argument that the width of the Swallow Park/Park Wash Road D segment should include room to allow the County to brush back sage brush along the Road and to reestablish the road surface is legally flawed. *See* Pl.'s FoF ¶¶ 41-42. There is no evidence that

29

either of the activities occurred prior to Oct 21, 1976. *Cf.* Trial Tr. 401 (J. Slyder did not observe a distinction between the travel surface and the total disturbance along the road). And a finding that these activities are part of the County's scope would impermissibly allow the County to improve the right-of-way without first consulting BLM. *See Kane Cnty*. 772 F.3d at 1224-25. Additionally, Plaintiffs have failed to show that it is reasonable or necessary for the County to brush back sage brush or reestablish the travel surface.

>   2.      Physical Condition.

The Swallow Park/Park Wash Road D segment is sandy and only one vehicle wide. *See* Mem. Decision 2013 ¶ 184. Plaintiffs have not established that Kane County had graded the travel surface of the D segment of the Swallow Park/Park Wash prior to October 21, 1976. Although there is some evidence that the County used equipment along the D segment of the route prior to the repeal of R.S. 2477, that evidence does not establish clearly and convincingly that the County's road work transformed the D segment to a graded travel surface. TT_610-12, 0714 (V. Campbell was unsure if the County had ever bladed the D segment of the road). For example, the clearest evidence of County graders on the D segment of the road is testimony that on one occasion, in either 1957 of 1958, the County cleared snow along the road. Mem. Decision 2013 ¶ 182. However, that testimony does not establish that clearing snow resulted in a graded travel surface, *see* TT_ 733-34, TT_740 (V. Campbell describing clearing snow after 1976), or that a graded travel surface was maintained as of October 21, 1976.

Moreover, even assuming the County had occasionally graded the travel surface of the D segment, that grading activity would not be within the scope of the R.S. 2477 right-of-way because it was not performed to facilitate travel by the general public. In contrast to testimony

that the County maintained class B roads to keep them open for the general public, Mr. Campbell testified that there was "no reason" for the County to maintain class D roads. *Compare* Mem. Decision 2013 at ¶ 181 (citing Trial Tr. at 1308–09 (M. Habbeshaw) *with* TT_610-12, 0697-98, 0714. On the rare occasions that the County may have performed road work on the class D segment, it was to benefit private land owners who also had federally permitted proprietary rights to graze their cattle on adjacent public lands. Mem. Decision 2013 ¶ 161, 182; TT_0610-12, 0714. Therefore, to the extent the County (or the ranchers and private land owners themselves) may have performed occasional road work on the class D segment of the Swallow Park/Park Wash Road, that road work is not part of the R.S. 2477 right-of-way because it was performed to benefit private, proprietary and private interests, not the interests of the general public. *See San Juan Cnty.*, 754 F.3d at 799-800.

In sum, the public has a right to travel the Swallow Park/Park Wash Road D segment, but the evidence is insufficient to demonstrate a right to a maintained, graded travel surface or other highway appurtenances.

### C.     North Swag

#### 1.     Width of the Travel Surface and Appurtenances.

The evidence clearly and convincingly establishes that the width of the travel surface of the North Swag road was, at most, 9 feet wide as of October 21, 1976. *See* Trial Tr. 467:10-15; Def.'s Ex. 548; Def.'s Ex. 549; *see also* Mem. Decision 2013 ¶ 210 ("Mr. Pratt stated the 1996 photographs showed the travel width was a little more than 8 feet"). Similar to the Swallow Park/Park Wash Road D segment, the evidence does not establish a travel surface width sufficient for two vehicles to pass while both vehicles are within the travel surface and in motion.

31

Nor does the evidence demonstrate construction (even through repeated public use) of particular areas in which vehicles would pull off the travel surface to pass another vehicle. *See* TT_0140-41 (testimony that if the travel surface is not wide enough, vehicles can find a clear area to pull over and pass each other). Instead, the evidence simply supports a general right of use in which the public can pass another vehicle by pulling over where space allows. *See id*. So long as the public does not create a new, permanent surface disturbance, *Cf. SUWA*, 425 F.3d at 748-49, 781-82 (explaining that repeated use by the public that creates surface disturbance would result in construction which the public no longer has a right to conduct after R.S. 2477's repeal), vehicles may pass each other in same manner as occurred historically.

The evidence does not establish the existence of any other highway appurtenances prior to October 21, 1976. Mem. Decision 2013 ¶¶ 204-06.

Plaintiffs' argument that the width of the North Swag should include room to allow the County to establish a "clear zone" is legally flawed. *See* Pl.'s FoF ¶ 62. There is no evidence that clear zones were constructed prior to Oct 21, 1976, or that they have ever been constructed at all. *Cf.* Trial Tr. 401 (J. Slyder did not observe a distinction between the travel surface and the total disturbance along the road). And a finding that clear zones are part of the County's scope would impermissibly allow the County to improve the right-of-way without first consulting BLM. *See Kane Cnty*. 772 F.3d at 1224-25. Additionally, Plaintiffs have failed to prove that clear zones are reasonable or necessary for travel on the North Swag.

### 2.    Physical Condition.

The North Swag is "a two track route through the surrounding sagebrush that [becomes] very sandy" as it travels southeast. Mem. Decision 2013 ¶ 208. The North Swag is sometimes

impassible due to weather conditions, such as "in the summer when the soil is dry." *Id*. ¶ 207. The evidence does not establish that prior to October 21, 1976 Kane County had graded the North Swag, or performed any other maintenance work, aside from the catchment pond discussed above. *Id*. ¶¶ 204-06; TT_119 (C. Johnson) (testifying Kane County road graders never went east of the sandy ridge on North Swag).

In sum, the public has a right to travel the North Swag road, but the evidence is insufficient to demonstrate a right to a maintained, graded travel surface or highway appurtenances aside from the catchment pond discussed above.

## CONCLUSION

For the foregoing reasons this Court's determination of scope is limited to determining what Plaintiffs have clearly and convincingly established as of October 21, 1976, aside from the proposed Skutumpah paving project. Additionally, Plaintiffs have failed to prove that any post-1976 improvements, including the Skutumpah paving project are reasonable or necessary. Thus, in all instances, Plaintiffs' scope is limited to the construction and public uses that existed as of October 21, 1976, as described above in part V.

Respectfully submitted this 25th day of September, 2023,

/s/ Michelle White

Michelle White
Stephen H.M. Bloch

**SOUTHERN UTAH
WILDERNESS ALLIANCE**
425 East 100 South
Salt Lake City, UT 84111

Mitch M. Longson
**MANNING CURTIS
BRADSHAW & BEDNAR PLLC**
215 S. State Street, #350
Salt Lake City, UT 84111

Trevor J. Lee
**HOGGAN LEE HUTCHINSON**
1225 Deer Valley Dr.
Park City, UT 84060
(435) 800-2096

Attorneys for Defendant-Intervenors
Southern Utah Wilderness Alliance and The
Wilderness Society